**UNITED STATES COURT OF INTERNATIONAL TRADE**
Before: The Honorable Jane A. Restani, Judge

| | |
|---|---|
| **THE MOSAIC COMPANY,** *Plaintiff*, **PHOSAGRO PJSC, JSC APATIT,** *Consolidated Plaintiffs*, and **INDUSTRIAL GROUP PHOSPHORITE LLC,** *Consolidated Plaintiff and Consolidated Plaintiff-Intervenor*, v. **UNITED STATES,** *Defendant,* **THE MOSAIC COMPANY,** *Consolidated Defendant-Intervenor*, and **PHOSAGRO PJSC, JSC APATIT, INDUSTRIAL GROUP PHOSPHORITE LLC,** *Defendant-Intervenors*. | **PUBLIC DOCUMENT** Consol. Court No. 21-117 |

**DEFENDANT-INTERVENOR EUROCHEM'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

WORD COUNT CERTIFICATE OF COMPLIANCE ....................................................... iii

I.     RULE 56.2 STATEMENT AND SUMMARY OF ARGUMENT ..................................... 1

       A.     Administrative Determination Sought to Be Reviewed ........................................ 1

       B.     Issues Presented and Summary of the Argument ................................................... 1

II.    STATEMENT OF FACTS ................................................................................................. 2

       A.     EuroChem did not receive any benefit from mining rights for LTAR during
              the POI. .................................................................................................................... 3

       B.     In constructing its "Tier Three" benchmark, Commerce did not adjust
              phosphate rock prices to include freight, import duties, and VAT. ........................ 5

       C.     Commerce did not adjust its "Tier Three" benchmark to exclude the price
              of Russian natural gas sold in Europe. .................................................................... 6

III.   STANDARD OF REVIEW ................................................................................................ 6

IV.    ARGUMENT ...................................................................................................................... 7

       A.     Commerce's exclusion of mining rights licenses granted before Russia
              became a market economy country was reasonable and in accordance with
              law. ........................................................................................................................... 7

       B.     Commerce did not err in refusing to adjust the Tier 3 benchmark price for
              phosphate rock to include ocean freight, VAT, and import duties. ....................... 10

       C.     Commerce's inclusion of Russian natural gas prices in the IEA data used to
              construct the "Tier Three" natural gas benchmark was reasonable and
              supported by substantial evidence. ......................................................................... 13

V.     CONCLUSION ................................................................................................................. 14

## TABLE OF AUTHORITIES

**Cases**

*Adv. Tech. & Materials Co. v. United States*, 35 C.I.T. 1380 (2011) .................................6, 13, 14
*Fujitsu Gen. Ltd. v. United States*, 99 F.3d 1034 (Fed. Cir. 1996) ......................................................6
*Ta Chen Stainless Steel Pipe Ltd. v. United States*, 298 F.3d 1330 (Fed. Cir. 20002) .................14
*TMK IPSCO v. United States*, 222 F. Supp. 3d 1306 (CIT 2017) ....................................................7
*TMK IPSCO v. United States*, 179 F. Supp. 3d 1328 (CIT 2016)  ....................................................7

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)...............................................................................................................6

**Regulations**

19 C.F.R. § 351.511(a)(2)(iv) .............................................................................................................10

**Administrative Materials**

*Certain Softwood Lumber Products From Canada: Final Affirmative Countervailing Duty Determination, and Final Negative Determination of Critical Circumstances*, 82 Fed. Reg. 51,814 (Dep't of Commerce Nov. 8, 2017), Issues & Decision Memo ..................................................................................................11

*Certain Steel Wire Garment Hangers From the Socialist Republic of Vietnam: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination*, 77 Fed. Reg. 75,973 (Dep't Commerce Dec. 26, 2012), Issues & Decision Memo ...................................................................................9

*Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from the Russian Federation: Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination*, 81 Fed. Reg. 49,935 (Dep't of Commerce Jul. 29, 2016), Issues & Decision Memo..................................................11

*Final Affirmative Countervailing Duty Determination: Certain Stainless Steel Wire Rod From Italy*, 63 Fed. Reg. 40,474 (Dep't Commerce July 29, 1998)...................................9

*Final Affirmative Countervailing Duty Determination: Polyethylene Retail Carrier Bags from the Socialist Republic of Vietnam*, 75 Fed. Reg. 16,428 (Dep't Commerce Apr. 1, 2010), Issues & Decision Memo ...........................................................9, 10

*Silicon Metal from Australia: Final Countervailing Duty Determination*, 83 Fed. Reg. 9,834 (Dep't of Commerce Mar. 8, 2018), Issues & Decision Memo .............................11

## WORD COUNT CERTIFICATE OF COMPLIANCE

This brief has been prepared utilizing Microsoft Word with 12-point Times New Roman font. In accordance with the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that this brief complies with the word limitations set forth in the Chambers Procedures. Specifically, excluding those exempted portions of the brief, as set forth in 2B(1) of the Chambers Procedures, undersigned certifies that this brief contains 4,312 words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

Date: March 16, 2022

Respectfully submitted,

*/s/ Jeremy W. Dutra*
Jeremy W. Dutra

*Counsel to Consolidated Plaintiff Industrial Group Phosphorite LLC*

Defendant-Intervenor Industrial Group Phosphorite, LLC ("EuroChem") submits this response in opposition to the motion for judgment on the agency record filed by Plaintiff, The Mosaic Company ("Mosaic"). ECF Nos. 43, 44, 50, 51 ("Pl. Br."). Mosaic challenges certain aspects of the U.S. Department of Commerce's ("the Department" or "Commerce") final determination in its countervailing duty ("CVD") investigation of Phosphate Fertilizers from Russia, Case No. C-821-825. Mosaic's arguments are without merit, and the Court should deny Mosaic's motion for judgment.

## I.   RULE 56.2 STATEMENT AND SUMMARY OF ARGUMENT

### A.   Administrative Determination Sought to Be Reviewed

Mosaic challenges certain aspects of the CVD final determination, which published as *Phosphate Fertilizers from the Russian Federation*, 86 Fed. Reg. 9,479 (Dep't Commerce Feb. 16, 2021) (final affirmative CVD determination) ("*Final CVD Determination*") (P.R. 418). Commerce published the CVD order as *Phosphate Fertilizers from the Kingdom of Morocco and the Russian Federation*, 86 Fed. Reg. 18,037 (Dep't Commerce Apr. 7, 2021) (CVD orders) ("*CVD Order*") (P.R. 425). Mosaic also contests certain aspects of Commerce's accompanying Issues and Decision Memorandum for the Final Affirmative Determination of the CVD Investigation of Phosphate Fertilizers from the Russian Federation, dated February 8, 2021 ("*Final IDM*") (P.R. 405). The CVD period of investigation ("POI") was January 1, 2019 through December 31, 2019.

### B.   Issues Presented and Summary of the Argument

1.   Whether Commerce's use of a cut-off date for selecting licenses to consider for the alleged mining rights LTAR program and its finding that EuroChem licenses were not materially changed after the cut-off date was supported by substantial evidence and otherwise in accordance with law.

Commerce was justified in using a cut-off date. Its determination was consistent with

1

statute and case law as Commerce articulated a relationship between the cut-off date selected and the implementation of reforms that would enable Commerce to identify and measure countervailable subsidies. Commerce also was correct that there were no substantial or material changes to the licenses issued to EuroChem before the cut-off date.

    2.    Whether Commerce's decision to make no adjustment for freight, customs duties, and value added tax in its "Tier Three" mining rights benchmark was supported by substantial evidence and otherwise in accordance with law.

Unlike Tier 1 and Tier 2 benchmarks, the regulations do not contemplate adjustments for freight, VAT, or customs duties in constructing a Tier 3 benchmark. Such adjustments would distort the benefit analysis, which involved comparing EuroChem's cost to produce phosphate rock obtained through its mining license (not the purchase price of the good on the open market) to an FOB world market price exclusive of freight, VAT, and customs duties. Adding freight, VAT, and import duties would therefore artificially inflate the alleged benefit by including costs not incurred by EuroChem when producing the phosphate rock used as input into the production of phosphate fertilizers.

    3.    Whether Commerce's inclusion of Russian natural gas prices in the IEA data in the "Tier Three" natural gas benchmark was supported by substantial evidence and otherwise in accordance with law.

Commerce correctly determined that Mosaic failed to supply record evidence demonstrating that European prices of Russian-produced natural gas are distorted.

## II.    STATEMENT OF FACTS

Mosaic filed a CVD petition on June 26, 2020 (the "Petition") concerning imports of phosphate fertilizers from Russia. *Petitions for Imposition of CVD: Phosphate Fertilizers from Morocco and Russia* (June 26, 2020) ("Petition") (P.R. 1–8; C.R. 1-8). Commerce initiated the CVD investigation on July 23, 2020. *Phosphate Fertilizers from the Kingdom of Morocco and the*

*Russian Federation*, 85 Fed. Reg. 44,505 (Dep't Commerce July 23, 2020) (initiation of CVD investigations) (P.R. 49). On August 4, 2020, Commerce selected EuroChem and PhosAgro as mandatory respondents. *CVD Investigation of Phosphate Fertilizers from Russia: Resp't Selection Mem.* (Aug. 4, 2020) (P.R. 55; C.R. 23).

Mosaic alleged that the Government of Russia ("GOR") provided certain countervailable subsidies during the POI to Russian phosphate fertilizer producers, including through the alleged provision of phosphate mining rights for LTAR and the alleged provision of natural gas for LTAR. *Petitions for Imposition of CVD: Phosphate Fertilizers from Morocco and Russia* (June 26, 2020) ("Petition") (P.R. 1–8; C.R. 1-8). In its Final Determination, Commerce, correctly, did not countervail the alleged mining rights program. *Final IDM* (P.R. 405) at 10.

Mosaic contends that Commerce's refusal to countervail alleged phosphate mining licenses initially issued before the cut-off date of April 1, 2002 is unsupported by substantial evidence and otherwise contrary to law. Pl. Br. at 1-2. Mosaic claims that the use of a subsidy cut-off date was arbitrary. *Id.* Mosaic further argues that Commerce failed to make certain adjustments (*i.e.*, freight, customs duties, and value-added tax ("VAT")) to the "Tier Three" benchmark for mining rights to determine a "delivered" benchmark price. *Id.* at 2.

Commerce countervailed the alleged provision of natural gas for LTAR; however, Mosaic asserts that Commerce improperly failed to exclude Russian natural gas exports to the EU from its "Tier Three" benchmark for natural gas. *Id.* at 3.[1]

### A. EuroChem did not receive any benefit from mining rights for LTAR during the POI.

In analyzing the alleged mining rights for LTAR program, Commerce applied a "cut-off

---

[1] EuroChem separately challenges Commerce's benchmark analysis of the alleged provision of natural gas for LTAR program on different grounds. *See* Memo. of Points & Authorities in Supp. of EuroChem's Mot. for J. on the Agency Record, ECF No. 46 at 12-20.

date, noting that it "has consistently found that it is appropriate and administratively desirable to apply a uniform date from which it will identify and measure subsidies from NME countries for purposes of the CVD law." *Final IDM* (P.R. 405) at 24. Commerce accordingly evaluated only those licenses acquired after April 1, 2002, the date on which Commerce recognized that Russia "transitioned to a market economy" and "had undergone changes and reforms that could permit Commerce to determine whether and to what extent countervailable subsidies were being bestowed on Russian producers." *Id.* at Cmt. 2d. With regard to those licenses issued before Russia transitioned from NME, Commerce explained that intervention by the state when Russia was an NME prevented Commerce from being able to meaningfully identify or measure subsidies. *Id.*

The record evidence shows that EuroChem acquired certain mining right licenses before April 1, 2002 and other mining rights licenses after April 1, 2002. *See* EuroChem Initial CVD Response (September 24, 2020) at 29 (P.R. No. 114, C.R. No. 44); *see also Final IDM* at Cmt. 2d (P.R. 405).[2] Commerce found that although the licenses issued to Joint Stock Company Kovdorsky GOK ("KGOK"), cross-owned by EuroChem, were renewed and subject to administrative changes after the cut-off date, these changes were of a "technical nature" and did not constitute a material alteration. *Final IDM* at Cmt. 2d (P.R. 405) (citing GOR Supplemental Response at 7).

Consistent with its normal practice with respect to Russia, Commerce determined that "record facts demonstrate that the terms and conditions for the mining rights were set prior to the

---

[2] GOR issued a license for a mineral deposit to EuroChem after the "cut off" date that EuroChem did not mine during the POI. See EuroChem Post-Preliminary Questionnaire Response (Dec. 7, 2020) at 4. Commerce did not consider this license in its analysis of whether GOR provided mining rights for LTAR. *Final Determination Calculations for EuroChem Group* (Feb. 8, 2021) (C.R. 560) at 3. Mosaic does not challenge this aspect of the determination.

cut-off date and have not been materially altered since they were granted." *Id.* Commerce further concluded that "the relevant mining rights licenses at issue in this case had been granted during a time {*i.e.*, before the cut-off-date} Commerce has determined did not permit any meaningful measurement of government distortion, including from subsidies." *Id.* These findings were supported by substantial evidence and in accordance with law.

> **B.    In constructing its "Tier Three" benchmark, Commerce did not adjust phosphate rock prices to include freight, import duties, and VAT.**

Commerce found that "mining rights licenses are goods that do not lend themselves to comparison to a world market price because it is not reasonable to conclude that such prices would be available to purchasers in Russia." *Final IDM* at Cmt. 2c. Consistent with its approach in *Russia Cold-Rolled Steel*, Commerce that no suitable "Tier One" or "Tier Two" benchmark prices for phosphate mining rights were available, and thus determined it appropriate to conduct a "Tier Three" benchmark analysis by calculating a benefit under the alleged mining rights program "based on the value of the mining rights *per se*, but on the value of the underlying good conveyed via the mining rights, and specifically any benefit from such good extracted during the relevant period under examination." *Id.*

When calculating the "Tier Three" benchmark for mining rights, Commerce compared the "actual per-unit cost build-up of KGOK's {EuroChem} beneficiated phosphate rock, inclusive of all taxes paid to the GOR during the POI" to benchmark FOB prices Mosaic provided for phosphate rock with a similar $P_2O_5$ as Russian phosphate rock. *Final IDM* at Cmt. 2e. Commerce declined to include freight, VAT, and import duties in the benchmark because "the benefit analysis involves comparing a good, *i.e.*, phosphate rock that was produced by KGOC using its reported production costs, rather than the purchase of a good on the open market for LTAR, to a world market price that is an FOB price (*i.e.*, exclusive of freight, VAT, and import duties)." *Id.* Given

5

that KGOC extracted the ore from its own sites instead of purchasing the input, Commerce determined it inappropriate "to build a comparison market-determined benchmark that includes freight, VAT, and import duties that were not incurred by KGOK." *Id.*

Commerce's calculation resulted in a final subsidy rate that is less than 0.005 percent *ad valorem* for EuroChem, thus yielding no measurable benefit. *Id.* at 10.

### C. Commerce did not adjust its "Tier Three" benchmark to exclude the price of Russian natural gas sold in Europe.

To calculate the "Tier Three" natural gas benchmark, Commerce included Russian natural gas prices in its use of the IEA data because it found that such prices "are reflective of the market dynamics in {the EU market}." *Final IDM* at Cmt. 3j. Commerce determined that "the record does not support removing sales of natural gas from Russia in the EU from consideration as market benchmarks," as "{n}o party has submitted any evidence that natural gas produced in Russia and sold in Europe is distorted or suppressed." *Id.*

### III. STANDARD OF REVIEW

This Court must sustain any determination by Commerce that is supported by "substantial evidence on the record" and is otherwise "in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). The substantial evidence standard requires "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Fujitsu Gen. Ltd. v. United States*, 99 F.3d 1034, 1038 (Fed. Cir. 1996). The Court must uphold Commerce's decision if Commerce "has examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Adv. Tech. & Materials Co. v. United States*, 35 C.I.T. 1380, 1387 (2011).

IV.   ARGUMENT

   A.   **Commerce's exclusion of mining rights licenses granted before Russia became a market economy country was reasonable and in accordance with law.**

Mosaic challenges Commerce's use of a cut-off date as arbitrary and unsupported by substantial evidence. Mosaic specifically faults Commerce for not assessing "whether it was able to identify and measure the subsidies conferred during the POI under each of the mining licenses at issue, without regard to whether the GOR initially issued the relevant license before or after the 'cut-off' date." Pl. Br. at 23. Mosaic is incorrect factually and legally.

Commerce specifically addressed this issue in its final determination, explaining that licenses issued before April 1, 2002 "had been granted during a time Commerce has determined did not permit any meaningful measurement of government distortion, including from subsidies," and therefore could not be countervailed." *Final IDM* at Cmt. 2d. Indeed, Commerce noted that after April 1, 2002, "Russia's economy had undergone changes and reforms that could permit Commerce to determine whether and to what extent countervailable subsidies were being bestowed on Russian producers." *Id.* This Court recognizes that "Commerce has significant discretion in determining whether it can identify and measure subsidies provided by the government or a public entity within the NME country because the statute is *silent* as to when Commerce can identify and measure a subsidy." *TMK IPSCO v. United States*, 222 F. Supp. 3d 1306, 1313 (CIT 2017) ("*TMK IPSCO II*") (emphasis in original). Here, Commerce explained the basis for the "cut-off" and further stated that it was reasonable and administratively practicable under the circumstances. *Final IDM* at Cmt. 2d.

Mosaic relies on *TMK IPSCO v. United States*, 179 F. Supp. 3d 1328, 1343 (CIT 2016) ("*TMK IPSCO I*") to argue that this Court expressly "repudiated this practice" of applying a uniform cut-off date. Pl. Br. at 26. Mosaic mischaracterizes this Court's precedent. In *TMK*

7

*IPSCO I*, Commerce, in its final determination, declined to identify and measure non-recurring subsidies alleged in the petition to have predated China's accession to the WTO on December 11, 2001. The Court held that the Department failed to articulate a relationship between the cut-off date and the implementation of reforms that would enable the Department to identify and measure countervailable subsidies, and remanded to Commerce to investigate each subsidy program and allocate subsidies on the first date it could identify and measure the subsidies considering the particular program and the impact of relevant economic reforms on that program.

On remand, Commerce identified four types of subsidies alleged in the petition, and established a "cut-off" date for each type of subsidy program while articulating a rational relationship between specific legal reforms in China and the effect of such reforms on the Department's ability to identify and measure subsidies. In affirming Commerce's determination, the Court observed that "Commerce has significant discretion in determining whether it can identify and measure subsidies provided by the government or a public entity within the NME country" and that Commerce had articulated "a logical relationship between specific types of reforms and the legal condition necessary to permit Commerce to identify and measure countervailable subsidies for individual actors within the Chinese economy."

Here, Commerce articulated why it could not identify and measure countervailable subsidies for mining rights licenses before April 1, 2002. It use of the "cut-off" date in its evaluation of the provision of mining rights for LTAR program was thus reasonable and consistent with Commerce's statutory obligations.

Mosaic further argues Commerce should have considered licenses issued by GOR before April 1, 2002 because there were substantial changes to the licenses after the "cut-off" date. Pl. Br. at 28. Mosaic's argument is unsupported by the record.

8

The licenses granted to KGOK before April 1, 2002 were extended after the cut-off date; however, the record confirms that licenses are "automatically extended if the owner continues to operate the mine." *EuroChem Suppl. Questionnaire Response* (Oct. 25, 2020) (P.R. 229, C.R. 437) at 5. Further, other changes merely reflected changes to the license holder's name and legal form. *Id.* at 4. The only other changes did not materially change the terms of the license. Specifically, the nature of the apatite ore body covered by the KGOK licenses is such that as "mining advances downward from the surface, spiraling down the con shape of the pit," one can only continue mining by making the side walls more vertical (to which there is a safety limit) or extending the surface contour to allow the safe mining of the same ore body in a larger pit cone. *Id.* at 7. Such technical changes—provided for by Russian law—do not reflect "an increase in mineral reserves" covered by the license. *Id.*

The other decisions on which Mosaic relies to argue a material change are inapposite. In *Certain Stainless Steel Wire Rod from Italy*, for example, Commerce treated a loan renegotiation occurring after the cut-off as a new loan because the renegotiation altered the interest rate. *Final Affirmative Countervailing Duty Determination: Certain Stainless Steel Wire Rod From Italy*, 63 Fed. Reg. 40,474, 40,486 (Dep't Commerce July 29, 1998). Likewise, in *Wire Garment Hangers from Vietnam*, Commerce found a material change to the terms and conditions of a land lease signed before the "cut-off" date because the amendment reduced the rental fees owed. *See Certain Steel Wire Garment Hangers From the Socialist Republic of Vietnam: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination*, 77 Fed. Reg. 75,973 (Dep't Commerce Dec. 26, 2012), Issues & Decision Memo. at 22.

In *Polyethylene Retail Carrier Bags from Vietnam,* Commerce determined that a land lease issued before the cut-off date for Vietnam was countervailable because the government extended

9

the lease's duration after the cut-off date for an additional 30 years.  *See Final Affirmative Countervailing Duty Determination: Polyethylene Retail Carrier Bags from the Socialist Republic of Vietnam*, 75 Fed. Reg. 16,428 (Dep't Commerce Apr. 1, 2010), Issues & Decision Memo. at 8.  Unlike in *Polyethylene Retail*, here, the license grant was for the mineral contained in the deposit, not a fixed temporal time.

Based on this undisputed record, Commerce correctly determined that the changes to the pre-April 1, 2002 licenses were merely "of a technical nature, such as a correction of the names of subsoil users, a change to the description of their organizational and legal form, or a small change in the surface area of the plot due to technological and safety needs in the process of exploration," were made to the terms of the licenses and that such renewal did not increase the holders' mineral reserves.  *Final IDM* at Cmt. 2d.  Commerce's determination is supported by substantial evidence and in accordance with law, and it should be upheld by this Court.

> **B.  Commerce did not err in refusing to adjust the Tier 3 benchmark price for phosphate rock to include ocean freight, VAT, and import duties.**

Mosaic argues that Commerce should have adjusted the Tier Three mining benchmark prices to reflect the ocean freight costs and Russian VAT and import duties that a Russian phosphate fertilizer producer would need to pay to obtain phosphate rock on market terms if it imported the product.  Pl. Br. at 30-31.  Mosaic's argument is inconsistent with Commerce's regulations and past practice.

In conducting benchmark analyses under Tier One and Tier Two, Commerce's regulations require Commerce to use "the price that a firm actually paid or would pay if it imported the product" (*i.e.*, the delivered price that necessarily includes freight, taxes, and duties).  19 C.F.R. § 351.511(a)(2)(iv).  The regulations include no such requirement for constructing a tier three benchmark.  *Id.*  Nor is there a logical basis for doing so given tier three

concerns whether the government price "is consistent with market principles," not whether the price is one the firm "actually paid or would pay if it imported the product."

Furthermore, in past cases involving the government provision of a right to extract natural resources, Commerce did not include ocean freight, VAT, or import duties in constructing a tier three benchmark. For example, Commerce did not adjust the benchmark for ocean freight, VAT, or import duties when considering mining rights allegations in *Cold-Rolled Steel Flat Products from Russia* and *Silicon Metal from Australia*. *See Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from the Russian Federation: Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination*, 81 Fed. Reg. 49,935 (Dep't of Commerce Jul. 29, 2016) and accompanying Issues and Decision Memorandum at Cmt. 17. See also *Silicon Metal from Australia: Final Countervailing Duty Determination*, 83 Fed. Reg. 9,834 (Dep't of Commerce Mar. 8, 2018), and accompanying Issues and Decision Memorandum at Cmt. 5.

Similarly, in *Softwood Lumber from Canada*, Commerce calculated a benefit for the government provision of stumpage (*i.e.*, the right to harvest standing timber) in British Columbia by benchmarking to a U.S. log price and adjusting the price backwards to the stump. Again, Commerce did not add international freight, VAT, or duties to the benchmark when making these adjustments. *See Certain Softwood Lumber Products From Canada: Final Affirmative Countervailing Duty Determination, and Final Negative Determination of Critical Circumstances*, 82 Fed. Reg. 51,814 (Dep't of Commerce Nov. 8, 2017), and accompanying Issues and Decision Memorandum at 71 (adjusting tier three log benchmark for stumpage allegation without adding international freight), 156 (adjusting tier-two log benchmark for log export allegation by adding international freight).

Mosaic cites no example in which Commerce included freight, VAT, and duties when conducting a tier three analysis of the provision of mining rights. Mosaic nevertheless argues Commerce should have adjusted the tier three benchmark for the provision of mining rights because "in the very same investigation (*i.e.*, the CVD investigation of phosphate fertilizers from Russia), Commerce adjusted the tier 3 benchmark prices for natural gas "by adding . . . delivery charges for the transmission and distribution of natural gas in Russia, any import duties and taxes, and surcharges" in order to "reflect what the respondents would have paid if they had imported natural gas directly," *i.e.*, a "delivered" price." Pl. Br. at 34.

Mosaic makes in inapt comparison. For the provision of natural gas allegation, Commerce recognized the availability of a "world price" for natural gas (*i.e.*, regional European OECD natural gas price). Commerce determined it could not consider such price a "tier two" benchmark, however, because "none of the pipelines are bi-directional" which means the regional European OECD natural gas price does not "reflect prices available to Russian purchasers."

There is no "world price" for the provision of mining rights. And including ocean freight, VAT, and import duties is illogical because Commerce did not investigate whether the GOR subsidized EuroChem through the provision of a good such as phosphate rock. The allegation investigated was whether the GOR provided EuroChem a subsidy by providing mining rights. Commerce used a proxy—the price of a downstream product (phosphate rock) produced from ore extracted—for evaluating whether the provision of mining rights by the GOR is consistent with market principles. Because mining rights are the right to extract a natural resource rather than a provision of a good, there is no basis to add the freight, tax, and duties to bring a good to the country under investigation into the benchmark calculation. Indeed,

12

Commerce recognized that adjusting the benchmark as Mosaic argues would distort the comparison by including costs not incurred by KGOC in producing subject merchandise:

> {A}dding in freight, VAT, and import duties would not allow for a proper comparison between the phosphate rock obtained through the phosphate mining license to the costs of a comparable phosphate rock with similar $P_2O_5$ content that is available for purchase on the world market on an FOB basis. . . {b}ecause KGOK did not purchase the input, . . . but rather extracted the ore from its own sites through the mining license.

*Final IDM* at Cmt. 2e.

Commerce provided a reasoned explanation for its decision and articulated "a rational connection between the facts found and the choice made." *Adv. Tech. & Materials*, 35 C.I.T. at 1387. The Court accordingly should reject Mosaic's challenges to the benchmark Commerce used to evaluate the alleged provision of mining rights for LTAR.

### C. Commerce's inclusion of Russian natural gas prices in the IEA data used to construct the "Tier Three" natural gas benchmark was reasonable and supported by substantial evidence.

Mosaic contends it was improper for Commerce to include Russian gas prices in the IEA data used in its "Tier Three" benchmark for natural gas LTAR program because of alleged "distorting behavior of the GOR and Gazprom." Pl. Br. at 35. Mosaic contends that Commerce should have made the adjustment in this investigation because it previously recognized "the distortive influence of the GOR on Russian natural gas export prices to the EU" in *Turkey Rebar II*. *Id.* at 37. Commerce, however, specifically addressed *Turkey Rebar II* in its Final Determination. Distinguishing the factual record between the two proceedings, Commerce emphasizing that its findings in *Turkey Rebar II* "pertained to certain record facts that Russian exports to the EU were distorted during the period of review in that proceeding," which "is not on the record of this proceeding pertaining to the POI." *Final IDM* at Cmt. 3j.

Indeed, in declining to adjust the IEA data, Commerce explained that "{n}o party has

13

submitted any evidence that natural gas produced in Russia and sold in Europe is distorted or suppressed." *Id.* Commerce continued that the evidence on which it relied to reject a Tier 1 benchmark—*i.e.*, "internal price regulations setting wholesale tariffs for gas produced by Gazprom and its affiliates which is allegedly impacting the price of natural gas within Russia"—"are not present in the EU" such that "prices for natural gas sold in Europe are reflective of the market dynamics in that market, which include sales of numerous sources, including Russia." *Id.*

It was Mosaic's burden to provide evidence supporting its contentions. *Ta Chen Stainless Steel Pipe Ltd. v. United States*, 298 F.3d 1330, 1336 (Fed. Cir. 20002). It failed to do so. The record is bereft of any evidence demonstrating that the price of Russian-produced natural gas sold in Europe was distorted during the POI. Even if, as Mosaic contends, some evidence detracts from Commerce's conclusion, the record shows that Commerce "has examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Adv. Tech. & Materials*, 35 C.I.T. at 1387. While EuroChem challenges Commerce's use of IEA data as a Tier 3 benchmark, if the Court agrees with Commerce's selected benchmark, it should sustain Commerce's inclusion of Russian export prices so as to reflect "prevailing market conditions" as statutorily required.

## V.     CONCLUSION

For the forgoing reasons, EuroChem requests that the Court, deny Mosaic's motion for judgment on the agency record.

Dated: March 16, 2022

                                            Respectfully submitted,

                                            */s/ Jeremy W. Dutra*
                                            Peter Koenig
                                            peter.koenig@squirepb.com
                                            Jeremy W. Dutra

jeremy.dutra@squirepb.com
SQUIRE PATTON BOGGS (US) LLP
2550 M Street, NW
Washington, DC 20037
Tel:  (202) 457-6000

*Counsel for Defendant-Intervenor*
*Industrial Group Phosphorite LLC*
