**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE JANE A RESTANI, SENIOR JUDGE**

|  |  |
|---|---|
| THE MOSAIC COMPANY, | |
| Plaintiff, | |
| and | |
| PHOSAGRO PJSC, JSC APATIT, EUROCHEM NORTH AMERICA CORP., INDUSTRIAL GROUP PHOSPHORITE, LLC, | |
| Consolidated Plaintiffs, | |
| v. | Consol. Court No. 21-00117 |
| UNITED STATES, | <u>NON-CONFIDENTIAL VERSION</u> |
| Defendant, | **Business Proprietary Information Deleted from Pages 12, 41** |
| and | |
| THE MOSAIC COMPANY, | |
| Consolidated Defendant-Intervenor. | |

<u>**THE MOSAIC COMPANY'S MEMORANDUM IN OPPOSITION TO CONSOLIDATED PLAINTIFFS' RULE 56.2 MOTIONS FOR JUDGMENT UPON THE AGENCY RECORD**</u>

David J. Ross
Patrick J. McLain
Stephanie E. Hartmann
Natan P.L. Tubman
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

Dated: March 16, 2022

*Counsel for The Mosaic Company*

## TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................................... 1

II.  RULE 56.2 STATEMENT ......................................................................................... 2

III. STATEMENT OF FACTS ......................................................................................... 4

IV. STANDARD OF REVIEW ......................................................................................... 6

V.  ARGUMENT ............................................................................................................... 8

   A.  Commerce's Application of AFA to Determine that Rosneft is a Government
       Authority is Reasonable, Supported by Substantial Evidence, and Otherwise in
       Accordance with Law ............................................................................................ 8

   B.  Commerce's *De Facto* Specificity Analysis for the Provision of Natural Gas for
       LTAR Program is Reasonable, Supported by Substantial Evidence, and Otherwise
       in Accordance with Law ...................................................................................... 15

   C.  Commerce's Rejection of Tier 1 Benchmarks for Natural Gas and Its Selection of
       the International Energy Agency ("IEA") Data as a Tier 3 Benchmark Are
       Reasonable, Supported by Substantial Evidence, and Otherwise in Accordance With
       Law ...................................................................................................................... 18

       1.  Commerce reasonably determined that there were no Tier One benchmarks
           available because of the GOR's interference in the Russian natural gas market 19

       2.  Commerce's use of European IEA data in constructing its Tier Three
           benchmark is reasonable and supported by substantial evidence .................... 29

   D.  Commerce's Calculation of EuroChem's Subsidy Rate for the Provision of Natural
       Gas for LTAR Program is Reasonable, Supported by Substantial Evidence, and
       Otherwise in Accordance with Law .................................................................... 34

       1.  Commerce's inclusion of VAT in the numerator does not overstate the amount
           of benefit or result in a mismatched comparison ........................................... 34

       2.  Commerce properly applied its regulations governing attribution of domestic
           and tied subsidies ......................................................................................... 37

       3.  Commerce properly applied its regulation governing attribution of subsidies to
           corporations with cross-ownership ................................................................. 39

VI. CONCLUSION .......................................................................................................... 47

## <u>TABLE OF AUTHORITIES</u>

**Statutes and Laws**

19 U.S.C. § 1516a(b)(1)(B)(i) ............................................................... 6

19 U.S.C. § 1677(5)(E)(iv) ................................................................... 32

19 U.S.C. § 1677(5A)(D)(iii)(II) ................................................... 15, 17

19 U.S.C. § 1677(5A)(D)(iii)(III) ........................................................ 17

19 U.S.C. § 1677e(a) ............................................................................. 8

19 U.S.C. § 1677e(b)(1) ......................................................................... 8

19 U.S.C. § 1677m(d) ............................................................................ 8

19 U.S.C. § 1677m(e)(2), (3) ............................................................... 26

28 U.S.C. § 2637(d) ......................................................................... 7, 33

**Regulations**

19 C.F.R. § 351.511(a)(2) .................................................................... 18

19 C.F.R. § 351.511(a)(2)(i) ................................................................ 18

19 C.F.R. § 351.511(a)(2)(ii) ......................................................... 18, 31

19 C.F.R. § 351.511(a)(2)(iii) ........................................................ 19, 31

19 C.F.R. § 351.525(a) ................................................................... 35, 37

19 C.F.R. § 351.525(b)(3), (5) ............................................................. 37

19 C.F.R. § 351.525(b)(6)(i) ........................................................... 40, 41

19 C.F.R. § 351.525(b)(6)(ii) .......................................................... 40, 42

19 C.F.R. § 351.525(b)(6)(iii) .............................................................. 45

19 C.F.R. § 351.525(b)(6)(iv) ......................................................... 40, 42

**Cases**

*AK Steel Corp. v. United States*, 192 F.3d 1367 (Fed. Cir. 1999) ................................ 17

*Am. Silicon Techs. v. United States*, 334 F.3d 1033 (Fed. Cir. 2003) ........................... 36

*Archer Daniels Midland Co. v. United States*, 37 CIT 760, 917 F. Supp. 2d 1331
(2013) .................................................................................................... 22, 25

*Archer Daniels Midland Co. v. United States*, 968 F. Supp. 2d 1269
(CIT 2014) .............................................................................................. 17

*Bethlehem Steel Corp. v. United States*, 25 CIT 307,
140 F. Supp. 2d 1354 (2001) ................................................................. 16, 17

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*,
61 F. Supp. 3d 1306 (CIT 2015), *aff'd sub nom.*, *Maverick Tube Corp. v.
United States,* 857 F.3d 1353 (Fed. Cir. 2017) ............................................21, 23, 29, 32

*Clearon Corp. v. United States*, 35 CIT 1685, 800 F. Supp. 2d 1355 (2011)...................7

*Colakoglu Metalurji A.S. v. United States*, No. 20-00153, Slip Op. No. 21-161
(CIT Dec. 2, 2021) ...........................................................................................18

*Corus Staal BV v. United States*, 502 F.3d 1370 (Fed. Cir. 2007) ...............................7

*Deacero S.A.P.I. de C.V. v. United States*, 996 F.3d 1283 (Fed. Cir. 2021) ............... 6, 10

*Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369 (Fed. Cir. 2015)............. 6

*Essar Steel, Ltd. v. United States*, 753 F.3d 1368 (Fed. Cir. 2014).................................7

*Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365 (Fed. Cir. 2014).... 12, 13

*Fuwei Films (Shangdong) Co. v. United States*, 35 CIT 1229,
791 F. Supp. 2d 1381 (2011)....................................................................................7

*Guangdong Wireking Housewares & Hardware Co. v. United States*, 37 CIT 319,
900 F. Supp. 2d 1362 (2013), *aff'd*, 745 F.3d 1194 (Fed. Cir. 2014) .................22, 25, 43

*Habas Sinai Ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States*,
992 F.3d 1348 (Fed. Cir. 2021)......................................................................... 14, 15

*Içdaş Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*,
498 F. Supp. 3d 1345 (CIT 2021).............................................................................32

*Jindal Poly Films Ltd. of India v. United States*, 439 F. Supp. 3d 1354
(CIT 2020).............................................................................................................8

*Koyo Seiko Co. v. United States*, 36 F.3d 1565 (Fed. Cir. 1994) ....................................36

*Mannesmann-Sumerbank Boru Endustrisi T.A.S. v. United States*, 23 CIT 1052,
86 F. Supp. 2d 1266 (1999)....................................................................................36

*Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927 (Fed. Cir. 1984)..................7

*Maverick Tube Corp. v. United States*, 857 F.3d 1353 (Fed. Cir. 2017)........................28

*Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056 (Fed. Cir. 2001) .............7

*Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333 (Fed. Cir. 2016)......................43

*Nat'l Ass'n of Mirror Mfrs. v. United States*, 12 CIT 771, 696 F. Supp. 642 (1988).........7

*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003)...........................11

*Pakfood Pub. Co. v. United States*, 453 F. App'x 986 (Fed. Cir. 2011)........................46

*QVD Food Co. v. United States*, 658 F.3d 1318 (Fed. Cir. 2011).................................18

*Rhone Poulenc, Inc. v. United States*, 13 CIT 218, 710 F. Supp. 341 (1989),
*aff'd*, 899 F.2d 1185 (Fed. Cir. 1990) ........................................................................7

*Royal Thai Gov't v. United States*, 30 CIT 1072, 441 F. Supp. 2d 1350 (2006) ............. 30

*RZBC Grp. Shareholding Co. v. United States*, 100 F. Supp. 3d 1288
(CIT 2015) .................................................................................................................... 32

*Samsung Elecs. Co. v. United States*, 973 F. Supp. 2d 1321 (CIT 2014) ....................... 39

*Sandvik Steel Co. v. United States*, 164 F.3d 596 (Fed. Cir. 1998) ................................. 7

*Shandong Huarong Gen. Corp. v. United States*, 25 CIT 834, 159 F. Supp. 2d 714
(2001), *aff'd sub nom.*, *Shandong Huarong Gen. Grp. Corp. v. United States*,
60 F. App'x 797 (Fed. Cir. 2003) .................................................................................. 36

*Ta Chen Stainless Steel Pipe, Ltd. v. United States*, 23 CIT 804 (1999) ....................... 44

*Transactive Corp. v. United States*, 91 F.3d 232 (D.C. Cir. 1996) ................................ 43

*USEC Inc. v. United States*, 27 CIT 489, 259 F. Supp. 2d 1310 (2003) .......................... 6

*Zhaoqing New Zhongya Aluminum Co. v. United States*, 70 F. Supp. 3d 1298
(CIT 2015) .................................................................................................................... 43

**Administrative Materials**

*Aluminum Extrusions From the People's Republic of China: Final Results of
Countervailing Duty Administrative Review; 2010 and 2011*, 79 Fed. Reg. 106 (Dep't
Commerce Jan. 2, 2014), and accompanying Issues and Decision Memorandum .......... 25

*Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed
Presses From the People's Republic of China: Final Affirmative Countervailing
Duty Determination*, 75 Fed. Reg. 59,212 (Dep't Commerce Sept. 27, 2010), and
accompanying Issues and Decision Memorandum ........................................................ 25

*Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from
the People's Republic of China: Final Affirmative Countervailing Duty Determination,
Final Affirmative Critical Circumstances Determination*, 75 Fed. Reg. 57,444 (Dep't
Commerce Sept. 21, 2010), and accompanying Issues and Decision Memorandum ....... 46

*Certain Softwood Lumber Products From Canada: Final Affirmative Countervailing
Duty Determination, and Final Negative Determination of Critical Circumstances*,
82 Fed. Reg. 51,814 (Dep't Commerce Nov. 8, 2017), and accompanying Issues and
Decision Memorandum ................................................................................................. 23

*Countervailing Duties*, 63 Fed. Reg. 65,348 (Dep't Commerce
Nov. 25, 1998) ................................................................................... 19, 20, 21, 38

*Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products From
the Russian Federation: Final Affirmative Countervailing Duty Determination and
Final Negative Critical Circumstances Determination*, 81 Fed. Reg. 49,935 (Dep't
Commerce July 29, 2016), and accompanying Issues and Decision Memorandum ........ 45

*Fine Denier Polyester Staple Fiber From India: Final Results of Countervailing Duty
Administrative Review; 2017-2018*, 85 Fed. Reg. 86,537 (Dep't Commerce
Dec. 30, 2020), and accompanying Issues and Decision Memorandum ........................ 35

*High Pressure Steel Cylinders From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 77 Fed. Reg. 26,738 (Dep't Commerce May 7, 2012), and accompanying Issues and Decision Memorandum ......... 27

*Non-Oriented Electrical Steel From Taiwan: Final Affirmative Countervailing Duty Determination*, 79 Fed. Reg. 61,602 (Dep't Commerce Oct. 14, 2014), and accompanying Issues and Decision Memorandum ....................................................... 45

*Notice of Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, and Alignment of Final Countervailing Duty Determination With Final Antidumping Duty Determination: Certain Softwood Lumber Products from Canada*, 66 Fed. Reg. 43,186 (Dep't Commerce Aug. 17, 2001) ......................................................................................... 31

*Phosphate Fertilizers From the Kingdom of Morocco: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9,482 (Dep't Commerce Feb. 16, 2021), and accompanying Issues and Decision Memorandum ....................................................... 14

*Ripe Olives From Spain: Final Affirmative Countervailing Duty Determination*, 83 Fed. Reg. 28,186 (Dep't Commerce June 18, 2018), and accompanying Issues and Decision Memorandum ................................................................................. 45

*Ripe Olives From Spain: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination With Final Antidumping Duty Determination*, 82 Fed. Reg. 56,218 (Dep't Commerce Nov. 28, 2017), and accompanying Decision Memorandum ............................................................................................................ 45

*Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Affirmative Countervailing Duty Determination Final Affirmative Critical Circumstances Determination*, 79 Fed. Reg. 54,963 (Dep't Commerce Sept. 15, 2014), and accompanying Issues and Decision Memorandum ....................................................... 35

*Supercalendered Paper From Canada: Final Affirmative Countervailing Duty Determination*, 80 Fed. Reg. 63,535 (Dep't Commerce Oct. 20, 2015), and accompanying Issues and Decision Memorandum ................................................. 32, 33

*Supercalendered Paper From Canada: Final Results of Countervailing Duty Expedited Review*, 82 Fed. Reg. 18,896 (Dept' Commerce Apr. 24, 2017), and accompanying Issues and Decision Memorandum ............................................................................... 23

**Other**

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316 (1994) ...................................................................................................... 12

I.    **INTRODUCTION**

Plaintiff and Consolidated Defendant-Intervenor The Mosaic Company ("Mosaic") respectfully submits this response in opposition to the Rule 56.2 motions for judgment upon the agency record filed on November 12, 2021, by Consolidated Plaintiff Industrial Group Phosphorite LLC ("EuroChem") and Consolidated Plaintiffs PhosAgro PJSC and JSC Apatit (collectively, "PhosAgro").  *See* EuroChem's Rule 56.2 Mot. for J. Upon the Agency R. (Nov. 12, 2021), ECF No. 46 ("EuroChem Br."); PhosAgro's Rule 56.2 Mot. for J. Upon the Agency R. (Nov. 12, 2021), ECF No. 48 ("PhosAgro Br.").

EuroChem and PhosAgro challenge several aspects of the final determination of the U.S. Department of Commerce ("Commerce") in the countervailing duty ("CVD") investigation of phosphate fertilizers from the Russia Federation.  *Phosphate Fertilizers From the Russian Federation: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9,479 (Dep't Commerce Feb. 16, 2021), P.R. No. 418, ECF No. 24-4 ("*Final Determination*"), and accompanying Issues and Decision Memorandum, P.R. No. 405, ECF No. 24-5 ("Final IDM"). Specifically, EuroChem challenges Commerce's (1) application of adverse inferences to find that Rosneft is a government authority; (2) *de facto* specificity analysis of the Provision of Natural Gas for Less Than Adequate Remuneration ("LTAR") Program; and (3) calculation of EuroChem's subsidy rate for the Provision of Natural Gas for LTAR Program.  Both PhosAgro and EuroChem challenge Commerce's use and construction of a Tier Three benchmark for the Provision of Natural Gas for LTAR Program.

As demonstrated below, Commerce's determinations with respect to Consolidated Plaintiffs' claims are reasonable, supported by substantial evidence, and otherwise in accordance

with law.  Accordingly, Mosaic respectfully requests that the Court deny EuroChem's and PhosAgro's motions in their entirety.

## II.     RULE 56.2 STATEMENT

### A.     Administrative Determination Under Review

The administrative determination under review is the final determination by Commerce in the CVD investigation of phosphate fertilizers from the Russian Federation. *Final Determination*, Final IDM.  The countervailing duty order on phosphate fertilizers from the Russian Federation was signed on April 1, 2021, and published in the *Federal Register* on April 7, 2021. *Phosphate Fertilizers From the Kingdom of Morocco and the Russian Federation: Countervailing Duty Orders*, 86 Fed. Reg. 18,037 (Dep't Commerce Apr. 7, 2021), P.R. No. 425.

### B.     Issues Presented and Summary of Arguments

**1.     Whether Commerce's application of adverse facts available ("AFA") to determine that Rosneft is a government authority is reasonable, supported by substantial evidence, and in accordance with law.**

Yes.  Commerce reasonably applied facts otherwise available and drew adverse inferences in finding that Rosneft is a government authority because the Government of Russia ("GOR") did not cooperate to the best of its ability and failed to provide requested information necessary to Commerce's analysis.  EuroChem's submission of factual information does not cure the gap in the record created by the GOR's failure to cooperate.  Accordingly, Commerce's reliance on facts otherwise available with adverse inferences is supported by substantial evidence and otherwise in accordance with law.

**2.     Whether Commerce's *de facto* specificity analysis for the Provision of Natural Gas for LTAR Program is reasonable, supported by substantial evidence, and otherwise in accordance with law.**

Yes.  Commerce found that the Provision of Natural Gas for LTAR Program is *de facto* specific because the agrochemical industry is a predominant user of the subsidy.  Commerce's analysis of "predominant use" took into account the relevant evidence put forward by the GOR on industrial usage of natural gas in Russia.  EuroChem fails to identify any contradictory evidence on the record that undermines the reasonableness of Commerce's *de facto* specificity finding.

> **3.      Whether Commerce's rejection of Tier One benchmarks for natural gas and its construction of a Tier Three benchmark are reasonable, supported by substantial evidence, and otherwise in accordance with law.**

Yes.  Commerce reasonably found that there were no usable Tier One benchmark prices on the record because Russia's natural gas market is distorted by the GOR's predominant role in the market.  Accordingly, and because there were no usable Tier Two benchmark data on the record, Commerce reasonably resorted to constructing a Tier Three benchmark under 19 C.F.R. § 351.511(a)(2)(iii).  There was no legal error in Commerce's rejection of Russian domestic prices as a potential Tier One benchmark, because substantial record evidence supports the agency's finding that the GOR's interventions in the market significantly distort all Russian domestic prices.  Further, Commerce did not err in selecting European natural gas prices on the record to construct a Tier Three benchmark because there is no requirement that prices be "available to" purchasers in the country under investigation in order to reflect "prevailing market conditions."

> **4.      Whether EuroChem fails to show that Commerce unreasonably calculated its subsidy rate for the Provision of Natural Gas for LTAR Program.**

Yes. There is no merit to EuroChem's challenge to Commerce's calculation of its subsidy rate for the Provision of Natural Gas for LTAR Program. Commerce's inclusion of VAT in the numerator does not overstate the amount of benefit or result in a mismatched comparison. Commerce also properly applied its regulations governing attribution of subsidies by evaluating whether the subsidy is tied to subject or non-subject merchandise *at the time of bestowal*, as the preamble to Commerce's CVD regulations directs. Finally, Commerce's calculation of EuroChem's sales in the subsidy rate denominator is consistent with the regulation governing attribution of subsidies to corporations with cross ownership and otherwise in accordance with law.

## III. STATEMENT OF FACTS

Consistent with Rule 81(k), the facts provided in this section are limited to those necessary to correct inaccuracies and omissions in EuroChem's and PhosAgro's briefs. Other relevant facts specific to the issues challenged by Consolidated Plaintiffs are discussed below in the context of each argument.

### A. Commerce's Investigation of Whether Rosneft is a Government Authority

EuroChem omitted the following key facts from its brief regarding Commerce's investigation of Rosneft as a government authority. In the initial questionnaire issued to the GOR, Commerce instructed the GOR to provide an *Input Producer Appendix* "for any company or enterprise that is wholly or partially owned by the {GOR}." *See* GOR Initial Questionnaire, Section II at 16 (Aug. 4, 2020), P.R. No. 56. The GOR furnished an appendix for Gazprom and PJSC Novatek, but not for Rosneft or any other Russian natural gas producers. *See* GOR Initial Questionnaire Response at 41 (Sept. 24, 2020), P.R. No. 131, C.R. No. 305 ("GOR IQR"). After mandatory respondent Phosphorite reported purchasing natural gas from Rosneft during the

period of investigation ("POI") and that Rosneft's largest shareholder is Rosneftegaz JSC ("Rosneftegaz"), which is wholly-owned by the GOR, Commerce issued a supplemental questionnaire instructing the GOR to submit an *Input Producer Appendix* for both Rosneft and Rosneftegaz.  *See* EuroChem Supplemental Questionnaire Response at 13 (Oct. 26, 2020), P.R. No. 229, C.R. No. 437; GOR 2nd Section II Supplemental Questionnaire, Attachment I at 1 (Nov. 3, 2020), P.R. No. 282 ("GOR 2nd SQ").

Rather than provide the requested information, the GOR merely asserted in its response that Rosneft and Rosneftegaz JSC are not government entities.  *See* GOR Second Supplemental Questionnaire Response at 1 (Nov. 12, 2020), P.R. No. 300, C.R. No. 481 ("GOR 2nd SQR").  Commerce asked the GOR a second time to furnish an *Input Producer Appendix* for Rosneft and Rosneftegaz JSC in a post-preliminary supplemental questionnaire; however, the GOR again failed to provide the requested information.  *See* GOR Section II Second Supplemental Questionnaire, Attachment I at 2 (Nov. 25, 2020), P.R. No. 317, C.R. No. 489 ("Post-Prelim. Questionnaire"); GOR Third Supplemental Questionnaire Response at 6 (Dec. 8, 2020), P.R. No. 331, C.R. No. 502 ("GOR Post-Prelim. QR").  The GOR refused these requests despite repeated warnings from Commerce that failing to provide the requested information could result in the application of AFA.  GOR 2nd SQ at 2; GOR Post-Prelim. Questionnaire at 2.

Commerce summarized the available record evidence in its discussion of Rosneft's status in the *Final Determination*, explaining that while it had preliminarily found the evidence to be "conflicting," after the GOR's repeated failure to cooperate, it inferred adversely that Rosneft is a government authority.  *See* Final IDM, Comment 3b at 32-37.

### B.    Commerce's *de facto* specificity analysis for the Provision of Natural Gas for LTAR Program

EuroChem omitted the following key facts regarding Commerce's *de facto* specificity analysis of the Provision of Natural Gas for LTAR Program from its brief.  To inform its *de facto* specificity analysis, Commerce asked the GOR to provide purchase data for natural gas by industrial classification during the POI.  *See Phosphate Fertilizers From the Russian Federation: Preliminary Affirmative Countervailing Duty Determination*, 85 Fed. Reg. 76,524 (Dep't Commerce Nov. 30, 2020), P.R. No. 319 ("*Preliminary Determination*"), and accompanying Decision Memorandum at 12, P.R. No. 308 ("PDM").  In response, the GOR reported it does not maintain statistics on industrial users that purchase natural gas, and it referred Commerce to Gazprom's 2019 annual report, which includes information on Gazprom's sales by industry, as an alternative data source.  *See id.*  Additionally, Commerce determined that the agrochemical sector was the single-largest industrial consumer of natural gas sold by Gazprom during the POI and among the top five consuming industries. *See id.*

## IV.    <u>STANDARD OF REVIEW</u>

In reviewing a countervailing duty determination, this Court will hold unlawful any determination, finding, or conclusion found "to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i); *Deacero S.A.P.I. de C.V. v. United States*, 996 F.3d 1283, 1295 (Fed. Cir. 2021) (citing *SolarWorld Ams., Inc. v. United States*, 910 F.3d 1216, 1222 (Fed. Cir. 2018)).  Substantial evidence is such "evidence that a reasonable mind might accept as adequate to support a conclusion." *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1374 (Fed. Cir. 2015) (internal quotation marks and citation omitted).  "The Court's function is not to re-weigh the evidence," *USEC Inc.*

*v. United States*, 27 CIT 489, 495, 259 F. Supp. 2d 1310, 1317 (2003), and "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984) (citation omitted). Absent some showing to the contrary, Commerce is entitled to the presumption that it considered the record evidence as a whole. *Nat'l Ass'n of Mirror Mfrs. v. United States*, 12 CIT 771, 779, 696 F. Supp. 642, 648 (1988); *see also Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056, 1062 (Fed. Cir. 2001).

Under 28 U.S.C. § 2637(d), the Court "shall, where appropriate, require the exhaustion of administrative remedies" in actions arising from Commerce's countervailing duty determinations. *See also Essar Steel, Ltd. v. United States*, 753 F.3d 1368, 1374 (Fed. Cir. 2014). The doctrine of exhaustion provides "that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Sandvik Steel Co. v. United States*, 164 F.3d 596, 599 (Fed. Cir. 1998) (citation omitted). Further, the Federal Circuit has held that the courts should take "a 'strict view' of the requirement that parties exhaust their administrative remedies before {Commerce} in trade cases." *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007); *accord Clearon Corp. v. United States*, 35 CIT 1685, 1692, 800 F. Supp. 2d 1355, 1362 (2011); *Fuwei Films (Shangdong) Co. v. United States*, 35 CIT 1229, 1230, 791 F. Supp. 2d 1381, 1384 (2011). The Federal Circuit has explained that a party's obligation to exhaust its administrative remedies before Commerce applies both to overall issues and to individual arguments. *See Rhone Poulenc, Inc. v. United States*, 13 CIT 218, 226-27, 710 F. Supp. 341, 348 (1989), *aff'd*, 899 F.2d 1185, 1191 (Fed. Cir. 1990).

## V.    ARGUMENT

### A.    Commerce's Application of AFA to Determine that Rosneft is a Government Authority is Reasonable, Supported by Substantial Evidence, and Otherwise in Accordance with Law

Section 776 of the Tariff Act of 1930, as amended (the "Act"), empowers Commerce to use the "facts otherwise available" to make determinations where "necessary information is not available on the record" or where an interested party: (1) "withholds information that has been requested" by Commerce; (2) fails to provide information within the established deadlines or in the form or manner requested, subject to section 782 of the Act; or (3) significantly impedes an investigation. 19 U.S.C. § 1677e(a). Section 782 of the Act states that where a party fails to provide requested information, Commerce must inform the party and, to the extent practicable, provide an opportunity to remedy or explain the deficiency. *Id.* § 1677m(d). If Commerce finds that "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information," the statute allows Commerce to "use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available." *Id.* § 1677e(b)(1); *see also Jindal Poly Films Ltd. of India v. United States*, 439 F. Supp. 3d 1354, 1363 (CIT 2020).

In this case, Commerce reasonably applied facts otherwise available and drew adverse inferences because it found that the GOR did not cooperate to the best of its ability and failed to provide information necessary for Commerce to determine whether Rosneft is a government authority within the meaning of section 771(5)(B) of the Act. Final IDM at 36. Over the course of the investigation, Commerce gave the GOR multiple opportunities to provide information regarding Rosneft and its largest shareholder, GOR-owned Rosneftegaz. Specifically, in its initial questionnaire, Commerce instructed the GOR to complete an *Input Producer Appendix* for

all wholly- or partially-government-owned (directly or indirectly) natural gas producers.  *See*

Initial Questionnaire, Section II at 16.  Commerce subsequently issued two supplemental

questionnaires instructing the GOR to complete an *Input Producer Appendix* for Rosneft and

Rosneftegaz.  GOR 2nd SQ, Attachment I at 1; GOR Post-Prelim. Questionnaire, Attachment I at

2.  Commerce also warned that failing to provide the requested information could result in the

application of AFA.  *See* GOR 2nd SQ at 2; GOR Post-Prelim. Questionnaire at 2.  But the GOR

repeatedly refused to provide the requested information and did not notify Commerce or explain

why it could not provide this information in the form and manner requested.  GOR IQR at 41;

GOR 2nd SQR at 1; GOR Post-Prelim. QR at 6.  The GOR's failure to cooperate – despite

multiple opportunities to do so – significantly impeded the Department's investigation and left a

factual gap in the record.  Thus, Commerce reasonably filled this gap and applied an adverse

inference by relying on other evidence on the record which indicated that Rosneft is a

government authority.  *See* Final IDM at 6-7, 36.

EuroChem argues that Commerce should not have resorted to using facts otherwise

available under 19 U.S.C. § 1677e(a) because the GOR and EuroChem provided relevant

information regarding Rosneft – such as Rosneft's charter, its bylaws, and the makeup of its

shareholders, directors, and management – such that there was no "gap" in the record.

EuroChem Br. at 4, 8-10 (citing GOR 3rd Supp. QR at 6-8; EuroChem Dec. 17 Response to

GOR 3rd Supp. QR).  However, as Commerce noted in the *Final Determination*, the GOR failed

to fully answer Commerce's specific inquiries in the *Input Producer Appendix* regarding Rosneft

and Rosneftegaz, and the information that EuroChem submitted does not replicate the missing

information.

In a particularly notable example, given EuroChem's erroneous assertion that the GOR merely held a minority ownership interest in Rosneft, *see* EuroChem Br. at 8, Commerce instructed the GOR to provide the following information, *inter alia*:

- a trace of all ownership in Rosneft back to the GOR;
- an explanation of the history of government ownership in Rosneft over the full AUL period;
- an explanation of the corporate governance structure of each entity in Rosneft's chain of ownership and the role of minority shareholders;
- an explanation of each ownership entity's corporate decision making processes;
- an explanation of whether there are any obligations each entity is required to carry out on behalf of the state;
- an explanation of whether each entity is subject to any explicit or implicit obligations or targets regarding prices or production quantities of raw materials; and
- a description of the role of the GOR in any restructuring during the AUL.

*See* GOR Initial Questionnaire, *Input Producer Appendix*; GOR 2nd SQ. EuroChem's submission provides none of this information, which was necessary for Commerce's analysis of the extent of the GOR's ownership and control over Rosneft and its determination as to whether Rosneft is a "government authority" under section 771(5)(B) of the Act. Further, EuroChem's argument ignores the fact that, according to Rosneft's 2019 Annual Report, the GOR and Rosneftegaz (which itself is wholly-owned by the GOR) held a majority of Rosneft's shares during the POI. *See* Final IDM at 32. Thus, Commerce reasonably found there was information necessary to its analysis under section 771(5)(B) of the Act missing from the record, such that it was appropriate for the agency to resort to the facts otherwise available to fill the gap in the record. *See Deacero*, 996 F.3d at 1295 (citing *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1381 (Fed. Cir. 2003)).

EuroChem also challenges the Department's decision to apply adverse inferences under 19 U.S.C. § 1677e(b) as unsupported by substantial evidence, contending that "{t}he only reason Commerce offers for finding GOR did not act to the best of its ability is the mere fact that GOR did not provide the *Input Producer Appendix* for Rosneft," and that Commerce allegedly failed to articulate why it concluded that the GOR failed to act to the best of its ability. EuroChem Br. at 5-6. EuroChem ignores the detailed summary that Commerce provided of the GOR's failure to cooperate in this investigation. *See* Final IDM at 6-7. In particular, Commerce explained that it instructed the GOR in the initial Section II questionnaire to complete an *Input Producer Appendix* for each government-owned supplier of natural gas, and that it subsequently instructed the GOR *twice* to submit an *Input Producer Appendix* for Rosneft and Rosneftegaz, but the GOR failed to provide any of the requested information or suggest alternatives. *Id.* Thus, Commerce's determination does not "simply assert the legal standard" or "provide the conclusory statement that a party has failed to cooperate to the best of its ability," as EuroChem suggests. *See* EuroChem Br. at 5.

A party cooperates to the "best of its ability" when it "has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." *See Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003). When Commerce first specifically instructed the GOR to submit an *Input Producer Appendix* for Rosneft and Rosneftegaz, the GOR merely stated that "neither PJSC Rosneft nor JSC ROSNEFTEGAZ are a vested government entity or authority in the natural gas market in Russia" and failed to complete the appendices. *See* GOR 2nd SQR at 1. As EuroChem acknowledges, *see* EuroChem Br. at 8 n.35, after the second time that Commerce specifically instructed the GOR to submit an *Input Producer Appendix* for Rosneft and Rosneftegaz, the GOR refused to do so on the basis that

[

                                                                                    ]. *See* GOR

Post-Prelim. QR at 6-8.  These are not "full and complete answers" to all of the Department's

inquiries.  Because the GOR refused to complete the *Input Producer Appendix* for Rosneft (or

Rosneftegaz) by the deadlines set by Commerce (and failed to provide an adequate explanation

for why it was unable to provide the requested information), Commerce was forced to substitute

for the missing information and did so in accordance with 19 U.S.C. § 1677e(b).  *See Fine

Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1372 (Fed. Cir. 2014).

      EuroChem argues further that Commerce's application of adverse inferences is unlawful

because "the sole statutory purpose of AFA is . . . to induce cooperation" and "Commerce

provides no evidence, much less substantial evidence, that GOR has any ability to compel

Rosneft to answer Commerce's questionnaire."  EuroChem Br. at 6-7.  The purpose of 19 U.S.C.

§ 1677e(b), according to the statute's legislative history, is to encourage cooperation by

"ensur{ing} that the party does not obtain a more favorable result by failing to cooperate than if

it had cooperated fully."  Uruguay Round Trade Agreements, Statement of Administrative

Action, H.R. Doc. No. 103-316, vol. 1, at 870 (1994).  In a countervailing duty investigation,

Commerce requires certain information from the foreign government allegedly providing

subsidies, including information regarding whether that government provides a financial

contribution.  *See Fine Furniture*, 748 F.3d at 1369-70.  Commerce requests such information

from the government because the government is "in the best position to provide information

regarding the administration of their alleged subsidy programs, including eligible recipients."  *Id.*

at 1370 (quoting *Essar Steel Ltd. v. United States*, 721 F. Supp. 2d 1285, 1297 (CIT 2010), *rev'd

on other grounds by* 678 F.3d 1268 (Fed. Cir. 2012)).

In this case, Commerce instructed the GOR to complete the *Input Producer Appendix* for both Rosneft and Rosneftegaz because there was evidence on the record that respondents had purchased natural gas from Rosneft and that the GOR indirectly owns Rosneft through Rosneftegaz. *See* Final IDM at 6-7. Commerce did not "just assume, without evidence, . . . that Rosneft is a government authority and so GOR can compel Rosneft to answer." *See* EuroChem Br. at 6. EuroChem's argument also completely ignores the GOR's failure to respond with respect to Rosneftegaz, which is wholly state-owned. *See* Final IDM at 36. Moreover, as Commerce explained in the *Final Determination*, its AFA practice is intended "to effectuate the statutory purposes . . . to induce respondents to provide Commerce with complete and accurate information in a timely manner." *See id.* at 5. It was reasonable for Commerce to conclude from the GOR's failure to provide the requested information about both Rosneft and Rosneftegaz that the GOR had failed to cooperate to the best of its ability, and Commerce's application of adverse inferences furthers the statutory goal of encouraging the GOR's cooperation in future proceedings. *See Fine Furniture*, 748 F.3d at 1372-73.

Finally, EuroChem challenges Commerce's determination that Rosneft is an "authority," based on facts otherwise available and adverse inferences, as unsupported by substantial evidence. *See* EuroChem Br. at 4-10. EuroChem criticizes Commerce for not applying the five-factor test for government ownership and control that the agency has used in some prior proceedings, arguing that the fact that the GOR did not complete an *Input Producer Appendix* for Rosneft would not have prevented Commerce from conducting this test. *See id.* at 8-10. EuroChem also criticizes Commerce's determination on the grounds that "{t}he only record facts Commerce cites for its AFA analysis is the information EuroChem provided that GOR, through Rosneftegaz JSC and the Federal Agency for State Property Management, owns 41.4%

of the shares of Rosneft," arguing that "{a}dversely inferring that Rosneft is an authority based solely on a minority ownership stake is irrational." *Id.* at 6.

EuroChem cites Commerce's enunciation of a five-factor test for government ownership and control from its final determination in *Dynamic Random Access Memory Semiconductors from Korea* in 2003. *See id.* at 8 n.33. In more recent cases, Commerce has declined to apply a five-factor test and instead analyzed the totality of record evidence to determine whether a government has "meaningful control" over an entity such that it possesses, exercises, or is vested with government authority within the meaning of section 771(5)(B) of the Act. *See, e.g.*, *Phosphate Fertilizers From the Kingdom of Morocco: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9,482 (Dep't Commerce Feb. 16, 2021), and accompanying Issues and Decision Memorandum, Comment 13. Neither the statute nor Commerce's regulations prescribe how the agency is to evaluate whether an entity is a "government authority," and EuroChem fails to articulate a legal error in the approach that Commerce took in this case.

Further, when Commerce finds it appropriate to resort to facts otherwise available with adverse inferences, the agency may select information from any portion of the record, and its determination is supported by substantial evidence unless it "unreasonably departs from" the overall statutory regime set forth in section 776 of the Act, 19 U.S.C. § 1677e. *See Habas Sinai Ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States*, 992 F.3d 1348, 1354 (Fed. Cir. 2021). As Mosaic explained in its administrative case brief, there was substantial evidence on the record showing that the GOR exercises "meaningful operational control" over Rosneft, such that it qualifies as an "authority" within the meaning of section 771(5)(B)(i) of the Act. *See* Mosaic Case Br. at 26-29 (Jan. 5, 2021), P.R. No. 373, C.R. No. 547. In particular, this record evidence includes: Rosneft's 2019 Annual Report, which states that during the POI, Rosneftegaz (which is

wholly-owned by the GOR) and the Russian Federation held more than 50 percent of Rosneft's

shares; European Union reports describing the GOR's use of Rosneft to further foreign policy

objectives; and a November 2015 decree from the GOR extending controls over the purchasing

decisions of Russian state-owned or controlled enterprises, including Rosneft. *See* Final IDM at

32-33. Commerce summarized this record evidence in its discussion of Rosneft's status in the

*Final Determination*, explaining that while it had preliminarily found the evidence to be

"conflicting," after the GOR's repeated failures to cooperate, it inferred adversely that Rosneft is

a government authority. *See* Final IDM, Comment 3b at 32-37. Commerce also provided a

detailed explanation of the GOR's repeated failures to cooperate and provide the information that

Commerce had requested. *Id.* at 6-7. Thus, Commerce's reliance on facts otherwise available

with adverse inferences was in accordance with 19 U.S.C. § 1677e and furthers the statutory goal

of deterring future non-cooperation, thereby satisfying the "substantial evidence" standard. *See*

*Habas Sinai*, 992 F.3d at 1354.

Accordingly, Commerce's finding that Rosneft is a government authority based on facts

available and adverse inference is reasonable, supported by substantial evidence, and otherwise

in accordance with law.

> **B.    Commerce's *De Facto* Specificity Analysis for the Provision of Natural Gas for LTAR Program is Reasonable, Supported by Substantial Evidence, and Otherwise in Accordance with Law**

In the *Final Determination*, Commerce affirmed its preliminary finding that the Provision

of Natural Gas for LTAR Program is *de facto* specific under section 771(5A)(D)(iii)(II) of the

Act. As Commerce explained, under section 771(5A)(D)(iii)(II) of the Act, a subsidy program is

*de facto* specific if an enterprise or industry is a predominant user of the subsidy. Final IDM at

44; *see also* 19 U.S.C. § 1677(5A)(D)(iii)(II). To inform its *de facto* specificity analysis,

Commerce asked the GOR to provide purchase data for natural gas by industrial classification

during the POI.  *See* PDM at 12.  The GOR reported that it does not maintain statistics on

industrial users that purchase natural gas, and it referred Commerce to Gazprom's 2019 annual

report, which includes information on Gazprom's sales by industry, as an alternative data source.

*See id.*  Thus, Commerce reasonably assessed whether the agrochemical industry (which includes

phosphate fertilizer producers) is a predominant user of the subsidy by reference to the list of

natural gas consuming industries in Gazprom's 2019 annual report.  *See id.*  Because the

agrochemical sector was the single largest industrial consumer of natural gas sold by Gazprom

during the POI, and among the top five consuming industries, Commerce concluded that the

agrochemical industry is a predominant user of the subsidy and that the program is therefore *de*

*facto* specific under 19 U.S.C. § 1677(5A)(D)(iii)(II).  *Id.* at 12-13.

EuroChem challenges Commerce's *de facto* specificity finding as unsupported by

substantial evidence and otherwise contrary to law.  EuroChem Br. at 11-12.  According to

EuroChem, Commerce's "simplistic examination" of consumption of natural gas by industry

"cannot sustain a finding of *de facto* specificity," citing this Court's decision in *Bethlehem Steel.*

*See id.* at 11.  EuroChem's reliance on *Bethlehem Steel* is misplaced.  In that case, the Court

found that it was reasonable for Commerce to consider an enterprise or industry's relative usage

of a subsidy program in determining whether the enterprise or industry were "dominant" or

"disproportionate" users of the program.  *See Bethlehem Steel Corp. v. United States*, 25 CIT

307, 322, 140 F. Supp. 2d 1354, 1369 (2001).  The Court observed that "{a}lthough the steel

industry received over 51% of the financial benefits afforded" under an electricity rate reduction

subsidy, "there is nothing in the record to indicate this percentage was disproportionately higher

than would be expected" because "Commerce . . . examined the Korean steel industry and

concluded that one of its inherent characteristics was the large consumption of electricity." *See id.* In this case, Commerce's *de facto* specificity analysis was based on whether the agrochemical industry is a predominant user of the subsidy under section 771(5A)(D)(iii)(II) of the Act, 19 U.S.C. § 1677(5A)(D)(iii)(II) (providing that a subsidy is specific if "{a}n enterprise or industry is a predominant user of the subsidy"), not on whether it received a disproportionate amount of the subsidy, which is a different factor under the Act's *de facto* specificity provisions. *See* Final IDM at 44; *see also* 19 U.S.C. § 1677(5A)(D)(iii)(III).

Further, Commerce's analysis of "predominant use" took into account the relevant evidence that the GOR submitted on industrial usage of natural gas in Russia. As the Federal Circuit has recognized, the statute and its regulations accord Commerce substantial discretion in how to evaluate "predominant use" of a subsidy. *See AK Steel Corp. v. United States*, 192 F.3d 1367, 1385 (Fed. Cir. 1999) ("Determinations of disproportionality and dominant use are not subject to rigid rules, but rather must be determined on a case-by-case basis taking into account all the facts and circumstances of a particular case.") (citing *Proposed Regulations*, 54 Fed. Reg. at 23,368 ("{T}he specificity test cannot be reduced to a precise mathematical formula. Instead, the Department must exercise judgment and balance various factors in analyzing the facts of a particular case.")). Here, to evaluate *de facto* specificity, Commerce asked the GOR to provide natural gas purchase data by industrial classification, but the GOR reported that it does not maintain such statistics, and it referred Commerce to the data in Gazprom's 2019 annual report. *See* PDM at 12. Thus, Commerce reasonably evaluated "predominant use" by reference to the available record evidence of natural gas usage by industry contained in Gazprom's 2019 annual report. *See Archer Daniels Midland Co. v. United States*, 968 F. Supp. 2d 1269, 1273 (CIT

2014) (affirming reasonableness of Commerce's finding of no *de facto* specificity based on usage data).

EuroChem asserts that "{i}t is a commercial reality that the fertilizer industry is going to consume natural gas, and that it will consume more gas than some industries and less gas than other industries" but "{t}here is . . . no dispute that natural gas is broadly available in Russia and used throughout the Russian economy." EuroChem Br. at 12. But EuroChem cites no record evidence in support of its arguments. *See id.* The obligation to populate the administrative record lies with the parties, not Commerce. *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011). Failing to identify any contradictory evidence on the record, EuroChem's unsupported assertions do nothing to undermine the reasonableness of Commerce's *de facto* specificity finding. *See Colakoglu Metalurji A.S. v. United States*, No. 20-00153, Slip Op. 21-161, at 17-18 (CIT Dec. 2, 2021) (affirming Commerce's selection of a countervailing duty rate where the respondent failed to make any attempt to place any contradictory information on the record).

### C.       Commerce's Rejection of Tier 1 Benchmarks for Natural Gas and Its Selection of the International Energy Agency ("IEA") Data as a Tier 3 Benchmark Are Reasonable, Supported by Substantial Evidence, and Otherwise in Accordance With Law

Section 351.511(a)(2) of Commerce's regulations establishes a hierarchy of methods to identify appropriate market-determined benchmarks to measure the adequacy of remuneration. 19 C.F.R. § 351.511(a)(2). Commerce is directed to first compare the government price to "a market-determined price" from actual transactions within the country under investigation (Tier One), *see id.* § 351.511(a)(2)(i), then to a world market price "where it is reasonable to conclude that such price would be available to purchasers in the country in question" (Tier Two). *Id.* §

351.511(a)(2)(ii). If neither Tier One nor Tier Two prices are available, Commerce assesses "whether the government price is consistent with market principles" (Tier Three). *Id.* § 351.511(a)(2)(iii). Although Commerce normally prefers to use domestic prices pursuant to 19 C.F.R. § 351.511(a)(2)(i), the *Preamble* explains that Commerce will not use domestic prices where it is reasonable to conclude that they are significantly distorted by a government's involvement in the market. *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,377 (Dep't Commerce Nov. 25, 1998) (the "*Preamble*"); *see also* PDM at 13-14.

In the *Final Determination*, Commerce found that there were no Tier One or Tier Two benchmark prices available and therefore resorted to using IEA data to construct a Tier Three benchmark for measuring the adequacy of remuneration paid for natural gas. *See* Final IDM at 47-54. PhosAgro and EuroChem challenge Commerce's rejection of Tier One benchmarks and use of the IEA data to construct a Tier Three benchmark as unsupported by substantial evidence and otherwise not in accordance with law. None of their arguments has merit.

        1.     **Commerce reasonably determined that there were no Tier One benchmarks available because of the GOR's interference in the Russian natural gas market**

Commerce found that there were no available Tier One benchmark prices because the domestic natural gas market in Russia is distorted due to "the predominant role played by the GOR in the Russian natural gas market through the significant portion of the market supplied by Gazprom and Rosneft, both government authorities, and because of other interventions in the natural gas market by the GOR." Final IDM at 49. Commerce relied on evidence that demonstrated "(1) a substantial proportion of total Russian domestic natural gas production during each of 2017, 2018, and 2019 is attributable to companies in which the GOR maintains a direct or indirect ownership/management interest; and (2) Gazprom alone accounted for a

majority of the natural gas production in each of these years, such that it is reasonable to conclude that Gazprom accounts for a substantial portion of the market." *Id.* Commerce also cited record evidence showing that:

- according to its 2019 annual report, Gazprom alone produced 68 percent of the natural gas consumed in Russia in 2019, which represents a predominant market share;

- the Russian market is divided into "regulated" and "unregulated" markets, with the former dominated by Gazprom and accounting for a majority of domestic consumption;

- Russia's domestic consumption needs are met almost entirely by domestic production of natural gas, with imports comprising only two percent of consumption;

- natural gas exports are subject to various restrictions, including an export customs duty of 30 percent and export licensing requirements; and

- as a matter of law, Gazprom holds the exclusive right to transport and export natural gas via pipeline. Thus "Gazprom enjoys a 'natural monopoly' over natural gas transportation" in Russia.

*Id.* at 49-50. In light of the totality of this evidence, Commerce concluded that the "actual transaction prices for natural gas in Russia cannot be used as a 'Tier One' benchmark pursuant to 19 C.F.R. § 351.511(a)(2)(i), because they reflect the significant distortion resulting from the government's involvement in the market." *Id.* at 50.

Commerce's determination is supported by substantial evidence and in accordance with law. The *Preamble* makes clear that, if Commerce finds the market for a good in the country subject to investigation is distorted by government involvement, such as if a "government provider constitutes a majority or, in certain circumstances, a substantial portion of the market," then the agency will not use a Tier One benchmark. *See Preamble*, 63 Fed. Reg. at 65,377. As this Court has acknowledged, this is because in such circumstances, domestic prices "may no

longer be concluded the result of a 'competitive' market-pricing mechanism." *Borusan*

*Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306, 1327 (CIT

2015), *aff'd sub nom.*, *Maverick Tube Corp. v. United States,* 857 F.3d 1353 (Fed. Cir. 2017).

PhosAgro and EuroChem present several arguments attempting to show that Commerce's

finding of significant distortion in the Russian natural gas market is unsupported by substantial

evidence and contrary to law. Each of these arguments fails. *First*, they argue that Commerce

erred in relying "almost exclusively on Gazprom's market share of *production*," as opposed to its

share of domestic supply or consumption, of natural gas. PhosAgro Br. at 21 (emphasis added);

*see also* EuroChem Br. at 13-17. Not only does this argument mischaracterize Commerce's

determination, but it also is incorrect as a matter of law. While Commerce did rely on evidence

of Gazprom's predominant share of Russian natural gas production during the POI (and in

preceding years), Commerce also cited significant other evidence of the GOR's interventions in

the market, including through Gazprom's monopoly on natural gas distribution and export

restraints. *See* Final IDM at 49-50.

Further, there is no support in Commerce's regulations or the *Preamble* for the distinction

that PhosAgro seeks to draw between a government authority's share of domestic production and

its share of domestic supply or consumption. The *Preamble* describes government distortion of

the market as occurring where "the government provider constitutes a majority or, in certain

circumstances, a substantial portion of the market." *Preamble*, 63 Fed. Reg. at 65,377. Nowhere

does the *Preamble* specify that the "substantial portion of the market" must be measured by

domestic consumption, as opposed to domestic production. Indeed, this Court has repeatedly

affirmed Commerce's findings of market distortion where (1) the government authority accounts

for approximately half of domestic production; (2) imports play a limited role in the market; and

(3) there exists some government control on exports. *See, e.g., Archer Daniels Midland Co. v. United States*, 37 CIT 760, 765, 771, 917 F. Supp. 2d 1331, 1339, 1343 (2013) (upholding Commerce's rejection of Tier One prices where the state controlled 56 percent of domestic production of the input at issue and there was an export tax on that input); *Guangdong Wireking Housewares & Hardware Co. v. United States*, 37 CIT 319, 338-40, 900 F. Supp. 2d 1362, 1380-82 (2013), *aff'd*, 745 F.3d 1194 (Fed. Cir. 2014) (affirming Commerce's finding of market distortion where 47.97 percent of domestic production was state-controlled, imports only comprised 1.53 percent of the domestic market, and export tariffs were in place).

The facts in the present case provide an even stronger basis for a finding of government distortion than those in *Archer Daniels* and *Guangdong Wireking*. Here, Commerce found that "Gazprom alone produced 68 percent of the natural gas consumed in Russia in 2019," which "accounts for a majority of the domestic natural gas market." Final IDM at 49. Commerce also noted that the GOR imposes VAT of 20 percent, import tariffs of five percent, and export customs duties of 30 percent on natural gas; that it requires companies to obtain licenses to export natural gas; and that Gazprom has a legal monopoly on the transport and export of natural gas via pipeline. *See id.* at 49-50. Commerce found based on this evidence that the Russian natural gas market is distorted both through the GOR's predominant role in the market via Gazprom and through its other interventions in the market. *Id.*

The only case that PhosAgro cites in support of its argument is this Court's decision in *Borusan*, which PhosAgro characterizes as "discussing market share in terms of *provision* of goods into the market," PhosAgro Br. at 20 (citing *Borusan*, 61 F. Supp. 3d at 1328). But that case does not support PhosAgro's argument. In the investigation underlying *Borusan*, *Oil Country Tubular Goods (OCTG) from Turkey*, Commerce cited the Turkish government's

statement that government authorities accounted for the majority of hot rolled steel *production* in Turkey in support of its finding that those entities accounted for "at least a substantial portion of the . . . market." *See Borusan*, 61 F. Supp. 3d at 1326. The Court remanded Commerce's determination for further explanation because, unlike in this case, the evidence of the government authorities' share of domestic production was the *only* record evidence that Commerce relied upon to find significant market distortion. *See id.* at 1327-31. PhosAgro asserts that Commerce's findings in *OCTG from Turkey* are "almost identical" to the findings at issue here, PhosAgro Br. at 23, but PhosAgro is incorrect. Rather, in this case Commerce cited numerous pieces of record evidence showing the GOR's interference in the Russian natural gas market, in addition to the evidence of Gazprom's predominant market share. *See* Final IDM at 49-50. Thus, PhosAgro and EuroChem are incorrect to assert that "Commerce relie{d} almost exclusively on Gazprom's market share of production in making its 'significant distortion' finding," *see* PhosAgro Br. at 21, or that Commerce otherwise failed to adequately explain its finding of market distortion. *See id.* at 23.

Further, contrary to PhosAgro's and EuroChem's arguments, Commerce did not apply an improper "*per se* rule" or "irrefutable presumption," *see id.* at 21; EuroChem Br. at 14. Rather, the agency based its finding on the totality of the record evidence, consistent with its prior practice. *See, e.g.*, *Supercalendered Paper From Canada: Final Results of Countervailing Duty Expedited Review*, 82 Fed. Reg. 18,896 (Dept' Commerce Apr. 24, 2017), and accompanying Issues and Decision Memorandum, Comment 13; *Certain Softwood Lumber Products From Canada: Final Affirmative Countervailing Duty Determination, and Final Negative Determination of Critical Circumstances*, 82 Fed. Reg. 51,814 (Dep't Commerce Nov. 8, 2017), and accompanying Issues and Decision Memorandum, Comment 18. This evidence included

Gazprom's and other GOR-owned and controlled natural gas producers' (*e.g.*, Rosneft) shares of production, as well as the limited role of imports in the market; the significant restraints the GOR imposes on exports; and Gazprom's "natural monopoly" over the export *and transportation* of natural gas in Russia via pipeline. *See* Final IDM at 49-50. Thus, contrary to PhosAgro's arguments, *see* PhosAgro Br. at 16-17, Commerce did take into account the factors enumerated in 19 C.F.R. § 351.511(a)(2)(i), including the availability of natural gas in the market and transportation.

PhosAgro and EuroChem seek to downplay the significance of the other record evidence that Commerce cited in addition to Gazprom's predominant market share. *See* PhosAgro Br. at 23-24; EuroChem Br. at 15-17. PhosAgro acknowledges in a footnote that "Commerce briefly mentions that Gazprom has a monopoly of exports and transportation of natural gas" but asserts that "Commerce does not provide any explanation for how these 'interventions' distort Russian prices." PhosAgro Br. at 24 n.6. EuroChem similarly criticizes Commerce for not "explain{ing} how import controls could have any impact on domestic market prices relevant to this investigation" or "explain{ing} with any evidence . . . how" the 30 percent export tariff and export licensing requirements "distort the *Russian* market in a way that would warrant use of out of country benchmarks." EuroChem Br. at 15-16.

Commerce cited the fact that Gazprom has a "natural monopoly" on transportation of natural gas via pipeline in Russia, that domestic consumption is supplied almost entirely by domestic production (with imports accounting for only two percent of consumption), and that the GOR maintains a range of export restraints on natural gas as evidence of the prevalence of the

GOR's influence in the market.[1]  *See* Final IDM at 49-50.  Commerce's reliance on this evidence

was reasonable and consistent with its prior practice.  In particular, Commerce has previously

found that high levels of import penetration may indicate that domestic prices are not distorted,

even where government ownership of domestic production is significant.  *See, e.g.*, *Certain*

*Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses From the*

*People's Republic of China: Final Affirmative Countervailing Duty Determination*, 75 Fed. Reg.

59,212 (Dep't Commerce Sept. 27, 2010), and accompanying Issues and Decision Memorandum

at 62 n.245.  Commerce has also determined that export restraints can discourage exports and

artificially increase supply in the domestic market, thereby depressing domestic prices.  *See, e.g.*,

*Aluminum Extrusions From the People's Republic of China: Final Results of Countervailing*

*Duty Administrative Review; 2010 and 2011*, 79 Fed. Reg. 106 (Dep't Commerce Jan. 2, 2014),

and accompanying Issues and Decision Memorandum at 27.  Moreover, as previously discussed,

this Court has affirmed Commerce's reliance on evidence of state-controlled production, the

prevalence of imports, and restrictions on exports to find market distortion.  *See Archer Daniels*,

37 CIT at 771, 917 F. Supp. 2d at 1343; *Guangdong Wireking*, 37 CIT at 338-40, 900 F. Supp.

2d at 1380-82.

　　　　Furthermore, PhosAgro and EuroChem fail to identify any record evidence that

undermines the reasonableness of Commerce's market distortion finding.  The only evidence that

---

[1] EuroChem cites Commerce's reference to "controls on imports and exports of natural gas" to argue that
"Commerce does not explain how import controls could have any impact on domestic market prices relevant to this
investigation and the selection of benchmarks," because "Russia is in a state of sizeable surplus for natural gas" and
"there is no incentive for imports to serve the Russian market."  EuroChem Br. at 13, 15.  Elsewhere Commerce
made clear that its analysis of import levels was in reference to the degree that domestic consumption needs are met
by domestic production of natural gas as opposed to imports.  *See* Final IDM at 49.  Thus, the factual assertions
made by EuroChem, *i.e.*, that "there is no incentive for imports to serve the Russian market," only buttress
Commerce's finding that the Russian natural gas market is served almost entirely by Russian producers.

PhosAgro and EuroChem cite in support of their arguments comes from the Brattle Report,

which is a report that EuroChem commissioned for purposes of the underlying investigation. *See*

PhosAgro Br. at 20-21; EuroChem Br. at 15.  The Brattle Report purports to show in a chart that

the market share of Russian independent gas producers and suppliers was slightly above 50

percent in 2019.  EuroChem and PhosAgro Benchmark Submission, Appendix 2 ("Brattle

Report"), at 6 fig.7 (Nov. 2, 2020), P.R. No. 279, C.R. No. 464.  According to PhosAgro,

Commerce erred in "refus{ing} even to consider the Brattle Report" and "unlawfully

presum{ing} the evidence presented in the Brattle Report was subjective."  PhosAgro Br. at 18.

However, the data in the Brattle Report are fundamentally flawed and unverifiable.

As Commerce noted in its *Final Determination*, the Brattle Report was "contradictory to

information provided by parties directly" and "not accompanied by original source

documentation describing the methodology and sources of the data."  Final IDM at 54, 56.  The

report defines independent gas producers and suppliers as any entity other than the Gazprom

Group and identifies Rosneft, which Commerce found to be a government authority, as one of

the two largest independent gas producers.  Brattle Report at v; Final IDM at 6-7, 36-37.

Further, the market share chart presented in the Brattle Report contains no figures or explanation

of how market share was calculated, nor does the report provide the underlying data (only citing

various Gazprom reports that are not on the record).  *See* Brattle Report at v.  Commerce is not

required to consider information that cannot be verified or is so incomplete that it cannot serve as

a reliable basis for reaching the applicable determination.  *See* 19 U.S.C. § 1677m(e)(2), (3).

The market share and other data presented in the Brattle Report are inherently flawed, and they

do not "fairly detract" from Commerce's reliance on other record evidence of Gazprom's market

share.

Furthermore, the Brattle Report itself acknowledges that Gazprom alone accounted for nearly 50 percent of the Russian natural gas market in 2019, and that "Gazprom remains the dominant supplier in the domestic market." *See* Brattle Report at 5. Thus, even assuming the flawed and unverified data presented in the Brattle Report were accurate, this evidence also supports Commerce's finding that Gazprom accounted for a "substantial" portion of the market during the POI. *See, e.g.*, *High Pressure Steel Cylinders From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 77 Fed. Reg. 26,738 (Dep't Commerce May 7, 2012), and accompanying Issues and Decision Memorandum at 19 (finding government ownership of 38 percent of a domestic steel industry to be "substantial").

Finally, PhosAgro and EuroChem attempt to draw a distinction between the regulated and unregulated natural gas markets in Russia, suggesting that Commerce's findings related to Gazprom's predominant role in the market pertain only to the former. For example, PhosAgro argues that Commerce provided "little to no discussion . . . on the alleged effect of Gazprom's substantial market share of the regulated market on the unregulated market." PhosAgro Br. at 24. EuroChem criticizes Commerce for failing to "demonstrate{} that GOR's ownership interest in and regulation of Gazprom actually distorted . . . non-affiliated private firms' prices in the *unregulated* natural gas market." EuroChem Br. at 14. These arguments are erroneous. Commerce reasonably found that the GOR's interference in the Russian natural gas market is so extensive that *all* prices are distorted, regardless of whether they stem from the regulated or unregulated market.

Commerce analyzed whether the GOR's significant interventions through Gazprom and other government authorities distort the Russian natural gas market *as a whole*, not just the regulated market. *See* Final IDM at 49. Commerce found that Gazprom accounts for a

"substantial portion" of the market based on its share of natural gas production in 2017-2019,

and it did *not* limit this finding to Gazprom's role in the regulated market. *See id.* Further, the

record evidence shows that Gazprom operates in both the regulated and the unregulated market.

The "regulated" market consists of natural gas sales that are subject to the GOR's pricing

controls. *See* PhosAgro Br. at 6 & n.4. As PhosAgro acknowledges, the "unregulated" market is

"comprised of both independent and government-owned gas suppliers," such as Gazprom. *See*

*id.* at 5. Specifically, Gazprom's sales at auctions organized by the GOR and its sales of natural

gas for LNG or methanol production are not subject to the GOR's regulation on wholesale gas

prices and are therefore part of the "unregulated" market. *See id.* at 6-7.

Moreover, in addition to its predominant role as a supplier in both the regulated and

unregulated markets, Gazprom has a "natural monopoly" on transportation of natural gas via

pipeline in Russia, and the GOR sets the tariffs for gas transportation. *See id.* at 6 n.4 (citing

GOR Initial Questionnaire Response at 47-48). Commerce found based on the totality of this

evidence that Gazprom has sufficient market power to effectively determine the prices of

purportedly private suppliers, such as Novatek, and that the GOR's predominant role in the

market via Gazprom results in significant distortion of all Russian natural gas prices. *See* Final

IDM at 49-50; *see also* PDM at 14. In light of the above, Commerce reasonably found that

prices from the relatively small portion of sales that involve allegedly private suppliers, like

Novatek, cannot be considered to meet the statutory and regulatory requirement for use of a

market-determined price. *See, e.g., Maverick Tube Corp.*, 857 F.3d at 1358 ("If the market in

that country is distorted by government involvement, however, then Commerce will consider the

prices paid *in that country* as not an appropriate basis of comparison.") (emphasis added).[2]

Accordingly, Commerce's finding that there were no available Tier One benchmark

prices due to distortion in the Russian natural gas market is reasonable, supported by substantial

evidence, and otherwise in accordance with law.

### 2.    Commerce's use of European IEA data in constructing its Tier Three benchmark is reasonable and supported by substantial evidence

PhosAgro and EuroChem also challenge Commerce's use of IEA data to construct a Tier

Three benchmark as unsupported by substantial evidence or otherwise contrary to law.  Their

arguments fail.

*First*, PhosAgro argues that Commerce erred in declining to use actual transaction prices

from "independent" Russian natural gas suppliers to construct a Tier Three benchmark.

According to PhosAgro, the respondents provided evidence in the Brattle Report and their

questionnaire responses of actual transaction prices in the unregulated market, and these prices

are usable as a Tier Three benchmark because they are "consistent with market principles" given

that the purportedly "independent" suppliers earned more revenues than their cost expenditures

during the POI.  *See* PhosAgro Br. at 26-27.  Notably, PhosAgro fails to cite any legal authority

or prior cases where Commerce has taken the approach that it advocates.  This is unsurprising

---

[2] PhosAgro seeks to articulate an alternative standard for whether Commerce may find there are no Tier One benchmarks available, namely whether "there are 'no market conditions prevailing in the country for the good or service being investigated or reviewed.'"  PhosAgro Br at 24-25 (citing *Borusan*, 61 F. Supp. 3d at 1327).  This Court stated in *Borusan* that "the tier two inquiry arises of necessity, assuming it has properly been determined that there are no market conditions prevailing in the country for the good or service being investigated or reviewed."  *Borusan*, 61 F. Supp. 3d at 1327.  This does not amount to a new legal standard separate and apart from the language of Commerce's regulation and the *Preamble*.  Having found that the Russian natural gas market is significantly distorted by the GOR's prevalence and interventions in the market, it was unnecessary for Commerce to further analyze whether the unregulated market or purportedly independent gas producers operate based on "market conditions."

given that PhosAgro's argument fundamentally misinterprets Commerce's regulation, 19 C.F.R. § 351.511(a)(2), and the regulation's hierarchy for selection of benchmarks.

As Commerce explained in the *Final Determination*, 19 C.F.R. § 351.511(a)(2) sets forth a hierarchy for the selection of benchmarks to measure the adequacy of remuneration in order of preference. Where Commerce finds that there are no Tier One (domestic market-based) prices or Tier Two (world market-based) prices that can serve as a benchmark, the agency resorts to constructing a Tier Three benchmark to determine whether prices charged by the government are "consistent with market principles." *See* Final IDM at 53. In this case, Commerce found there were no available Tier One benchmarks because the Russian natural gas market is significantly distorted by the GOR's interventions, such that even prices of the so-called "independent" suppliers in the unregulated market cannot be considered "market-based." *See id.* at 49-50. Contrary to PhosAgro's argument, *see* PhosAgro Br. at 27, the fact that Novatek earned more revenue than its cost expenditures during the POI does nothing to undermine Commerce's conclusion that *all* Russian natural gas prices are distorted by the GOR's pervasive role in the market and, for that reason, cannot be considered "market-based" or serve as a benchmark to measure the adequacy of remuneration.

Having found that purportedly independent producers' prices are not "market-based," Commerce reasonably declined to use them as a Tier Three benchmark for assessing whether the government prices are "consistent with market principles," as to do so would have entailed a comparison of a government price to a benchmark price that is distorted by the influence of the very same government. *Cf. Royal Thai Gov't v. United States*, 30 CIT 1072, 1081, 441 F. Supp. 2d 1350, 1360 (2006) (holding that Commerce reasonably discounted the relevance of a report because it "assumed the very issue which {lay} at the heart of the market principles analysis").

EuroChem argues that whether prices are "market-based" is only relevant for Tier One

benchmarks and, thus, irrelevant for a Tier Three analysis. EuroChem Br. at 18-19. But, as

Commerce explained in *Certain Softwood Lumber Products from Canada*, "the adequacy of

remuneration must be measured by reference to the marketplace free of government

interference." *Notice of Preliminary Affirmative Countervailing Duty Determination,*

*Preliminary Affirmative Critical Circumstances Determination, and Alignment of Final*

*Countervailing Duty Determination With Final Antidumping Duty Determination: Certain*

*Softwood Lumber Products From Canada*, 66 Fed. Reg. 43,186, 43,193 (Dep't Commerce Aug.

17, 2001). Thus, determining whether a potential benchmark is "market-based" is an essential

aspect of every step of the hierarchy in 19 C.F.R. § 351.511(a)(2). Accordingly, there was no

legal error in Commerce's rejection of Russian domestic prices – which, as Commerce properly

found, are significantly distorted by the GOR's interventions in the market – as a potential Tier

Three benchmark.

*Second*, PhosAgro argues that Commerce erred in selecting the IEA data to construct a

Tier Three benchmark because those prices are not "available to" purchasers in Russia and thus

"not reflective of the prevailing market conditions" in Russia. *See* PhosAgro Br. at 27.

PhosAgro's argument conflates the regulatory standard for a Tier Two analysis – which requires

a world market price that is "available to" purchasers in the country subject to investigation or

review, *see* 19 C.F.R. § 351.511(a)(2)(ii) – with the analysis of whether a government price is

"consistent with market principles" under Tier Three. *See* 19 C.F.R. § 351.511(a)(2)(iii). Thus,

the fact that European natural gas prices may not technically be "available to" purchasers in

Russia is immaterial to Commerce's analysis under Tier Three. Moreover, this Court "has

consistently sustained Commerce's reliance on IEA data in constructing a natural gas

benchmark." *Içdaş Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*, 498 F. Supp. 3d

1345, 1370-1371 (CIT 2021) (citing *Rebar Trade Action Coal. v. United States I*, 389 F. Supp.

3d 1371 (CIT 2019); *Habaş Sinai v. United States*, 459 F. Supp. 3d 1341 (CIT 2020)).

PhosAgro attempts to shoehorn the "available to purchasers" language in 19 C.F.R. §

351.511(a)(2)(ii) into 19 C.F.R. § 351.511(a)(2)(iii) using the direction in section 771(5)(E)(iv)

of the Act that adequacy of remuneration must be determined in relation to "prevailing market

conditions" for the good being provided for LTAR in the country subject to investigation. *See*

19 U.S.C. § 1677(5)(E)(iv). However, this argument also fails. As this Court observed in *RZBC*

*Grp. Shareholding Co. v. United States*, the statute lists the conditions that Commerce should

consider as "prevailing market conditions" (including price, quality, availability, marketability,

and transportation), but it does not explain what it means for these conditions to "prevail" in the

domestic market. 100 F. Supp. 3d 1288, 1306 (CIT 2015). Nothing in the statute requires that a

potential benchmark price be "available to" purchasers in the country subject to investigation in

order for it to reflect "prevailing market conditions" in that country. Rather, a potential

benchmark must merely "bear a reasonably realistic resemblance to the importing market's

reality." *Borusan*, 61 F. Supp. 3d at 1341. PhosAgro fails to demonstrate that the IEA data do

not meet this standard.

The only case that PhosAgro cites in support of its argument is *Supercalendered Paper*

*From Canada*. *See* PhosAgro Br. at 29. However, PhosAgro misconstrues Commerce's

reasoning in *Supercalendered Paper From Canada*. As PhosAgro acknowledges, in that case,

Commerce declined to use Alberta electricity prices as a potential Tier One benchmark to

measure the adequacy of remuneration for electricity in Nova Scotia. *See Supercalendered*

*Paper From Canada: Final Affirmative Countervailing Duty Determination*, 80 Fed. Reg. 63,535

(Dep't Commerce Oct. 20, 2015), and accompanying Issues and Decision Memorandum at 41-42.  Further, Commerce declined to use the Alberta prices specifically because they did not meet two of the criteria for Tier One benchmarks under 19 C.F.R. § 351.511(a)(2)(i): (1) Tier One benchmark prices must stem from actual transactions, which the Alberta prices did not; and (2) Tier One benchmark prices must be "delivered" prices, which was not possible because of a lack of inter-provincial electricity transmission connectivity.  *See id.*  Thus, contrary to PhosAgro's argument, Commerce's choice in that case was *not* premised on a finding that Alberta prices are not "available to" purchasers in Nova Scotia, as required for Tier Two benchmarks under 19 C.F.R. § 351.511(a)(2)(ii).  Further, PhosAgro is incorrect to suggest that Commerce's reasoning in *Supercalendered Paper From Canada* related to the "prevailing market conditions" language in section 771(5)(E) of the Act.  *See* PhosAgro Br. at 29.  Rather, Commerce's analysis was focused almost entirely on the two regulatory criteria for Tier One benchmarks under 19 C.F.R. § 351.511(a)(2)(i), as previously discussed.

PhosAgro also argues that IEA data cannot be used to construct a benchmark that reflects prevailing market conditions because those data include countries that are highly remote from Russia but do not account for the associated high transportation costs of natural gas, and because the data include sales to small-to-medium companies that allegedly lack the buying power of large industrial purchasers like PhosAgro.  PhosAgro Br. at 27-31.  However, PhosAgro did not raise these arguments in its administrative case brief before Commerce, *see generally* PhosAgro Case Br. (Jan. 5, 2021), P.R. No. 374, C.R. No. 548, thereby failing to exhaust its administrative remedies.  Accordingly, the Court should disregard these arguments.  *See* 28 U.S.C. § 2637(d) ("the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies").

For all of the foregoing reasons, the Court should reject PhosAgro's and EuroChem's

arguments that Commerce's selection of the IEA data as a Tier Three benchmark was

unsupported by substantial evidence or otherwise not in accordance with law.

**D.      Commerce's Calculation of EuroChem's Subsidy Rate for the Provision of Natural Gas for LTAR Program is Reasonable, Supported by Substantial Evidence, and Otherwise in Accordance with Law**

In the *Final Determination*, Commerce calculated the amount of benefit conferred to

respondents under the Provision of Natural Gas for LTAR Program by comparing quarterly

benchmark prices to each respondent company's reported purchase prices for gas (inclusive of

VAT and delivery charges). *See* EuroChem Final Calculations Mem. at 5 (Feb. 9, 2021), P.R.

Nos. 407-08, C.R. Nos. 560-61. Commerce then summed the non-zero benefits for each quarter

to derive a total benefit for the POI for each company and divided the total benefit by the total

consolidated sales (exclusive of intercompany sales) in 2019 to derive a program subsidy rate.

*Id.* at 5-6. In the case of EuroChem, Commerce calculated a final subsidy rate of 45.36 percent

for this program. *See id.* at 6. Commerce's calculation is reasonable and supported by

substantial evidence, and the Court should reject EuroChem's challenges to Commerce's

calculation in their entirety.

**1.      Commerce's inclusion of VAT in the numerator does not overstate the amount of benefit or result in a mismatched comparison**

EuroChem argues that Commerce "erroneously and inconsistently included VAT in the

numerator (the benefit), but not in the sales denominators (the universe of sales to which the

benefit applies" and that "{t}his imbalance between the numerator and denominator in

calculating the subsidy margin is improper," citing *Mannesmann-Sumerbank Boru Endustrisi*

*T.A.S. v. United States*, 23 CIT 1052, 86 F. Supp. 2d 1266, 1277 (1999). EuroChem Br. at 24.

According to EuroChem, Commerce's inclusion of VAT in the numerator and not in the denominator overstates the alleged benefit, and thus the amount of subsidy, such that Commerce should have either removed VAT from the numerator calculation or included it in the sales denominator. *See id.* EuroChem is incorrect.

In measuring the benefit (*i.e.*, calculating the numerator), Commerce properly accounted for VAT in order to ensure an apples-to-apples comparison of the respondents' reported purchase prices for natural gas (which were inclusive of VAT) to the quarterly benchmark prices. In other words, Commerce compared a VAT-inclusive government price to a VAT-inclusive benchmark price to determine the amount of benefit conferred by the subsidy program. This calculation methodology does not "overstate{} the alleged benefit," as EuroChem argues, because it accounts for VAT on both sides of the comparison. Commerce then followed its well-established practice of dividing the amount of benefit it calculated by each company's total sales, exclusive of VAT and other taxes. *See, e.g., Fine Denier Polyester Staple Fiber From India: Final Results of Countervailing Duty Administrative Review; 2017-2018*, 85 Fed. Reg. 86,537 (Dep't Commerce Dec. 30, 2020), and accompanying Issues and Decision Memorandum, Comment 1; *Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Affirmative Countervailing Duty Determination Final Affirmative Critical Circumstances Determination*, 79 Fed. Reg. 54,963 (Dep't Commerce Sept. 15, 2014), and accompanying Issues and Decision Memorandum, Comment 2.

Commerce's regulations specify that Commerce will calculate subsidy rates by dividing the amount of the benefit allocated to the POI by the sales value during the same period, normally calculated on an f.o.b. basis (*i.e.*, exclusive of taxes and duties). 19 C.F.R. § 351.525(a). Commerce's well-established practice of utilizing sales denominators that are

exclusive of VAT and other indirect taxes is consistent with this regulation, reasonable, and should be accorded substantial deference. *See Koyo Seiko Co. v. United States*, 36 F.3d 1565, 1575 (Fed. Cir. 1994) (citing *Zenith Radio Corp. v. United States*, 437 U.S. 443, 457-58 (1978)) ("{T}he longstanding status of Commerce's practice provides a . . . rationale for deferring to the agency's interpretation."); *see also Am. Silicon Techs. v. United States*, 334 F.3d 1033, 1038 (Fed. Cir. 2003) (citing *Koyo Seiko Co.*, 36 F.3d at 1570, 1575) (sustaining "as reasonable Commerce's well established practice of basing interest expenses and income on fully consolidated financial statements."); *Shandong Huarong Gen. Corp. v. United States*, 25 CIT 834, 159 F. Supp. 2d 714, 724-25 (2001), *aff'd sub nom.*, *Shandong Huarong Gen. Grp. Corp. v. United States*, 60 F. App'x 797 (Fed. Cir. 2003) (affirming as reasonable Commerce's well-established practice of using surrogate value data covering the entire period of review).

EuroChem's reliance on *Mannesmann* is misplaced. In that case, the Court held that Commerce failed to provide a reasoned explanation for its decision to exclude foreign exchange gains from the denominator of a subsidy rate calculation. 23 CIT at 1064-65, 86 F. Supp. 2d at 1276-77. The Court then stated that "{d}epending on Commerce's remand results, it may also need to consider whether the denominator and numerator of its subsidy equation 'match.' In order for Commerce to calculate an accurate subsidy margin, the numerator and denominator must both take into account factors affecting value such as, in this case, inflation and foreign exchange movements." *Id.*, 23 CIT at 1065, 86 F. Supp. 2d at 1277. In this case, the numerator and denominator of Commerce's subsidy rate calculations do "match," because neither reflects the incidence of VAT – *i.e.,* as discussed above, the numerator reflects the subsidy benefit (not VAT), and the denominator reflects relevant sales, exclusive of VAT. Further, while neither the statute nor Commerce's regulations address how Commerce is to account for foreign exchange

differences in a subsidy rate calculation, Commerce's regulations expressly provide that

Commerce should normally calculate the denominator on an f.o.b. basis, *i.e.*, exclusive of taxes.

*See* 19 C.F.R. § 351.525(a). Thus, Commerce's treatment of VAT in EuroChem's subsidy rate

calculation was reasonable and in accordance with law.

### 2. Commerce properly applied its regulations governing attribution of domestic and tied subsidies

In addition to its arguments about VAT, EuroChem also argues that Commerce

"overstated the subsidy margin for the provision of natural gas at LTAR by failing to allocate the

natural gas benefit to all product {sic} that benefited from it based on their relative usage of

natural gas in production." EuroChem Br. at 25. EuroChem asserts that, regardless of

Commerce's practice in applying its attribution regulation, it "must yield to the overarching

purpose of the CVD statute and Commerce's statutory mandate to accurately determine

countervailable duty margins." *Id.* According to EuroChem, Commerce's allocation of the

subsidy across respondents' total sales is "only reasonable if the production of both subject and

non-subject fertilizers consume the same amount of natural gas," which EuroChem asserts is not

the case here. *Id.* at 26.

EuroChem's arguments ignore Commerce's regulation governing the attribution of

subsidies and the clear guidance of the *Preamble*. Section 351.525(b) of Commerce's

regulations provides that Commerce will attribute a domestic subsidy to all products sold by a

firm, including products that are exported, unless a subsidy is tied to the production of a

particular product, in which case Commerce will attribute the subsidy only to that product. *See*

19 C.F.R. § 351.525(b)(3), (5). The *Preamble* states that, in applying this provision, Commerce

will "analyze the purpose of the subsidy based on information available at the time of bestowal"

and not "trace the use of specific funds to determine whether such funds were used for their stated purpose, or the purpose that we evince from record evidence." *Preamble*, 63 Fed. Reg. at 65,403.

Commerce consistently applies its attribution regulation by evaluating whether a subsidy is tied to subject or non-subject merchandise *at the time of bestowal*, as the *Preamble* directs, and not based on how a respondent actually uses the subsidy. Contrary to EuroChem's argument, Commerce's attribution of the benefit conferred by the GOR's provision of natural gas for LTAR to the respondents' total sales was not based on a "false assumption concerning relative natural gas usage," *see* EuroChem Br. at 26, but rather on the absence of any evidence tying the subsidy at the time of bestowal to either subject or non-subject merchandise. Indeed, EuroChem cites to no such record evidence but merely complains that Commerce improperly rejected its untimely submission of new factual information on December 24, 2020, "concerning relative natural gas usage," *id.*, which is wholly irrelevant to Commerce's tying analysis. Further, given Commerce's consistent application of its attribution regulation and the clear guidance in the *Preamble*, EuroChem had sufficient notice and the opportunity to submit relevant information showing the subsidy was tied to subject or non-subject merchandise prior to Commerce's *Preliminary Determination* and failed to do so. Thus, there was nothing unlawful in Commerce's rejection of EuroChem's irrelevant and untimely submission, and EuroChem's citations to cases faulting Commerce for failing to properly instruct respondents are inapposite. *See id.* at 26 n.104 (citing *Usinor Sacilor v. United States*, 907 F. Supp. 426, 427 (CIT 1995); *Creswell Trading Co. v. United States*, 15 F.3d 1054 (Fed. Cir. 1994); *Nihon Cement v. United States*, 17 CIT 400, 410 (1993); *Daewoo Elec. Co. v. United States*, 13 CIT 253, 266 (1989)).

Finally, EuroChem cites the Federal Circuit's decision in *Kajaria Iron Castings Pvt. Ltd. v. United States*, 156 F.3d 1163, 1176 (Fed. Cir. 1998), to argue that Commerce erred in refusing to consider evidence of its relative usage of natural gas to produce subject and non-subject merchandise, *id.* at 27, but that case predates Commerce's promulgation of 19 C.F.R. § 351.525(b) and its interpretation of the regulation in the *Preamble*. Further, the Federal Circuit in *Kajaria* did not mandate that Commerce trace usage of a subsidy in every case; the court merely held that where a respondent submits evidence demonstrating that a portion of a subsidy is tied to non-subject merchandise, Commerce should not countervail that portion of the subsidy. *See id.* In the years since Commerce promulgated section 351.525 of its regulations, it has consistently limited its tying analysis under 19 C.F.R. § 351.525(b)(5) to evidence of whether a subsidy is tied *at the time of bestowal*, an interpretation that this Court has affirmed as reasonable and entitled to substantial deference. *See Samsung Elecs. Co. v. United States*, 973 F. Supp. 2d 1321, 1330 (CIT 2014).

As previously explained, EuroChem does not cite any record evidence showing that the GOR's provision of natural gas for LTAR is tied to subject or non-subject merchandise at the time of bestowal. Accordingly, Commerce's attribution of the subsidy to EuroChem and its affiliates' total sales, net of intra-company sales, pursuant to 19 C.F.R. § 351.525(b)(3) is supported by substantial evidence and otherwise in accordance with law.

### 3.   Commerce properly applied its regulation governing attribution of subsidies to corporations with cross-ownership

EuroChem's final challenge to Commerce's calculation is that Commerce allegedly "erred in constructing the sales denominator used to calculate subsidy margins for EuroChem" because Commerce "declined to use either EuroChem's consolidated financial statement (with

adjustments to arrive at net sale FOB values) or the combined sales from the undisputed ten cross-owned affiliates less intercompany sales as the sales denominator for the natural gas for LTAR program." EuroChem Br. at 27-28. EuroChem's arguments are unavailing and once again ignore the detailed regulatory framework that governs Commerce's attribution of subsidies.

As EuroChem acknowledges, Commerce's regulations provide that in general, "{Commerce} normally will attribute a subsidy to the products produced by the corporation that received the subsidy." 19 C.F.R. § 351.525(b)(6)(i). However, section 351.525(b)(6) of Commerce's regulations sets forth four specific exceptions to this general rule, two of which Commerce applied in calculating EuroChem's subsidy rate for the Provision of Natural Gas for LTAR Program. In particular, under 19 C.F.R. § 351.525(b)(6)(ii), if two (or more) corporations with cross-ownership produce subject merchandise, Commerce will attribute subsidies received by either or both corporations to the products produced by both corporations; and under 19 C.F.R. § 351.525(b)(6)(iv), if there is cross-ownership between an input supplier and a downstream producer, and production of the input product is primarily dedicated to production of the downstream product, Commerce will attribute subsidies received by the input producer to the combined sales of the input and downstream products produced by both corporations (excluding intra-company sales).

In this case, Phosphorite, which was a mandatory respondent, reported that its cross-owned affiliates, EuroChem-BMU, LLC ("BMU") and JSC Nevinnomyssky Azot ("Nevinka"), produce subject merchandise. *See* PDM at 5. Accordingly, pursuant to 19 C.F.R. § 351.525(b)(6)(ii), Commerce attributed subsidies received by any of these three companies to their combined sales, net of intercompany sales. *Id.* Thus, with respect to the Provision of

**BUSINESS PROPRIETARY**
**INFORMATION DELETED**

Consol. Court No. 21-00117                                                                    NON-CONFIDENTIAL VERSION

Natural Gas for LTAR Program, Commerce calculated the denominator for these three

companies as [                                                    ], which is the total of their combined sales, net of

intercompany sales. *See* EuroChem Final Calculations Mem., Attachment 2, Benefit Chart.

Phosphorite also reported that it received inputs from cross-owned affiliates to produce

subject merchandise, specifically NAK Azot, JSC ("NAK Azot"); EuroChem Northwest, JSC

("EuroChem Northwest"); EuroChem-Energo, LLC ("EuroChem Energo"); and EuroChem-

Usolsky Potash Complex, LLC ("EuroChem-UKK"). PDM at 6. Pursuant to 19 C.F.R. §

351.525(b)(6)(iv), Commerce attributed subsidies received by any of these companies to the

relevant company's total sales plus the combined total sales of the three subject merchandise

producers (Phosphorite, BMU, and Nevinka), net of intercompany sales. *Id.* For the Provision

of Natural Gas for LTAR Program, Commerce calculated denominators for each of these

companies as follows: [


]. *See* EuroChem Final Calculations Mem., Attachment 2, Benefit Chart.

Commerce's calculation of these denominators is wholly consistent with its attribution

regulation, 19 C.F.R. § 351.525(b)(6). EuroChem's arguments to the contrary are without merit.

First, EuroChem argues that "Commerce's stilted reasoning in the *Final Determination* avoided

the threshold issue; namely that its regulations require a subsidy to be allocated over

products/sales benefiting from the subsidy," citing 19 C.F.R. § 351.525(b)(6)(i). EuroChem Br.

at 28-29. Contrary to EuroChem's argument, 19 C.F.R. § 351.525(b)(6)(i) does not create a

"threshold issue" for Commerce to address. Rather, it establishes the rule that Commerce

"normally" will apply where none of the circumstances set forth in 19 C.F.R. § 351.525(b)(6)(ii)-

(iv) applies. *See* 19 C.F.R. § 351.525(b)(6)(i). In this case, however, some of those

circumstances did apply (as discussed above), and thus Commerce properly applied the more specific attribution rules for subsidies provided to multiple cross-owned affiliates producing subject merchandise (19 C.F.R. § 351.525(b)(6)(ii)) and cross-owned affiliates that are input suppliers (19 C.F.R. § 351.525(b)(6)(iv)).

Second, EuroChem proffers a hypothetical example – where "a company receives a subsidy of $10 per ton for a particular production input" and "half of the acquired input . . . is used in domestic production while the other half . . . is shipped to . . . third-country production facilities" and argues that "allocate{ing} the entire received input subsidy to just domestic production . . . would lead to an absurd result, artificially doubling the subsidy actually received on production domestically." *See* EuroChem Br. at 29. EuroChem fails to explain how this hypothetical is relevant to the facts of this case or why the purportedly "absurd result" it illustrates would be unlawful. EuroChem is essentially attacking the validity of Commerce's attribution regulation for subsidies to cross-owned input suppliers, *i.e.*, 19 C.F.R. § 351.525(b)(6)(iv), but it fails to identify any legal authority whatsoever in support of its argument, and the Court should reject it accordingly. Further, even assuming, *arguendo*, that Commerce were to disregard the attribution rule for subsidies to cross-owned input suppliers, EuroChem's proffered hypothetical would require reporting all subsidies received by all of its subsidiaries, which EuroChem did not do in this investigation.

Third, EuroChem criticizes Commerce's attribution regulation, 19 C.F.R. § 351.525(b)(6), for failing to define the terms "firm," "company," "producer," "production," and "corporation," and argues that Commerce's definition of such terms in antidumping proceedings (and its practice of treating the EuroChem Group as a single entity in antidumping proceedings) renders its application of the attribution regulation in this case unlawful. *Id.* at 29-30. Contrary

to EuroChem's assertion, there is nothing arbitrary or capricious in Commerce's application of

its attribution regulation, 19 C.F.R. § 351.525(b)(6), in this countervailing duty investigation

while simultaneously applying the collapsing doctrine to treat the EuroChem Group as a single

entity in antidumping duty proceedings. Countervailing duty and antidumping duty proceedings

are subject to different statutory and regulatory regimes. *See Zhaoqing New Zhongya Aluminum*

*Co. v. United States*, 70 F. Supp. 3d 1298, 1306-07 (CIT 2015); *Guangdong Wireking*, 37 CIT at

330 n.7, 900 F. Supp. 2d at 1374 n.7. These are not "similar situations" that could potentially

give rise to arbitrary agency action if treated differently without sufficient explanation. *See*

*Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996) (citing *Motor Vehicle*

*Mfrs. Ass'n, Inc. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 57 (1983)).

Fourth, EuroChem criticizes Commerce's "mere mechanical application" of its

attribution regulation that purportedly "achieves a result 'contrary to the underlying goal' of the

trade statutes – *i.e.*, 'calculating the most accurate margin possible.'" EuroChem Br. at 30. The

Federal Circuit has clarified that a Commerce determination is "accurate" if it is correct as a

mathematical and factual matter, and thus supported by substantial evidence. *See Nan Ya*

*Plastics Corp. v. United States*, 810 F.3d 1333, 1344 (Fed. Cir. 2016) (citing *Essar Steel*, 678

F.3d at 1275-76). EuroChem fails to identify any mathematical or factual flaw in Commerce's

application of the attribution regulation, 19 C.F.R. § 351.525(b)(6), or otherwise demonstrate

that Commerce's benefit calculation is not supported by substantial evidence. It would be

improper for the Court to assess whether Commerce's subsidy rate calculations are "accurate" in

some broader sense, based on EuroChem's assertions about the "reality" of its commercial

operations. *See id.* ("The court does not use 'accurate' and 'commercial reality' in some broader

sense, such as to require Commerce to apply the statutory methods to determine the industry-wide 'commercial realities prevailing' during a particular time period.").

Fifth, EuroChem asserts that Commerce's determination "is inconsistent with long-established and undisputed precedent where multiple legal entities are to be treated as a single entity when, in substance and reality, the entities operate as a single entity."  EuroChem Br. at 30.  The only case that EuroChem cites, *Ta Chen Stainless Steel Pipe, Ltd. v. United States*, 23 CIT 804 at *4 (1999), does not support its argument.  In that case, the Court affirmed Commerce's determination (based on facts available and adverse inferences) that a Taiwanese producer was affiliated with one of its U.S. distributors in an administrative review of the antidumping duty order on welded stainless steel pipe from Taiwan.  *Id.* at *2-3.  Commerce's analysis turned on the statutory definition of "affiliation" in 19 U.S.C. § 1677(33) and whether there was record evidence of one entity's control over the other's production, pricing, and cost decisions, *see id.* at *4, not whether "in substance and reality, the entities operate as a single entity."  *See id.*  Here, EuroChem does not challenge Commerce's determination that Phosphorite and its cross-owned companies are "affiliates" within the meaning of 19 U.S.C. § 1677(33).  Given that the affiliation of the EuroChem Group entities is not in dispute, *Ta Chen* is not instructive of how Commerce should apply its attribution regulation, 19 C.F.R. § 351.525(b)(6), to calculate EuroChem's subsidy rate.

Finally, EuroChem argues that Commerce's attribution analysis was "inconsistent with Commerce's practice that it attribute subsidies received by cross-owned entities to the consolidated sales of the combined entity," citing *Certain Cold-Rolled Steel Flat Products from Russia*, *Non-Oriented Electrical Steel from Taiwan*, *Ripe Olives from Spain*, and *Certain Seamless Carbon and Steel Standard, Line, and Pressure Pipes from China*.  EuroChem Br. at

30-31. According to EuroChem, it "operates as a single entity, such that Commerce, in view of past practices . . . erred in not using the single entity's adjusted consolidated sales or the combined cross-owned companies' sales as the denominator." *Id.* at 33 (citation omitted). Contrary to EuroChem's arguments, Commerce's determinations in the cited cases do not amount to an undifferentiated "practice" of treating cross-owned affiliates as a "single entity" and attributing subsidies to the consolidated sales of the combined entity.

Cold-Rolled Steel Flat Products from Russia, Non-Oriented Electrical Steel from Taiwan, and *Ripe Olives from Spain* involved mandatory respondents that were each a producer of subject merchandise as well as a parent company. *See Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products From the Russian Federation: Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination*, 81 Fed. Reg. 49,935 (Dep't Commerce July 29, 2016), and accompanying Issues and Decision Memorandum at 9-12; *Non-Oriented Electrical Steel From Taiwan: Final Affirmative Countervailing Duty Determination*, 79 Fed. Reg. 61,602 (Dep't Commerce Oct. 14, 2014), and accompanying Issues and Decision Memorandum at 7; *Ripe Olives From Spain: Final Affirmative Countervailing Duty Determination*, 83 Fed. Reg. 28,186 (Dep't Commerce June 18, 2018), and accompanying Issues and Decision Memorandum at 77; *Ripe Olives From Spain: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination With Final Antidumping Duty Determination*, 82 Fed. Reg. 56,218 (Dep't Commerce Nov. 28, 2017), and accompanying Decision Memorandum at 11. Accordingly, in those cases, Commerce correctly applied section 351.525(b)(6)(iii) of its attribution regulation to calculate the denominators as the total consolidated sales of the affiliated companies, net of intra-company sales. *See* 19 C.F.R. § 351.525(b)(6)(iii) (providing that if the firm that receives a subsidy is a parent or holding

company, Commerce will attribute the subsidy to the consolidated sales of the parent/holding company and its subsidiaries). In contrast, in this case, Phosphorite (the mandatory respondent) is not the parent or holding company of its cross-owned affiliates, and therefore 19 C.F.R. § 351.525(b)(6)(iii) does not apply.

The last case that EuroChem cites, *Seamless Pipe from the People's Republic of China*, involved five cross-owned affiliates of subject merchandise that had different intermediate owners under the same holding company. *Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the People's Republic of China: Final Affirmative Countervailing Duty Determination, Final Affirmative Critical Circumstances Determination*, 75 Fed. Reg. 57,444 (Dep't Commerce Sept. 21, 2010), and accompanying Issues and Decision Memorandum at 112. The issue Commerce faced in that case was whether subsidies to cross-owned affiliates that did not produce subject merchandise benefitted all five cross-owned subject merchandise producers. *See id.* Commerce found that, in attributing subsidies under provisions other than 19 U.S.C. § 351.525(b)(6)(ii), it was appropriate to include the sales of all five cross-owned subject merchandise producers. *Id.* at 112-13. Commerce followed the same approach in this case. Specifically, Commerce included the sales of all three cross-owned subject merchandise producers in attributing subsidies to cross-owned input suppliers under 19 U.S.C. § 351.525(b)(6)(iv). Thus, Commerce's determination in this case does not represent an unreasoned departure from prior practice and is therefore not arbitrary or capricious. *See Pakfood Pub. Co. v. United States*, 453 F. App'x 986, 989 (Fed. Cir. 2011) (citing *Consol. Bearings v. United States*, 412 F.3d 1266, 1269 (Fed. Cir. 2005)).

In sum, Commerce's application of its attribution regulation for cross-owned affiliates to calculate the denominators for the Provision of Natural Gas for LTAR Program is supported by substantial evidence and otherwise in accordance with law.

## VI.    CONCLUSION

For the reasons discussed above, Mosaic respectfully requests that this Court reject all arguments made by PhosAgro and EuroChem and accordingly deny their motions for judgment on the agency record.

Respectfully submitted,

/s/ Patrick J. McLain
David J. Ross
Patrick J. McLain
Stephanie E. Hartmann
Natan P.L. Tubman
Wilmer Cutler Pickering Hale and Dorr
LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363
Email: patrick.mclain@wilmerhale.com

*Counsel for The Mosaic Company*

Dated: March 16, 2022

## CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this Memorandum in Opposition to Consolidated Plaintiffs' Rule 65.2 Motions for Judgment on the Agency Record complies with the word limitation requirement. The word count for this submission, as computed by Wilmer Cutler Pickering Hale and Dorr LLP's word processing system, is 13,993 words.

/s/ Patrick J. McLain
(Signature of Attorney)

Patrick J. McLain
(Name of Attorney)

The Mosaic Company
(Representative Of)

March 16, 2022
(Date)