## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE
_____

| | |
|---|---|
| THE MOSAIC COMPANY, )| |
| )| |
| Plaintiff, )| |
| v. )| |
| )| |
| PHOSAGRO PJSC, JSC APATIT, )| |
| )| |
| Consolidated Plaintiffs, )| |
| )| |
| and )| |
| )| |
| INDUSTRIAL GROUP PHOSPHORITE LLC, )| |
| )| |
| Consolidated Plaintiffs and )| |
| Consolidated Plaintiffs-Intervenor, )| |
| )| |
| v. )| |
| )| |
| UNITED STATES, )| |
| )| Consol. Court No. 21-00117 |
| Defendant, )| **NON-CONFIDENTIAL** |
| )| **VERSION** |
| THE MOSAIC COMPANY, )| |
| )| |
| Consolidated Defendant, )| |
| v. )| |
| )| |
| PHOSAGRO PJSC, JSC APATIT, )| |
| INDUSTRIAL GROUP PHOSPHORITE LLC, )| |
| )| |
| Defendant-Intervenors. )| |
| _____) | |

## ORDER

Upon consideration of plaintiffs' motions for judgment on the agency record, defendant's and defendant-intervenors' responses thereto, plaintiffs' replies, the administrative record, and all other pertinent papers, it is hereby

ORDERED that plaintiffs' motions are DENIED; and it is further

ORDERED that the Department of Commerce's final determination is sustained; and it is further

ORDERED that judgment is entered in favor of the United States.

Dated: _____        _____

New York, New York                                    Judge

# TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 56.2 .................................................................2

    I.    Administrative Decision Under Review ................................................2

    II.   Issues Presented ............................................................................3

STATEMENT OF FACTS .....................................................................................3

    I.    Initiation Of Investigation ............................................................3

ARGUMENT .....................................................................................................5

    I.    Standard Of Review......................................................................5

    II.   Commerce Properly Determined That Rosneft Is A Government Authority That Provides A Financial Contribution .............................................6

        A.    Legal Framework ................................................................6

        B.    Background...........................................................................8

        C.    Commerce Properly Resorted To Facts Available After Russia Failed To Provide The *Input Producer Appendix* For Rosneft And Rosneftegaz..........10

        D.    Commerce Properly Applied Adverse Facts Available To Conclude That Rosneft Is A Government Authority .........................12

    III.  Commerce's *De Facto* Specificity Analysis For The Provision Of Natural Gas At Less Than Adequate Remuneration Is Supported By Substantial Evidence And In Accordance With Law ...........................................17

        A.    Legal Framework ...............................................................17

        B.    Background.........................................................................18

        C.    Commerce's Determination That The Provision Of Natural Gas By Gazprom And Rosneft Is *De Facto* Specific Is Supported By Substantial Evidence And In Accordance With Law.......................................20

IV.    Commerce Properly Conducted Its Benchmark Analysis For The Provision Of Natural Gas At Less Than Adequate Renumeration For EuroChem .........................23

    A.    Legal Framework ........................................................................................23

    B.    Background ..................................................................................................24

    C.    Commerce's Decision Not To Use A Tier One Benchmark, And Instead Use A Tier Three Benchmark Is Supported By Substantial Evidence And In Accordance With Law ..............................................................................26

        i.    Commerce Reasonably Concluded That There No Viable Tier-One Benchmarks Available ..........................................................26

        ii.    Commerce Reasonably Selected European OECD Export Prices From The International Energy Agency To Construct A Tier-Three Benchmark For Natural Gas ......................................................................31

        iii.    Commerce Reasonably Included The European Value Added Tax And Import Duties Because Doing So Ensures The Benchmark Prices Reflect What Phosagro And Eurochem Would Have Paid Had They Imported Natural Gas ......................................................................37

        iv.    Commerce's Determination That The Record Does Not Support Removing Sales Of Natural Gas From Russia In The European Union From Its Tier-Three Benchmark Analysis Is Supported By Substantial Evidence And In Accordance With Law ..................................................39

V.    Commerce Properly Divided The Value Added Tax -Inclusive Benefit By Value Added Tax -Exclusive Sales For The Subsidy Margin Of Natural Gas For Less Than Adequate Renumeration .............................................................................................42

VI.    Commerce Properly Excluded From The Subsidy Margin The Relative Consumption Of Natural Gas Used In The Production Of Phosphate Fertilizer .............................47

VII.    Commerce's Construction Of Eurochem's Sales Denominators Used To Calculate The *Ad Valorem* Subsidy Rate For The Provision Of Natural Gas For Less Than Adequate Renumeration Is Supported By Substantial Evidence And In Accordance With Law ...............................................................................................................51

VIII.    Commerce Properly Established A Cut-off Date And Reasonably Determined That Any Benefits Conferred Prior To The Cut-off Date Could Not Be Identified Or Measured ........................................................................................................59

IX.    Commerce Appropriately Excluded Freight, Import Duties, And Value Added Tax From Its Tier-Three Benchmark Analysis for Mining Rights at Less than Adequate Renumeration .......................................................................................................69

CONCLUSION ..............................................................................................................74

## TABLE OF AUTHORITIES

**Cases**                                                                                        **Page(s)**

*Alt. Sugar Ltd. v. United States,*
   744 F.2d 1556 (Fed. Cir. 1984)..................................................................... 5

*An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States,*
   287 F. Supp. 3d 1361 (Ct. Int'l Trade 2018) ........................................... 8

*Ansaldo Componenti, S.p.A. v. United States,*
   628 F. Supp. 198 (Ct. Int'l Trade 1986) ..................................................16

*ArcelorMittal USA LLC v. United States,*
   399 F. Supp. 3d 1271 (Ct. Int'l Trade 2019).....................................21, 22, 23, 50

*Bethlehem Steel Corp. v. United States,*
   140 F. Supp. 2d 1354 (Ct. Int'l Trade 2001) ........................................22

*Bio-Lab, Inc. v. United States,*
   435 F. Supp. 3d 1361 ..........................................................................15

*Borden, Inc. v. United States,*
   4 F. Supp. 2d 1221 (Fed. Cir. 1998)...................................................13

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States,*
   61 F. Supp. 3d 1306 (Ct. Int'l Trade 2015)..........................................22

*Canadian Solar Inc. v. United States,*
   537 F. Supp. 3d 1380 (Ct. Int'l Trade 2021) .......................................32

*Ceramica Regiomontana, S.A. v. United States,*
   636 F. Supp. 961 (Ct. Int'l Trade 1986) ...............................................44

*Ceramica Regiomontana, S.A. v. United States,*
   810 F.2d 1137 (Fed. Cir. 1987)...........................................................44

*Changzhou Trina Solar Energy Co. v. United States,*
   352 F. Supp. 3d 1316 (Ct. Int'l Trade 2018) .......................................36

*Changzhou Trina Solar Energy Co. v. United States,*
   466 F. Supp. 3d 1287 (Ct. Int'l Trade 2020) .......................................28

*Clearon Corp. v. United States,*
   359 F. Supp. 3d 1344 (Ct. Int'l Trade 2019)................................13, 14

*Cleo Inc. v. United States,*
   501 F.3d 1291 (Fed. Cir. 2007) .......................................................... 6

*Consol. Edison Co. v. NLRB,*
   305 U.S. 197 (1938) ........................................................................... 5

*Consolo v. Fed. Mar. Comm'n,*
   383 U.S. 607 (1966) ........................................................................... 5

*Daewoo Elecs. Co. v. Int'l Union of Elec., Elec., Technical, Salaried & Mach. Workers, AFL–CIO,*
   6 F.3d 1511 (Fed. Cir. 1993) ............................................................40

*Deacero S.A.P.I. de C.V. v. United States,*
   996 F.3d 1283 (Fed. Cir. 2021) .......................................................... 7

*Essar Steel Ltd. v. United States,*
   721 F. Supp. 2d 1285 (Ct. Int'l Trade 2010) ..............................passim

*Essar Steel Ltd. v. United States,*
   678 F.3d 1268 (Fed. Cir. 2012) ..........................................7, 23, 50, 54

*Fabrique De Fer De Charleroi v. United States,*
   166 F. Supp. 2d 593 (Ct. Int'l Trade 2001) .....................................49

*Fine Furniture (Shanghai) Ltd. v. United States,*
   748 F.3d 1365 (Fed. Cir. 2014) ...................................................passim

*Fujitsu Gen. Ltd. v. United States,*
   88 F.3d 1034 (Fed. Cir. 1996) ............................................ 5, 6, 44, 59

*Goldlink Indus. Co. v. United States,*
   431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) .................................... 6

*GPX Int'l Tire Corp. v. United States,*
   645 F. Supp. 2d 1231 (Ct. Int'l Trade 2009) .............................62, 64

*Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi A.S. v. United States,*
   536 F. Supp. 3d 1333 (Ct. Int'l Trade 2021) .......................35, 36, 37, 39

*Habaş Sinai Ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States,*
   459 F. Supp. 3d 1341 (Ct. Int'l Trade 2020) ...................................36

*Habaş Sinai Ve Tibbi Gazlar Istihsal Endüstrisi A.Ş. v. United States,*
   413 F. Supp. 3d 1347 (Ct. Int'l Trade 2019) .................................... 8

*Hercules, Inc. v. United States,*
  673 F. Supp. 454 (1987) ..........................................................................................12

*Heze Huayi Chem. Co. v. United* States,
  532 F. Supp. 3d 1301 (Ct. Int'l Trade 2021) ........................................................33

*Içdaş Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States,*
  498 F. Supp. 3d 1345 (Ct. Int'l Trade 2021) ............................................... 47, 49, 51

*Jacobi Carbons AB v. United States,*
  422 F. Supp. 3d 1318 (Ct. Int'l Trade 2019) ........................................................30

*Jiaxing Bro. Fastener Co. v. United States,*
  822 F.3d 1289 (Fed. Cir. 2016) ..............................................................................46

*Kajaria Iron Castings Pvt. Ltd. v. United States,*
  156 F.3d 1163 (Fed. Cir. 1998) ........................................................................50, 51

*MacLean-Fogg Co. v. United States,*
  100 F. Supp. 3d 1349 (Ct. Int'l Trade 2015) ........................................................54

*Mannesmann -Sumerbank Boru Endustrisi T.A.S. v. United States,*
  86 F. Supp. 2d 1266 (Ct. Int'l Trade 1999) ..........................................................45

*Mannesmannrohren-Werke AG & Mannesmann Pipe & Steel Corp. v. United States,*
  77 F. Supp. 2d 1302 (Ct. Int'l Trade 1999) ..........................................................13

*Matsushita Elec. Indus. Co., Ltd. v. United States,*
  750 F. 2d 927 (Fed. Cir. 1984) ..............................................................................36

*Maverick Tube Corp. v. United States,*
  107 F. Supp. 3d 1318 (Ct. Int'l Trade 2015) ........................................................50

*Maverick Tube v. United States,*
  857 F.3d 1353 (Fed. Cir. 2017) .......................................................................27, 28

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ..................................................................................................62

*MTZ Polyfilms, Ltd. v. United States,*
  659 F. Supp. 2d 1303 (Ct. Int'l Trade 2009) ........................................................49

*Mueller Comercial de Mexico, S. de R.L. de C.V. v. United States,*
  753 F.3d 1227 (Fed. Cir. 2014) ............................................................................. 8

*Nippon Steel Corp. v. United States*,
 301 F. Supp. 2d 1355 (Fed. Cir. 2003) ...............................................................32

*Nippon Steel Corp. v. United States*,
 337 F.3d 1373 (Fed. Cir. 2003).......................................................................... 7

*Nippon Steel Corp. v. United States*,
 458 F.3d 1345 (Fed. Cir. 2006)......................................................................5, 12

*Nucor Corp. v. United States*,
 286 F. Supp. 3d 1364 (Ct. Int'l Trade 2018) ...............................................36, 44

*POSCO v. United States*,
 296 F. Supp. 3d 1320 (Ct. Int'l Trade 2018) ......................................................36

*Qingdao Sea-Line Trading Co. v. United States*,
 766 F.3d 1378 (Fed. Cir. 2014)............................................................. 39, 46, 57

*QVD Food Co. v. United States*,
 658 F.3d 1318 (Fed. Cir. 2011).....................................................................6, 39

*Reiner Brach GmbH & Co. v. United States*,
 206 F. Supp. 2d 1323, (Ct. Int'l Trade 2002) .....................................................50

*Royal Thai Gov't v. United States*,
 850 F. Supp. 44 (Ct. Int'l Trade 1994) ...............................................................33

*Timken Co. v. United States*,
 699 F. Supp. 300 (Ct. Int'l Trade 1988) .........................................................6, 36

*Timken Co. v. United States*,
 788 F. Supp. 1216 (Ct. Int'l Trade 1992)............................................................32

*TMK IPSCO v. United States*,
 179 F. Supp. 3d 1328 (Ct. Int'l Trade 2016) .................................................62, 63

*TMK IPSCO v. United States*,
 222 F. Supp. 3d 1306 (Ct. Int'l Trade 2017) ...............................................passim

*United States v. Eurodif S.A.*,
 555 U.S. 305 (2009) ........................................................................................... 6

*Universal Camera Corp. v. NLRB*,
 340 U.S. 474 (1951) ........................................................................................... 5

*Yama Ribbons & Bows Co., Ltd. v. United States,*
    865 F. Supp. 2d 1294 (Ct. Int'l Trade 2012) ...................................... 54, 56, 57

*Yantai Timken Co. v. United States,*
    521 F. Supp. 2d 1356 (Ct. Int'l Trade 2007) ...................................... 50

*Yantai Timken Co. v. United States,*
    300 F. App'x 934 (Fed. Cir. 2008) ...................................... 50

*Zhejiang DunAn Hetian Metal Co. v. United States,*
    652 F.3d 1333 (Fed. Cir. 2011) ...................................... 36

**Statutes**

9 U.S.C. § 1677 ...................................... passim

19 U.S.C. § 1671(a)(1)-(2) ...................................... 49

19 U.S.C. § 1671(f)(1) ...................................... 61, 62

19 U.S.C. § 1671(f)(2) ...................................... 61, 62

19 U.S.C. § 1677(5)(B)(i) ...................................... 23

19 U.S.C. § 1677(5)(D)(iii) ...................................... 10

19 U.S.C. § 1677(5)(D)(iv) ...................................... 23

19 U.S.C. § 1677(5)(E)(iv) ...................................... 23

19 U.S.C. § 1677(5A)(D)(i) ...................................... 17

19 U.S.C. § 1677e ...................................... 11

19 U.S.C. § 1677e(a) ...................................... 6

19 U.S.C. § 1677e(b) ...................................... 7, 17

19 U.S.C.S. § 1677(9)(B) ...................................... 15

**Regulations**

19 C.F.R. § 351.224(f) ...................................... 42

19 C.F.R. § 351.302(d) ...................................... 42, 50

19 C.F.R. § 351.308 ...................................... 6, 7

19 C.F.R. § 351.401(b)(1) ..................................................................................57

19 C.F.R. § 351.511(a)(2)(iv)................................................................... 70, 71, 72

19 C.F.R. § 351.525.............................................................................passim

**Administrative Determinations**

*Certain Cold-Rolled Steel Flat Products from the Russian Federation,*
    81 Fed. Reg. 12,072, (Dep't of Commerce March 8, 2016). ...........................56, 60

*Certain Hot-Rolled Carbon Steel Flat Products From India,*
    73 Fed. Reg. 40,295 (Dep't Commerce July 14, 2008).........................................65

*Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the People's Republic of China,*
    75 Fed. Reg. 57,444 (Dep't of Commerce September 21, 2010)............................56

*Certain Softwood Lumber Products from Canada,*
    67 Fed. Reg. 15,545 (Dep't of Commerce April 2, 2002).....................................28

*Certain Stainless Steel Wire Rod From Italy,*
    63 Fed. Reg. 40,474, 40,486 (Dep't Commerce July 29, 1998). ...........................67

*Certain Steel Wire Garment Hangers From the Socialist Republic of Vietnam,*
    77 Fed. Reg. 75,973 (Dep't Commerce Dec. 26, 2012). .......................................67

*Certain Uncoated Paper from Indonesia: Final Affirmative Countervailing Duty Determination,*
    81 Fed. Reg. 3,104, (Dep't of Commerce January 20, 2016)…………………………………34

*Coated Free Sheet Paper from the People's Republic of China: Final Affirmative Countervailing Duty Determination,*
    72 Fed. Reg. 60,645 (Dep't of Commerce Oct. 25, 2007). ...................................48

*Coated Free Sheet Paper from Indonesia,*
72 Fed. Reg. 60,642 (Dep't of Commerce October 25, 2007) ...................................72

*Countervailing Duties,*
    63 Fed. Reg. 65,348, 65,378 (Dep't of Commerce Nov. 25, 1998) .......................24

*Decision Memorandum for the Affirmative Preliminary Determination of the CVD Investigation of Phosphate Fertilizers from the Russian Federation,*
    85 Fed. Reg. 76,524 (Dep't of Commerce Nov. 23, 2020). ................................... 4

*Granular Polytetrafluoroethylene Resin From the Russian Federation: Final*

*Affirmative Countervailing Duty Determination*,
   87 Fed. Reg. 3,764 (Dep't of Commerce Jan. 25, 2022)..................................................46, 73

*Industrial Phosphoric Acid from Israel:  Final Results of Countervailing Duty*,
   63 Fed. Reg. 13,628-30 (Dep't of Commerce March 20, 1998). ...........................................48

*Phosphate Fertilizers From the Kingdom of Morocco and the Russian Federation:
Countervailing Duty Orders*,
   86 Fed. Reg. 18,037 (Dep't of Commerce Apr. 7, 2021). .....................................................2, 4

*Phosphate Fertilizers from the Russian Federation: Final Affirmative Countervailing Duty
   Determination*,
86 Fed. Reg. 9,479 (Dep't of Commerce Feb. 16, 2021)........................................................... 2

*Phosphate Fertilizers From the Kingdom of Morocco:  Final Affirmative Countervailing Duty
Determination*,
   86 Fed. 9,482 (Dep't Commerce Feb. 16, 2021). ..................................................................65

*Phosphate Fertilizers from the Kingdom of Morocco and the Russian Federation:  Initiation of
Countervailing Duty Investigations*,
   85 Fed. Reg. 44,505 (Dep't of Commerce July 23, 2020).....................................................2, 4

*Polyethylene Retail Carrier Bags from the Socialist Republic of Vietnam*,
   75 Fed. Reg. 16,428 (Dep't of Commerce Apr. 1, 2010). ......................................................68

*Silicon Metal From Australia*,
   83 Fed. Reg. 9,834 (Dep't Commerce Mar. 8, 2018) ............................................................73

*Steel Concrete Reinforcing Bar from the Republic of Turkey*,
   84 Fed. Reg. 48,583 (Dep't of Commerce September 16, 2019)............................................37

*Steel Concrete Reinforcing Bar from the Republic of Turkey*,
   85 Fed. Reg, 16,056 (Dep't of Commerce March 20, 2020). ...........................................32, 40

*Supercalendered Paper From Canada*,
   80 Fed. Reg. 63,535 (Dep't of Commerce Oct. 20, 2015) .....................................................35

# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE JANE A. RESTANI, JUDGE

_____

| | |
|---|---|
| THE MOSAIC COMPANY, | ) |
| | ) |
|       Plaintiff, | ) |
|   v. | ) |
| | ) |
| PHOSAGRO PJSC, JSC APATIT, | ) |
| | ) |
|       Consolidated Plaintiffs, | ) |
| | ) |
|   and | ) |
| | ) |
| INDUSTRIAL GROUP PHOSPHORITE LLC, | ) |
| | ) |
|       Consolidated Plaintiffs and | ) |
|       Consolidated Plaintiffs-Intervenor, | ) |
| | ) |
|   v. | ) |
| | ) |
| UNITED STATES, | ) |
| | )      Consol. Court No. 21-00117 |
|       Defendant, | )      **NON-CONFIDENTIAL** |
| | )      **VERSION** |
| THE MOSAIC COMPANY, | ) |
| | )      Business Proprietary Information |
|       Consolidated Defendant, | )      Deleted from Pages 14, 16, 27, 68 |
|   v. | ) |
| | ) |
| PHOSAGRO PJSC, JSC APATIT, | ) |
| INDUSTRIAL GROUP PHOSPHORITE LLC, | ) |
| | ) |
|       Defendant-Intervenors. | ) |

_____)

## DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTIONS FOR JUDGMENT UPON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade, defendant, the United States, respectfully submits this response to the motions for judgment on the agency record filed by plaintiff The Mosaic Company (Mosaic), and plaintiff-intervenors

PhosAgro PJSC, JSC Apatit (PhosAgro) and Industrial Group Phosphorite LLC (EuroChem). Mosaic, PhosAgro, and EuroChem challenge several aspects of the United States Department of Commerce's (Commerce) final determination in the investigation of the countervailing duty order on phosphate fertilizer from Russia. As explained below, the motions should be denied because Commerce's determination is supported by substantial evidence and is otherwise in accordance with law.

**STATEMENT PURSUANT TO RULE 56.2**

I.     **Administrative Decision Under Review**

The final administrative determination under review is *Phosphate Fertilizers from the Russian Federation: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9,479 (Dep't of Commerce Feb. 16, 2021 (Final Determination) (P.R. 418)[1] and accompanying Issues and Decision Memorandum (IDM) (P.R. 405). Commerce published the initial notice for this investigation on July 23, 2020. *See Phosphate Fertilizers from the Kingdom of Morocco and the Russian Federation: Initiation of Countervailing Duty Investigations,* 85 Fed. Reg. 44,505 (Dep't of Commerce July 23, 2020) (P.R. 49). The countervailing duty order on phosphate fertilizers from the Russian Federation was published in the Federal Register on April 7, 2021. *Phosphate Fertilizers From the Kingdom of Morocco and the Russian Federation: Countervailing Duty Orders*, 86 Fed. Reg. 18,037 (Dep't of Commerce Apr. 7, 2021) (Order) (P.R. 425). The period of investigation (POI) is January 1, 2019, through December 31, 2019.

---

[1] "P.R." and "C.R." refer to documents in the public and confidential records, respectively.

## II.     Issues Presented

1.     Whether Commerce properly determined that PSJC Rosneft Oil Company (Rosneft) is a government authority that provides a financial contribution.

2.     Whether Commerce's *de facto* specificity analysis for the provision of natural gas at less than adequate remuneration is supported by substantial evidence and in accordance with law.

3.     Whether Commerce properly conducted its benchmark analysis for the provision of natural gas at less than adequate renumeration.

4.     Whether Commerce properly calculated the subsidy margin for the provision of natural gas for less than adequate renumeration.

5.     Whether Commerce properly determined the subsidy margin of natural gas at less than adequate renumeration by allocating the natural gas benefit to all products that benefited from it.

6.     Whether Commerce properly constructed EuroChem's sales denominator when calculating the *ad valorem* subsidy rate provision.

7.     Whether Commerce's determination not to countervail the phosphate mining rights subsidies is supported by substantial evidence and is in accordance with law.

8.     Whether Commerce properly did not adjust the world market benchmark prices for phosphate rock to include freight, customs duties, and value added tax.

## STATEMENT OF FACTS

## I.     Initiation Of The Investigation

On June 26, 2020, Commerce received a countervailing duty (CVD) petition concerning imports of phosphate fertilizers from Russia. *See* Petitioner's Letter, "Petitions for the

Imposition of Countervailing Duties: Phosphate Fertilizers from Morocco and Russia," dated June 26, 2020 (C.R. 1-8) (P.R. 1-8). On July 23, 2020, Commerce published the initiation of a countervailing duty investigation on phosphate fertilizers from Russia. *See Phosphate Fertilizers from the Kingdom of Morocco and the Russian Federation: Initiation of Countervailing Duty Investigations,* 85 Fed. Reg. 44,505 (Dep't of Commerce July 23, 2020) (P.R. 49). On August 4, 2020, Commerce selected Industrial Group Phosphorite LLC (Phosphorite) (part of EuroChem Group (EuroChem)) and Joint Stock Company Apatit (JSC Apatit) (part of PhosAgro PJSC (PhosAgro)) as the mandatory respondents in the investigation. *See* Memorandum, "Countervailing Duty Investigation of Phosphate Fertilizers from Russia: Respondent Selection," dated August 4, 2020 (C.R. 23) (P.R. 55).

On November 30, 2020, Commerce published its preliminary determination. *See Decision Memorandum for the Affirmative Preliminary Determination of the CVD Investigation of Phosphate Fertilizers from the Russian Federation,* 85 Fed. Reg. 76,524 (Dep't of Commerce Nov. 23, 2020) (PDM) (P.R. 308). On December 21, 2020, Commerce released a post-preliminary determination. *See* Memorandum, "Decision Memorandum for the Post-Preliminary Analysis of Countervailing Duty Investigation of Phosphate Fertilizers from the Russian Federation," dated December 21, 2020 (Post-Preliminary Determination) (P.R. 344). On February 8, 2021, Commerce published its final determination. *See generally* IDM. On April 7, 2021, Commerce published a countervailing duty order on phosphate fertilizers from Russia following its affirmative countervailing duty determination and an affirmative injury determination by the U.S. International Trade Commission. *Phosphate Fertilizers From the Kingdom of Morocco and the Russian Federation: Countervailing Duty Orders,* 86 Fed. Reg. 18,037 (Dep't of Commerce Apr. 7, 2021) (Order) (P.R. 425).

Facts specific to each issue are presented below.

## ARGUMENT

## I. Standard Of Review

In reviewing Commerce's countervailing duty determinations, "the Court of International Trade must sustain 'any determination, finding or conclusion' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (*Fujitsu*) (quoting 19 U.S.C. § 1516a(b)(1)(B)). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence may be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions from the record does not render Commerce's findings unsupported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

A party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (*Nippon 2006*) (citation and internal quotation marks omitted), and the Court sustains Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even if some evidence detracts from the agency's conclusions, *Alt. Sugar Ltd. v. United States*, 744 F.2d 1556, 1562-63 (Fed. Cir. 1984) (citation omitted).

Moreover, this Court affords Commerce "tremendous deference" that is "both greater than and distinct from that accorded the agency in interpreting the statutes it administers" when Commerce exercises its technical expertise to select and apply methodologies to implement the

dictates of the trade statute. *Fujitsu*, 88 F.3d at 1039 ("Antidumping and countervailing duty determinations involve complex economic and accounting decisions of a technical nature, for which agencies possess far greater expertise than courts."); *see also United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009) (explaining the scope of Commerce's discretion under the antidumping statute). The Court may not overturn an agency determination "simply because the reviewing court would have reached a different conclusion based on the same record," *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007), and the Court will not substitute its judgment for that of Commerce in choosing between two fairly conflicting views, even though it could justifiably have made a different choice had the matter been before it *de novo*. *See Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006); *Timken Co. v. United States*, 699 F. Supp. 300, 306 (Ct. Int'l Trade 1988) (*Timken Co.*) (explaining that the Court will not "weigh the adequate quality or quantity of the evidence for sufficiency").

## II. Commerce Properly Determined That Rosneft Is A Government Authority That Provides A Financial Contribution

### A. Legal Framework

In countervailing duty investigations, "the burden of creating an adequate record lies with interested parties." *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) (*QVD*) (internal quotation marks, alterations, and citation omitted). If Commerce determines that "necessary information is not available on the record" or "an interested party or any other person . . . withholds information that has been requested by {Commerce}," "fails to provide such information by the deadlines . . . or in the form and manner requested," "significantly impedes a proceeding," or "provides such information but the information cannot be verified," then Commerce is permitted to use "facts otherwise available" in making its determinations. 19 U.S.C. § 1677e(a); *see also* 19 C.F.R. § 351.308 (providing for "{d}eterminations on the basis of

the facts available"). Commerce uses "facts otherwise available" to "fill in . . . gaps" in the administrative record. *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1381 (Fed. Cir. 2003) (*Nippon 2003*).

"Further, if an interested party 'fail{s} to cooperate by not acting to the best of its ability to comply with a request for information,' then Commerce 'may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available,' commonly referred to as {adverse facts available}." *Deacero S.A.P.I. de C.V. v. United States*, 996 F.3d 1283, 1295–96 (Fed. Cir. 2021) (alterations in original) (quoting 19 U.S.C. § 1677e(b)); *see* 19 C.F.R. § 351.308 (similar). "Because Commerce has no subpoena power, {adverse facts available} is an essential investigative tool . . . ." *Id.* (internal citations and quotation marks omitted). To avoid adverse facts available, "interested parties" must "cooperate . . . to the best of {their} ability," 19 U.S.C. § 1677e(b), meaning they must "do the maximum {they are} able to do," *Nippon 2003*, 337 F.3d at 1382. This standard "does not require perfection and recognizes that mistakes sometimes occur," but "it does not condone inattentiveness, carelessness, or inadequate record keeping." *Id.*; *see also id.* at 1383 (explaining that, "{w}hile intentional conduct, such as deliberate concealment or inaccurate reporting," may show "a failure to cooperate, the statute does not contain an intent element").

In countervailing duty proceedings, Commerce requires information from both the foreign government in question and the foreign producers or exporters. "Typically, foreign governments are in the best position to provide information regarding the administration of their alleged subsidy programs, including eligible recipients." *Essar Steel Ltd. v. United States*, 721 F. Supp. 2d 1285, 1297 (Ct. Int'l Trade 2010), *aff'd in part, rev'd in part on other grounds*, 678 F.3d 1268 (Fed. Cir. 2012). Commerce may use an adverse inference, even if doing so may

"have collateral consequences for a cooperating party." *An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 287 F. Supp. 3d 1361, 1373 (Ct. Int'l Trade 2018) (citing *Mueller Comercial de Mexico, S. de R.L. de C.V. v. United States*, 753 F.3d 1227, 1236 (Fed. Cir. 2014)). "Cooperating respondents may be subject to collateral effects due to the adverse inferences applied when a government fails to respond to Commerce's questions," but "this result is not contrary to the statute or its purposes, nor is it inconsistent with this court's precedent." *Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1373 (Fed. Cir. 2014); *Habaş Sinai Ve Tibbi Gazlar Istihsal Endüstrisi A.Ş. v. United States*, 413 F. Supp. 3d 1347, 1353 (Ct. Int'l Trade 2019); *see Canadian Solar, Inc. v. United States*, No. 2021-1434, 9 (Fed. Cir. Jan. 28, 2022).

### B. <u>Background</u>

Commerce issued its initial questionnaire and requested that the government of Russia provide an *Input Producer Appendix* for any company or enterprise that is wholly or partially owned by the government of Russia, whether directly or indirectly. IDM at 6; *see* Commerce's Letter, "Countervailing Duty Investigation of Phosphate Fertilizers from the Russian Federation: Countervailing Duty Questionnaire," dated August 4, 2020 (Initial Questionnaire) at Section II at 16 (P.R.56). Commerce explained the importance of the *Input Producer Appendix* to the government of Russia, including how it would permit Commerce to understand the corporate structures of state invested enterprises. *Id.* Further, Commerce stated that "{i}t is the Government of Russia's responsibility to ensure that the respondent companies provide the identities of their producers in sufficient time to enable the Government of Russia to include the information requested in this questionnaire in the initial response." *Id.*

In its initial questionnaire response, Russia provided an *Input Producer Appendix* for Gazprom and PJSC Novatek. IDM at 6; *see also* Government of Russia's Letter, "Phosphate Fertilizers from the Russian Federation: Questionnaire Response of the Ministry of Economic Development of the Russian Federation," September 24, 2020 (Government of Russia Questionnaire Response) at 41 (C.R. 305) (P.R.131). However, EuroChem reported that cross-owned affiliate NAK Azot purchased natural gas from Rosneft and that Rosneft's "main shareholder is Rosneftegaz JSC, which is 100 percent owned by the state." IDM at 6; EuroChem's Letter, "Phosphate Fertilizers from the Russian Federation," dated October 23, 2020 (EuroChem First Supplemental Response) at 13 and Exhibit SQ-16.2 (C.R. 437, 440) (P.R. 225, 230).

Commerce then requested that Russia provide the *Input Producer Appendix* for Rosneft and Rosneftegaz JSC as well. IDM at 6; *see* Commerce's Letter, "Countervailing Duty Investigation of Phosphate Fertilizers from the Russian Federation: 2nd Section II Supplemental Questionnaire," dated November 3, 2020 (P.R. 282) (Commerce Second Input Producer Request). Russia declined to provide the requested appendix, stating, "neither PJSC Rosneft nor JSC Rosneftegaz are a vested government entity or authority in the natural gas market in Russia". IDM at 6; *see* Government of Russia's Letter, "Phosphate Fertilizers from the Russian Federation: Second Supplemental Questionnaire Response," dated November 12, 2020 (Government of Russia 2nd Supplemental Response) at 1 (C.R. 481) (P.R.300). Thus, in the preliminary determination, Commerce found conflicting evidence on the record concerning the government of Russia's authority over Rosneft, and preliminarily determined that it did not have sufficient evidence to determine whether the company is an authority. PDM at 9; IDM at 6.

Following the preliminary determination, Commerce again requested the *Input Producer Appendix* for Rosneft and Rosneftegaz JSC but Russia did not submit the requisite information. IDM at 7; *see* Commerce's Letter, "Countervailing Duty Investigation of Phosphate Fertilizers from the Russian Federation: Section II Second Supplemental Questionnaire," dated November 25, 2020 (C.R. 489) (P.R. 317) (Commerce Third Input Producer Request); *see also* Government of Russia Letter, "Phosphate Fertilizers from the Russian Federation: Third Supplemental Questionnaire Response," dated December 7, 2020 (Government of Russia Post-Prelim Response) at 6 (C.R. 502) (P.R.331). After not receiving the *Input Producer Appendix*, Commerce concluded that necessary information was missing from the record to clarify Rosneft's authority, and that Russia failed to cooperate in refusing to provide the requested information. IDM at 7. As such, Commerce relied on "facts available." *Id.* at 36. Further, because the government of Russia failed to provide necessary information, Commerce found that an adverse inference was warranted. *Id.* at 36. Consequently, Commerce determined that Rosneft is an authority, and the natural gas sold by Rosneft to the respondents constituted a financial contribution. *See* 19 U.S.C. § 1677(5)(D)(iii).

## C. Commerce Properly Resorted To Facts Available After Russia Failed To Provide The *Input Producer Appendix* For Rosneft And Rosneftegaz

Commerce first requested that the government of Russia provide an *Input Producer Appendix* for any company or enterprise that is wholly or partially owned by the government, whether directly or indirectly, and the government provided an *Input Producer Appendix* concerning only Gazprom and PJSC Novatek. IDM at 6; Initial Questionnaire at Section II, p.16; *see* Government of Russia Questionnaire Response at 41. Later, EuroChem reported that "its cross-owned affiliate NAK Azot purchased natural gas from Rosneft" and stated that Rosneft's "main shareholder is Rosneftegaz SC, which is 100 percent owned by the state." IDM

at 6; *see* EuroChem First Supplemental Response at 13 and Exhibit SQ-16.2. Commerce asked the government of Russia to provide an *Input Producer Appendix* for Rosneft and Rosneftegaz JSC; although the government stated that neither were a vested government entity or authority, it failed to provide the requested *Input Producer Appendix*. IDM at 6; *see* Government of Russia's Letter, "Phosphate Fertilizers from the Russian Federation: Second Supplemental Questionnaire Response," dated November 12, 2020 at 1 (Government of Russia 2nd Supplemental Response) (C.R. 481) (P.R.300). Consequently, Commerce has conflicting record evidence that Rosneft and Rosneftegaz are state-owned authorities that supplied natural gas to NAK Azot, EuroChem's cross-owned affiliate. The government of Russia provided an *Input Producer Appendix* for Gazprom and Novatek but failed to furnish Commerce with the same for Rosneft and Rosneftegaz. PDM at 14. As a result of its failure to provide the *Input Producer Appendix* for Rosneft and Rosneftegaz, there is a gap in the record. Thus, Commerce resorted to facts available as a gap filling exercise. 19 U.S.C. § 1677e.

EuroChem contends that Commerce cannot apply facts available because there is no record gap. EuroChem Br. at 3-4. EuroChem asserts that other record information provides sufficient evidence about Rosneft's ownership and operations that would absolve Rosneft from being designated as an authority. *Id*. at 4. Specifically, EuroChem cites to the Third Supplemental Response from the government of Russia as evidence that Rosneft and Rosneftegaz are not government authorities. *See id*. at 4 However, this evidence directly conflicts with record information that Rosneft's "main shareholder is Rosneftegaz JSC, which is 100 percent owned by the state." IDM at 6; EuroChem's Letter, "Phosphate Fertilizers from the Russian Federation," dated October 23, 2020 (EuroChem Supplemental Response) at 13 and Exhibit SQ-16.2. Commerce never received the *Input Producer Appendix* from the government

of Russia that may have provided information as to the ownership and status of Rosneft and Rosneftegaz.

When there is conflicting evidence, the Court will not disturb Commerce's determination because "it is unquestionably the role of the expert factfinder . . . to decide which side's evidence to believe." *Ta Chen Stainless Steel Pipe Co. v. United States*, Consol. Ct. No. 05-00094, Slip Op. 2007-87, at 45 (Ct. Int'l Trade May 30, 2007) (citing *Nippon 2006*, 458 F.3d at 1359; *see also Hercules, Inc. v. United States*, 673 F. Supp. 454, 466 (Ct. Int'l Trade 1987) (explaining that "{c}learly, it is within Commerce's discretion to make reasonable interpretations of the evidence and to determine [its] overall significance") (internal quotation omitted)). Thus "{w}here Commerce has conflicting evidence on the record and substantial evidence exists on both sides of an issue, the standard compels deference to Commerce, provided Commerce has reasonably explained its determination." *Catfish Farmers of Am. v. United States*, Consol. Ct. No. 12-00087, Slip Op. 16-29, at 8 (Ct. Int'l Trade Mar. 30, 2016). In the absence of the requested information, Commerce was left with a gap in the record and reasonably relied on facts available.

### D. Commerce Properly Applied Adverse Facts Available To Conclude That Rosneft Is A Government Authority

Commerce's use of an adverse inference in selecting from among the facts available to find that Rosneft is a government authority is supported by substantial evidence and otherwise in accordance with law. Commerce reasonably determined that, without the requested *Input Producer Appendix* for Rosneft and Rosneftegaz, necessary information was missing from the record to adequately clarify and support the government of Russia's statement that "neither PJSC Rosneft nor JSC Rosneftegaz are {a} vested government entity or authority in the natural gas market in Russia." IDM at 36; *see* Government of Russia 2nd Supplemental Response at 1.

Commerce determined that the government of Russia's failure to provide the requested necessary information concerning Rosneft's status as an authority was the government of Russia's responsibility, as only Russia possessed that information. IDM at 37. Without the requested *Input Producer Appendix*, Commerce determined that the government of Russia failed to provide necessary information and to cooperate to the best of its ability, thereby justifying application of an adverse inference in selecting from the facts available. *Id*. at 36-37. Consequently, Commerce determined that Rosneft is an authority. *Id*. at 36.

EuroChem argues that adverse facts available are not warranted because Commerce must assert more than the legal standard and articulate why a party failed to act to the best of its ability. EuroChem Br. at 4-5 (citing *Borden, Inc. v. United States*, 4 F. Supp. 2d 1221, 1246 (Fed. Cir. 1998); *Mannesmannrohren-Werke AG & Mannesmann Pipe & Steel Corp. v. United States*, 77 F. Supp. 2d 1302, 1313-14 (Ct. Int'l Trade 1999)). Specifically, EuoChem asserts that Commerce may not find adverse facts available simply because the government of Russia did not provide the requested *Input Producer Appendix* for Rosneft. EuroChem Br. at 5. However, to analyze whether a subsidy is countervailable "Commerce often requires information from the foreign government allegedly providing the subsidy." *Fine Furniture*, 748 F.3d at 1369-70 (citing *Essar Steel 2010*, 721 F. Supp. 2d at 1296-97; *Clearon Corp. v. United States*, 359 F. Supp. 3d 1344, 1354 (Ct. Int'l Trade 2019)). The Court in *Essar Steel* recognized that "foreign governments are in the best position to provide information regarding the administration of their alleged subsidy programs, including eligible recipients{,}" while "the respondent companies, . . . will have information pertaining to the existence and amount of the benefit conferred on them by the program." *Essar Steel 2010*, 721 F. Supp. 2d at 1297. Commerce seeks different information from each respondent, and "the Department's {adverse facts available} analysis

varies depending on which party has provided a deficient response." *Id.* Further, "a foreign

government may be found to be a non-cooperating party{,}" and "the statute authorizes

Commerce to apply adverse inferences when an interested party, including foreign government,

fails to provide requested information." *Clearon Corp.*, 359 F. Supp. 3d at 1355; *see also Fine*

*Furniture*, 748 F.3d at 1371.

      Here, Commerce sent Russia three requests for an *Input Producer Appendix* concerning

government ownership of Rosneft and Rosneftegaz. *See* Initial Questionnaire; Commerce

Second Input Producer Request; Commerce Third Input Producer Request. Instead, the

government stated that Rosneft and Rosneftegaz were not vested government entities but did not

provide the requested the *Input Producer Appendix* and supplementary documentation. IDM at

36; Government of Russia 2nd Supplemental Response at 1. Commerce has not invoked a

"magic phrase" nor skipped its reasoning as EuroChem contends. EuroChem Br. at 5-6. Rather,

EuroChem ignores that the government of Russia provided a complete *Input Producer Appendix*

for Gazprom and Novatek but not Rosneft and Rosneftegaz and that [



]. *See* Government of Russia Post-Prelim Response at 7-8. Thus, the government of

Russia significantly impeded the investigation, and did not act to the best of its ability to produce

information that would clarify the status of Rosneft and Rosneftegaz, and therefore Commerce

had to rely on adverse facts available.

      EuroChem provided the information highlighting the ownership of Rosneft and

Rosneftegaz. EuroChem Br. at 5-7. According to Exhibit 16.2, [

]. EuroChem First Supplemental Response at

Exhibit 16.2. However, footnote 1 provides [                                                    ]. *Id.*

at Exhibit 16.2 at fn. 1. This information directly conflicts with the government of Russia's statement that "neither PJSC Rosneft nor JSC Rosneftegaz are a vested government entity or authority in the natural gas market in Russia." IDM at 36; *See* Government of Russia 2nd Supplemental Response at 1.

EuroChem also contends that Commerce cannot expect the government of Russia to provide an *Input Producer Appendix*, and Rosneft has no incentive to answer the questionnaire. EuroChem Br. at 6-7. This argument lacks merit, because it ignores the fact that Russia was able to produce an appendix for Gazprom, a government authority, and Novatek, a private Russian natural gas company. *See* Government of Russia Questionnaire Response at Exhibit III-53-54 (C.R. 342). Russia's failure to do so for Rosneft demonstrates that the government failed to act to the best of its ability.

Moreover, this Court has provided that "{t}he rationale for permitting the application of {adverse facts available} to cooperative respondents is that 'a remedy that collaterally reaches a cooperative respondent has the potential to encourage the foreign government to cooperate so as not to hurt its overall industry.'" *Bio-Lab*, 435 F. Supp. 3d at 1368 (quoting *Fine Furniture*, 748 F.3d at 1373) (internal brackets omitted). Thus, without the necessary information, in accordance with the statute, Commerce may use an adverse inference where requested information is not provided by an interested party. 19 U.S.C.S. § 1677e(b); *see Fine Furniture,* 748 F.3d at 1371 (citing 19 U.S.C.S. § 1677(9)(B) ("the statute defines an 'interested party' to include 'the government of a country in which the subject merchandise is produced or manufactured.'").

Finally, EuroChem argues that Commerce must conduct a five-factor analysis to determine whether Rosneft is an authority. EuroChem Br. at 7-10. In particular, EuroChem

claims that in previous cases Commerce considered: (1) government ownership; (2) the government's presence on the entity's board of directors; (3) the government's control over the entity's activities; (4) the entity's pursuit of governmental policies or interests; and (5) whether the entity is created by statute." EuroChem Br. at 7 (citing *The Final Determination in the Countervailing Duty Investigation of Dynamic Random Access Memory Semiconductors from the Republic of Korea*, (Dep't of Commerce June 16, 2003) and accompanying IDM at 16). EuroChem's claims highlight the conflicting record evidence and the discrepancies that the government of Russia could have clarified.

As previously noted, EuroChem reported that "its cross-owned affiliate NAK Azot purchased natural gas from Rosneft and provided evidence that Rosneft's main shareholder is Rosneftegaz SC, which is 100 percent owned by the state." IDM at 6; *see* EuroChem's Letter, "Phosphate Fertilizers from the Russian Federation," dated October 23, 2020 (EuroChem Supplemental Response) at 13 and Exhibit SQ-16.2. The government of Russia conceded that it [

]. EuroChem Br. at 8 at fn. 35; *see* Government of Russia Post-Prelim Response at 7-8. The government also explained [

]. *Id*. However, the government's response [

].

Government of Russia Post-Prelim Response at 7-8. Commerce, not the government of Russia, determines what information is relevant to an investigation. *See Ansaldo Componenti, S.p.A. v. United States*, 628 F. Supp. 198, 205 (Ct. Int'l Trade 1986); *see also Essar Steel 2010*, 721 F. Supp. 2d at 1298-99. Russia is not charged with conducting the countervailing duty

investigation and weighing the record to determine and calculate a countervailing duty margin. *See Essar Steel Ltd. 2010*, 721 F. Supp. 2d at 1299 ("Regardless of whether Essar deemed the license information relevant, it nonetheless should have produced it in the event that Commerce reached a different conclusion.).

Thus, given Russia's failure to provide necessary information, Commerce acted appropriately in relying on facts otherwise available, concluding that the government of Russia had failed to cooperate by not acting to the best of its ability, and determining that an adverse inference was warranted. 19 U.S.C. § 1677e(b).

## III. Commerce's *De Facto* Specificity Analysis For The Provision Of Natural Gas At Less Than Adequate Remuneration Is Supported By Substantial Evidence And In Accordance With Law

### A. Legal Framework

19 U.S.C. §1677(5A) defines a "countervailable subsidy" as a subsidy (*i.e.*, a financial contribution that confers a benefit) that is "specific" within the meaning of 19 U.S.C. § 1677(5A). *See* 19 U.S.C. § 1677(5). Domestic subsidies, such as those at issue in this proceeding, can be specific as a matter of law (*de jure*) or in fact (*de* facto). *See* 19 U.S.C. § 1677(5A)(D)(i)-(iii). A subsidy is *de jure* specific "{w}here the authority providing the subsidy, or the legislation pursuant to which the authority operates, expressly limits access to the subsidy to an enterprise or industry." 19 U.S.C. § 1677(5A)(D)(i). Pursuant to 19 U.S.C. § 1677(5A)(D)(iii) a subsidy is *de facto* specific if any one of the following four factors exist:

(I)     The actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number.
(II)    An enterprise or industry is a predominant user of the subsidy.
(III)   An enterprise or industry receives a disproportionately large amount of the subsidy.
(IV)    The manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others.

19 U.S.C. § 1677(5A)(D)(iii)(I)-(IV). Commerce's regulations also provide that in *de facto* specificity analyses, Commerce "will examine the factors contained in {19 U.S.C. § 1677(5A)(D)(iii)} sequentially in order of their appearance. If a single factor warrants a finding of specificity, {Commerce} will not undertake further analysis." 19 CFR § 351.502(a).

## B.    <u>Background</u>

During the period of investigation, Commerce preliminary determined that there was no evidence on the record that Gazprom sells natural gas to the phosphate fertilizer industry in a manner that is *de jure* specific. PDM at 12; *see* 19 U.S.C. § 1677(5A)(D)(i). Thus, Commerce turned to the question of whether there is *de facto* specificity pursuant to 19 U.S.C. § 1677(5A)(D)(iii). Commerce requested purchase data (volume and value) for natural gas by industrial classification during the period of investigation. PDM at 12; *see* Initial Questionnaire at Section II–34-36. Russia reported that it did not maintain such statistics on industrial consumers' purchase of natural gas; nonetheless, in its first supplemental questionnaire response, Russia reported that in 2019 the fertilizer industry consumed 4.7 percent of Russia's total gas consumption. PDM at 12; *see* Government of Russia Questionnaire Response at 56; *see also* Government of Russia Supplemental Response at 11. Commerce requested additional information and the submission of alternate data that could be used to evaluate natural gas purchases based on the statistics that the government maintained. PDM at 12; *see* Commerce's Letter, "Countervailing Duty Investigation of Phosphate Fertilizers from the Russian Federation: 2nd Section II Supplemental Questionnaire," dated November 3, 2020, at 4 (P.R 282). In its response, Russia stated that it does not maintain such volume and value purchase data; Russia then referred Commerce to Gazprom's 2019 annual report as an alternative data source, because the annual report included information on Gazprom's domestic natural gas sales. PDM at 12; *see*

Government of Russia 2nd Supplemental Response at 4-8; *see also* Government of Russia Questionnaire Response at Exhibit III-47 (2019 Gazprom Annual Report) (C.R. 333) (P.R.159).

The record shows that, according to Gazprom's data on the volumes of gas transported through its pipeline system in 2019, natural gas is heavily used in the agro-chemistry sector, which includes phosphate fertilizer producers, and that agro-chemistry was in the top natural gas consuming groups for 2019. PDM at 12; *see* Government of Russia 2nd Supplemental Response at 6. There was no specific industrial sector listed in the top consuming groups for 2019, but the agro-chemical[2] industrial sector accounted for the largest percentage of total domestic natural gas sales among industrial groups in 2019. PDM at 12; *see* Government of Russia 2nd Supplemental Response at 6.

Because the information reported includes non-manufacturing sectors (*i.e.*, households, housing/utilities, and power generation/heating), Commerce looked to compare the agro-chemical industry with the next three largest industries' consumption of natural gas and to the "other" category of natural gas consumption during 2019. IDM at 44; PDM at 12. However, the next three largest industries accounted for a small percentage, each less than half of the agro-chemical industry, and even with the "other" category, the proportion of consumption for each group was still insignificant. IDM at 44; PDM at 12; 2019 Gazprom Annual Report. This is consistent with Commerce's determination in *Cold-Rolled Steel from Russia* where the agro-chemical sector, which includes phosphate fertilizer producers, was determined to be a predominant user of natural gas in Russia. IDM at 44; PDM at 12; *Cold-Rolled Steel from Russia Final Determination* IDM at 48. Thus, the record reflects that the agro-chemistry sector:

---

[2] IDM at 44 ("… the Agrochemical sector (which includes the Russian phosphate fertilizers industry) is the largest industrial consumer of natural gas sold by Gazprom in 2019, Commerce is continuing to find that the agrochemical sector, which includes phosphate fertilizer producers, is a predominant user of natural gas in Russia.").

(1) is the largest consumer of natural gas; (2) was in the top five consuming groups; and (3) when compared to all other reported groups, was still the predominant consumer of natural gas. IDM at 44; PDM at 12-13. Therefore, consistent with 19 U.S.C. § 1677(5A)(D)(iii)(II)(iii), Commerce determined that the provision of natural gas by Gazprom and Rosneft is *de facto* specific.

### C. Commerce's Determination That The Provision Of Natural Gas By Gazprom And Rosneft Is *De Facto* Specific Is Supported By Substantial Evidence And In Accordance With Law

Commerce found that the provision of natural gas by Gazprom and Rosneft was *de facto* specific because the agro-chemistry industry is a predominant consumer of natural gas when compared to other industrial sectors. IDM at 44. As discussed above, natural gas is heavily used by the agro-chemistry sector, and agro-chemistry was in the top five natural gas consuming groups during the POI, and no other specific industrial sectors were listed in the top five consuming groups. *Id.* Further, when compared to consumers from all industries and sectors, the agro-chemistry sector accounted for the largest percentage of Gazprom's total domestic natural gas sales among industrial groups for the period of investigation. *Id.* Accordingly, Commerce determined that the provision of natural gas by Gazprom and Rosneft was *de facto* specific pursuant to 19 U.S.C. § 1677(5A)(D)(iii)(II), which provides that "a subsidy may be specific as a matter of fact" when "an enterprise or industry is a predominant user of the subsidy." *Id.*; 19 U.S.C. § 1677(5A)(D)(iii)(II).

EuroChem contends Commerce's determination is flawed because natural gas is broadly available in Russia and used throughout the Russian economy. EuroChem Br. at 11-12. EuroChem also notes the record confirms that the fertilizer industry in Russia consumes only 4.7% of Russia's total natural gas consumption. *Id.* Commerce's determination of *de facto*

specificity is in accordance with 9 U.S.C. § 1677, which provides a subsidy may be specific as a matter of fact if an enterprise or industry is a predominant user of the subsidy. *See* 19 U.S.C. § 1677(5A)(D)(iii)(II)(iii). Moreover, this methodology was upheld by the Court in *ArcelorMittal* when Commerce provided evidence that the metallurgy sector is "a predominant user" of the natural gas subsidy and thus met the *de facto* specificity criteria of 19 U.S.C. § 1677(5A)(D)(iii)(II). *ArcelorMittal USA LLC v. United States*, 399 F. Supp. 3d 1271, 1283 (Ct. Int'l Trade 2019) (*ArcelorMittal*). In *ArcelorMittal*, Commerce concluded that the metallurgy industry (1) "'heavily used' natural gas and accounted for four percent of Gazprom's total sales in 2013"; (2) was "one of the top six sectors that accounted for Gazprom's 2013 domestic natural gas sales"; and (3) was "the only industrial manufacturing sector whose consumption of Gazprom's natural gas is separately listed in the annual report". *ArcelorMittal*, 399 F. Supp. 3d at 1283.

Similar to *ArcelorMittal*, the record here shows that natural gas is heavily used in the agro-chemistry sector and that agro-chemistry was in the top natural gas consuming groups for 2019; no other specific industrial sectors were listed in the top consuming groups. IDM at 44; PDM at 12; *see* Government of Russia 2nd Supplemental Response at 4-8. Further, the agro-chemical industrial sector accounted for the largest percentage of total domestic natural gas sales among industrial groups for 2019. IDM at 44; PDM at 12; *see* Government of Russia 2nd Supplemental Response at 6. When compared to the next three largest industries' consumption of natural gas and to the "other" category, the proportion of consumption for each group is insignificant, and Gazprom did not provide more detailed information. IDM at 44; PDM at 12; *see* Government of Russia 2nd Supplemental Response at 6. Thus, Commerce reasoned that the agro-chemistry industry is a predominant consumer of natural gas when compared to other

industrial sectors, and properly determined that the provision of natural gas by Gazprom is *de facto* specific. *See* 19 U.S.C. § 1677(5A)(D)(iii)(II).

Despite the Court's holding in *ArcelorMittal*, EuroChem first relies upon *Borusan* and argues "that a subsidy program would be found to be *de facto* specific when the subsidy is *not* broadly available and widely used throughout an economy." EuroChem Br. at 11 (citing *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306 (Ct. Int'l Trade 2015) (*Borusan*)). However, EuroChem's reliance on *Borusan* is misplaced, because in *Borusan* the Court reviewed Commerce's *de facto* specificity analysis pertaining to 19 U.S.C. § 1677(5A)(D)(iii)(I), not 19 U.S.C. § 1677(5A)(D)(iii)(II). *See Borusan*, 61 F. Supp. 3d at 1342. Under 19 U.S.C. § 1677(5A)(D)(iii)(I), Commerce may find a subsidy program *de facto* specific if the actual recipients of a subsidy, whether on an enterprise or industry basis, are limited in number. 19 U.S.C. § 1677(5A)(D)(iii)(I). Under 19 U.S.C. § 1677(5A)(D)(iii)(II), which Commerce relied upon here, Commerce may find a subsidy is *de facto* specific if an enterprise or industry is a predominant user of the subsidy. 19 U.S.C. § 1677(5A)(D)(iii)(II). Thus, EuroChem's citation to *Borusan* confuses the basis of Commerce's *de facto* determination, and *Borusan* is inapposite.

EuroChem also relies upon *Bethlehem Steel* in support of its argument. EuroChem Br. at 11 (citing *Bethlehem Steel Corp. v. United States*, 140 F. Supp. 2d 1354 (Ct. Int'l Trade 2001)). However, *Bethlehem Steel* does not prevent Commerce from finding that an industry is a predominant user. In *Bethlehem Steel*, the Court agreed with Commerce's methodology for determining that a "dominant" or "disproportionately" large consumer of electricity was not *de facto* specific. *Bethlehem Steel*, 140 F. Supp. 2d at 1369. In so doing, the Court found that the "mere fact that the steel industry received a greater monetary benefit from the program than did

other participants was not determinative of whether that industry was 'dominant' or receiving 'disproportionate' benefits." *Id*. The record only contained information that "the steel industry received over 51% of the discounts afforded by the VCA program during the period of investigation," and there was nothing in the record to indicate this percentage was disproportionately higher than would be expected. *Id*.

However, here, Commerce possesses more information than simply the "mere fact" that the agro-chemistry industry received a greater monetary benefit than other industries. As previously stated, Commerce's analysis closely aligns with *ArcelorMittal*, where the agro-chemistry sector is the largest consumer of natural gas, was in the top five consuming groups, and compared to all other reported groups, was still the predominant consumer of natural gas.

Accordingly, Commerce determination that the provision of natural gas by Gazprom and Rosneft is *de facto* specific is supported by substantial evidence and in accordance with law.

## IV. Commerce Properly Conducted Its Benchmark Analysis For The Provision Of Natural Gas At Less Than Adequate Renumeration For EuroChem

### A. Legal Framework

Under 19 U.S.C. § 1677(5)(B)(i), a countervailable subsidy occurs where an authority provides a financial contribution, and a benefit is thereby conferred. The definition of "financial contribution" includes the provision of goods and services. 19 U.S.C. § 1677(5)(D)(iv). Under 19 U.S.C. § 1677(5)(E)(iv), a "benefit" is considered conferred by the provision of goods and services at "less than adequate remuneration."

Commerce's regulations ascribe a three-tiered hierarchy by which Commerce measures the adequacy of remuneration. *See Essar Steel 2012*, 678 F.3d at 1273. First, Commerce will normally measure "adequate remuneration" using a "tier-one" benchmark, pursuant to 19 C.F.R. § 351.511(a)(2)(i), by comparing government prices to a market-determined price for the good or

service resulting from actual transactions in the country in question. Where market-based prices are unavailable, Commerce will then use a "tier-two" benchmark, under 19 C.F.R. § 351.511(a)(2)(ii), by comparing government prices to a "world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question." If no world market prices are available, Commerce will resort to a "tier-three" benchmark, under 19 C.F.R. § 351.511(a)(2)(iii), under which Commerce will measure adequate remuneration by assessing whether or not the government-provided input price "is consistent with market principles."

When using a "tier-three" benchmark, Commerce assesses whether the government price was set in accordance with market principles by analyzing such factors as the government's price-setting philosophy, costs (including rates of return sufficient to ensure future operations), or possible price discrimination. *Id.* These tier-three factors are not hierarchical in application, and Commerce may rely on one or more of these factors in any particular case. *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,378 (Dep't of Commerce Nov. 25, 1998) (*Preamble*).

### B. <u>Background</u>

Mandatory respondents, PhosAgro and EuroChem, reported purchasing natural gas from several entities during the period of investigation and purchases by auction on the Saint Petersburg International Commodity Exchange (SPIMEX). PDM at 9. As previous noted, there is conflicting evidence regarding Russia's authority over Rosneft, but Russia did report that Gazprom is majority-owned by the government, with it holding 50.23 percent of Gazprom's shares. Id. at 9-10. Accordingly, Commerce found the domestic gas market to be distorted because of Russia's predominant role in the natural gas market given Gazprom's and Rosneft's

status as government authorities, in addition to other government interventions in the natural gas market. IDM at 49.

Specifically, Commerce relied on information provided by Russia to find that "(1) a substantial proportion of total Russian domestic natural gas production during each of 2017, 2018, and 2019 is attributable to companies in which the Government of Russia maintains a direct or indirect ownership/management interest; and (2) Gazprom alone accounted for a majority of the natural gas production in each of these years, such that it is reasonable to conclude that Gazprom accounts for a substantial portion of the market." IDM at 49. Gazprom reported that it produced 68 percent of the natural gas consumed in Russia in 2019. Id. As a predominant supplier of natural gas, in addition to Gazprom's monopoly over the transportation of natural gas, Gazprom effectively determines the prices of private suppliers of natural gas in Russia. Id.; see 2019 Gazprom Annual Report; Government of Russia Questionnaire Response at 55-57.

Additionally, Russia maintains tight controls of import and exports of natural gas, further evidencing a distortion in the Russian natural gas market. The government reported that there was value added tax and import tariffs on natural gas of 20 and five percent, respectively, during the period of investigation. IDM at 49; Government of Russia Questionnaire Response at 54. In addition, evidence on the record establishes that an export customs duty of 30 percent is applicable on natural gas, and that export licenses are required for the export of natural gas. IDM at 49; Government of Russia Questionnaire Response at 54-55. Gazprom also holds the exclusive rights to transport and export natural gas through a pipeline; thus, Gazprom enjoys a "natural monopoly" over natural gas transportation. IDM at 49-50; Government of Russia Questionnaire Response at 55-57. Finally, information on the record also demonstrates that only

two percent of domestic consumption of natural gas is from imports of natural gas into Russia. IDM at 49; Government of Russia Questionnaire Response at 43.

Commerce determined that there were no suitable tier-one prices that could be used as benchmarks, and that there were no suitable tier two benchmarks for valuing any benefit for natural gas. IDM at 51; PDM at 15. Thus, Commerce relied on a tier-three natural gas benchmark to determine the extent to which Gazprom and Rosneft sold natural gas to the respondent companies at less than adequate renumeration. IDM at 53-54; 19 C.F.R. § 351.511(a)(2)(iii).

EuroChem and PhosAgro contend that Commerce ignored useable tier-one data on the record, and inappropriately used a tier-three benchmark data based on regional, European OECD natural gas prices sourced from the International Energy Association (IEA). EuroChem Br. at 17-24; PhosAgro Br. at 26-31. As detailed below, EuroChem and PhosAgro's argument fails for several reasons.

## C. Commerce's Decision Not To Use A Tier One Benchmark, And Instead Use A Tier Three Benchmark Is Supported By Substantial Evidence And In Accordance With Law

### i. Commerce Reasonably Concluded That There No Viable Tier-One Benchmarks Available

Commerce's determination to forgo a tier-one benchmark because there were no viable prices that could serve as a suitable benchmark for measuring the adequacy of remuneration for the natural gas that Gazprom and Rosneft sold to EuroChem and PhosAgro during the period of investigation is supported by substantial evidence and in accordance with law. *See* IDM at 47-50. EuroChem and PhosAgro assert that Commerce improperly concluded that there are no viable tier-one prices that can serve as the benchmark because the prices in the Russian domestic market for natural gas are reflective of prevailing market conditions in Russa. *See* EuroChem

Br. at 12-17; *see* PhosAgro Br. 16-24. EuroChem and PhosAgro advance three theories in support of this assertion—all of which the Court should reject based upon the record evidence.

First, EuroChem and PhosAgro argue that there is no distortion in the domestic market for natural gas despite the government's substantial control over both the regulated and unregulated markets. EuroChem Br. at 13-17.; PhosAgro at 20-24. This argument is contradicted by record evidence. Russia provided information demonstrating that Gazprom is majority owned by the government and that Gazprom alone accounts for at least 68 percent of the production of natural gas in Russia. PDM at 13-14; *see* 2019 Gazprom Annual Report. The record also shows that the total volume of domestic production that is accounted for by companies in which the government of Russia maintains an ownership or management interest either directly or through other government entities was overwhelming compared to privately owned natural gas companies. *See* Government of Russia Questionnaire Response at 42-44. Specifically, government owned companies produced [                    ] billion cubic meters of natural gas in 2017, 2018, and 2019, respectively, when the total production of natural gas in Russia for the same years was 691.1, 725.4, and 737.7 billion cubic meters, respectively. *See* Government of Russia Questionnaire Response at 42-44.

In its preliminary determination, Commerce explained that under 19 C.F.R. § 351.511(a)(2)(i), Commerce will first attempt to measure "adequate remuneration" by comparing government prices to a market-determined price for the goods resulting from actual transactions in the country in question. PDM at 13; 19 C.F.R. § 351.511(a)(2)(i); *see Maverick Tube v. United States*, 857 F.3d 1353, 1358 (Fed. Cir. 2017) ("Commerce generally prefers to compare prices paid to actual transactions in the country in question). However, if the government plays a predominant role as a provider of the goods, Commerce considers the prices

for private sellers of the same or similar goods compromised, because comparing the government prices to those or private prices would amount to comparing the financial contribution to itself. PDM at 13; *see also Certain Softwood Lumber Products from Canada*, 67 Fed. Reg. 15,545 (Dep't of Commerce April 2, 2002) (*Softwood Lumber from Canada*) (final affirm. countervailing duty determ.) and accompanying IDM at 38-39 ("Where the market for a particular good or service is so dominated by the presence of the government, the remaining private prices in the country in question cannot be considered to be independent of the government price"). Thus, where Commerce finds, as it did here, that the government provides the majority, or a substantial portion, of the goods, Commerce will consider the prices in the country to be significantly distorted and therefore improper to use as a tier one benchmark. PDM at 13; *see Changzhou Trina Solar Energy Co. v. United States*, 466 F. Supp. 3d 1287, 1297-99 (Ct. Int'l Trade 2020); *see also Borusan*, 61 F. Supp. 3d at 1330; *Maverick Tube 2017*, 857 F.3d at 1362.

Second, EuroChem argues that Commerce failed to explain the importance of the import and export controls and their relationship to demonstrating control or distortion of the natural gas market in Russia. EuroChem Br. at 15-16. EuroChem contends that the export tariffs and licensing are not indicators of "government involvement" in the market, and that Commerce failed to explain how these measures distort the Russian market in a way that would warrant use of out-of-country benchmarks. *Id.* at 16.

However, Commerce's explanation of the import and export controls further demonstrates Gazprom's and, by extension, the government's, control over, and the distortion within, the natural gas market. The record shows that domestic consumption needs are met by domestic production, and only two percent of domestic consumption is derived from imports of

natural gas into Russia. IDM at 49; *see* Government of Russia Questionnaire Response at 43. During the period of investigation, any import of natural gas would be subject to value added tax and import tariffs on natural gas of 20 and 5 percent, respectively. IDM at 49; *see* Government of Russia Questionnaire Response at 42-44. In addition, the government of Russia also reported that an export customs duty of 30 percent is applicable on natural gas, and that export licenses are required for the export of natural gas. IDM at 49; *see* Government of Russia Questionnaire Response at 54-55. Evidence provided by the government of Russia reported that pursuant to Article 3 of the Federal Law N 117-FZ of July 18, 2006, "On Export of Gas," Gazprom holds the exclusive rights to transport and export natural gas through a pipeline; thus, Gazprom enjoys a "natural monopoly" over natural gas transportation. IDM at 49-50; *see* Government of Russia Questionnaire Response at 55 and 57.

Commerce's determination that the Russian natural gas market is distorted comports with its determination in *Cold Rolled Steel from Russia*, where Commerce also found that the import and export controls imposed by the government of Russia evidenced that the domestic market in Russia for natural gas is distorted. *Cold Rolled Steel from Russia* at Comment 3.

Gazprom's transportation monopoly, its predominate control of the natural gas market, and the tight government controls of import tariffs all evidence a distorted market. Accordingly, Commerce properly determined that, through Gazprom, the government of Russia is able to play a predominant role in the market of natural gas; that the prices for natural gas are significantly distorted; and that Gazprom has sufficient market power to effectively determine the prices of natural gas in the regulated and unregulated market. IDM at 50; PDM at 14; *see Softwood Lumber from Canada* IDM 38-39. Thus, Commerce properly determined that it is not reasonable for it to rely upon a tier one benchmark. PDM at 13-14.

Third, EuroChem and PhosAgro argue that Commerce must analyze the record as a whole, and that there is suitable information on the record in the *Brattle Report* for Commerce to use for a tier-one benchmark analysis. *See* EuroChem Br. at 13-17; PhosAgro Br. at 18-19; 19 C.F.R. § 351.511(a)(2)(i). Both parties argue that the *Brattle Report* shows prices of unregulated natural gas provided by private companies, such as Novatek, are lower than Gazprom. EuroChem Br. at 15. However, this argument is incorrect because Commerce did analyze the record as a whole and reasonably explained why a tier-one benchmark was not viable. IDM at 49-50; s*ee Jacobi Carbons AB v. United States*, 422 F. Supp. 3d 1318, 1325 (Ct. Int'l Trade 2019) ("Commerce need not address every piece of evidence presented by parties."). Based on record evidence, the vast majority of natural of gas is produced by companies in which the government maintains an ownership or management interest either directly or through other government entities. Government of Russia Questionnaire Response at 42-44. Further, evidence provided by EuroChem shows that the vast majority of the companies' natural gas is sold through the regulated market and from Gazprom and its affiliates. *See* EuroChem's Letter, "Phosphate Fertilizers from Russian Federation," dated September 24, 2020 (EuroChem Questionnaire Response) at Exhibit PQ-A11 (C.R. 376). There is substantial record evidence that EuroChem and PhoAgro received a majority of their natural gas from Gazprom, and that Gazprom maintains a predominant role as a supplier of natural gas in the market, allowing it to effectively determine the prices of private suppliers of natural gas in Russia. Thus, even if the *Brattle Report* shows that sales for Novatek and other private natural gas suppliers are "growing," because of the government's predominant role as a provider of the good, Commerce considers the prices for private sellers of the same or similar goods compromised, and comparing

the government prices to those or private prices would amount to comparing the financial contribution to itself. PDM at 13; *see Softwood Lumber from Canada* IDM at 38-39.

In sum, Commerce properly determined that it could not use a tier-one benchmark because there were no viable tier-one prices.

### ii. Commerce Reasonably Selected European OECD Export Prices From The International Energy Agency To Construct A Tier-Three Benchmark For Natural Gas

Commerce's use of pricing data published by the IEA as a tier-three benchmark is supported by substantial evidence and in accordance with law. To measure the program benefit, Commerce first concluded that a proxy to determine a market-based natural gas benchmark was required, because Russia's prices are not set in accordance with market principles. PDM at 17. Based on record evidence, Commerce found that the most appropriate proxy for a market-based natural gas benchmark was European OECD natural gas prices sourced from the IEA. *Id*. at 17; IDM at 54. Commerce then compared the corresponding quarterly benchmark unit prices to the unit prices that EuroChem and PhosAgro paid to Gazprom and Rosneft, including delivery charges, surcharges, and taxes during the period of investigation. PDM at 17-18; IDM at 54.

Nonetheless, EuroChem and PhosAgro argue that Commerce's conclusion that the government of Russia's natural gas prices are not reflective of market principles is improper and Commerce should construct a benchmark based on prevailing market conditions in Russia. *See* EuroChem Br. at 17-24; *see* PhosAgro Br. at 26-31. Specifically, EuroChem and PhosAgro argue: (1) current record evidence shows that pricing data in Russia was consistent with market principles; (2) Commerce cannot rely on the IEA data concerning European prices for its tier-three benchmark analysis; and (3) Commerce impermissibly considered its distortion analysis in its tier-three analysis. *See* EuroChem Br. at 17-24; *see* PhosAgro Br. at 26-31.

First, both EuroChem and PhosAgro argue that there is evidence on the record that the unregulated market or natural gas operates on market principles. EuroChem at 17-20; PhosAgro 26-27. EuroChem and PhosAgro assert that Commerce should rely on evidence provided by the government of Russia concerning Gazprom's pricing methodology or the *Brattle Report*, which purportedly shows that private natural gas suppliers in Russia sold natural gas at unregulated prices in accordance with market prices. *Id.*

Contrary to EuroChem and PhosAgro's assertions, the *Brattle Report* is not reliable. IDM at 54. "It is within Commerce's discretion to weigh the relevant factors." *Canadian Solar Inc. v. United States*, 537 F. Supp. 3d 1380, 1391 (Ct. Int'l Trade 2021) (*citing Nippon Steel Corp. v. United States*, 301 F. Supp. 2d 1355, 1360 (Fed. Cir. 2003)). Commerce explained that the *Brattle Report* was not superior to the IEA data because the *Brattle Report* data could not be used to calculate a tier-three benchmark. IDM at 54. Commerce determined that the *Brattle Report* was unsuitable for use because it was not accompanied by original source documentation describing the methodology and sources of the data. *Id.* In contrast to the *Brattle Report*, the IEA European OECD natural gas prices clearly state price data for the natural gas industry and has been used in prior cases. *Id.*; *see Steel Concrete Reinforcing Bar from the Republic of Turkey*, 85 Fed. Reg, 16,056 (Dep't of Commerce March 20, 2020) (final affirm. countervailing duty determ.) and accompanying IDM at 18-26 (*Turkey Rebar 2017*). Additionally, the IEA dataset contained a per-unit value in U.S. dollars, which allowed Commerce to derive average quarterly prices using the selected OECD European export market prices and an average quarterly exchange rate, which Commerce used to convert the prices to rubles. PDM at 18.

EuroChem and PhosAgro provide no evidence that addresses Commerce's concerns over the reliability and the missing original source documentation describing the methodology and

sources of the *Brattle Report* data. The lack of explanation as to the methodology used to collect and calculate the data, coupled with concerns over the sources of the data, led Commerce to reasonably reject the *Brattle Report* as a viable tier-three benchmark. IDM at 54; *see Royal Thai Gov't v. United States*, 850 F. Supp. 44, 50 (Ct. Int'l Trade 1994) ("Commerce has articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made.") (citation omitted) (internal quotes omitted). It was reasonable for Commerce to conclude that the IEA European OECD data set was the most appropriate proxy for a market based natural gas benchmark.

Second, PhosAgro and EuroChem argue that the IEA data is unsuitable because it is not available to Russian buyers and not reflective of market conditions in Russia. EuroChem at 20-23; PhosAgro Br. at 27-31. However, "{w}hen Commerce is faced with the decision to choose between two alternatives and one alternative is favored over the other in their eyes, then they have the discretion to choose accordingly if their selection is reasonable." *Timken Co. v. United States*, 788 F. Supp. 1216, 1220 (Ct. Int'l Trade 1992). Here, the reliability of IEA data is well-established; it has been used in many other countervailing duty proceedings to construct a tier-three natural gas benchmark, and represents the best available information. *Heze Huayi Chem. Co. v. United* States, 532 F. Supp. 3d 1301, 1326 (Ct. Int'l Trade 2021) ("The record shows that Commerce exercised properly its broad discretion in selecting the best available information for the record from a reliable database.").

PhosAgro's and EuroChem's issues with IEA data extend from mischaracterizations. For example, PhosAgro argues that the IEA data is not based on large industrial buyers. PhoArgo Br. at 30-31. However, the IEA data states that is for the industrial sector and there is no evidence that the data is for "small-to-medium size companies with limited buying power." IDM

at 54; *see* Petitioner's Letter, "Phosphate Fertilizers from Russia: Petitioner's Submission of Factual Information to Measure the Adequacy of Remuneration," dated November 2, 2020, at Exhibit 15 (Petitioner Benchmark Submission) (P.R. 245, 264)). PhosAgro and EuroChem also state that because Russia does not have bi-directional pipelines that Commerce can only rely on data from Russia. EuroChem Br. at 21-22; PhosAgro Br. at 27-29. However, EuroChem's and PhosAgro's argument misconstrues Commerce's determination regarding Russia's lack of bi-directional pipelines. IDM at 51.

In *Cold-Rolled Steel from Russia*, Commerce found that Russia did not have bi-directional pipelines so natural gas could not be imported from Asia or Europe, and "exclude{d} the possibility of gas supply from Central and Western parts of Europe, the Middle East, and the East/Asian-Pacific region." PDM at 15; *see Russia Cold-Rolled Steel* IDM at 60-61. In the present case, Commerce found that no evidence contradicted this information, and therefore Commerce could not rely on a tier-two benchmark. IDM at 51-52; PDM at 15. Because there are no available tier-one or tier-two prices that may serve as a benchmark, Commerce resorted to a tier-three benchmark analysis, and relied upon a proxy market-based natural gas benchmark. IDM at 53; PDM at 17. "The regulations do not specify how {Commerce} is to conduct such a market principles analysis" and the analysis must be done on a case-by-case basis. *Certain Uncoated Paper from Indonesia: Final Affirmative Countervailing Duty Determination*, 81 Fed. Reg. 3,104, (Dep't of Commerce January 20, 2016) and accompanying IDM at 15. Accordingly, Commerce found that the most appropriate proxy for a market-based natural gas benchmark is the IEA data, and the lack of bi-directional pipelines did not inhibit Commerce from constructing an accurate tier-three analysis.

Additionally, PhosAgro contends that Commerce should treat natural gas akin to electricity and characterize it as a regional commodity. PhosAgro Br. at 29 (citing *Supercalendered Paper From Canada*, 80 Fed. Reg. 63,535 (Dep't of Commerce Oct. 20, 2015) (final affirm. countervailing duty determ.) and accompanying IDM at comment 12) (*Supercalendered Paper from Canada*). PhosAgro's argument is unavailing though. First, PhosAgro concedes its analogy is flawed because it relates to Commerce's tier-one benchmark analysis. PhosAgro Br. at 29. Second, in the administrative determination PhosAgro relies on, Commerce did not determine that all electricity prices in Canada were distorted by government interference and unreliable which is what it found here with respect to natural gas from Russia. S*upercalendered Paper from Canada* IDM at 131. Lastly, PhosAgro's argument that many of the countries are not physically close is true but there are also plenty of countries belonging to the IEA that abut Russia. *See* Petitioner Benchmark Submission at exhibit 15. The lack of explanation as to the methodology used to collect and calculate the data, coupled with concerns over the sources of the data, led Commerce to reasonably reject the *Brattle Report* as a viable tier-three benchmark. IDM at 54. It was reasonable for Commerce to conclude that the IEA European OECD data set was the most appropriate proxy for a market based natural gas benchmark. *Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi A.S. v. United States*, 536 F. Supp. 3d 1333, 1340 (Ct. Int'l Trade 2021) ("…for the court to sustain the Final Results, Commerce must simply demonstrate a rational connection between the facts found and the choice made.") (citations omitted) (quotes omitted).

Third, EuroChem argues that price distortion also cannot be a factor in Commerce's tier-three benchmark analysis, and Commerce should consider the prices of private suppliers in Russia instead of the IEA data. EuroChem Br. at 18-19. However, the Court recognizes that 19

U.S.C. § 351.511 permits consideration of "other factors such as price-setting and price discrimination (in a {tier-three} analysis), when market-based prices are unavailable." *POSCO v. United States*, 296 F. Supp. 3d 1320, 1356 (Ct. Int'l Trade 2018). Moreover, "Commerce's {tier-three} benchmark analysis preserves a place for the preferentiality test when market-based prices are unavailable." *Nucor Corp. v. United States*, 286 F. Supp. 3d 1364, 1380 (Ct. Int'l Trade 2018) (*Nucor*). "Commerce's goal in setting a benchmark rate is to best approximate the market rate … not to choose the rate respondents were most likely to pay" in a market Commerce argues is tainted by the government's interference. *Changzhou Trina Solar Energy Co. v. United States*, 352 F. Supp. 3d 1316, 1343 (Ct. Int'l Trade 2018). As previously reasoned, Commerce appropriately found the Russian natural gas market is distorted and as a result, the prices charged by private suppliers are not reliable benchmarks. Accordingly, Commerce reasonably did not consider Novatek and other private suppliers as suitable benchmarks.

Even though EuroChem and PhosAgro disagree with Commerce's determination that there were no viable tier-three benchmarks on the record, Commerce provided a reasonable explanation for relying on the IEA data such that a reasonable mind could conclude that Commerce chose the best available information. And it is not this Court's role to reweigh that evidence. *Matsushita Elec. Indus. Co., Ltd. v. United States*, 750 F. 2d 927, 933 (Fed. Cir. 1984); *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011); *Timken Co.*, 699 F. Supp. at 306.

Moreover, this Court has rejected arguments similar to those asserted by EuroChem and PhosAgro. In so doing, this Court has sustained Commerce's decision to use IEA data as a tier-three benchmark to determine whether natural gas was purchased at less than adequate remuneration. *See, e.g., Habaş Sinai Ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States*,

36

459 F. Supp. 3d 1341, 1345 (Ct. Int'l Trade 2020); *Habaş 2021*, 536 F. Supp. 3d at 1337. Thus, Commerce's determination to rely on European OECD export prices sourced from the IEA to construct a tier-three benchmark should be sustained.

### iii. Commerce Reasonably Included The European Value Added Tax And Import Duties Because Doing So Ensures The Benchmark Prices Reflect What Phosagro And Eurochem Would Have Paid Had They Imported Natural Gas

PhosAgro argues that Commerce improperly adjusted the IEA data to account for value added tax and import duties, and thereby double-counted when Commerce adjusted the benchmark to account for the price PhosAgro would have paid had it imported natural gas. PhosAgro Br. at 30-32. PhosAgro's blanket assertion that Commerce double counted the value added tax and import duties misrepresents Commerce's motive to construct an accurate benchmark price that is consistent with Commerce's practice.

In *Turkey Rebar 2017 Prelim*, Commerce applied a similar methodology when the respondent reported that its invoices for natural gas from a state economic enterprise included delivery fees, a special consumption tax, stamp tax, and value added tax of 18 percent. *Steel Concrete Reinforcing Bar from the Republic of Turkey*, 84 Fed. Reg. 48,583 (Dep't of Commerce September 16, 2019) (preliminary countervailing duty determ.) and accompany PDM at 15. As Commerce explained, "when measuring the adequacy of remuneration, Commerce will adjust the benchmark price to reflect the price that a firm actually paid or would pay if it imported the product, including delivery charges and import duties, *i.e.*, a 'delivered' price to the company's facility." IDM at 57; PDM at 18. This ensures the benchmark prices reflect what PhosAgro and EuroChem would have paid they had imported natural gas directly, and includes adjustments to average the delivery charges for the transmission and distribution of natural gas in Russia, any import duties and taxes, and surcharges. *Id*.

In addition, Commerce also adjusted the benchmark prices to include import-specific value added tax and the import duty in addition to the EU export value added tax that was included in the IEA because the government of Russia reported that imports of natural gas into Russia are subject to a 20 percent value added tax and five percent import duty. IDM at 57; PDM at 17; *see* GOR Questionnaire Response at 54. Commerce determined that the benchmark required import-specific value added tax and the import duty in addition to the EU export value added tax that is included in the IEA data because it reflects the price that PhosAgro and EuroChem would have paid if they imported natural gas into Russia.

PhosAgro's assertion that Commerce "double-counted" is incorrect because Commerce is constructing a price that PhosAgro would have paid had it imported natural gas. Record evidence denotes that imports of natural gas into Russia would be subject to a 20 percent value added tax and five percent import duty. IDM at 57; PDM at 18; *see* GOR Questionnaire Response at 54. In addition, there is an EU export value added tax that firms exporting natural gas would be subject to based on the IEA data. IDM at 57. When constructing an accurate benchmark that reflects a rate that PhosAgro would have paid had it imported natural gas into Russia, Commerce included both the Russian VAT and import duty and the EU export VAT in the price benchmark price. PhosAgro's assertion that Commerce double-counted in its adjustment is not correct; these taxes and duties are assessed by different taxing authorities—Russia and the EU. Commerce properly included the EU export value added tax and the Russian import value added tax and import duties in its benchmark price.

### iv. Commerce's Determination That The Record Does Not Support Removing Sales Of Natural Gas From Russia In The European Union From Its Tier-Three Benchmark Analysis Is Supported By Substantial Evidence And In Accordance With Law

As explained above, Commerce found that record evidence established that Russia's natural gas prices were not reflective of market principles and required Commerce to use a proxy to determine a market-based natural gas benchmark. PDM at 17; *see* The Mosaic Company's Benchmark Submission. Commerce found the most appropriate proxy to be regional European OECD natural gas price, specifically European OECD export prices sourced from the IEA. IDM at 56; PDM at 17. Accordingly, Commerce used the IEA dataset, which included Russian sales in the European Union. IDM at 56; *see* PDM at 17-18. Commerce's decision not to exclude export prices of Russian natural gas from the IEA benchmark price for natural gas is supported by substantial evidence and in accordance with law.

"{W}hen no data supports the use of either of the first two benchmarks, the Department will look to whether the government price is 'consistent with market principles.'" *Essar Steel 2010*, 721 F. Supp. 2d at 1292 (quoting 19 C.F.R. § 351.511(a)(2)(iii)). Commerce's tier three analysis considers "such factors as the government's price-setting philosophy, costs (including rates of return sufficient to ensure future operations), or possible price discrimination." *Preamble*, 63 Fed. Reg. at 65,378. However, "{t}hese factors are not hierarchical in application, and Commerce may rely on one or more factors to calculate a tier-three benchmark in any particular case." *Habaş 2021*, 536 F. Supp. 3d at 1337.

Furthermore, it is well established that "{e}ach administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record." *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1387 (Fed. Cir. 2014) (*Qingdao*) (internal citation omitted); *QVD*, 658 F.3d at 1326 (sustaining Commerce's

decision to reject financial data used in a previous administrative review for surrogate valuation because new record information suggested that the data previously used was unreliable). Thus, "{t}he question is whether the record adequately supports the decision of {Commerce.}" *Daewoo Elecs. Co. v. Int'l Union of Elec., Elec., Technical, Salaried & Mach. Workers, AFL–CIO*, 6 F.3d 1511, 1520 (Fed. Cir. 1993).

Here, Commerce reasonably determined that the record does not support removing sales of natural gas from Russia in the European Union from the IEA benchmark prices. As Commerce explained, the internal price regulations setting wholesale tariffs for natural gas produced in Russia, which is allegedly affecting natural gas prices in Russia, is not present in the European Union. IDM at 56. Further, Commerce found that there was no evidence suggesting that natural gas produced in Russia and sold in Europe is distorted or suppressed. *Id*. Thus, Commerce found that information on the record supported, rather than detracted from, including Russian prices in the IEA benchmark prices.

Mosaic claims that Commerce improperly refused to adjust the IEA benchmark prices for natural gas to exclude Russia exports because of the government of Russia's ability to influence natural gas prices in the European market. The Mosaic Company Br. at 35-38. In support, Mosaic contends that the present case is analogous to *Turkey Rebar 2017 Final*, where Commerce determined that it was appropriate to adjust the IEA data to remove the Russian price component. The Mosaic Company Br. at 37-38; *Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg. 16,056 (Dep't of Commerce Mar. 20, 2020) (*Turkey Rebar 2017 Final Determination*).

However, *Turkey Rebar 2017* and the present case are easily distinguishable. In the *Turkey Rebar 2017 Preliminary Determination*, Commerce found that IEA benchmark data

concerning Russia exports were unusable under a tier two analysis because Commerce was comparing "the government price to a world market price when it is reasonable to conclude that such price would be available to purchasers in the country in question." 19 C.F.R. § 351.511(a)(2)(ii) Turkey Rebar 2017 *Preliminary Determination at 22*. Moreover, in *Turkey Rebar 2017 Preliminary Determination*, Commerce determined there were specific geo-political instances during the period of investigation that caused Commerce to conclude Russia had a greater influence over European market prices. *Turkey Rebar 2017 Preliminary Determination at 22*.

Even though The Mosaic Company presents similar evidence that Commerce found persuasive in *Turkey Rebar 2017 Preliminary Determination*, such as cutting off natural gas supplies to Belarus, Latvia, and Lithuania, those geo-political events and the articles and reports that Mosaic relies on are prior to the period of investigation. *See* Mosaic's Benchmark Submission at Exhibit 22; *Turkey Rebar 2017 Preliminary Determination* at 22. For example, many of the articles provided by The Mosaic Company were published in 2014 and 2017, and even the Office of the United States Trade Representative's 2019 and 2020 *National Trade Estimate Reports on Foreign Trade Barriers* reflects facts and figures predating the period of investigation. *See* Mosaic's Benchmark Submission at Exhibit 22(d) at 423, 429; Exhibit 22(e) at 425, 432. Commerce reasonably determined that substantial evidence did not support that Russian exports to the EU were distorted during the period of investigation and therefore removing Russian prices would not be appropriate.

Accordingly, Commerce's determination not to adjust the IEA Benchmark Prices by removing sales of natural gas from Russia in the European Union in its tier-three benchmark analysis is supported by substantial evidence and in accordance with law.

## V. Commerce Properly Divided The Value Added Tax -Inclusive Benefit By Value Added Tax -Exclusive Sales For The Subsidy Margin Of Natural Gas For Less Than Adequate Renumeration

In the preliminary determination, Commerce calculated the benefit to EuroChem for the provision of natural gas by comparing the corresponding monthly benchmark unit prices to the unit prices that the respondents paid Gazprom, including delivery charges, surcharges, and taxes during the period of investigation. PDM at 18. Next, Commerce summed the benefits for each respondent and divided that amount by the appropriate sales denominator for the period of investigation. PDM at 18. EuroChem challenged Commerce's methodology, arguing that the value added tax must be included to provide a "fair apples-to-apples" comparison in the natural gas subsidy calculations. EuroChem's Letter, "Phosphate Fertilizers from Russia," dated January 5, 2021, at 2 (EuroChem Inv. Case Brief) (C.R. 550) (P.R. 376).

Commerce addressed this issue in the final determination, agreeing with The Mosaic Company that "Commerce properly ensured that the numerator consists of a subsidy benefit figure reflecting an apples-to-apples comparison to a market benchmark – *i.e.*, a value added tax -inclusive benchmark price minus a value added tax -inclusive government price." IDM at 57; (citing Petitioner's Letter, "Phosphate Fertilizers from Russia: Petitioner's Rebuttal Brief," dated January 12, 2021, at 20 (C.R. 557) (P.R. 382) (Petitioner Inv. Rebuttal Brief)); *See* Memorandum, "Final Determination Calculations for EuroChem Group," dated February 8, 2021 (EuroChem Final Calculation Memo). Commerce explained "that the inclusion of value added tax in the subsidy benefit numerator ensures a proper comparison to the market benchmark and has no bearing on the value of the sales to which the benefit is attributed." IDM at 57.

EuroChem then filed a ministerial error allegation under 19 C.F.R. § 351.302(d), again challenging Commerce's methodology. *See* EuroChem's Letter, "Phosphate Fertilizers from

Russia," dated February 16, 2021 (EuroChem Ministerial Error Comments) (C.R. 564) (P.R. 415); *see* Countervailing Duty Investigation of Phosphate Fertilizers from the Russian Federation: Ministerial Error Allegations in the Final Determination dated March 11, 2021 (P.R. 442) (Post-Final Determination Ministerial Error Memo). Commerce disagreed with EuroChem that there was a ministerial error, because Commerce clearly articulated its intent to include value added tax in the numerator but not the denominator. Commerce again explained the importance of including the value added tax in the subsidy benefit numerator to guarantee a proper comparison to the market benchmark and that it has no bearing on the value of the sales to which the benefit is attributed. Post-Final Determination Ministerial Error Memo at 3; IDM at 57. Further, "the numerator totaled a benefit calculated as the difference between a value added tax-inclusive price paid by the respondents and a value added tax-inclusive benchmark price." Post-Final Determination Ministerial Error Memo at 3. Therefore, Commerce did not make any revisions request by EuroChem to the final subsidy calculation by either removing the value added tax component from its numerator or including a value added tax component in the sales denominator.

Eurochem continues to challenge Commerce's methodology for calculating the benefit conferred to EuroChem for the provision of natural gas. EuroChem again argues that Commerce erred by failing to include the value added tax in the denominators, thereby overstating the subsidy attributable to the subject phosphate fertilizers produced by EuroChem. Eurochem Br. at 24. Eurochem contends that Commerce should either remove the value added tax from the numerator calculation or include a value added tax component in the sales denominator for the provision of natural gas for less than adequate renumeration program. *Id*. The Court should reject EuroChem's argument.

It is well-established that "Commerce has discretion to establish what constitutes 'adequate remuneration' for the purpose of determining whether a benefit was conferred to the recipient of a subsidy{,}" and the statute does not provide a specific methodology for measuring the adequacy of remuneration. *Nucor*, 286 F. Supp. 3d at 1370-71. Thus, Congress has granted Commerce considerable discretion to construct a methodology "to identify and measure the benefit of a subsidy." Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 927 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4241 ("SAA"). "[T]he Court also affords Commerce significant deference in "[a]ntidumping and [CVD] determinations involv[ing] complex economic and accounting decisions of a technical nature[.]" *Fujitsu*, at 1039 (citation omitted). Nonetheless, Commerce's methodological approach must be a "reasonable means of effectuating the statutory purpose" and its conclusions must be supported by substantial evidence. *Nucor*, 286 F. Supp. 3d at 1370-71 (referencing *Ceramica Regiomontana, S.A. v. United States*, 636 F. Supp. 961, 966 (Ct. Int'l Trade 1986) (citations omitted), *aff'd*, 810 F.2d 1137, 1138-39 (Fed. Cir. 1987)).

Here, Commerce calculated the benefit by using the value added tax OECD benchmark price minus the government of Russia's value added tax inclusive price divided by the total sales to derive the benchmark price. Ministerial Error Memo at 3; IDM at 57. Based on the information provided, Commerce explained that including the value added tax in the subsidy benefit numerator was to ensure a proper comparison to the market benchmark. Ministerial Error Memo at 3; IDM at 57. This calculation offers an apples-to-apples comparison, and has no bearing on the value of the sales to which the benefit is attributed. Rather the value added tax is negated in the calculation, and the resulting numerator simply provides the OECD price minus the government of Russia price. The numerator represents the subsidy, not the value added tax.

Thus, Commerce is left with the difference between the OECD and the government of Russia price divided by the total sales, which reflects the benefit EuroChem received. Final Calculation. Memo at 6.

Commerce is not required to include value added tax in the sales denominators or remove value added tax from the numerator of the benefit. Commerce has already accounted for the valued added tax between the OECD and the government of Russia, which—when subtracted— help derive the total benefit EuroChem receives. Including value added tax in the denominator would cause imbalance in the calculation, and Commerce would not be able to accurately determine the benefit EuroChem received during the period of investigation. IDM at 57; EuroChem Final Calculation Memo at 4-6.

The cases EuroChem relies upon in support of its argument are distinguishable. First, EuroChem cites *Mannesmann*, for the proposition that "to calculate an accurate subsidy margin, the numerator and denominator must both take into account factors affecting value such as, in this case, inflation and foreign exchange movements." *Mannesmann -Sumerbank Boru Endustrisi T.A.S. v. United States*, 86 F. Supp. 2d 1266, 1277 (Ct. Int'l Trade 1999). In *Mannesmann* the Court reviewed a calculation concerning the exclusion of exchange difference accounts and held that Commerce erred in its explanation for rejecting the Turkish generally accepted accounting principles. *See id*. However, *Mannesmann* is inapposite because the issue there was how Commerce constructed denominators at the time of receipt for exchange difference accounts. *Id*. at 1063. Specifically, the Court held that Commerce's numerator and denominator should match when handling the time and date of sales. *Id*. at 1063-64. Thus, the Court's ruling in *Mannesmanni* is not applicable because, here, Commerce is handling value added prices from the same period of investigation. EuroChem Final Calculation Memo at 5.

Second, EuroChem cites *Granular PTFE Resin from Russia* in support of its contention that Commerce should either remove the value added tax component from its numerator calculation or include a value added tax component in the sales denominator for the provision of natural gas for LTAR program. EuroChem Br. at 24. However, the instant case and *Granular PTFE Resin from Russia* are distinguishable because in the final determination for *Granular PTFE Resin from Russia* relied on a tier-two analysis and world market prices from Kazakhstan, instead of a tier-three benchmark. *See Granular Polytetrafluoroethylene Resin From the Russian Federation: Final Affirmative Countervailing Duty Determination*, 87 Fed. Reg. 3,764 (Dep't of Commerce Jan. 25, 2022) and accompany IDM at 15-22. In *Granular PTFE Resin from Russia*, Commerce had record evidence to support that natural gas exported from Kazakhstan was available to industrial purchasers in Russia and not re-exported to other markets, and therefore fulfilled the criteria for a tier-two benchmark. *Granular PTFE Resin from Russia* IDM at 19. Accordingly, Commerce engaged in a different analysis from the instant case and that same evidence is not available here. *See Granular PTFE Resin from Russia* PDM at 30; *See Granular PTFE Resin from Russia* IDM at 15-22.

Underscoring this latter point, the Federal Circuit has held that Commerce is not forever bound by its past practices since "each administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record." *Hyundai Elec. & Energy Sys. Co. v. United* States, 15 F.4th 1078, 1089 (Fed. Cir. Oct. 4, 2021); *see Jiaxing Bro. Fastener Co. v. United States*, 822 F.3d 1289, 1299 (Fed. Cir. 2016); *Qingdao*, 766 F.3d at 1387. Therefore, this case presents a different set of record facts and evidence than *Granular PTFE Resin from Russia* and EuroChem's analogy is inappropriate.

Accordingly, Commerce's decision to include the value added tax in the subsidy benefit numerator, ensuring a proper comparison to the market benchmark, is in accordance with law.

## VI.      Commerce Properly Excluded From The Subsidy Margin The Relative Consumption Of Natural Gas Used In The Production Of Phosphate Fertilizer

In its Final Determination, Commerce declined to consider the relative consumption of nature gas used in the production of phosphate fertilizer.  *See* IDM at 61 (P.R. 405).  Commerce also declined to consider EuroChem's untimely and unsolicited December 24, 2020 submission concerning relative natural gas usage.  Both decisions are supported by substantial evidence and in accordance with law.

Pursuant to 19 C.F.R. § 351.525(b)(5)(ii),  "if a subsidy is tied to production of an input product, then {Commerce} will attribute the subsidy to both the input and downstream products produced by a corporation."  19 C.F.R. § 351.525(b)(5)(ii).  In addition, the *Preamble* provides that there is no "all-encompassing definition of' 'tied,'" and that the rules regulating tied subsidies are intended to "reasonably {attribute} the benefit from a subsidy based on the stated purpose of the subsidy or the purpose we evince from record evidence at the time of bestowal."  *See Preamble*, 63 Fed. Reg. at 65,403;  *see also Içdaş Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*, 498 F. Supp. 3d 1345, 1363 (Ct. Int'l Trade 2021); IDM at 62.  In situations where a subsidy is provided to an input producer whose production is dedicated almost exclusively to the production of a higher value-added product then "the purpose of a subsidy provided to the input producer is to benefit the production of both the input and downstream products."  *Preamble* 63 Fed. Reg. at 65,401.  Under 19 C.F.R. § 351.525(b)(6)(iv)  Commerce will attribute the subsidies received by the input producer to the combined sales of the input and downstream products (excluding the sales between the corporations).  19 C.F.R. § 351.525(b)(6)(iv);  IDM at 62.

EuroChem asserts that Commerce must trace the input of natural gas on a "dollar-by-dollar" basis—*i.e.*, to consider the relative consumption of natural gas in the production of phosphate fertilizer—through EuroChem's respective companies and production processes to weed out a major input that it widely used in EuroChem's subject and non-subject merchandise. IDM at 62. Commerce explained that, consistent with the regulations and its practice, it did not consider the relative consumption of natural gas in the production of phosphate fertilizer. *Id*. at 61-62. For example, in *CFS from China* and *Phosphoric Acid from Israel*, Commerce rejected similar reasoning, and explained "that the benefit flowed equally to all downstream products that could use the subsidized inputs . . .even if the some of the subsidized inputs were not actually used to produce {the subject merchandise} during the period of review. *Coated Free Sheet Paper from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 72 Fed. Reg. 60,645 (Dep't of Commerce Oct. 25, 2007) (*CFS Paper from China*), and accompanying IDM at 94; *Industrial Phosphoric Acid from Israel: Final Results of Countervailing Duty*, 63 Fed. Reg. 13,628-30 (Dep't of Commerce March 20, 1998) (*Phosphoric Acid from Israel*). Similar to *CFS from China*, EuroChem's request involves tracing inputs to subject and non-subject merchandise sold to the United States as well as other markets. EuroChem Br. 25-27; EuroChem's Letter, "Phosphate Fertilizers from Russia," dated January 5, 2021 (EuroChem Inv. Brief) at 4-9; EuroChem's Letter, "Phosphate Fertilizers from Russian Federation," dated January 12, 2021, at 1 (EuroChem Inv. Rebuttal Brief) (C.R. 556) (P.R. 366). However, such tracing is neither practical nor required. Rather than tracing subsidized inputs through the production process to particular downstream products, Commerce calculated natural gas benefits for all fertilizer products produced by EuroChem, and divided it by EuroChem's total sales during the period of investigation. IDM at 62.

Nonetheless, EuroChem argues Commerce erroneously excluded the relative consumption of natural gas in its calculation for the subsidy margin because EuroChem produces different types of fertilizers that require varying amounts of natural gas. EuroChem Br. at 25-26. EuroChem does not cite any supporting law with regard to its specific argument that Commerce must calculate the exact amount of natural gas for every type of fertilizer EuroChem produces, *i.e.,* both subject and non-subject merchandise. EuroChem Br. at 25-26. Instead, EuoChem only restates the broad statutory requirement, which Commerce complied with in this investigation. EuroChem Br. at 25-26 (citing 19 U.S.C. § 1671(a)(1)-(2)).

This Court has previously held that Commerce does not need to trace every subsidized input through a company's production process. *İçdaş*, 498 F. Supp. 3d at 1364 ("{i}t is well-settled that Commerce is not required to examine the ultimate use of the subsidy."). "So long as a subsidy is provided with respect to the manufacture, production or sale of subject merchandise, Commerce may impose countervailing duties." *Fabrique De Fer De Charleroi v. United States*, 166 F. Supp. 2d 593, 603 (Ct. Int'l Trade 2001); *see MTZ Polyfilms, Ltd. v. United States*, 659 F. Supp. 2d 1303, 1314 (Ct. Int'l Trade 2009) ("{a}s long as the subject merchandise could be produced, it is immaterial whether and how such subject merchandise is actually produced."). Thus, the manner in which EuroChem used its inputs is not relevant to Commerce's subsidy analysis.

EuroChem also contends that Commerce erred in rejecting its December 24, 2020, submission as new factual information because the submission provided unsolicited information concerning relative natural gas usage. EuroChem Br. at 26-27. This argument lacks merit.

First, EuroChem concedes that its December 24, 2020 submission was untimely and offered unsolicited information. EuroChem Br. at 26 ("On seeing Commerce's Preliminary

Determination, EuroChem provided information on December 24, 2020 to *assist* Commerce to correct its false assumption concerning relative natural gas usage.") (emphasis added); *see also* Commerce Letter, Countervailing Duty Investigation of Phosphate Fertilizers from the Russian Federation: Rejection of December 24, 2020, Submission of Untimely New Factual Information (P.R. 366). On this basis alone, Commerce had no obligation to consider or accept the untimely information, as it is well-established that, consistent with 19 C.F.R. § 351.302(d), "Commerce generally does not consider untimely filed factual information." 19 C.F.R. § 351.302(d)(1); *Essar Steel 2012*, 678 F.3d at 1278. "Commerce has broad discretion to establish its own rules governing administrative procedures, including the establishment and enforcement of time limits." *Yantai Timken Co. v. United States*, 521 F. Supp. 2d 1356, 1370-71 (Ct. Int'l Trade 2007), *aff'd*, 300 F. App'x 934 (Fed. Cir. 2008) (quoting *Reiner Brach GmbH & Co. v. United States*, 206 F. Supp. 2d 1323, 1334, (Ct. Int'l Trade 2002)); *see also ArcelorMittal*, 399 F. Supp. 3d at 1279. "In order for Commerce to fulfill its mandate to administer the antidumping duty law, including its obligation to calculate accurate dumping margins, it must be permitted to enforce the time frame provided in its regulations." *Yantai*, 521 F. Supp. 2d at 1371. Thus, "{s}trict enforcement of time limits and other requirements is neither arbitrary nor an abuse of discretion when Commerce provides a reasoned explanation for its decision." *Maverick Tube Corp. v. United States*, 107 F. Supp. 3d 1318, 1331 (Ct. Int'l Trade 2015). Given the untimeliness of EuroChem's submission, Commerce acted well within its discretion in refusing to consider the additional information.

Second, EuroChem's reliance on *Kajaria Iron Castings Pvt. Ltd. v. United States* does nothing to bolster its argument that Commerce improperly captured non-subjected merchandise

due, in part, to its refusal to consider its December 24, 2020 submission.[3] EuroChem Br. at 27

(citing *Kajaria Iron Castings Pvt. Ltd. v. United States*, 156 F.3d 1163, 1176 (Fed. Cir. 1998)

(*Kajaria*)). In that case, the Federal Circuit undermined the position EuroChem advances,

stating "our decision does not mean that in every review or investigation Commerce must trace

the tax treatment of subsidies on non-subject merchandise when a tax deduction results in a

countervailable subsidy to determine if the deduction is partially based on the subsidy on non-

subject merchandise." *Kajaria*, 156 F.3d at 1176. EuroChem's misplaced reliance on *Kajaria*

only highlights that Commerce does not need to trace every subsidized input through a

company's production process. *See Içdaş*, 498 F. Supp. 3d at 1364. Accordingly, Commerce's

decisions to exclude the relative consumption of natural gas in the production of phosphate

fertilizer and to reject, as untimely, EuroChem's December 24, 2020 submission are supported

by substantial evidence and in accordance with law.

## VII. Commerce's Construction Of Eurochem's Sales Denominators Used To Calculate The *Ad Valorem* Subsidy Rate For The Provision Of Natural Gas For Less Than Adequate Renumeration Is Supported By Substantial Evidence And In Accordance With Law

During the investigation, the mandatory respondent, Phosphorite, disclosed that

EuroChem, its parent company, is based in Switzerland, and reported that all of its cross-owned

affiliates, EuroChem-BMU, LLC (BMU) and JSC Nevinnomyssky Azot (Nevinka), are

producers of phosphate fertilizers. PDM at 5; *see* EuroChem Letter, "Phosphate Fertilizers from

Russian Federation," dated August 18, 2020 at 7 (EuroChem Affiliation Response) (C.R. 25)

(P.R. 76). Pursuant to 19 C.F.R. § 351.525(b)(6)(ii), Commerce attributed subsidies received by

---

[3] The other cases that EuroChem cites related to Commerce's request for information after the expiration of a stated deadline, *see* EuroChem Br. at 26-27, fn. 104, are unavailing. No statute, regulation, or case requires Commerce to trace subsidized inputs through a company's production process.

Phosphorite, BMU, and Nevinka to their combined total sales, net of intercompany sales. PDM at 5; EuroChem Affiliation Response at 3, 7 and Exhibit 2; *see also* EuroChem Questionnaire Response at 9-10.

Phosphorite also reported Mineral and Chemical Company EuroChem, JSC (MCC EuroChem) as the holding and managing company for the Russian assets of EuroChem Group. PDM at 5; *see* EuroChem Questionnaire Response at 5-6. Although Commerce would normally attribute subsidies received by MCC EuroChem to its total sales plus the combined total sales of Phosphorite, BMU, and Nevinka, net of intercompany sales, MCC EuroChem did not report receiving any subsidies during the period of investigation or average useful life period. PDM at 5; s*ee, generally,* EuroChem Questionnaire Response; 19 C.F.R. § 351.525(b)(6)(iii).

In addition, Phosphorite also reported inputs from AK Azot, JSC (NAK Azot); EuroChem Northwest, JSC (EuroChem North-West); Joint Stock Company Kovdorksy GOK (KGOK); EuroChem-Energo, LLC (Energo); and EuroChem-Usolsky Potash Complex, LLC provided inputs to BMU and Nevinka. PDM at 6; *see* EuroChem Affiliation Response at 3; *see* EuroChem Supplemental Affiliation Response at 2. Therefore, pursuant to 19 C.F.R. § 351.525(b)(6)(iv), Commerce attributed the subsidies received by these companies to their total sales plus the combined total sales of Phosphorite, BMU, and Nevinka, net of intercompany sales. PDM at 6.

Finally, Phosphorite also reported EuroChem Trading Rus, LLC (EuroChem Trading Rus) as an export trading company but, EuroChem Trading Rus did not report receiving any subsidies during the POI or average useful life period. PDM at 6; *See, generally*, *see* PhosAgro's Letter, "Countervailing Duty Investigation of Phosphate Fertilizers from Russia: PhosAgro

PJSC Initial Section III CVD Questionnaire Response," dated September 24, 2020, at 9 (PhosAgro Questionnaire Response) (C.R. 45) (P.R.115).

Based on the foregoing reports, Commerce declined to use either EuroChem's consolidated financial statement or the combined sales from the ten cross-owned affiliates as the sales denominator. EuroChem argues that Commerce should treat EuroChem as a single entity, and that Commerce should adjust the *ad valorem* subsidy rate to reflect EuroChem Group's consolidated sales or a collapsed group of ten entities. EuroChem Br. at 27-37. Specifically, EuroChem maintains that (1) Commerce incorrectly applied 19 C.F.R. § 351.525(b); (2) EuroChem should be treated as single entity based on administrative and judicial precedent; (3) Commerce failed to consider previous instances where it treated EuroChem as a single entity; (4) Commerce should include the consolidated sales of all ten cross-owned affiliates; and (5) Commerce never analyzed whether it should be treated as a single entity. *Id*. The Court should reject EuroChem's arguments because they are not supported by either the record or precedent.

First, Commerce properly applied 19 C.F.R. § 351.525(b). "In general, Commerce calculate(s) an *ad valorem* subsidy rate by dividing the amount of the benefit allocated to the period of investigation . . . by the sales value during the same period of the product or products to which [Commerce] attributes the subsidy." *TMK IPSCO v. United States*, 222 F. Supp. 3d 1306, 1322 (Ct. Int'l Trade 2017) (*TMK IPSCO II*) (citing 19 C.F.R. § 351.525(a) (internal quotes omitted). Commerce generally attributes subsidies to goods produced by the corporation receiving the subsidy. 19 C.F.R. § 351.525(b)(6)(i). "However, if two or more corporations are cross-owned, Commerce's regulations provide a number of exceptions to its default attribution rule." *TMK IPSCO II*, 222 F. Supp. 3d at 1322 (referencing 19 C.F.R. § 351.525(b)(6)(ii)-(v)).

Subsidies received by cross-owned corporations are jointly attributed to subject merchandise produced by both corporations. 19 C.F.R. § 351.525(b)(6)(ii); *MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1356 (Ct. Int'l Trade 2015). Whereas if a "firm that received a subsidy is a holding company, including a parent company with its own operations, Commerce will attribute the subsidy to the consolidated sales of the holding company and its subsidiaries." *TMK IPSCO II*, 222 F. Supp. 3d at 1322; *see* 19 C.F.R. § 351.525(b)(6)(iii). Pursuant to 19 C.F.R. § 351.525(b)(6)(iv), "for subsidies received by an input supplier whose production of inputs is primarily dedicated to the production of the downstream product by a cross-owned producer, Commerce attributes the benefit to the combined sales of the input and downstream products produced by both corporations, excluding the sales between the two corporations." 19 C.F.R. § 351.525(b)(6)(iv); PDM at 6.

"While there are exceptions that allow Commerce to attribute the subsidies to foreign cross-owned subsidiaries and affiliates, Commerce must base its decisions on the record before it in each individual investigation." *Yama Ribbons & Bows Co., Ltd. v. United States*, 865 F. Supp. 2d 1294, 1298 (Ct. Int'l Trade 2012) (*Yama Ribbons*). Accordingly, the burden rests on the interested parties to create an accurate record during the investigation. *Yama Ribbons*, 865 F. Supp. 2d at 1298 (citing *Essar Steel 2012*, 678 F.3d at 1277).

Here, record evidence does not support EuroChem's proposal. There are specific guidelines governing how a subsidy may be attributed involving corporations with cross-ownership, and the record evidence provided by EuroChem does not justify the requested treatment. For example, Phosphorite establishes that the ultimate parent company of the EuroChem Group is based in Switzerland. *See* EuroChem Affiliation Response at 3 and Exhibit 2; *see also* EuroChem Questionnaire Response at 9-10. There is no evidence that the Swiss

parent company of the EuroChem Group companies is a producer of the subject merchandise or received a subsidy from the government of Russia. IDM at 59. EuroChem also reported plants in other third countries, such as Belgium, Kazakhstan, Lithuania, and China as part of its ten cross-owned companies. EuroChem Affiliation Response, "Phosphate Fertilizers From Russian Federation," dated August 18, 2020 at 2. (C.R. 25) (P.R. 76). Commerce explained in the final determination that EuroChem's request to consolidate sales from foreign companies would be irrational because it would also require the foreign companies to report subsidies they received from the government of Russia. IDM at 64. "Commerce is not investigating subsidies to entities outside of Russia, nor is Commerce investigating whether sales of subject merchandise to third countries are unfairly subsidized." *Id*. It would not be consistent or appropriate to "attribute any benefit of subsidies received by Russian companies to the sales made by non-Russian companies or to unrelated third countries regardless of whether they are part of the same corporate structure." *Id*. Therefore, Commerce appropriately reasoned that EuroChem did not demonstrate that it would be consistent with the regulations to attribute the natural gas subsidies to the EuroChem Group's consolidated sales or a collapsed group of ten entities.

Second, EuroChem argues that based on administrative precedent Commerce must attribute subsidies received by cross-owned entities to the consolidated sales of the combined entity. EuroChem Br. at 30. However, EuroChem does not provide any analysis for how these cases are applicable to the case before the Court. For example, in *Ripe Olives from Spain*, Commerce applied adverse facts available because the respondent failed to provide complete reporting related to its cross-owned suppliers, and therefore Commerce treated the respondent and its cross-owned input suppliers as one entity for purposes of calculating countervailable subsidy rate. *See Ripe Olives from Spain* IDM at 77. In *Seamless Line and Pressure Pipes from*

*China*, Commerce's decision to attribute the sales of all cross-owned subject merchandise producers was supported by record evidence and did not involve foreign companies outside of China. *Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the People's Republic of China*, 75 Fed. Reg. 57,444 (Dep't of Commerce September 21, 2010) (final affirm. Countervailing duty determ.) and accompanying IDM at 96; 111-13 (*Seamless Line and Pressure Pipes from China*). In *Cold-Rolled Steel from Russia Preliminary Determination*, Commerce found cross-ownership of the Severstal companies, however, Severstal Export's sales, (it operated a Swiss-based trading company), were not included in the sales denominators. *Certain Cold-Rolled Steel Flat Products from the Russian Federation*, 81 Fed. Reg. 12,072, (Dep't of Commerce March 8, 2016)) (preliminary countervailing duty determ.) and accompany PDM at 12 (*Cold-Rolled Steel From Russia*). In each of these cases, Commerce may have found cross-ownership, however, it was supported by record evidence and did not require Commerce to attribute any benefit of subsidies received by subject country companies to the sales made by non-subject country companies or to unrelated third countries regardless of whether they are part of the same corporate structure.

Moreover, in *Yama Ribbons*, the Court held that Commerce correctly determined that only Chinese companies received Chinese subsidies, therefore it was inappropriate to use sales figures from a Hong Kong company. *See Yama Ribbons*, 865 F. Supp. 2d at 1298; *see also* 19 C.F.R. § 351.525(b)(6)(i). The Court agreed that Yama's argument that Commerce should have requested the necessary information was incorrect because "it is well established that in AD and CVD investigations, the burden falls on the interested party to place relevant information within its possession on the record." *Yama Ribbons*, 865 F. Supp. 2d at 1299; Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-

316, vol. 1 (1994) at 829, reprinted in 1994 U.S.C.C.A.N. 4040; 19 C.F.R. § 351.401(b)(1) ("The interested party that is in possession of the relevant information has the burden of establishing to the satisfaction of {Commerce} the amount and nature of a particular adjustment.").

Similar to *Yama Ribbons*, Commerce reasoned that EuroChem did not demonstrate that it would be consistent with those rules to attribute the natural gas subsidies to the EuroChem Group's consolidated sales or a collapsed group of ten entities. IDM at 64. EuroChem's proposal would include foreign companies, and that would require reports of subsidies the foreign companies received from the government of Russia. *Id*., at 64. Commerce explained that this would be irrational because "Commerce is not investigating subsidies to entities outside of Russia, nor is Commerce investigating whether sales of subject merchandise to third countries are unfairly subsidized." Thus, similar to *Yama Ribbons*, attributing any benefit of subsidies received by Russian companies to the sales made by non-Russian companies or to unrelated third countries regardless of whether they are part of the same corporate structure is not consistent with 19 C.F.R. § 351.525 and judicial precedent.

Third, EuroChem states that Commerce recognizes that the terms used in cross-owned provisions are undefined, and cites to the "collapsing doctrine" as evidence that "…Commerce has *always* treated the EuroChyem {sic} as a single entity." EuroChem Br. at 30 (emphasis added). EuroChem only cites to antidumping duties proceedings, where Commerce collapsed the EuroChem entities, yet those proceedings are not relevant to a subsidies attribution analysis nor has EuroChem established such treatment should be provided. EuroChem Br. at 37. In addition, it is well-established that "{e}ach administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record." *Qingdao*, 766 F.3d at 1387 (internal citation omitted).

Fourth, EuroChem argues that Commerce failed to include the consolidated sales of all ten cross-owned affiliates, and therefore, the sales denominators used to calculate the *ad valorem* subsidy rate for the provision of natural gas at less than adequate renumeration are incorrect. EuroChem Br. at 33-37. However, as explained above, including many of the foreign companies would not be appropriate and would be antithetical. EuroChem also faults Commerce for not including intracompany sales, however, that would inflate EuroChem's sales numbers. EuroChem Br. at 42. For example, including Trading Rus would not be appropriate because EuroChem stated that Trading Rus did not sell to the United States. EuroChem Affiliation Response at 2. Otherwise, Commerce treated each of the remaining companies properly by excluding any intercompany sales between the ten cross-owned affiliates identified to be involved in the production, sales and/or distribution of subject merchandise. EuroChem Final Calc Memo at 2. Then Commerce attributed subsidies received by any of the three EuroChem companies producing subject merchandise (*i.e.*, Phosphorite, Nevinka, and BMU) to the total sales for all three companies. *Id*. Finally, Commerce attributed subsidies received by the other cross-owned affiliates to their respective total free-on-board sales, net of intercompany sales, plus the total free-on-board sales for Phosphorite, BMU, and Nevinka. *Id*.

Finally, EuroChem claims that Commerce never analyzed whether it should be treated as a single entity. EuroChem Br. at 30-31. This is incorrect. Commerce explained in its final determination why this would be inappropriate because "Commerce is not investigating subsidies to entities outside of Russia, nor is Commerce investigating whether sales of subject merchandise to third countries are unfairly subsidized." IDM at 64. Moreover, this would require Commerce to attribute any benefit of subsidies received by Russian companies to the sales made by non-Russian companies or to unrelated third countries regardless of whether they

are part of the same corporate structure. *Id*. Information provided by EuroChem shows companies from across the globe and Commerce is not investigating subsidies to entities outside of Russia, nor is Commerce investigating whether sales of subject merchandise to third countries are unfairly subsidized. Even if Commerce's practice were as EuroChem paints it, EuroChem did not report subsidies from all of its subsidiaries, and it is incumbent on "the interested party that is in possession of relevant information has the burden of establishing to the satisfaction of the Secretary the amount and nature of a particular adjustment.") (emphasis supplied); *Fujitsu*, 88 F.3d at 1040 (explaining that a party seeking an adjustment bears the burden of proving the entitlement to the adjustment).

Therefore, Commerce's determination to forego the use of EuroChem's consolidated financial statement for constructing the sales denominator is supported by substantial evidence and in accordance with law.

## VIII. Commerce Properly Established A Cut-off Date And Reasonably Determined That Any Benefits Conferred Prior To The Cut-off Date Could Not Be Identified Or Measured

During the investigation, JSC Aptit reported it attained four mining licensees from the government of Russia; however, two were obtained prior to April 1, 2002—the date Commerce recognized that Russia made the transition to a market economy for purposes of the CVD law. PDM at 34; Post-Preliminary Determination at 4; *see* PhosAgro Questionnaire Response at 9. Prior to April 1, 2002, Russia was designated as a non-market economy, and as a result of intervention by the state, meaningful identification or measurement of subsidies is not possible. IDM at 24. Commerce stated that it would only consider licenses acquired after April 1, 2002, to be countervailable because the financial contribution—*i.e.*, the issuance of the mining licenses— occurred after the cut-off date, and this date was when Commerce determined that Russia had

undergone meaningful reforms that would permit Commerce to accurately determine whether, and to what extent, countervailable subsidies were being bestowed on Russian producers. *Id*. at 23-24; PDM at 34 (referencing *Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from the Russian Federation*, 81 Fed. Reg. 49,935 (Dep't of Commerce July 29, 2016) (preliminary countervailing duty determ.) and accompanying IDM at 8. Further, record evidence demonstrates that the terms and condition for the mining rights were set prior to the cut-off date and have not been materially altered since they were granted. IDM at 24; Post-Preliminary Determination 4; *see* EuroChem First Supplemental Response at 6 (C.R. 435) (P.R.225).

Accordingly, the record unambiguously indicates that the licenses were granted prior to the cut-off date and the terms and conditions of the licenses were established prior to the time that Commerce recognized Russia had transitioned to a market economy for purposes of the AD and CVD laws. IDM at 24; *see* EuroChem Supplemental Response at 5; PhosAgro Questionnaire Response at 9-12. As such, Commerce determined that regardless of any methodology required to measure the benefit from the two relevant mining rights licenses at issue, they were granted during a time when Commerce does not possess the ability to meaningfully measure the potential government distortion. IDM at 24.

Moreover, the information provided by the government shows that the terms of the phosphate licenses issued to JSC Apatit and Joint Stock Company Kovdorksy GOK prior to the cut-off date did not substantially change since their initial issuance. *Id*. at 24; *see* PDM at 34; *see also* EuroChem Supplemental Response at 6. The government of Russia provided that a license to use a subsoil plot is subject to re-issuing upon transfer of the right of the subsoil, the conditions reviewed were not subject to revision here, and any changes to the licenses granted to

JSC Apatit and Joint Stock Company Kovdorksy GOK were technical in nature and did not increase the mineral reserves. IDM at 24; *see* Government of Russia Supplemental Response at 7-8. Russian law permits the change of any boundaries of the subsoil plot and that the coordinates of a deposit can be revised in case of technological needs to expand the boundaries of the subsoil area without an increase in mineral reserves. IDM at 25; Government of Russia Supplemental Response at 8 and 10. Therefore, Commerce reasonably determined that the terms of the phosphate mining licenses issued to JSC Apatit and KGOK prior to the cut-off date of April 1, 2002, did not substantially change after the cut-off date and could not be included in the final calculation of a benefit concerning the provision of phosphate mining for less than adequate renumeration.

Nevertheless, The Mosaic Company asserts that Commerce's decision to institute a "cut-off" date for the phosphate mining licenses issued to JSC Apatit and KGOK prior to April 1, 2002, is unreasonable, not supported by substantial evidence, and not in accordance with law. Specifically, The Mosaic Company, argues that: (1) Commerce cannot impose a uniform "cut-off" date; (2) the terms of the mining licenses where substantially altered; (3) Commerce's determination is inconsistent with prior practice.

Under 19 U.S.C. § 1671(f)(1), Commerce shall impose countervailing duties on imports from nonmarket economies on merchandise from a non-market economy country if Commerce makes the findings necessary to countervail a subsidy more generally under the statute. *See* 19 U.S.C. § 1671(f)(1). Relatedly, 19 U.S.C. § 1671(f)(2) provides that Commerce does not need to countervail a subsidy from a nonmarket economy country when Commerce cannot identify and measure the subsidy in question because the economy of that country is essentially comprised of a single entity. *Id*. § 1671(f)(2). Further, "Commerce has significant discretion in determining

61

whether it can identify and measure subsidies provided by the government or a public entity within the NME country because the statute is silent as to when Commerce can identify and measure a subsidy." *TMK IPSCO II*, 222 F. Supp. 3d at 1314 (*TMK IPSCO II*) (referencing 19 U.S.C. § 1671(f)(1)-(2)). "Normally, a reviewing court should not disrupt the agency's exercise of discretion in fashioning an approach to a problem delegated to it unless the agency has not supplied a reasoned basis for its action." *Id.* (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (*Motor Vehicle*)). "Nonetheless, the agency must cogently explain why it has exercised its discretion in a given manner." *TMK IPSCO II* (citing *Motor Vehicle*, 463 U.S. at 48).

In both *GPX Int'l*, *TMK IPSCO I* and *TMK IPSCO II*, the Court reviewed Commerce's ability to uniformly apply a cut-off date as the earliest date it could identify and measure subsidies issued by the Chinese government using the date the People's Republic of China (China) acceded to the World Trade Organization (WTO). *See GPX Int'l Tire Corp. v. United States*, 645 F. Supp. 2d 1231, 1249 (Ct. Int'l Trade 2009); *see TMK IPSCO v. United States*, 179 F. Supp. 3d 1328, 1343-44 (Ct. Int'l Trade 2016) (*TMK IPSCO I*); *see TMK IPSCO v. United States*, 222 F. Supp. 3d 1306, 1313-19 (Ct. Int'l Trade 2017) (*TMK IPSCO II*).

First, in *GPX Int'l* the Court determined that Commerce application of a cut-off date for China's accession to the WTO was unsupported by substantial evidence, and required Commerce to determine the existence of countervailable subsidies based on the specific facts rather than focusing on a bright-line cut-off date. *See GPX Int'l*, 645 F. Supp. 2d at 1249. In *TMK IPSCO I*, the Court originally determined that Commerce did not provide sufficient reasoning as "why China's WTO accession date was the first date it could identify and measure subsidies in the

Chinese economy." *TMK IPSCO I*, 179 F. Supp. 3d at 1343-44. However, the Court did not prohibit Commerce's ability to apply a cut-off date generally. *See id*.

In *TMK IPSCO II*, the Court found that "Commerce's determination to establish categories of programs and determine when each type of program would first be countervailable and measurable is reasonable and consistent with the statutory obligations to countervail all identifiable and measurable subsidies in a {non-market economy} country." *TMK IPSCO II*, 222 F. Supp. 3d at 1317. The Court reasonably determined that "Commerce cannot, for example, identify and measure the benefit provided by a specific loan to a specific party before it is possible to identify a loan as a legal, binding contract between distinct parties generally." *Id*. at 1318. Further, "it is possible that a specific program could be identifiable and measurable later than the category of program to which it belongs, but not earlier." *Id*. Therefore, the Court established that Commerce may apply a cut-off date. *Id*. at 1318.

Here, KGOK reported that it had obtained four mining licenses from the government of Russia, two of which were obtained prior to April 1, 2002, the cut-off date. PDM at 34; *see* EuroChem Initial Questionnaire Response at 31. Commerce established criteria for the programs to determine when each type of program would first be countervailable and measurable. *See* IDM at 13-25 (Commerce's analysis of mining rights for less than adequate renumeration); *see also Russia Cold-Rolled Steel Final Determination* IDM at 24. As a result of the nature of Russia's previous nonmarket economy status, Commerce cannot accurately identify and measure alleged subsides conferred to Russian producers before the cut-off date irrespective of the methodology. IDM at 23-24. Although Commerce could review the two licenses after the cut-off date, the two relevant mining rights licenses at issue were granted during a time when Commerce does not possess the ability to meaningfully measure the potential government

distortion. IDM at 24. Further, Commerce explained that even though reforms in Russia were ongoing and some preceded April 1, 2002, Commerce reasonably determined that a uniform cut-off date coinciding with Commerce's recognition of Russia's transition from a nonmarket economy to a market economy presented a date where Russia's economy had reached the state at which subsidies, and disciplines on subsidies in the form of countervailing duties, became meaningful. IDM at 24 (referencing Memorandum, "Market Economy Status for the Russian Federation," dated September 14, 2015). Therefore, Commerce has provided a logical rationale for its decision to apply a uniform cut-off date to aid with its review of the countervailability of mining rights for less than adequate renumeration.

The Mosaic Company relies on *GPX Int'l* and *TMK IPSCO I* to contend that it is arbitrary and unreasonable for Commerce to impose a uniform cut-off date. The Mosaic Company Br. at 22-23. But the Court in *GPX Int'l* and *TMK IPSCO I* required more analysis concerning Commerce's decision to apply a cut-off date, not an outright rejection of the principle. *GPX Int'l*, 645 F. Supp. 2d at 1250 ("… the court remands to Commerce to determine the existence of countervailable subsidies based on the specific facts for each subsidy, rather than by examining those subsidies found after an arbitrary cut-off date."); *TMK IPSCO I*, 179 F. Supp. 3d at 1344 ("…Commerce has not explained why China's WTO accession date was the first date it could identify and measure subsidies in the Chinese economy."). In *TMK IPSCO II* expressly held that Commerce can apply a cut-off date to determine the basic elements of property transactions necessary for identifying and measuring subsidies. *See* The Mosaic Company Br. at 19-23; *TMK IPSCO II*, 222 F. Supp. 3d at 1318 (". . . Commerce's adoption of a uniform cut-off date for each category of subsidy program is reasonable.").

Commerce's application of a uniform cut-off date in this specific instance is also consistent with precedent. In *Russia Cold-Rolled Steel*, Commerce also explained that licenses issued prior to 2002 could not be reviewed because of the lack of definitive information indicating that the terms of sale of the license changed as a result of the reissuance, and the record only indicated that the government of Russia issued the license and subsequent re-issue dates of the license. *Russia Cold-Rolled Steel Final Determination* IDM at 24. Thus, Commerce could not countervail licenses issued prior to the cut-off date. Here too, Commerce also stated that similar to *Russia Cold-Rolled Steel Final Determination*, that information prior to the cut-off date is nebulous, and Commerce cannot meaningfully identify or measure the subsidies before the established cut-off date. IDM at 23-24 (referencing *Cold Rolled Steel from Russia Final* IDM at 24). Commerce also found that the terms of the licenses did not substantially change from their initial issuance. IDM at 24-25.

Next, Mosaic argues that Commerce has a "practice of 'identifying and measuring' subsidies in the form of mining rights provided for {less than adequate renumeration} based on the resources extracted by respondents during the POI, not based on when the mining rights were first acquired." The Mosaic Company Br. at 24. The Mosaic Company cites to *Hot-Rolled Steel From India*, *Phosphate Fertilizers from Morocco*, and *Russia Cold-Rolled Steel Final Determination*. The Mosaic Company Br. at 25-26; *Certain Hot-Rolled Carbon Steel Flat Products From India*, 73 Fed. Reg. 40,295 (Dep't Commerce July 14, 2008) (final affirm. countervailing duty determ.) (*Hot-Rolled Steel from India*), and accompanying IDM at Comment 24; *Phosphate Fertilizers From the Kingdom of Morocco: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9,482 (Dep't Commerce Feb. 16, 2021), and accompanying

IDM at Comment 8 (*Phosphate Fertilizer from Morocco*); *Russia Cold-Rolled Steel Final Determination* IDM at comment 9.

The Mosaic Company's reliance on *Hot-Rolled Steel from India* and *Phosphate Fertilizer from Morocco* is misplaced because neither case addresses the fact that neither Morocco nor India were ever designated a nonmarket economy that transitioned to a market economy similar to Russia. Additionally, in *Russia Cold-Rolled Steel Final Determination*, Commerce also applied a uniform cut-off date pertaining to mining licenses acquired prior to April 1, 2002. *See Cold-Rolled Steel from Russia Final* IDM at 24. Commerce stated "…we limited our subsidy analysis to "active licenses," *i.e.*, those mining right licenses under which the Severstal Companies extracted coal during the POI{,}" and "we determine that those licenses initially issued … prior to April 1, 2002, are not countervailable because the financial contribution, *i.e.*, the issuance of the coal mining licenses, occurred prior to the cut-off date." *Russia Cold-Rolled Steel Final Determination* IDM at 24. Here too, Commerce stated that "we {will} only consider the countervailability of licenses acquired after the cut-off date of April 1, 2002, because the financial contribution, *i.e.*, the issuance of the mining licenses, occurred after the cut-off date." Post-Preliminary Determination at 4.

Of the two reported mining licenses obtained by JSC Apatit, record evidence demonstrated that JSC Apatit did not extract phosphate rock during the period of investigation from the two deposits for which the licenses were acquired after 2002. Post-Preliminary Determination at 4; *see* PhosAgro's Letter, "Countervailing Duty Investigation of Phosphate Fertilizers from Russia: PhosAgro PJSC Section III Supplemental Questionnaire," dated October 21, 2020 at 15 (C.R. 392) (P.R.221). Further, of the four mining licenses Phosphorite's cross-owned input supplier KGOK reported, two were obtained prior to the cut-off date so

Commerce focused on the remaining two obtained after the cut-off date. Post-Preliminary Determination at 4. KGOK then reported that one of the two licenses corresponded to an area that was not mined so Commerce analyzed the one license issued after the cut-off date under which KGOK mined phosphate during the period of investigation. Post-Preliminary Determination at 4.

The Mosaic Company also relies on *Steel Wire Rod from Italy* as an example of treating a new loan prior to the period of investigation. The Mosaic Company Br. at *Certain Stainless Steel Wire Rod From Italy*, 63 Fed. Reg. 40,474, 40,486 (Dep't Commerce July 29, 1998) (final affirm. countervailing duty determ.) (*Steel Wire Rod from Italy*). However, *Steel Wire Rod from Italy* is inapposite because renegotiating an interest rate is a material term to a loan, and Commerce had the ability to identify and measure the subsidies in question. And, cogently, Italy has not been designated as a nonmarket economy.

The other administrative decisions that The Mosaic Company cites are also distinguishable. In *Steel Wire Garment Hangers from Vietnam*, Commerce established a uniform cut-off date of January 11, 2007, the date Vietnam became a member of the WTO. *See Certain Steel Wire Garment Hangers From the Socialist Republic of Vietnam*, 77 Fed. Reg. 75,973 (Dep't Commerce Dec. 26, 2012) (final affirm. countervailing duty determ.) and accompanying IDM at 22 (*Steel Wire Garment Hangers from Vietnam*). The respondent originally signed a contract prior to the accession date, however, the respondent self-reported it "*signed a new lease contract*" with the Government of Vietnam" on August 11, 2009, well after the cut-off date. *Certain Steel Wire Garment Hangers From the Socialist Republic of Vietnam*, 77 Fed. Reg. 32,930, 32,933 (Dep't of Commerce June 4, 2012) (preliminary affirm. countervailing duty

determ.) (emphasis added). Thus, Commerce found it appropriate to consider the land rent exemptions in the new contract.

In *Polyethylene Retail Carrier Bags from Vietnam*, Commerce determined that a contract that received a rate adjustment a year prior to the established cut-off date, and then was renegotiated for a tract of land leased by one of the respondents for an additional 30 years constituted a new contract. *Polyethylene Retail Carrier Bags from the Socialist Republic of Vietnam*, 75 Fed. Reg. 16,428 (Dep't of Commerce Apr. 1, 2010) (final affirm. countervailing duty determ.) and accompanying IDM at 7-8 (*Polyethylene Retail Carrier Bags from Vietnam*). Here, KGOK and JSC Aptit did not receive a rate adjustment prior to the established cut-off date, both licenses were issued in the [                                    ], and the licenses were set to automatically renew with no new contractual amendments. PhosAgro Initial Questionnaire Response at 8-9 (C.R. 435). "Licenses number [

] and [                                              ] to KROK were developed since the Soviet period and were issued in accordance with Soviet standards, reflective of an economy comprised of a single entity." Government of Russia's Letter, "Phosphate Fertilizers from the Russian Federation: Government of Russia Rebuttal Brief," dated January 12, 2021 (Government of Russia Inv. Rebuttal Brief) (C.R. 558) (P.R.383); EuroChem Initial Questionnaire Response at 31. Further, both respondents submitted evidence that "the duration of their licenses granted before the cut-off date would renew "automatically" to the extent that the owner of the license continued to operate the mine in accordance with the terms of the license with no changes to the terms of the licenses." Government of Russia Inv. Rebuttal Brief at 12; PhosAgro Questionnaire Response at 11-13; EuroChem Supplemental Response at 5.

Thus, *Polyethylene Retail Carrier Bags from Vietnam* can be distinguished from the present case.

Commerce reasonably established a uniform cut-off date given that it did not have the ability to identify and measures subsidies in the form of mining rights as a result of Russia being a former nonmarket economy.

## IX. Commerce Appropriately Excluded Freight, Import Duties, And Value Added Tax From Its Tier-Three Benchmark Analysis for Mining Rights at Less than Adequate Renumeration

In the post-preliminary decision, Commerce determined that there were no suitable tier one prices that could be used as benchmarks, and that there were no suitable tier two benchmarks for valuing any benefit for mining rights. Post-Preliminary Determination at 7. Commerce determined it could consider world market prices for the underlying good that is conveyed with the mining rights, the phosphate rock, for its tier three analysis. *Id*.

Thus, Commerce calculated the benefit by comparing the actual per-unit cost build-up of KGOK's beneficiated phosphate rock, inclusive of taxes paid to the government of Russia, to the benchmark, *i.e.*, the world market price of phosphate rock. *Id*. Using information provided by The Mosaic Company, Commerce compared export volume and value data of equivalent HTS categories of the subject merchandise to other countries known to export phosphate rock of corresponding grade, measured by percentage of bone phosphate of lime, as well as countries exporting igneous rocking containing apatite ore deposit with similar chemical construction, $P_2O_5$, to the Russian phosphate rock and rock reported by KGOK. *Id*.; *see* Petitioner's Letter, "Phosphate Fertilizers from Russia: Petitioner's Submission of Factual Information to Measure the Adequacy of Remuneration," dated November 2, 2020, at 2 and Exhibits 1(a), 7(a), and 9(a) (The Mosaic Company Benchmark Submission) (P.R.245-75).

Commerce obtained a world market price by using petitioner's benchmark data that included information that was reported on a free-onboard basis, and included information related to the $P_2O_5$ content of the rock. IDM at 26; Post-Preliminary Decision at 7. Excluding data of non-comparable phosphate rock that was not comparable to the phosphate rock mined or beneficiated by KGOK during the period of investigation, Commerce was able to calculate the benefit. IDM at 26; Post-Preliminary Decision at 7.

In the final determination, Commerce declined to include freight, value added tax, and import duties to the phosphate mining rights benchmark because:

> KGOK did not purchase the input, phosphate ore, directly from the market, but rather extracted the ore from its own sites via the mining license, there is no need to build a comparison, market-determined benchmark that includes freight, value added tax, and import duties that were not incurred by KGOK when producing the phosphate rock used as input into the production of phosphate fertilizers.

IDM at 26-27. Further, "the benefit analysis involves comparing a good, *i.e.*, phosphate rock, that was produced by KGOK using its reported production costs, rather than the purchase of a good on the open market for LTAR, to a world market price that is a free-on-board price (*i.e.,* exclusive of freight, value added tax, and import duties)." *Id*.; *see* EuroChem's Letter, "Phosphate Fertilizers from Russia," dated December 7, 2020 at 5 (EuroChem Post-Prelim Response) (C.R. 494); *see also* EuroChem First Supplemental Response at 16-18 and Exhibit SQ2-2 (C.R. 437).

In accordance with 19 C.F.R. § 351.511(a)(2)(iv), if Commerce uses either "(1) an actual transaction price or (2) a world market price as the benchmark in its price comparison," Commerce will adjust the benchmark "to reflect the price that a firm actually paid or would pay if it imported the product" and include "delivery charges and import duties" where appropriate.

§ 351.511(a)(2)(iv)." *United States Steel Corp. v. United States,* Consol. Ct. No. 08-00239, Slip

Op. 2009-152, 12-13 (Ct. Int'l Trade December 30, 2009); *see* 19 C.F.R. § 351.511(a)(2)(iv).

However, "when no world market price is available to purchasers in the country subject to the

review will the Department 'measure the adequacy of remuneration by assessing whether the

government price is consistent with market principles.'" *Id.* at 13 (referencing 19 C.F.R.

§ 351.511(a)(2)(iii)).

Here, Commerce determined there were no suitable tier one or tier two benchmarks for

analyzing mining rights. However, Commerce determined that to conduct a benefit analysis it

would analyze whether the value of the acquired underlying good through the mining rights was

market-based. Post-Preliminary Determination at 7. Commerce excluded the freight, value

added tax, and import duties because KGOK did not purchase the input, phosphate ore, directly

from the market but instead extracted it from its own mining license. IDM at 26. Based on this

information it would be inappropriate to add freight, value added tax, and import duties when

these expenses were not incurred by KGOK when producing phosphate rock as an input into the

production of phosphate fertilizer. *Id.*, at 26. Thus, Commerce reasonably determined that the

constructed tier three benchmark benefit analysis did not need to include freight, value added tax,

and import duties.

The Mosaic Company argues that Commerce unreasonably refused to adjust the tier three

world market benchmark for phosphate rock for freight, customs duties, and value added tax to

arrive at a "delivered" benchmark price. The Mosaic Company Br. at 30-31. Specifically, The

Mosaic Company argues that although the 19 C.F.R. § 351.511(a)(2)(iv) expressly requires

Commerce to add freight, customs duties, and value added tax for tier-one and tier-two

benchmarks, Commerce should also adjust the tier-three benchmark to include the information as

well. *Id.*, at 30-35. The Mosaic Company also argues that Commerce's tier three benchmark is a *per se* tier two benchmark, and asserts that Commerce fails to cite any authority to not adjust the tier three benchmark to include delivery charges. *Id.*, at 32.

The Mosaic Company's first argument ignores that 19 C.F.R. § 351.511(a)(2)(iv) explicitly states that delivery charges will be included under a tier one and tier two analysis. 19 C.F.R. § 351.511(a)(2)(iv). Additionally, in the *Preamble*, Commerce sets forth the approach of 19 C.F.R. § 351.511(a)(2)(iii) as:

> Where the government is the sole provider of a good or service, and there are no world market prices available or accessible to the purchaser, we will assess whether the government price was set in accordance with market principles through an analysis of such factors as the government's price-setting philosophy, costs (including rates of return sufficient to ensure future operations), or possible price discrimination. We are not putting these factors in any hierarchy, and we may rely on one or more of these factors in any particular case.

*Preamble*, 63 Fed. Reg. at 65, 378. Commerce further explained in *CFS from Indonesia* that "{t}he regulations do not specify how the Department is to conduct its analysis of consistency with market principles. By its nature the analysis depends upon available information concerning the market sector at issue and, therefore, must be developed on a case-by-case basis." *Coated Free Sheet Paper from Indonesia*, 72 Fed. Rep. 60,642 (Dep't of Commerce October 25, 2007) (final affirm. countervailing duty determ.) and accompany IDM at 70 (*CFS from Indonesia*).

Here, the regulation does not require Commerce to include delivery charges if Commerce determines that a tier three benchmark is necessary. *See* 19 C.F.R. § 351.511(a)(2)(iv). Commerce explained in the final determination that, in calculating the benefit received from the mining rights, Commerce evaluated the underlying goods conveyed, the phosphate rock using

the reported production costs against a world market price that is a free-on-board price (*i.e.*, exclusive of freight, value added tax, and import duties). IDM at 26-27. This analysis is in accordance with the regulation, which gives Commerce flexibility to construct a benchmark for its benefit analysis.

Next, The Mosaic Company asserts that *Silicon Metal from Australia* and *Granular Polytetrafluoroethylene Resin from the Russian Federation* require Commerce to include delivery charges in its tier three benchmark analysis. The Mosaic Company Br. at 33-35. In *Silicon Metal from Australia* under a tier three benchmark analysis, Commerce did elect to include transportation expenses. *Silicon Metal From Australia*, 83 Fed. Reg. 9,834 (Dep't Commerce Mar. 8, 2018) (final affirm. countervailing duty determ.) and accompanying IDM at 31 (*Silicon Metal from Australia*). However, in that decision, Commerce compared the respondent total per-unit quartz costs, which included transportation expenses, to data on the record that included transportation expenses yielding a more accurate comparison to the quartz utilized in the production of silicon metal. *Silicon Metal from Australia* at IDM 31. Here, Commerce did not need to "bake-in" costs that KGOK did not incur to yield a more accurate benchmark. Rather, since KGOK extracted phosphate ore from its own site through the mining license it is more appropriate to compare similar phosphate rock at a world market price and at a free-on-board price (*i.e.*, exclusive of freight, value added tax, and import duties). IDM at 26.

The Mosaic Company also argues that here, as in *Granular PTFE Resin from Russia*, Commerce included the delivery charges, import duties, and any additional surcharges when constructing a tier three benchmark for natural gas. *Granular PTFE Resin from Russia* at 30; IDM at 57. However, mining rights are different than both *Granular PTFE Resin from Russia*, and natural gas in the current case. In both *Granular PFTE Resin from Russia* and the current

case, Commerce included delivery charges, import duties, and any additional surcharges to the tier three benchmark for the provision of natural gas as a response to the government of Russia's report that imports of natural gas into Russia would be subject to a 20 percent value added tax and five percent import duty, and delivery charges relating to the delivery of natural gas from Gazprom. *Granular PTFE Resin* at 30; IDM at 56. Commerce's inclusion of delivery charges, value added tax, and import duties in *Granular PTFE Resin*, and the present case concerning natural gas yielded comparable prices that could be used for a tier three benchmark analysis.

However, The Mosaic Company comparison is inappropriate because the adjustment granted in *Granular PTFE Resin* concerned natural gas, not mining rights, which does not have the same world-wide availability for Commerce to easily compare. Therefore, Commerce is comparing prices of the underlying good, the phosphate rock, that is conveyed with the mining rights to calculate the benefit. IDM at 26. Further, the addition of freight, value added tax, and import duties would distort the analysis and prevent Commerce from properly comparing the costs of the phosphate rock obtained through the phosphate mining license to the costs of a comparable phosphate rock with similar $P_2O_5$ content that is available for purchase on the world market on a free-on-board basis. Thus, The Mosaic Company's comparisons are misplaced, and Commerce appropriately determined not to include freight, value added tax, and import duties in its benchmark analysis.

## CONCLUSION

For these reasons, we respectfully request that the Court sustain Commerce's final determination.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ L. Misha Preheim
L. MISHA PREHEIM
Assistant Director

/s/ Ebonie Branch
EBONIE BRANCH
OF COUNSEL:                              Trial Attorney
Jared M. Cynamon                         U.S. Department of Justice
Attorney                                 Civil Division
U.S. Department of Commerce              Commercial Litigation Branch
Office of the Chief Counsel              P.O. Box 480
  for Trade Enforcement and Compliance   Ben Franklin Station
Washington, D.C.                         Washington, D.C. 20044
                                         Telephone: (202) 353-0521

March 16, 2022                           Attorneys for Defendant

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing brief complies with the word-count limitation, as modified by this Court's January 24, 2022 Order (ECF No. 56), in that it contains 22,150 words according to the word-count function of the word-processing software used to prepare the memorandum, including text, footnotes, and headings.

.

<u>/s/ Ebonie Branch</u>