UNITED STATES COURT OF INTERNATIONAL TRADE

NEW YORK, NEW YORK

BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| THE MOSAIC COMPANY, ) | |
| Plaintiff, ) | |
| and ) | |
| PHOSAGRO PJSC, JSC APATIT, ) | |
| Consolidated Plaintiffs, ) | |
| and ) | |
| INDUSTRIAL GROUP PHOSPHORITE LLC, ) | |
| Consolidated Plaintiff and ) Consolidated Plaintiff-Intervenor, ) | |
| v. ) | Consol. Court No. 21-00117 |
| UNITED STATES, ) | **NON-CONFIDENTIAL VERSION** |
| Defendant, ) | Business Proprietary Information removed from pages 5 and 11 |
| THE MOSAIC COMPANY, ) | |
| Consolidated Defendant-Intervenor ) | |
| and ) | |
| PHOSAGRO PJSC, JSC APATIT, ) INDUSTRIAL GROUP PHOSPHORITE LLC, ) | |
| Defendant-Intervenors. ) | |

**<u>DEFENDANT-INTERVENORS' RESPONSE IN OPPOSITION TO
PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>**

H. Deen Kaplan
Jonathan T. Stoel
Jared R. Wessel

HOGAN LOVELLS US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
Phone:  +1.202.637.5600
Fax:  +1.202.637.5910

*Counsel to PhosAgro PJSC
and JSC Apatit*

March 16, 2022

## TABLE OF CONTENTS

**Page**

RULE 56.2 STATEMENT AND SUMMARY OF ARGUMENT ...............................................1

I.      ADMINISTRATIVE DETERMINATION SOUGHT TO BE REVIEWED....................1

II.     ISSUES PRESENTED AND SUMMARY OF THE ARGUMENT.................................2

III.    STATEMENT OF FACTS ..................................................................................................3

      A.      JSC Apatit Did Not Receive Any Benefits From Mining Rights for LTAR During The POI..................................................................................................................4

      B.      Commerce Did Not Adjust Phosphate Rock Prices To Include Freight, VAT, and Import Duties In Its "Tier Three" Benchmark To Provide for Accurate Comparison ...........................................................................................................6

      C.      Commerce Included Russian Prices of Natural Gas Sold in Europe in Its "Tier Three" Benchmark to Reflect Prevailing Market Conditions..................................7

IV.     STANDARD OF REVIEW ...............................................................................................7

V.      ARGUMENT ....................................................................................................................8

      A.      Commerce's Finding that JSC Apatit Did Not Receive a Measurable Benefit from the Phosphate Rock Mining Rights LTAR Program Was In Accordance with Law and Supported by Substantial Evidence..................................................................8

            1.      Commerce Has Discretion to Use a "Cut-Off Date" from which It Will Identify and Measure Subsidies for NME Countries .................................. 8

            2.      Commerce's Finding That JSC Apatit's Mining Licenses Did Not Materially Change After the Cut-off Date Was Reasonable and Supported by Substantial Evidence ......................................................................... 11

      B.      Commerce's Use of FOB prices for Phosphate Rock Benchmark Calculations Was Reasonable and Supported by Substantial Evidence ...............................................14

      C.      Commerce's Inclusion of Russian Natural Gas Prices in the IEA Data in the "Tier Three" Natural Gas Benchmark Was Reasonable and Supported by Substantial Evidence.................................................................................................................15

VI.     CONCLUSION.................................................................................................................17

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Advanced Tech. & Materials Co. v. United States,*
    35 C.I.T. 1380 (2011) ................................................................. 7, 15, 16

*Consolo v. Fed. Mar. Comm'n,*
    383 U.S. 607 (1966) ........................................................................ 8

*Fujitsu Gen. Ltd. v. United States,*
    88 F.3d 1034 (Fed. Cir. 1996) ........................................................ 7

*GPX Int'l Tire Corp. v. United States,*
    666 F.3d 732 (Fed. Cir. 2011) ........................................................ 9

*Mittal Steel Roman v. United States,*
    32 C.I.T. 42 (2008) .................................................................... 7, 16

*Nippon Steel Corp. v. United States,*
    337 F.3d 1373 (Fed. Cir. 2003) ...................................................... 7

*Olympia Indus., Inc. v. United States,*
    22 C.I.T. 387, 7 F.Supp.2d 997 (1998) .......................................... 8

*Ta Chen Stainless Steel Pipe, Inc. v. United States,*
    298 F.3d 1330 (Fed. Cir. 2002) .................................................... 16

*TMK IPSCO v. United States,*
    179 F.Supp.3d 1328 (Ct. Int'l Trade 2016) .................................... 9

*TMK IPSCO v. United States,*
    222 F.Supp.3d 1306 (Ct. Int'l Trade 2017) ................................. 8, 9

*Yantai CMC Bearing Co. v. United States,*
    203 F.Supp.3d 1317 (Ct. Int'l Trade 2017) .................................. 16

*Zhejiang DunAn Hetian Metal Co. v. United States,*
    652 F.3d 1333 (Fed. Cir. 2011) ...................................................... 7

**Statutes**

19 U.S.C § 1671(f) .............................................................................. 9

19 U.S.C. § 1516a(b)(1)(B)(i) ............................................................. 7

19 U.S.C. § 1677(5)(E)(iv) ............................................................... 15

**Administrative Materials**

*Certain Cold-Rolled Steel Flat Products from the Russian Federation*, 81 Fed. Reg. 49,935 (Dep't Commerce July 29, 2016) (final affirmative CVD determination and final negative critical circumstances determination), and accompanying Issues and Decision Memorandum ....... 4, 10

*Certain Cold-Rolled Steel Flat Products from the Russian Federation*: Market Economy Status Memorandum (Dep't Commerce Sept. 14, 2015).................................................................. 4, 10

*Certain Stainless Steel Wire Rod From Italy*, 63 Fed. Reg. 40,474, 40,486 (Dep't Commerce July 29, 1998) (final affirmative CVD determination) .................................................... 12

*Certain Steel Wire Garment Hangers From the Socialist Republic of Vietnam*, 77 Fed. Reg. 75,973 (Dep't Commerce Dec. 26, 2012) (final affirmative CVD determination and final affirmative critical circumstances determination), and accompanying Issues and Decision Memorandum ...................................................................................................... 13

Memorandum to Faryar Shirzad from Albert Hsu et al. on Inquiry into the Status of the Russian Federation as a Non-Market Economy Country Under the U.S. Antidumping Law (June 6, 2002) ...................................................................................... 10, 11

*Polyethylene Retail Carrier Bags from the Socialist Republic of Vietnam*, 75 Fed. Reg. 16,428 (Dep't Commerce Apr. 1, 2010) (final affirmative CVD determination), and accompanying Issues and Decision Memorandum.......................................................... 13

*Steel Concrete Reinforcing Bar from the Republic of Turkey*, 85 Fed. Reg. 16,056 (Dep't Commerce Mar. 20, 2020) (final results of CVD administrative review; 2017), and accompanying Issues and Decision Memorandum ...................................................... 16

**DEFENDANT-INTERVENORS' RESPONSE IN OPPOSITION TO
PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of this Court, Defendant-Intervenors PhosAgro PJSC and its wholly owned subsidiary JSC Apatit (collectively "PhosAgro"), respectfully submit this response in opposition to the motion for judgment on the agency record filed by Plaintiff, The Mosaic Company ("Mosaic" or "Petitioner").  ECF Nos. 43, 44, 50, 51 ("Pl.'s Br.").  Mosaic challenges the U.S. Department of Commerce's ("the Department" or "Commerce") final determination in its countervailing duty ("CVD") investigation of Phosphate Fertilizers from Russia, Case No. C-821-825.  Specifically, Mosaic challenges the following:

(1) Commerce's finding that neither mandatory respondent PhosAgro nor Industrial Group Phosphorite LLC ("EuroChem") received a measurable benefit from phosphate mining rights for less than adequate remuneration ("LTAR"), particularly Commerce's use of a "cut-off date" (before which measures in Russia are not countervailable) and its finding that licenses were not materially changed after the cut-off date;

(2) Commerce's finding that no adjustment for freight, customs duties, and value added tax was necessary when constructing the "Tier Three" benchmark for phosphate rock; and

(3) Commerce's decision to include Russian natural gas prices in its benchmark prices for the alleged natural gas LTAR program.

As we demonstrate below, Mosaic's contentions are without merit and should be rejected. Accordingly, Mosaic's motion for judgment on the agency record should be denied.

## RULE 56.2 STATEMENT AND SUMMARY OF ARGUMENT

## I.   ADMINISTRATIVE DETERMINATION SOUGHT TO BE REVIEWED

Mosaic, among other parties, contests certain aspects of the CVD final determination, which was published as *Phosphate Fertilizers from the Russian Federation*, 86 Fed. Reg. 9,479 (Dep't Commerce Feb. 16, 2021) (final affirmative CVD determination) ("*Final CVD*

*Determination*") (P.R. 418). 1/  The CVD order was published as *Phosphate Fertilizers from the Kingdom of Morocco and the Russian Federation*, 86 Fed. Reg. 18,037 (Dep't Commerce Apr. 7, 2021) (CVD orders) ("*CVD Order*") (P.R. 425).  This appeal, like others, also contests certain aspects of Commerce's accompanying Issues and Decision Memorandum for the Final Affirmative Determination of the CVD Investigation of Phosphate Fertilizers from the Russian Federation, dated February 8, 2021 ("*Final Issues and Decision Memo*") (P.R. 405).  The CVD period of investigation ("POI") was January 1, 2019 through December 31, 2019.

## II.    ISSUES PRESENTED AND SUMMARY OF THE ARGUMENT

1.    Whether Commerce's practice of using a cut-off date to find that JSC Apatit did not receive a benefit from the alleged mining rights LTAR program was supported by substantial evidence and otherwise in accordance with law.

2.    Whether Commerce's use of "free on board" ("FOB") price for phosphate rock in its "Tier Three" mining rights benchmark was supported by substantial evidence and otherwise in accordance with law.

3.    Whether Commerce's inclusion of Russian natural gas prices in the IEA data in the "Tier Three" natural gas benchmark was supported by substantial evidence and otherwise in accordance with law.

---

1/    References to public and confidential documents in the administrative record for this appeal are identified as "P.R." and "C.R.," respectively.

### III.   STATEMENT OF FACTS

Mosaic filed a CVD petition on June 26, 2020 (the "Petition") concerning imports of phosphate fertilizers from Russia.  *Pets. for Imposition of CVD: Phosphate Fertilizers from Morocco and Russia* (June 26, 2020) ("Petition") (P.R. 1–8; C.R. 1–8).  Commerce then initiated the CVD investigation on July 23, 2020 and on August 4, 2020, selected EuroChem and PhosAgro as mandatory respondents (together, the "Respondents").  *Phosphate Fertilizers from the Kingdom of Morocco and the Russian Federation*, 85 Fed. Reg. 44,505 (Dep't Commerce July 23, 2020) (initiation of CVD investigations) (P.R. 49); *CVD Investigation of Phosphate Fertilizers from Russia: Resp't Selection Mem.* (Aug. 4, 2020) (P.R. 55; C.R. 23).

In the Petition, Mosaic alleged that the Government of Russia ("GOR") provided certain countervailable subsidies during the POI to Russian phosphate fertilizer producers, including through the alleged provision of phosphate mining rights for LTAR and the provision of natural gas for LTAR.  Commerce countervailed the alleged natural gas for LTAR program, which was unlawful for the reasons described in PhosAgro's motion for judgment on the agency record filed on November 12, 2021 (ECF Nos. 48, 49), but Commerce correctly did not countervail the alleged mining rights program.  Commerce assigned a final duty rate of 9.19% to PhosAgro.  *Final CVD Determination* (P.R. 418); *CVD Order* (P.R. 425).  The CVD Order was published in the *Federal Register* on April 7, 2021.  *CVD Order* (P.R. 425).

In this appeal, Mosaic contends that Commerce's refusal to countervail alleged phosphate mining licenses initially issued before the cut-off date of April 1, 2002 is unsupported by substantial evidence and otherwise contrary to law.  Pl.'s Br. at 1–2.  Mosaic claims that the use of a subsidy cut-off date was arbitrary.  *Id.*  Mosaic also argues that Commerce failed to make certain adjustments (i.e., freight, customs duties, and value-added tax ("VAT")) to the "Tier Three"

benchmark for mining rights to determine a "delivered" benchmark price. *Id.* at 2. Lastly, Mosaic asserts that Commerce improperly failed to exclude Russian natural gas exports to the EU from its "Tier Three" benchmark for natural gas. *Id.* at 3. All of these claims are meritless and should be rejected by this Court.

### A.    JSC Apatit Did Not Receive Any Benefits From Mining Rights for LTAR During The POI

In its analysis of the Mining Rights for LTAR program, Commerce applied a "cut-off date" consistent with its normal practice. *Final Issues and Decision Memo.* (P.R. 405) at 24 (explaining, "Commerce has consistently found that it is appropriate and administratively desirable to apply a uniform date from which it will identify and measure subsidies from NME countries for purposes of the CVD law."). Specifically, Commerce explained that it only examined the countervailability of licenses acquired after April 1, 2002, the date on which "Commerce recognized that Russia made the transition to a market economy," or, "{i}n other words, {when} Russia's economy had reached the state at which subsidies, and disciplines on subsidies in the form of countervailing duties, became meaningful." *Final Issues and Decision Memo* at Cmt. 2d (P.R. 405) (citing *Certain Cold-Rolled Steel Flat Products from the Russian Federation*, 81 Fed. Reg. 49,935 (Dep't Commerce July 29, 2016) (final affirmative CVD determination and final negative critical circumstances determination), and accompanying Issues and Decision Memorandum (hereinafter, "*Russia Cold-Rolled Steel*"); and Memorandum, "Market Economy Status for the Russian Federation," dated September 14, 2015 (hereinafter, "2015 Market Economy Status Memorandum"). Commerce explained that, with respect to subsidies conferred prior to April 1, 2002, the agency was unable to address whether a given program was specific and to quantify the benefits of such a program given the massive distortions in the Russian economy (and the fact that the economy essentially comprised of a single entity).

**NONCONFIDENTIAL VERSION**
**CONFIDENTIAL INFORMATION DELETED FROM BRACKETS**

The record evidence shows that, with respect to PhosAgro, JSC Apatit acquired **[        ]** Mining Rights Licenses Before April 1, 2002 and **[        ]** mining rights licenses after April 1, 2002, which were **[                                            ]**. *See* PhosAgro's Initial CVD Questionnaire Response (Sept. 24, 2020) at 9–12 (P.R. 115; C.R. 45), Exhibits CVD-16–CVD-17 (P.R. 116; C.R. 46–47); *see also Final Issues and Decision Memo* at Cmt. 2d (P.R. 405). Commerce found that although the licenses issued to JSC Apatit (and Joint Stock Company Kovdorksy GOK ("KGOK"), cross-owned by EuroChem) were renewed and subject to administrative changes after the cut-off date, these changes were of a "technical nature" and did not constitute a material alteration. *Final Issues and Decision Memo* at Cmt. 2d (P.R. 405) (citing GOR Supplemental Response at 7). Further, JSC Apatit **[                    ]** phosphate rock using the two licenses acquired after the cut-off date during the POI and therefore did not receive any benefits from the alleged subsidy program. PhosAgro's Initial CVD Questionnaire Response (Sept. 24, 2020) at 14–16 (P.R. 115; C.R. 45).

Accordingly, in applying its normal practice with respect to Russia, Commerce determined that "record facts demonstrate that the terms and conditions for the mining rights were set prior to the cut-off date and have not been materially altered since they were granted." *Final Issues and Decision Memo* at Cmt. 2d (P.R. 405). Commerce further concluded that "the relevant mining rights licenses at issue in this case had been granted during a time {i.e., before the cut-off-date} Commerce has determined did not permit any meaningful measurement of government distortion, including from subsidies." *Id.* These findings were both supported by substantial evidence and in accordance with law.

**B.**   **Commerce Did Not Adjust Phosphate Rock Prices To Include Freight, VAT, and Import Duties In Its "Tier Three" Benchmark To Provide for Accurate Comparison**

Given its findings that mining licenses issued before April 1, 2002 did not confer a benefit on PhosAgro, Commerce analyzed only EuroChem's cross-owned input supplier, KGOK, in its calculation of mining rights for LTAR.  When calculating the "Tier Three" benchmark for mining rights, Commerce compared the "actual per-unit cost build-up of KGOK's beneficiated phosphate rock, inclusive of all taxes paid to the GOR during the POI" to benchmark FOB prices provided by the Petitioner based on the $P_2O_5$ content of the phosphate rock.  *Final Issues and Decision Memo* at Cmt. 2e (P.R. 405).  Commerce determined that it was not necessary to include freight, VAT, and import duties in the benchmark because it compared phosphate rock using reported production costs, rather than price on the open market, to a FOB price (i.e. one that is exclusive of freight, VAT, and import duties).  *Id.*  Specifically Commerce stated:

> We find that this benchmark calculation is appropriate, as adding in freight, VAT, and import duties would not allow for a proper comparison between the costs of the phosphate rock obtained through the phosphate mining license to the costs of a comparable phosphate rock with similar $P_2O_5$ content that is available for purchase on the world market on an FOB basis.

*Id.*  Further, Commerce clarified that because KGOK (EuroChem) "extracted the {phosphate} ore from its own sites through the mining license, there is no need to build a comparison, market-determined benchmark that includes freight, VAT, and import duties" not incurred by KGOK.  *Id.* Commerce's calculation resulted in a final subsidy rate that is less than 0.005 percent *ad valorem* for EuroChem, and therefore yielded no measurable benefit.  *Id.* at 10.

C.      **Commerce Included Russian Prices of Natural Gas Sold in Europe in Its "Tier Three" Benchmark to Reflect Prevailing Market Conditions**

In its calculation of the "Tier Three" natural gas benchmark, Commerce included Russian natural gas prices in its use of the IEA data because it found that such prices "are reflective of the market dynamics in {the EU market}." *Final Issues and Decision Memo* at Cmt. 3j (P.R. 405). Commerce determined that "the record does not support removing sales of natural gas from Russia in the EU from consideration as market benchmarks," as "{n}o party has submitted any evidence that natural gas produced in Russia and sold in Europe is distorted or suppressed." *Id.*

IV.     **STANDARD OF REVIEW**

This Court must sustain any determination, finding, or conclusion found by an agency that is supported by "substantial evidence on the record" and is otherwise "in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *see Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 103 (Fed. Cir. 1996).  The substantial evidence standard requires "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Fujitsu Gen. Ltd.*, 88 F.3d at 1044; *see also* 19 U.S.C. § 1516a(b)(1)(B)(i); *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1340 (Fed. Cir. 2011) (quoting *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003)).  In reviewing Commerce's decision, "the Court must consider {} whether the Department has examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Advanced Tech. & Materials Co. v. United States*, 35 C.I.T. 1380, 1387 (2011) (internal citations and quotation marks omitted).  If such rational connection is demonstrated, the Court must uphold Commerce's determination.  *Id.*  Lastly,  the Court should affirm Commerce's decision as long as it is "reasonable and supported by the record as a whole, even if there is some evidence that detracts from the agency's conclusions." *Mittal Steel Roman v. United States*, 32 C.I.T. 42, 44 (2008)

(citing *Olympia Indus., Inc. v. United States*, 22 C.I.T. 387, 389, 7 F.Supp.2d 997, 1000 (1998)). The possibility of drawing two inconsistent conclusions from the evidence in the record does not preclude Commerce's determination from being supported by substantial evidence. *See Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

## V.    ARGUMENT

### A.    Commerce's Finding that JSC Apatit Did Not Receive a Measurable Benefit from the Phosphate Rock Mining Rights LTAR Program Was In Accordance with Law and Supported by Substantial Evidence

#### 1.    Commerce Has Discretion to Use a "Cut-Off Date" from which It Will Identify and Measure Subsidies for NME Countries

Mosaic argues that Commerce's use of a cut-off date was arbitrary and unsupported by substantial evidence. Specifically, Mosaic contends that although the Department considered mining rights to be recurring subsidies, the agency "failed to assess whether there were sufficient facts on the record to identify and measure the subsidies conferred during the POI for each of the mining licenses at issue." Pl.'s Br. at 2. As described below, Commerce's use of a cut-off is not arbitrary when the agency finds that it is unable to identify and measure alleged subsidies prior to a cut-off date.

Commerce found that "record facts demonstrate that the terms and conditions of the mining rights were set prior to the cut-off date and have not been materially altered since they were granted." *Final Issues and Decision Memo* at Cmt. 2d (P.R. 405). The Department also stated that "Commerce has consistently found that it is appropriate and administratively desirable to apply a uniform date from which it will identify and measure subsidies from NME countries for purposes of the CVD law." *Id.* (citing *TMK IPSCO v. United States*, 222 F.Supp.3d 1306 (Ct. Int'l Trade 2017) (hereinafter, "*TMK IPSCO II*")). Commerce concluded here that "the relevant mining rights licenses at issue in this case had been granted during a time Commerce has determined did

8

not permit any meaningful measurement of government distortion, including from subsidies," and therefore could not be countervailed.  *Id.*

By way of background, the Federal Circuit held that Congress did not originally intend the countervailing duty law to apply to NME countries at all, and therefore Commerce was precluded from applying CVD to NME countries.  *GPX Int'l Tire Corp. v. United States*, 666 F.3d 732, 736 n.5 (Fed. Cir. 2011).  Congress subsequently amended the CVD statute to allow Commerce to countervail subsidies by a government of an NME country but provided for an exception:  when Commerce is unable to "*identify and measure*" alleged subsidies provided because "the economy of that country is essentially comprised of a single entity," no countervailing duties should be imposed.  19 U.S.C § 1671(f).

In its brief, Mosaic relies heavily on the court's determination in *TMK IPSCO v. United States*, 179 F.Supp.3d 1328, 1343 (Ct. Int'l Trade 2016) ("*TMK IPSCO I*"), remanding Commerce's use of a cut-off date.  In that limited instance, Commerce arbitrarily picked the date of China's accession to the WTO as the cut-off date without articulating a relationship between it and China's implementation of necessary and sufficient reforms for countervailable subsidies to be measured.  *Id*.  That case is not binding on this Court's review of a Russian investigation, however, and *TMK IPSCO II* at 1313–14 upheld Commerce's use of a cut-off date.  The court explained:

> Commerce's {use of cut-off dates in its} evaluation of subsidy programs in this investigation {was} reasonable and consistent with its statutory obligations. . . . Commerce has significant discretion in determining whether it can identify and measure subsidies provided by the government or a public entity within the NME country . . . . On remand Commerce {articulates} a rational relationship between specific legal reforms in China and the effect of such reforms on Commerce's ability to identify and measure subsidies . . . .

*Id.*

Here, similar to *Russia Cold-Rolled Steel*, Commerce found that it was unable to identify and measure the alleged subsidies provided before April 1, 2002 in Russia. *Id.* Commerce has articulated the relationship between certain reforms undertaken by Russia that affected its legal and economic framework in a way that allows the Department to measure and identify subsidies when it revoked Russia's non-market economy status in 2015, effective April 1, 2002:

> In the case of Russia, applying a cut-off date for the CVD law when the country was recognized to have transitioned to a market economy reflects the fact that Russia's economy had undergone changes and reforms that could permit Commerce to determine whether and to what extent countervailable subsidies were being bestowed on Russian producers. In other words, Russia's economy had reached the state at which subsidies, and disciplines on subsidies in the form of countervailing duties, became meaningful. Conversely, prior to the cut-off date, the nature of the NME meant that intervention by the state would not allow for such meaningful identification or measurement of subsidies. Although the reforms in Russia have been ongoing and some have preceded April 1, 2002, Commerce has appropriately determined that the application of a uniform "cut-off" date is reasonable, within its discretion, and administratively practicable.

*Final Issues and Decision Memo* at Cmt. 2d (citing 2015 Market Economy Status Memorandum) (P.R. 405).

Commerce's use of April 1, 2002 is well justified because it is the date Commerce recognized that Russia made the transition to a market economy for purposes of the antidumping ("AD") and CVD laws. In 2002, Commerce found that the "Russian government has continued to withdraw from the economy and has taken significant steps to strengthen market-supporting laws and institutions. These steps, along with the independent actions of firms and individuals, have had a dramatic effect, such that market forces are now driving Russia's economy." Memorandum to Faryar Shirzad from Albert Hsu et al. on Inquiry into the Status of the Russian Federation as a Non-Market Economy Country Under the U.S. Antidumping Law (June 6, 2002) at 9. Because at that point in time, "trade ha{d} been fully liberalized and Russian markets and prices {were}

**NONCONFIDENTIAL VERSION**
**CONFIDENTIAL INFORMATION DELETED FROM BRACKETS**

linked with world markets and prices," Commerce is able to meaningfully identify and quantify the effect of alleged subsidies. *Id.* at 23.

Contrary to the assertions by Mosaic, Commerce has clearly articulated the relationship between certain reforms in Russia and its transition to a market economy, effective April 1, 2002, which allows it to measure and identify the benefit of an alleged subsidy *after* the cut-off date. For this reason, consistent with past practice and decisions of the Court, it is within Commerce's discretion to employ a cut-off date in its analysis of whether mining rights were provided at LTAR.

> **2.**    **Commerce's Finding That JSC Apatit's Mining Licenses Did Not Materially Change After the Cut-off Date Was Reasonable and Supported by Substantial Evidence**

Mosaic also argues that even if Commerce uses a cut-off date, the licenses were materially altered after the cut-off date and should be treated as a new subsidy. This claim must fail given the record and the deference accorded to Commerce under the substantial evidence standard.

Commerce's practice is that if there is a material change after the cut-off date, the program at issue may still be countervailed. Here, however, Commerce found that "the record is clear that for those licenses granted prior to the cut-off date, the terms and conditions of the licenses were established prior to the time that Commerce recognized Russia had transitioned to a market economy for purposes of the AD and CVD laws." *Final Issues and Decision Memo* at Cmt. 2d (P.R. 405). Further, Commerce found that those licenses "did not substantially change since their initial issuance." *Id.*

Mosaic's argument that the GOR materially changed the licenses by extending or renewing them, or by making other administrative changes, is not supported by the facts on the record. First, while the licenses granted prior to April 1, 2002 were extended after the cut-off date in [                    ], Commerce found that only minor administrative changes, or changes "of a technical

nature, such as a correction of the names of subsoil users, a change to the description of their organizational and legal form, or a small change in the surface area of the plot due to technological and safety needs in the process of exploration," were made to the terms of the licenses and that such renewal did not increase the holders' mineral reserves. *Final Issues and Decision Memo* at Cmt. 2d (P.R. 405). The fact that the extension did not increase the holders' mineral reserves is important because, as explained in PhosAgro's initial CVD response, mining rights in Russia are acquired for the ***entirety of ore or minerals contained in the deposit***, not for a fixed temporal time. *See* PhosAgro's Initial CVD Questionnaire Response at 11 (P.R. 115; C.R. 45). Licenses may be extended or renewed at the initiative of the license holder, provided that there are no violations of the license terms by the license holder. *Id.* Essentially, license renewal is automatically granted, and more or less assumed, if minerals remain in the deposit, therefore it does not constitute a material change.

Mosaic cites certain cases purportedly in support of its argument, but they are inapposite since they involved changes that did materially alter the terms of a license or contract. Specifically, those cases involved material changes conferring additional benefits on respondents:

- In *Certain Stainless Steel Wire Rod from Italy*, Commerce found that the 1992 renegotiation of the interest rate for a loan originally issued in 1979 should be "treated it as a new loan from that point" because a different interest rate was due than what was contemplated by the original loan agreement and therefore a different benefit was conferred. *Certain Stainless Steel Wire Rod From Italy*, 63 Fed. Reg. 40,474, 40,486 (Dep't Commerce July 29, 1998) (final affirmative CVD determination).

- In *Polyethylene Retail Carrier Bags from Vietnam,* Commerce determined that a land lease issued by a provincial government prior to the January 11, 2007 "cut-off" date for Vietnam was countervailable because the provincial government extended the lease's duration in May 2007 for an additional 30 years, thereby increasing the benefit conferred as compared to what was agreed to in the original agreement.  *See Polyethylene Retail Carrier Bags from the Socialist Republic of Vietnam*, 75 Fed. Reg. 16,428 (Dep't Commerce Apr. 1, 2010) (final affirmative CVD determination), and accompanying Issues and Decision Memorandum at 8.  This case is inapposite.  As explained above, the initial license grant was for the ***entirety of ore or minerals contained in the deposit***, not for a fixed temporal time.

- Lastly, in *Wire Garment Hangers from Vietnam*, Commerce found that the terms and conditions of a land lease signed prior to the "cut-off" date changed in August 2010 when the lease was amended to grant additional rent exemptions and reductions for the respondent companies.  *See Certain Steel Wire Garment Hangers From the Socialist Republic of Vietnam*, 77 Fed. Reg. 75,973 (Dep't Commerce Dec. 26, 2012) (final affirmative CVD determination and final affirmative critical circumstances determination), and accompanying Issues and Decision Memorandum at 22.  Again, an additional clear benefit was conferred because rental fees were reduced.

In this case, no additional benefit or financial contribution was conferred on the mining rights license holder by simple renewal—specifically, the license holder had access to the mineral deposit and resources remained under the terms of the existing license.  Extending the license thus did not provide additional material to the license holder, meaning that no additional benefit was conferred on the license holder through extension.  As such, the full benefit of extraction until the exhaustion of the resource was conferred prior to the cut-off date.

In sum, Commerce reviewed the evidence on the record and clearly explained that license renewal and "changes of a technical nature" did not constitute material changes and therefore did not result in a benefit or financial contribution.  Under the applicable standard of review, Commerce's determination is supported by substantial evidence and in accordance with law, and it should be upheld by this Court.

**B.**    **Commerce's Use of FOB prices for Phosphate Rock Benchmark Calculations Was Reasonable and Supported by Substantial Evidence**

Mosaic challenges Commerce's use of FOB phosphate rock prices exclusive of freight, VAT, and import duties in its "Tier Three" benchmark.  Specifically, Mosaic contends that "to the extent that a tier 3 benchmark is based on world market prices (which is the case here {}), and therefore is a variation of a tier 2 benchmark analysis, it would be illogical for Commerce to exclude delivery charges and deviate from the {statutory rule}."  Pl.'s Br. at 32.  Mosaic further argues that Commerce "failed to cite any legal authority for its refusal to adjust the tier 3 benchmark." *Id.* 2/

Petitioner's arguments miss the point.  Commerce explicitly articulated the reasons that making Mosaic's requested adjustments would not result in an appropriate benchmark:

> {A}dding in freight, VAT, and import duties would not allow for a proper comparison between the phosphate rock obtained through the phosphate mining license to the costs of a comparable phosphate rock with similar $P_2O_5$ content that is available for purchase on the world market on an FOB basis. . . {b}ecause KGOK did not purchase the input, . . . but rather extracted the ore from its own sites through the mining license.

*Final Issues and Decision Memo* at Cmt. 2e (P.R. 405).  Further, "there is no need to build a comparison" price that includes costs ***not incurred*** by KGOK in its production. *Id.*  Inherently, such a comparison price would not be comparing the same types of mined phosphate rock available to KGOK.

---

2/       Commerce found that PhosAgro did not receive a measurable benefit from its mining rights licenses.  If the Court determines that the April 1, 2002 cut-off cannot be used, *and* Commerce finds on remand that PhosAgro benefitted from its mining rights licenses during the POI, which it did not, Commerce should continue to decline to adjust its phosphate rock benchmark for reasons summarized here.

Commerce adequately reviewed the evidence on the record and "articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Advanced Tech. & Materials Co.*, 35 C.I.T. at 1387 (internal citations omitted).  For this reason, Commerce's determination is reasonable and supported by substantial evidence.

### C. Commerce's Inclusion of Russian Natural Gas Prices in the IEA Data in the "Tier Three" Natural Gas Benchmark Was Reasonable and Supported by Substantial Evidence

Mosaic argues that Commerce erred by including Russian gas prices in the IEA data used in its "Tier Three" benchmark for natural gas LTAR program.  In its final determination, Commerce explained "We therefore continue to find that EU natural gas prices provide a reasonable, market-determined benchmark against which to assess whether and to what extent sales of natural gas from authorities in Russia confer a benefit to the respondents." *Final Issues and Decision Memo* at Cmt. 3j (emphasis added) (P.R. 405).

To the extent the Court agrees with Commerce's erroneous use of the IEA data as a "Tier Three" benchmark, the adequacy of remuneration must be determined in relation to "prevailing market conditions" under 19 U.S.C. § 1677(5)(E)(iv).  Inclusion of prices of Russian gas exports to Europe reflect prevailing market prices.  As Commerce clearly articulated, Mosaic has failed to provide evidence refuting Commerce's conclusion.  *See Final Issues and Decision Memo* at Cmt. 3j (P.R. 405).  The prices of natural gas exported from Europe are set according to market principles, based on supply and demand.  *See* PhosAgro's Opening Br. at 6–7 (describing Russian natural gas tariff regulations), ECF Nos. 48, 49.

Mosaic mistakenly relies on Commerce's removal of Russian export prices from its benchmark employed in *Steel Concrete Reinforcing Bar from the Republic of Turkey*, 85 Fed. Reg. 16,056 (Dep't Commerce Mar. 20, 2020) (final results of CVD administrative review; 2017), and

accompanying Issues and Decision Memorandum (hereinafter, "*Turkey Rebar 2017*").   In that case, Commerce explicitly found based on the evidence provided that "information on the record continues to support the fact that Russia can, and does, distort the natural gas market" and therefore the Russian export prices were "unsuitable" for use in the natural gas benchmark.  *Turkey Rebar 2017* at Cmt. 1.   Here, in the *Final CVD Determination*, however, Commerce distinguished the record facts of *Turkey Rebar 2017* from the facts of this case: "Commerce's findings in that case pertained to certain record facts that Russian exports to the EU were distorted during the period of review in that proceeding."  *Final Issues and Decision Memo* at Cmt. 3j (P.R. 405).   Commerce further concluded that "{s}uch information is not on the record of this proceeding pertaining to the POI."  *Id.*

Mosaic bore the burden of demonstrating to Commerce that the prices of Russian natural gas prices exported to the EU were distorted during the POI.  *See, e.g.*, *Yantai CMC Bearing Co. v. United States*, 203 F.Supp.3d 1317, 1324 (Ct. Int'l Trade 2017) (citing *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1336 (Fed. Cir. 2002)) ("Commerce's role in an administrative proceeding is to weigh the evidence established in the record.  It is the respondent's burden to create the record.").   Commerce reviewed the record evidence and concluded that Mosaic had failed to meet its burden.   Plaintiff urges this Court to re-weigh the evidence, *see* Pl.'s Br. at 36–37, but that is not the task of this Court.

In sum, Commerce has demonstrated that the agency reviewed the record and provided a rational connection between the evidence and its choice. Therefore, its decision is reasonable and supported by substantial evidence, even if Mosaic maintains there is "some evidence that detracts from the agency's conclusions."  *See Advanced Tech. & Materials Co.*, 35 C.I.T. at 1387; *Mittal Steel Roman*, 32 C.I.T. at 44.   If the Court were to agree with Commerce's erroneous use of the

IEA data as a "Tier Three" Benchmark, Russian export prices should be included to reflect "prevailing market conditions" as statutorily required.

## VI.     CONCLUSION

For the forgoing reasons, PhosAgro respectfully requests that the Court, deny Plaintiff's motion for judgment on the agency record and grant Plaintiff-Intervenor's motion for judgment on the agency record.

Respectfully submitted,

/s/ H. Deen Kaplan
H. Deen Kaplan
Jonathan T. Stoel
Jared R. Wessel

HOGAN LOVELLS US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
Phone:  +1.202.637.5600
Fax:  +1.202.637.5910
E-mail: deen.kaplan@hoganlovells.com

*Counsel to PhosAgro PJSC and JSC Apatit*

Dated: March 16, 2022

## CERTIFICATE OF COMPLIANCE

The undersigned counsel at Hogan Lovells US LLP hereby certifies that the foregoing Response in Opposition to Plaintiff's Motion for Judgment on the Agency Record dated March 16, 2022 complies with the word-count limitation described in the Standard Chambers Procedures. The memorandum of law contains 5,072 words according to the word-count function of the word processing software used to prepare the memorandum.

Respectfully submitted,

/s/ H. Deen Kaplan

H. Deen Kaplan
HOGAN LOVELLS US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
Phone: (202) 637-5600

*Counsel to PhosAgro PJSC and JSC Apatit*

Dated: March 16, 2022