UNITED STATES COURT OF INTERNATIONAL TRADE

NEW YORK, NEW YORK

BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| THE MOSAIC COMPANY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| and ) | |
| ) | |
| PHOSAGRO PJSC, JSC APATIT, ) | |
| ) | |
| Consolidated Plaintiffs, ) | |
| ) | |
| and ) | |
| ) | |
| INDUSTRIAL GROUP PHOSPHORITE LLC, ) | |
| ) | |
| Consolidated Plaintiff and ) | |
| Consolidated Plaintiff-Intervenor, ) | |
| ) | |
| v. ) | Consol. Court No. 21-00117 |
| ) | **PUBLIC DOCUMENT** |
| UNITED STATES, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| THE MOSAIC COMPANY, ) | |
| ) | |
| Consolidated Defendant-Intervenor ) | |
| ) | |
| and ) | |
| ) | |
| PHOSAGRO PJSC, JSC APATIT, ) | |
| INDUSTRIAL GROUP PHOSPHORITE LLC, ) | |
| ) | |
| Defendant-Intervenors. ) | |

**REPLY OF PLAINTIFFS PHOSAGRO PJSC AND JSC APATIT
IN SUPPORT OF RULE 56.2 MOTION
FOR JUDGMENT ON THE AGENCY RECORD**

H. Deen Kaplan
Jonathan T. Stoel
Jared R. Wessel

HOGAN LOVELLS US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
Phone:  +1.202.637.5600
Fax:  +1.202.637.5910

*Counsel to PhosAgro PJSC
and JSC Apatit*

April 28, 2022

# TABLE OF CONTENTS

**Page**

I.      SUMMARY OF THE ARGUMENT……………………………………………...1

II.     ARGUMENT ....................................................................................................4

    A.      Commerce's Decision to Ignore Domestic Benchmarks for Natural Gas Is Contrary to Law and Unsupported by Substantial Evidence ..................................................4

        1.      Defendants cannot justify Commerce's unlawful application of a *per se* rule based on market share. ................................................................................ 4

        2.      Defendants' purported rationales for Commerce's disregard of the expert evidence are baseless. ................................................................................. 9

    B.      Commerce's Use of IEA Data in its "Tier Three" Benchmark Does Not Reflect the Prevailing Market Conditions in and the Market Principles of the Russian Natural Gas Market ...............................................................................................................12

        1.      Commerce fails to consider two key factors of prevailing market conditions in the Russian natural gas market. ............................................................ 13

        2.      Commerce's use of the IEA data that does not reflect market conditions results in a CVD margin that is not as accurate as possible...................... 14

        3.      In-Country transactions on the record   are reflective of market conditions and market principles in Russia and provides a more accurate margin calculation. ............................................................................................. 16

    C.      At Minimum, Commerce's IEA Data Benchmark Must Be Revised to Correct for the Double Counting of VAT and Import Taxes ...................................................17

CONCLUSION.......................................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acciai Speciali Terni S.p.A. v. United States,*
    26 C.I.T. 148 (2002) ........................................................................................................ 15

*Albemarle Corp. & Subsidiaries v. United States,*
    821 F.3d 1345 (Fed. Cir. 2016) ....................................................................................... 11

*Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. United States,*
    61 F.Supp.3d 1306 (Ct. Int'l Trade 2015), *aff'd sub nom., Maverick Tube Corp. v. United*
    *States*, 857 F.3d 1353 (Fed. Cir. 2017) ....................................................... 1, 6, 8, 14

*Ceramark Technology, Inc. v. United States,*
    11 F.Supp.3d 1317 (Ct. Int'l Trade 2014) ...................................................................... 17

*Changzhou Trina Solar Energy Co. v. United States,*
    352 F.Supp.3d 1316 (Ct. Int'l Trade 2018) .................................................................... 14

*Gallant Ocean (Thailand) Co. v. United States,*
    602 F.3d 1319 (Fed. Cir. 2010) ....................................................................................... 17

*Gerald Metals, Inc. v. United States,*
    132 F.3d 716 (Fed. Cir. 1997) ........................................................................................... 2

*Maverick Tube Corp. v. United States,*
    857 F.3d 1353 (Fed. Cir. 2017) ..................................................................................... 6, 8

*Oy v. United States,*
    No. 97-05-00864, 1999 WL 270028 (Ct. Int'l Trade 1999) ......................................... 11

*Rhone Poulenc, Inc. v. United States,*
    899 F.2d 1185 (Fed. Cir. 1990) ....................................................................... 13, 15, 17

*Universal Camera Corp. v. N.L.R.B.,*
    340 U.S. 474, 488 (1951) ......................................................................................... 2, 17

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ................................................................................................ 1

19 U.S.C. § 1677(5)(E) ................................................................................................ 3, 5, 13, 14

**Regulations**

19 C.F.R. § 351.221(b)(3) ................................................................................................... 11

19 C.F.R. § 351.301(c)(1) ............................................................................. 11

19 C.F.R. § 351.307 ..................................................................................... 11

19 C.F.R. § 351.511(a)(2) ..................................................................... passim

**International Materials**

Appellate Body Report, *United States—Final Countervailing Duty Determination With Respect To Certain Softwood Lumber from Canada*, WTO Doc. WT/DS257/AB/R, AB 2003–06 (adopted Jan. 19, 2004) ................................................................................................ 6, 7

Panel Report, *United States—Countervailing Measures on Softwood Lumber from Canada*, WT/DS533/R (Aug. 24, 2020) ................................................................................ 7

**Administrative Materials**

*Countervailing Duties; Final Rule*, 63 Fed. Reg. 65,348 (Dep't of Commerce Nov. 25, 1998).... 16

*Large Diameter Welded Pipe from the Republic of Korea*, 87 Fed. Reg. 5,780 (Dep't of Commerce Feb. 2, 2022) (final results CVD admin. review), and accompanying Issues and Decision Memorandum ............................................................................................. 16

*Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the Russian Federation*, 86 Fed. Reg. 35,263 (Dep't of Commerce July 2, 2021) (final affirmative CVD determination), and accompanying Issues and Decision Memorandum ......................................... 5, 6

*Welded Line Pipe from the Republic of Korea*, 80 Fed. Reg. 61,365 (Dep't of Commerce Oct. 13, 2015) (final negative CVD determination), and accompanying Issues and Decision Memorandum ............................................................................................. 16

<u>**REPLY OF PLAINTIFFS PHOSAGRO PJSC AND JSC APATIT**</u>
<u>**IN SUPPORT OF RULE 56.2 MOTION FOR**</u>
<u>**JUDGMENT ON THE AGENCY RECORD**</u>

Consolidated Plaintiffs PhosAgro PJSC and JSC Apatit (collectively, "PhosAgro"), respectfully submit this reply brief to the March 16, 2022 Defendant's Response to Plaintiffs' Motions for Judgment Upon the Agency Record (CM/ECF 66, 72) ("Def. Response Br.") and March 16, 2022 Plaintiffs' Memorandum in Opposition to Consolidated Plaintiffs' Rule 56.2 Motions for Judgment Upon the Agency Record (CM/ECF 64, 65) ("Mosaic Response Br.").  For the reasons set forth below and in its Memorandum in Support of Rule 56.2 Motion for Judgment on Agency Record ("Motion for Judgment"), PhosAgro requests this Court to hold that the countervailing duty ("CVD") Final Determination on Phosphate Fertilizers from the Russian Federation of the U.S. Department of Commerce ("Commerce" or the "Department") is unsupported by substantial evidence and otherwise not in accordance with law.  *Phosphate Fertilizers from the Russian Federation*, 86 Fed. Reg. 9,479 (Dep't of Commerce Feb. 16, 2021) (final affirmative CVD determination) ("Final Determination") (P.R. 418).  PhosAgro further respectfully requests that this Court remand the challenged Final Determination consistent with this Court's findings and instructions.

## I.      SUMMARY OF THE ARGUMENT

Commerce's Final Determination must be remanded if it is unsupported by substantial evidence on the record.  19 U.S.C. § 1516a(b)(1)(B)(i); *Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. United States*, 61 F.Supp.3d 1306, 1314 (Ct. Int'l Trade 2015), *aff'd sub nom.*, *Maverick Tube Corp. v. United States*, 857 F.3d 1353 (Fed. Cir. 2017).  To determine whether sufficient evidence supports Commerce's decisions, the Court reviews the record as a whole, including whatever evidence fairly detracts from the agency's determination.  *See, e.g., Universal*

*Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951); *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997).

Defendant, the Government, and Defendant-Intervenor, The Mosaic Company ("Mosaic") (together, "Defendants"), offer certain inapposite arguments in an unsuccessful attempt to remedy the legal and factual deficiencies in Commerce's Final Determination detailed in PhosAgro's Motion for Judgment on the Agency Record.  For instance, they contend that Commerce's finding that no viable "Tier One" benchmark prices in Russia are available is based on the record as a whole, rather than the employ of a *per se* rule. They also argue that Commerce's disregard for PhosAgro and Industrial Group Phosphorite, LLC's ("EuroChem") (together, "Respondents") "Tier One" data can be summarily dismissed as "unverifiable."  *See* Mosaic Response Br. at 26. Additionally, Defendants argue that Commerce is entitled to rely on a benchmark that makes unlawful and unnecessary adjustments that are contrary to law and Commerce's own practice to be tailored to the prevailing market conditions in the country (here Russia) under investigation.

Plaintiffs demonstrate again below why the Final Determination is contrary to law and unsupported by substantial evidence.  As set forth in Plaintiffs' Motion for Judgment and again herein, Defendants' arguments:  (1) ignore evidence placed on the record by Respondents and Commerce's obligation to review the record as whole (*see Universal Camera Corp.*, 340 U.S. at 488); (2) fail to conform to the tiered hierarchy of preferred benchmarks mandated by 19 C.F.R. § 351.511(a)(2)(i); and (3) misstate the plain language set forth by Commerce in the Issues and Decision Memorandum for the Final Affirmative Determination of the CVD Investigation of Phosphate Fertilizers from the Russian Federation, dated February 8, 2021 ("*Final Issues & Decision Memo*") (P.R. 405)*.*  Commerce may not simply disregard record evidence to engineer a

benchmark that is untethered to the prevailing market conditions in the country under investigation, particularly when other benchmark data are available.

Defendants also assert that Commerce is permitted to employ the International Energy Agency data for specific Organisation of Economic Cooperation & Development ("OECD") member countries (the "IEA data") for its "Tier Three" benchmark. Defendants ignore that the IEA data is not consistent with market principles in Russia, does not reasonably approximate prices for natural gas in Russia, and is thus inconsistent with the governing statue and regulations. Specifically, the IEA data do not reflect the prevailing market conditions in the Russian natural gas market, and they fail to take into consideration the availability and transportability of natural gas into Russia (or lack thereof), factors Commerce is statutorily required to consider. *Accord* 19 U.S.C. § 1677(5)(E)(iv).

Lastly the Government argues that Commerce's adjustments to its "Tier Three" benchmark are lawful because they reflect the "price that PhosAgro and EuroChem would have paid if they imported natural gas into Russia." Def. Response Br. at 38. This is not accurate. The IEA data itself states, with respect to every EU country included in the data, the EU VAT is returned to purchasers, and therefore it should not be added to the benchmark. Further, according to industry standards, Russia's import tax is already included in the IEA reported purchase price—as such, Commerce's adjustment patently results in the double counting of the import tax and must be corrected on remand.

For all of these reasons and those set forth in Plaintiffs' Motion for Judgment, Commerce's determination is not supported by substantial evidence and contrary to law. The Final Determination should be remanded with instructions to correct.

## II.    ARGUMENT

### A.    Commerce's Decision to Ignore Domestic Benchmarks for Natural Gas Is Contrary to Law and Unsupported by Substantial Evidence

#### 1.    Defendants cannot justify Commerce's unlawful application of a *per se* rule based on market share.

Defendants' contentions around Commerce's refusal to employ a "Tier One" benchmark do not cure Commerce's reliance on an unlawful "market distortion" theory to disregard Russian market prices.  Commerce almost entirely relies on Gazprom's share of the natural gas market to conclude that the market is distorted and therefore no "Tier One" benchmarks are available.  *Final Issues & Decision Memo* at Cmt. 3g (P.R. 405).  Defendants' attempt to justify Commerce's reasoning by arguing that it is based on "the totality of record evidence," dramatically overstates Commerce's brief acknowledgement of Russian import and export controls and Gazprom's transportation monopoly.  *See* Def. Response Br. at 28–30; Mosaic Response Br. at 20, 23–24. But, this contention mischaracterizes Commerce's finding—the "black-and-white" of the Final Determination show that the agency explicitly relied on Gazprom's share of the market. Commerce's actual words are as follows:

> Based on the record evidence, we continue to find the domestic natural gas market to be distorted because of the predominant role played by the GOR in the Russian natural gas market through the significant portion of the market supplied by Gazprom and Rosneft, both government authorities, and because of other interventions in the natural gas market by the GOR, as described in further detail below. . . .

> In reaching this conclusion, Commerce relied on information reported by the GOR to find that (1) a substantial proportion of total Russian domestic natural gas production during each of 2017, 2018, and 2019 is attributable to companies in which the GOR maintains a direct or indirect ownership/management interest; and (2) Gazprom alone accounted for a majority of the natural gas production in each of these years, such that it is reasonable to conclude that Gazprom accounts for a substantial portion of the market.

*Final Issues & Decision Memo* at Cmt. 3g (P.R. 405).

The Government acknowledges, as it must, that "Commerce relied" on the above two points to reach its finding of distortion. Def. Response Br. at 25. This *per se* reliance on market share was unlawful per the governing statute, the Department's regulations, and this Court's decisions.

As detailed in PhosAgro's Motion for Judgment, the Government's reliance on this "market distortion" theory departs from the terms of the governing statute, which explains that the provision of a good by a government authority does not confer a benefit on the recipient unless the good is provided for less than adequate remuneration ("LTAR"). 19 U.S.C. § 1677(5)(E). The statute further dictates that adequacy of remuneration "***shall*** be determined in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation." *Id.* § 1677(5)(E)(iv) (emphasis added). As such, the governing statute makes clear that adequacy of remuneration for a good must be assessed against a benchmark reflecting the prevailing market conditions for the good within that region.

Likewise, the Department's regulatory hierarchy for the selection of a benchmark by which to assess the adequacy of remuneration reinforces this preference for a market transaction-based benchmark. A "Tier One" benchmark measures the adequacy of remuneration by using prices resulting from actual transactions in the relevant country, which could include prices from actual transactions between private parties. 19 C.F.R. § 351.511(a)(2)(i). Thus, the "preferred benchmark in the hierarchy is an observed market price for the good stemming from actual transactions within {Russia}." *Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the Russian Federation*, 86 Fed. Reg. 35,263 (Dep't of Commerce July 2, 2021) (final affirmative CVD determination), and accompanying Issues and Decision Memorandum at Cmt.

3d.  Commerce has explained that this is "because such prices generally would be expected to reflect most closely the prevailing market conditions of the purchaser under investigation."  *Id.*

Only if no such price exists should the Department move on to its second-tier benchmark, comparing the government price to a world market price "available to purchasers in the country in question."  19 C.F.R. § 351.511(a)(2)(ii).  If neither of the first two benchmarks is viable, the third-tier benchmark assesses whether the government price in the country of provision of the good or service is "consistent with market principles."  *Id.* § 351.511(a)(2)(iii).

As set forth in the Department's implementing regulation, the preferred benchmark for determining whether the provision of natural gas by Gazprom here provides a countervailable benefit is a comparison of the price of natural gas sold by Gazprom with a market-determined price "resulting from actual transactions in the country in question."  *Id.* § 351.511(a)(2)(i).

Here, the Government has impermissibly relied almost exclusively on Gazprom's market share of production in defending Commerce's "significant distortion" finding and refusal to use a "Tier One" benchmark, contrary to the direction of the statute and regulations.  Defendant's arguments for its "market distortion" theory fail because Commerce, U.S. courts, and international tribunals have repeatedly discredited simple reliance on market share alone.  *See, e.g.*, *Maverick Tube Corp. v. United States*, 857 F.3d 1353, 1362 (Fed. Cir. 2017); *Borusan*, 61 F.Supp.3d at 1328–31; Appellate Body Report, *United States—Final Countervailing Duty Determination With Respect To Certain Softwood Lumber from Canada*, WTO Doc. WT/DS257/AB/R, AB 2003–06 (adopted Jan. 19, 2004) ("Softwood Lumber WTO Appellate Body Report"), para. 102. Particularly, the Court is bound by binding precedent set by the Federal Circuit, when affirming its own decision,  that such a "*per se*" rule based on market share to determine  market distortion is contrary to law and cannot support a finding that a particular benchmark should not be employed.

*Maverick*, 857 F.3d at 1362 ("Commerce applied what *amounted to a* per se *rule of market distortion* after finding {the government} controlled a substantial portion of the market . . . .") (emphasis added).

Consistent with this principle, the United States itself has acknowledged in a WTO dispute that "there is no market share threshold above which an investigating authority may conclude *per se* that price distortion exists." Panel Report, *United States—Countervailing Measures on Softwood Lumber from Canada*, WT/DS533/R (Aug. 24, 2020). Notably, the WTO has rejected a finding by Commerce of *per se* price distortion based on market share when the government's share is between 83 and 99 percent—significantly higher than Gazprom's market share here. Softwood Lumber WTO Appellate Body Report, para. 102 ("{A}n allegation that a government is a significant supplier would not, on its own, prove distortion and allow an investigating authority to choose a benchmark other than private prices in the country of provision."); *Id.* n.103; *see* PhosAgro's Motion for Judgment at 20.

Respondents provided the Department with precisely the type of information described in the Department's CVD implementing regulation—market-determined prices "resulting from actual transactions in the country in question." *See* 19 C.F.R. § 351.511(a)(2)(i). Respondents provided (through the Brattle Report and their questionnaire response) prices stemming from actual transactions in the unregulated Russian market for Commerce to employ as a "Tier One" benchmark. *See Final Issues & Decision Memo* at 49 (P.R. 405); *Letter from Crowell Moring to the U.S. Department of Commerce re: PhosAgro PJSC and Eurochem North America Corp. Benchmark Data Letter*, Case No. C-821-825 (Nov. 2, 2020) at App. 2 (hereinafter "Brattle Report" with internal pages referenced therein) at v (P.R. 279; C.R. 464). The data provided in Appendix B of the Brattle Report list total prices paid per month in 2019 between Respondents

and other parties.  Commerce is obligated under 19 C.F.R. § 351.511(a)(2)(i) and the precedent set forth above to use the prices provided by PhosAgro as they stem from actual transactions in Russia between two private parties.

Confronted with the detailed evidence submitted by Respondents in accordance with the governing statute and the Department's regulations, Commerce shirked its statutory and regulatory requirements and failed to address that evidence.  Instead, the Department relied on a *per se* market distortion theory to ignore the Russian market prices on the record.  This decision runs afoul of Commerce's legal obligations and its evidentiary burden to explain the "certain circumstances" that lead to a finding of "significant distortion" apart from substantial market share.  *Maverick Tube Corp.*, 857 F.3d at 1362; *Borusan*, 61 F.Supp.3d at 1330.  The Final Determination cherry picked certain factors that may be relevant to Commerce's benchmark analysis (*e.g.*, applicable VAT, Russian import and export customs duties, and Gazprom's methods of natural gas transport), see *Final Issues & Decision Memo* at Cmt. 3g (P.R. 405), but the agency failed to connect how these factors relate to Commerce's assertion that there is distortion in the Russian natural gas market.  *Id.*  Indeed, the Government's portrayal of these factors to this Court confirms Commerce's failure to link these factors and any alleged market distortion.  Def. Response Br. at 25–26.  That is, Defendant merely recycles the same factors identified by Commerce without elucidating their connection to its conclusion that the prices for Russian natural gas negotiated between private prices are distorted.  *Id.*  This is unsurprising as the Final Determination itself admits that Commerce unlawfully relied solely on Gazprom's percentage share of the market to disregard the "Tier One" benchmark prices on the record.

### 2. Defendants' purported rationales for Commerce's disregard of the expert evidence are baseless.

Commerce's decision to ignore market-based prices in the country under investigation is flawed for another reason—Defendants' purported rationales for Commerce's unlawful decision to discard the "Tier One" data placed on the record by Respondents are unfounded. The Respondents jointly provided a study on the Russian natural gas market produced by a third-group of economic experts, The Brattle Group Ltd. Brattle Report (P.R. 279; C.R. 464). The Brattle Report found that Gazprom is the largest single supplier of natural gas in Russia but that its market share of natural gas supply to the Russian domestic market has decreased substantially in recent years, with the market share of independent gas suppliers ("IGS") increasing to over 50% by 2019. *Id.* at v (P.R. 279; C.R. 464). Importantly, the report illustrates that prices of natural gas supplied by independent suppliers are based on market principles. For example, the Brattle Report's analysis demonstrates that prices paid by EuroChem and PhosAgro to independent gas suppliers in Russia are equal to or higher than regional European prices. *Id.* at viii (P.R. 279; C.R. 464). Notwithstanding the thoroughness of the Brattle Report and its relevance to the Department's assessment of natural gas prices in Russia, Mosaic points that the data in the Brattle Report are "fundamentally flawed and unverifiable." Mosaic Response Br. at 26. The Government likewise argues that the Brattle Report is unsuitable because it was not accompanied by original source data and explanation of methodology. Def. Response Br. at 32–33. Neither of these assertions are accurate or consistent with the record evidence.

PhosAgro explained in its Motion for Judgment the careful construction and sourcing of the Brattle Report. Brattle provided ample and clear citations to the sources on which it relied to support the Brattle Report's figures, data and conclusions. PhosAgro's Motion for Judgment at 19. Moreover, each section setting forth calculations or figures provides a clear explanation of its

methodology and calculations, for example, its calculation of gas production operating costs for

Novatek is detailed and fulsome:

> Novatek's financial statements provide cost data for its oil and gas
> production activities. We rely on these data to estimate Novatek's
> production operating costs; see Table 1. We include Novatek's
> lifting costs, exploration expenses and taxes to calculate costs.
> Although Novatek predominantly produces natural gas, it also
> produces hydrocarbon liquids. Novatek does not provide a detailed
> breakdown of its production and overhead costs between natural gas
> and hydrocarbon liquids. We conservatively assume that the total
> lifting and exploration costs are attributable to the production of
> natural gas. Row [5] in Table 1 shows Novatek's operating costs
> excluding the MET. We consider the MET independently because it
> has a significant weight in the operating costs and so it is particularly
> important to arrive at a reasonable estimate. {}

Table 1: Novatek's gas production operating costs based on its accounts

|  |  |  |  | 2018 | 2019 |
|---|---|---|---|---|---|
| Lifting Expenses | RUB mln | [1] | See Note | 14,938 | 16,045 |
| Exploration Expenses | RUB mln | [2] | See Note | 7,012 | 8,386 |
| Property and Other Taxes | RUB mln | [3] | See Note | 4,124 | 4,046 |
| General and Adminstrative Expenses | RUB mln | [4] | See Note | 22,282 | 24,568 |
| Operating Costs Excluding MET | RUB mln | [5] | [1]+[2]+[3]+[4] | 48,356 | 53,045 |
| Gas Production | bcm | [6] | See Note | 69 | 75 |
| Operating Costs Excluding MET | RUB/mcm | [7] | [5]/[6] | 703 | 710 |
| Mineral Extraction Tax | RUB mln | [8] | See Note | 54,644 | 57,935 |
| Mineral Extraction Tax | RUB/mcm | [9] | [8]/[6] | 794 | 776 |
| Operating Costs | RUB/mcm | [10] | [7]+[9] | 1,497 | 1,486 |

Notes and sources:
Thousand cubic meters are *mcm* and billion cubic meteres are *bcm*
[1], [2]: PAO Novatek IFRS Consolidated Financial Statements 2019, p. 71.
[3]: PAO Novatek IFRS Consolidated Financial Statements 2019, p. 41.
[4]: PAO Novatek IFRS Consolidated Financial Statements 2019, p. 42.
[6]: PAO Novatek Annual Report 2019, p. 20.
[8]: PAO Novatek IFRS Consolidated Financial Statements 2019, p. 41.

Brattle Report at 17 (P.R. 279; C.R. 464).

Moreover, the Report provides a detailed Exhibit List in Appendix F. *Id*. at App. F

(P.R. 279; C.R. 464). These detailed citations, explanations, and calculations are hardly

"fundamentally flawed and unverifiable" as Mosaic wildly asserts. On the basis of the record

evidence, this Court should readily dismiss Mosaic's claim (at 26) to the contrary.

Additionally, Respondents timely placed the Brattle Report on the record in response to Commerce's questionnaire. If Commerce had issues with the Brattle Report's original source documentation, or questions about the transactional data, the agency should have requested additional materials or clarification, or conducted verification, but it failed to do so. *See* 19 C.F.R. § 351.301(c)(1), (providing Commerce authority to issue initial and supplemental questionnaires); 19 C.F.R. §§ 351.221(b)(3), 351.307 (providing authority for Commerce to conduct verification if appropriate and necessary). Commerce may not summarily dismiss evidence on the record merely because it speculates that the information is unverifiable. *See Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345, 1358–59 (Fed. Cir. 2016) (finding that Commerce acted unreasonably where it had the ability to gather information but refused to do so); *see also Oy v. United States*, No. 97-05-00864, 1999 WL 270028 at *2 (Ct. Int'l Trade 1999) (holding that the agency did not engage in "fair treatment" of evidence on the record when it "apparently observed the evidence only to the extent necessary to conclude that it was 'subjective' and did not need to be considered."). Commerce had ample opportunity and authority to request additional source documentation through supplemental questionnaires and verification process. It failed to do so.

In sum, the Department erred by failing to employ Russian market prices for natural gas placed on the record by Respondents. It is black-letter law that Commerce may not rely on a market distortion theory alone to select a benchmark outside the country under investigation, and yet that is precisely what the agency did in the Final Determination. Moreover, Defendants' attempts to tarnish the legitimate and verifiable findings of the distinguished experts who compiled the Brattle Report are not credible. Indeed, they suggest an effort to gerrymander (unnecessarily) a benchmark outside of Russia despite the presence of substantial evidence supporting the employ

of valid market prices in the country under investigation.   Accordingly, this case should be remanded to Commerce for reconsideration of its benchmark selection consistent with U.S. CVD law and the substantial evidence.

**B.     Commerce's Use of IEA Data in its "Tier Three" Benchmark Does Not Reflect the Prevailing Market Conditions in and the Market Principles of the Russian Natural Gas Market**

Having unlawfully determined not to rely on the actual market transactions in Russia placed on the record by Respondents and supported by the detailed findings in the Brattle Report, Commerce instead employed a "Tier Three" Benchmark using Petitioner's IEA data. *Final Issues & Decision Memo* at Cmt. 3i (P.R. 405).   PhosAgro demonstrated in its Motion for Judgment why this decision was contrary to law and unsupported by the substantial evidence.   Defendants' erroneous contentions with respect to this issue are discussed below.   First, Commerce failed to employ a benchmark reflective of "prevailing market conditions" in its "Tier Three" analysis.   The IEA data do not reflect prevailing market conditions for the natural gas market in Russia and therefore do not allow Commerce to accurately assess whether the government price is consistent with market principles and are unlawfully employed.   Second, Commerce's use of a benchmark that does not reflect market conditions or market principles in the Russian natural gas market results in a calculation of CVD margin that is not as accurate as possible.   Third, Commerce wrongfully concluded that Respondent's benchmark data providing in-country transactions were unsuitable for use as "Tier Three" benchmark.   Respondent's benchmark data reflect transactions with IGS in Russia who are not subject to government regulation, and are instead driven by supply and demand and other market principles.   Commerce's selection of IEA data as its "Tier Three" benchmark rather than Respondent's benchmark data was unlawful and unsupported by evidence on the record.

### 1. Commerce fails to consider two key factors of prevailing market conditions in the Russian natural gas market.

As mandated by 19 U.S.C. § 1677(5)(E)(iv), Commerce must always ensure that its benchmark reflects "prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation." As such, Commerce's benchmark here must reflect prevailing market conditions of the Russian natural gas market. Prevailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale. 19 U.S.C. § 1677(5)(E)(iv). Further, when employing a "Tier Three" benchmark, Commerce must use the benchmark to determine whether the government's price is consistent with market principles. 19 C.F.R. § 351.511(a)(2)(iii). Therefore the benchmark Commerce selects must be reflective of both prevailing market conditions of and the market principles present in the Russian natural gas market. The IEA data do not meet these requirements, and therefore Commerce's use of such data was unlawful.

Availability and transportation are two of the five factors Commerce must consider when selecting a benchmark pursuant to 19 U.S.C. § 1677(5)(E)(iv). Commerce failed to consider these factors whatsoever in its selection of its "Tier Three" benchmark. In response to this fact, Mosaic asserts that PhosAgro conflates a "Tier Two" (world market price) analysis with a "Tier Three" (market principles) analysis, and contends that "European natural gas prices may not technically be 'available to' purchasers in Russia is immaterial to Commerce's analysis under Tier Three." Mosaic Response Br. at 31. But, Mosaic misses the point here – the IEA data are inconsistent with the governing statue and regulations. Further, Commerce is tasked with calculating subsidy margins "as accurately as possible*." Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990). Accordingly, the availability of European natural gas in Russia is a significant fact that is far from immaterial.

Commerce may not simply ignore certain statutory factors because it merely "prefers" one data set over another. Commerce must consider prevailing market conditions *in the country* where the good or service is provided. *See* 19 U.S.C. § 1677(5)(E)(iv). The Government concedes that "many of the countries {included in the IEA data} are not physically close" to Russia (Def. Response Br. at 35) and therefore are not reflective of market conditions in Russia. Commerce also explicitly acknowledges that there is no pipeline capable of conveying gas to Russia from Europe (*see Final Issues & Decision Memo* at Cmt. 3h (P.R. 405)) but still fails to consider the geographic distance and the significant difficulty and high costs of transporting natural gas in its "Tier Three" analysis, all of which are discussed in detail in the Brattle Report provided by Respondents. *See* Brattle Report at 11, 22 (P.R. 279; C.R. 464). Commerce's failure to account for these unrepresentative data points in its "Tier Three" benchmark is contrary to law.

### 2. Commerce's use of the IEA data that does not reflect market conditions results in a CVD margin that is not as accurate as possible.

The Government argues that "Commerce's goal in setting a benchmark rate is to best approximate the market rate . . . not to choose the rate respondents were most likely to pay." Def. Response Br. at 36 (citing *Changzhou Trina Solar Energy Co. v. United States,* 352 F.Supp.3d 1316, 1343 (Ct. Int'l Trade 2018)). Further, Mosaic contends that "a potential benchmark must merely 'bear a reasonably realistic resemblance to the importing market's reality.'" Mosaic Response Br. at 32 (citing *Borusan,* 61 F.Supp.3d at 1341).

The Federal Circuit and Court of International Trade have emphasized that the ease of Commerce's calculation does not permit the agency to rely on data inconsistent with the governing statute and Commerce's regulations. Notwithstanding, Commerce's benchmark approach appears to have been designed to facilitate its calculations. Def. Response Br. at 32 (claiming that "the IEA dataset . . . allowed Commerce to derive average quarterly prices using the selected OECD

*European export market* prices . . . ") (emphasis added).  This is not reasonable decision-making.  Rather, the Federal Circuit has repeatedly made clear that the calculation of *fair and accurate margins* should drive Commerce's methodology in administering the trade laws—not the ease of Commerce's calculations.  *See Rhone Poulenc*, 899 F.2d at 1191; *see also Acciai Speciali Terni S.p.A. v. United States*, 26 C.I.T. 148, 164 n.7 (2002) ("{Commerce} cannot, in the name of efficiency considerations, dispense with its obligation to render a fair and accurate determination.").

The Government's claim shows precisely why its employ of the IEA data is fundamentally unlawful.  The IEA data are not market prices in Russia—they thus are not more reflective of prevailing market conditions in Russia than the actual transactional data placed on the record by Respondents and substantiated by the Brattle Report.  Indeed, the Government's own description of the IEA data shows why this Court should not accept them as a benchmark for Russian natural gas prices, particularly when other valid in-country data are available. That is, the Government describes the IEA data as reflective of *European export market prices*, not the pricing and market conditions pertinent to the provision of natural gas in Russia.

In sum, the IEA data do not "best approximate" or "bear a reasonable realistic resemblance to" the prices paid by Russian purchasers of natural gas during the POI.  Employing actual transactions in Russia placed on the record by the Respondents would much more accurately approximate the prices paid by Russian purchases and be consistent with both the governing statute and the regulations.  For these reasons also, Commerce's determination must be remanded.

###### 3.    In-country transactions on the record are reflective of market conditions and market principles in Russia and provide a more accurate margin calculation.

Sales from independent gas suppliers are reflective of prevailing market conditions and market principles in the Russian natural gas market. One compelling fact confirming this point is that the benchmark data supplied to Commerce demonstrate that Russian suppliers of natural gas earned more revenue than their cost expenditures during the POI.  Brattle Report at v, 16–17 (P.R. 279; C.R. 464).  Mosaic contends that there is no legal authority that cost compared to revenue is a relevant consideration when determining whether prices are set within accordance to market principles.  Mosaic Response Br. at 29.  This contention is puzzling and patently incorrect.  Commerce's regulations explain that whether a price covers costs plus a rate of recovery or profit is a significant consideration in determining whether market principles apply.  *Countervailing Duties; Final Rule*, 63 Fed. Reg. 65,348, 65,378 (Dep't of Commerce Nov. 25, 1998) (providing that Commerce may consider costs, "including rates of return sufficient to ensure future operations," in its "Tier Three" analysis); *accord Large Diameter Welded Pipe from the Republic of Korea*, 87 Fed. Reg. 5,780 (Dep't of Commerce Feb. 2, 2022) (final results CVD admin. review), and accompanying Issues and Decision Memorandum at Cmt. 1 ("{W}e determine a benchmark that would be in line with market principles (*i.e.*, a price that covers costs plus a rate of recovery or profit)"); *Welded Line Pipe from the Republic of Korea*, 80 Fed. Reg. 61,365 (Dep't of Commerce Oct. 13, 2015) (final negative CVD determination), and accompanying Issues and Decision Memorandum at Section IV. B. ("Under a Tier 3 Benchmark analysis, the Department will assess whether the prices charged {} are set in accordance with market principles through an analysis of such factors as {} price-setting philosophy, costs (including rates of return sufficient to ensure future operations), or possible price discrimination.").

Here, the fact that the revenues of Gazprom and the IGS are plainly greater than their costs substantiates that the IGS transaction prices are consistent with market principles.  The IGS transactions are not subject to government regulation and instead are driven by supply and demand. IGS average sales prices are actually lower than those of Gazprom.  Brattle Report at v (P.R. 279; C.R. 464).   Additionally, the Brattle Report's analysis demonstrates that prices paid by EuroChem and PhosAgro to IGS in Russia are equal to or higher than regional European prices.  *Id.* at viii (P.R. 279; C.R. 464).  The IGS transactions are reflective of prevailing market conditions and are consistent with market principles, as they include prices for natural gas sales actually performed in the Russian market. Their employ thus would meet Commerce's requirement to calculate the CVD margin as accurately as possible.  Commerce's disregard of these data and its employ  of the IEA data are contrary to law and unsupported substantial evidence.

### C.     At Minimum, Commerce's IEA Data Benchmark Must Be Revised to Correct for the Double Counting of VAT and Import Taxes

Commerce has an obligation to calculate subsidy margins "as accurately as possible*." Rhone Poulenc*, 899 F.2d at 1191.  Further, Commerce's determination must be supported by substantial evidence, which requires consideration of the record as a whole including and may not disregard evidence contrary to its findings without reasonable explanation.  *See Ceramark Technology, Inc. v. United States*, 11 F.Supp.3d 1317, 1321 (Ct. Int'l Trade 2014) (quoting *Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319, 1323 (Fed. Cir. 2010)); *Universal Camera Corp.*, 340 U.S. at 488.

Commerce's unlawful IEA data benchmark comprises certain adjustments (including both EU and Russian VAT and Russian import taxes) that are inaccurate, untethered to the actual prices paid in the Russian market for natural gas, and contrary to the record evidence. Accordingly, at minimum, Commerce's benchmark calculation must be corrected.  19 C.F.R. § 351.511(a)(2)(iv)

(requiring Commerce to adjust benchmark prices to include accurate delivery charges and import duties).

Commerce adjusted the IEA data to account for a 20-percent VAT, comprising VATs assessed by both Russian and the EU. *Final Issues & Decision Memo* at Cmt. 3j (P.R. 405). Commerce's finding ignores the plain text of the IEA reports selected by the Department to construct its benchmark for Russian natural gas. Those reports state that European VAT is refunded by *all* relevant European OECD countries' governments for natural gas purchases for commercial purposes. *Final Issues & Decision Memo* at Cmt. 3k (P.R. 405); *see e.g.*, Mosaic's Benchmark Submission at Ex. 14 at 58 (P.R. 264) ("VAT is refunded for purchases for commercial purposes."). This means, according to the IEA reports selected by the Department for its benchmark, the actual end price paid by Russian purchasers does not include EU VAT, and therefore must be removed to ensure an accurate calculation.

Additionally, Commerce does not need to "construct" the import price to include import taxes as they already were included in the IEA pricing in accordance with industry practice. Instead, Commerce unnecessarily added 5% import taxes to its benchmark prices.

Commerce's adjustments do not reflect the prevailing market conditions in Russia, nor do they accurately reflect the prices Russian customers paid based on record evidence. The agency's unlawful adjustments to its "Tier Three" benchmark caused the CVD margin to be inaccurate and unsupported by substantial evidence. These adjustments are contrary to law and should be remanded to Commerce.

## CONCLUSION

For the forgoing reasons and those set forth in its Motion for Judgment, PhosAgro respectfully asks this Court to find that Commerce's Final Determination is contrary to law and unsupported by record evidence.  Accordingly, this Court should grant PhosAgro's Motion for Judgment and remand the Final Determination to Commerce, with instructions to recalculate PhosAgro's CVD margin consistent with this Court's decision.

<div style="margin-left:40%">

Respectfully submitted,

/s/ H. Deen Kaplan
H. Deen Kaplan
Jonathan T. Stoel
Jared R. Wessel

HOGAN LOVELLS US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
Phone:  +1.202.637.5600
Fax:  +1.202.637.5910
E-mail: deen.kaplan@hoganlovells.com

*Counsel to PhosAgro PJSC and JSC Apatit*

</div>

Dated: April 28, 2022

## CERTIFICATE OF COMPLIANCE

The undersigned counsel at Hogan Lovells US LLP hereby certifies that the foregoing Reply in Support of Motion for Judgment on the Agency Record dated April 28, 2022 complies with the word-count limitation described in the Standard Chambers Procedures.  The memorandum of law contains 5,441 words according to the word-count function of the word processing software used to prepare the memorandum.

<div align="right">

Respectfully submitted,

/s/ H. Deen Kaplan

H. Deen Kaplan
HOGAN LOVELLS US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
Phone: (202) 637-5600

*Counsel to PhosAgro PJSC and JSC Apatit*

</div>

Dated: April 28, 2022