## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE:  THE HONORABLE JANE A. RESTANI, SENIOR JUDGE

| | |
|---|---|
| THE MOSAIC COMPANY,<br><br>　　　　　　　　Plaintiff,<br><br>　　and<br><br>PHOSAGRO PJSC, JSC APATIT, EUROCHEM NORTH AMERICA CORP., INDUSTRIAL GROUP PHOSPHORITE, LLC,<br><br>　　　　　　　　Consolidated Plaintiffs,<br><br>　　　　　　v.<br><br>UNITED STATES,<br><br>　　　　　　　　Defendant,<br><br>　　and<br><br>THE MOSAIC COMPANY,<br><br>　　　　　　　　Consolidated Defendant-Intervenor. | Consol. Court No. 21-00117<br><br>**NON-CONFIDENTIAL VERSION**<br><br>**Business Proprietary Information Deleted from Pages 9-11** |

## THE MOSAIC COMPANY'S REPLY IN SUPPORT OF ITS RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD

David J. Ross
Patrick J. McLain
Stephanie E. Hartmann
Natan P.L. Tubman
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

Dated: April 28, 2022

*Counsel for The Mosaic Company*

## TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................ 1

II.  ARGUMENT ..................................................................................................... 2

   A.  **Commerce Improperly Refused to Countervail Phosphate Mining Rights Subsidies that the GOR Provided During the POI Pursuant to Mining Licenses Initially Issued Before an Arbitrary Cut-Off Date** ........................................................ 2

     1.  **Defendants concede that Commerce applied a uniform cut-off date in refusing to analyze respondents' mining rights subsidies** ...................................... 2

     2.  **Commerce has the ability to identify and measure the subsidies conferred during the POI under each of the mining licenses at issue** ............................ 6

     3.  **The terms and conditions of all of the respondents' mining rights licenses changed in material ways after the "cut-off" date** ................................... 8

   B.  **Commerce Improperly Refused to Adjust the Tier 3 World Market Benchmark Price For Phosphate Rock For Freight, Customs Duties, and VAT In Order To Arrive at a "Delivered" Benchmark Price** .............................................. 11

     1.  **Defendants fail to rebut the relevance of 19 C.F.R. § 351.511(a)(2)(iv)** .............. 13

     2.  **Defendants fail to show that Commerce's decision is consistent with its prior practice** ......................................................................................... 15

   C.  **Commerce Improperly Refused to Adjust the IEA Benchmark Prices for Natural Gas to Exclude Exports of Russian Natural Gas** ............................... 19

III. CONCLUSION ................................................................................................. 23

i

NON-CONFIDENTIAL VERSION

# TABLE OF AUTHORITIES

**Page(s)**

**Statutes**

19 U.S.C. § 1671(f) ............................................................................2, 3

**Regulations**

19 C.F.R. § 351.511(a)(2)(iv) ............................................................12, 13, 14

19 C.F.R. 351.524(c)(1) ......................................................................6

**Cases**

*ArcelorMittal USA LLC v. United States*, 337 F. Supp. 3d 1285 (CIT 2018) ....................5

*Beijing Tianhai Industry Co. v. United States*, 52 F. Supp. 3d 1351 (CIT 2015)..............14

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) ..................7

*CS Wind Viet. Co. v. United States*, 832 F.3d 1367 (Fed. Cir. 2016) ................20

*GPX Int'l Tire Corp. v. United States*, 33 CIT 1368,
645 F. Supp. 2d 1231 (2009) .................................................................3, 4, 5, 6

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)................................................................................7

*NMB Sing. Ltd. v. United States*, 557 F.3d 1316 (Fed. Cir. 2009) ....................9

*RHP Bearings Ltd. v. United States*, 288 F.3d 1334 (Fed. Cir. 2002)............11

*SKF USA Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001).....................22

*TMK IPSCO v. United States,* 179 F. Supp. 3d 1328 (CIT 2016), *aff'd on remand,*
222 F. Supp. 3d 1306 (CIT 2017) .........................................................3, 4, 6

*Transactive Corp. v. United States*, 91 F.3d 232 (D.C. Cir. 1996)...................11

**Administrative Materials**

*Certain Hot-Rolled Carbon Steel Flat Products From India*,
73 Fed. Reg. 40,295 (Dep't Commerce July 14, 2008) ......................................7

*Certain Softwood Lumber Products From Canada: Final Affirmative Countervailing
Duty Determination, and Final Negative Determination of Critical Circumstances*,
82 Fed. Reg. 51,814 (Dep't Commerce Nov. 8, 2017), and accompanying Issues and
Decision Memorandum................................................................................18, 19

*Certain Softwood Lumber Products From Canada: Preliminary Affirmative
Countervailing Duty Determination, and Alignment of Final Determination with
Final Antidumping Duty Determination*, 82 Fed. Reg. 19,657 (Dep't Commerce
Apr. 28, 2017), and accompanying Preliminary Decision Memorandum ..................18, 19

Consol. Court No. 21-00117                                  NON-CONFIDENTIAL VERSION

*Certain Steel Wire Garment Hangers From the Socialist Republic of Vietnam*,
77 Fed. Reg. 75,973 (Dep't Commerce Dec. 26, 2012) ....................................................10

*Certain Stainless Steel Wire Rod From Italy*,
63 Fed. Reg. 40,474, 40,486 (Dep't Commerce July 29, 1998) .........................................7

*Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products From
the Russian Federation: Final Affirmative Countervailing Duty Determination and
Final Negative Critical Circumstances Determination*, 81 Fed. Reg. 49,935 (Dep't
Commerce July 29, 2016), and accompanying Issues and Decision Memorandum ...17, 18

*Granular Polytetrafluoroethylene Resin From The Russian Federation: Final
Affirmative Countervailing Duty Determination*, 87 Fed. Reg. 3,764 (Dep't
Commerce Jan. 25, 2022), and accompanying Issues and Decision Memorandum..........15

*Phosphate Fertilizers From the Kingdom of Morocco: Final Affirmative Countervailing
Duty Determination*, 86 Fed. Reg. 9,482 (Dep't Commerce Feb. 16, 2021), and
accompanying Issues and Decision Memorandum.........................................................7, 8

*Phosphate Fertilizers From the Russian Federation: Preliminary Affirmative
Countervailing Duty Determination*, 85 Fed. Reg. 76,524 (Dep't Commerce
Nov. 30, 2020), and accompanying Preliminary Decision Memorandum .......................12

*Silicon Metal From Australia: Final Affirmative Countervailing Duty Determination*,
83 Fed. Reg. 9,834 (Dep't Commerce Mar. 8, 2018), and accompanying Issues and
Decision Memorandum...................................................................................12, 15, 16, 17

*Steel Concrete Reinforcing Bar From the Republic of Turkey: Preliminary
Affirmative Countervailing Duty Determination and Alignment of Final
Countervailing Duty Determination With Final Antidumping Duty
Determination*, 82 Fed. Reg. 12,195 (Dep't Commerce Mar. 1, 2017).....................21, 22

*Steel Concrete Reinforcing Bar From the Republic of Turkey: Preliminary
Results of Countervailing Duty Administrative Review; 2017*,
84 Fed. Reg. 48,583 (Dep't Commerce Sept. 16, 2019), and accompanying
Preliminary Decision Memorandum.................................................................20, 21, 22

I.   **INTRODUCTION**

Plaintiff and Consolidated Defendant-Intervenor The Mosaic Company ("Mosaic") respectfully submits this reply in support of its Rule 56.2 motion for judgment upon the agency record challenging certain aspects of the U.S. Department of Commerce's ("Commerce") final determination in the countervailing duty ("CVD") investigation of phosphate fertilizers from the Russia Federation. *Phosphate Fertilizers From the Russian Federation: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9,479 (Dep't Commerce Feb. 16, 2021), P.R. No. 418, ECF No. 24-4 ("*Final Determination*"), and accompanying Issues and Decision Memorandum, P.R. No. 405, ECF No. 24-5 ("Final IDM").

This reply addresses arguments made by Defendant, the United States ("Defendant"), Consolidated Plaintiff and Defendant-Intervenor Industrial Group Phosphorite LLC ("EuroChem"), and Consolidated Plaintiffs and Defendant-Intervenors PhosAgro PJSC and JSC Apatit ("PhosAgro") (collectively, "Defendants") in their response briefs. *See* Defendant's Response to Motions for Judgement on the Agency Record (Mar. 18, 2022), ECF No. 72 ("Def.'s Response Br."); EuroChem's Response in Opposition to Motion for Judgment on the Agency Record (Mar. 16, 2022), ECF No. 63 ("EuroChem Response Br."); PhosAgro's Response in Opposition to Motion for Judgment on the Agency Record (Mar. 16, 2022), ECF No. 67 ("PhosAgro Response Br."). As demonstrated below, Defendants fail to rebut Mosaic's arguments that the following elements of the *Final Determination* are unreasonable, unsupported by substantial evidence, and otherwise not in accordance with law:

> (1) Commerce's refusal to countervail phosphate mining rights subsidies that the Government of Russia ("GOR") provided during the period of investigation ("POI") pursuant to mining licenses initially issued before the "cut-off" date for treating Russia as a nonmarket economy country ("NME");

Case 1:21-cv-00117-JAR   Document 77   Filed 04/28/22   Page 6 of 28

Consol. Court No. 21-00117                                  NON-CONFIDENTIAL VERSION

(2) Commerce's refusal to adjust the tier 3 world market benchmark price for phosphate rock for freight, customs duties, and VAT in order to arrive at a "delivered" benchmark price; and

(3) Commerce's refusal to adjust the tier 3 benchmark price for natural gas to exclude exports of Russian natural gas.

Given Defendants' failed rebuttals, Mosaic respectfully requests that the Court grant its motion for judgment on the agency record and remand these issues to Commerce for redetermination consistent with the Court's opinion.

## II.   ARGUMENT

### A.   Commerce Improperly Refused to Countervail Phosphate Mining Rights Subsidies that the GOR Provided During the POI Pursuant to Mining Licenses Initially Issued Before an Arbitrary Cut-Off Date

In the *Final Determination*, Commerce declined to countervail mining rights subsidies that the GOR provided to the respondents during the POI pursuant to mining licenses that the GOR initially issued before the "cut-off" date for treating Russia as an NME.  As Mosaic demonstrated in its opening brief, Commerce's determination was unreasonable, not supported by substantial evidence, and otherwise not in accordance with law.  Mosaic's Memorandum in Support of Rule 56.2 Motion for Judgment Upon the Agency Record (Nov. 12, 2021), ECF No. 51 ("Mosaic Br.") at 17-30.  Defendants' conclusory defenses of Commerce's determination are without merit, and the Court should remand to Commerce with instructions to investigate all of respondents' mining rights licenses regardless of their initial date of issuance.

#### 1.   Defendants concede that Commerce applied a uniform cut-off date in refusing to analyze respondents' mining rights subsidies

Section 701(f) of the Tariff Act of 1930, as amended (the "Act") requires Commerce to impose countervailing duties on imports from NMEs on the same terms as imports from market economy countries.  19 U.S.C. § 1671(f).  The sole exception to this rule is if Commerce is

Case 1:21-cv-00117-JAR   Document 77   Filed 04/28/22   Page 7 of 28

Consol. Court No. 21-00117                     NON-CONFIDENTIAL VERSION

unable to identify and measure the subsidies because the economy of the country in question is essentially comprised of a single entity. *See id.* In addition, as Mosaic discussed in its opening brief, the Court has ruled that it is arbitrary and unreasonable for Commerce to impose a uniform "cut-off" date to determine which subsidies in a former NME are countervailable. *See, e.g.*, Mosaic Br. at 23, citing *GPX Int'l Tire Corp. v. United States*, 645 F. Supp. 2d 1231, 1246-50 (2009) ("*GPX Int'l*").

Nonetheless, this is precisely what Commerce did in the underlying investigation, as Defendants concede. *See, e.g.*, Def.'s Response Br. at 64 ("Commerce reasonably determined that a uniform cut-off date coinciding with Commerce's recognition of Russia's transition from a nonmarket economy to a market economy presented a date where Russia's economy had reached the state at which subsidies, and disciplines on subsidies in the form of countervailing duties, became meaningful."); EuroChem Response Br. at 7; PhosAgro Response Br. at 8-10. Moreover, Defendants misstate the Court's jurisprudence in seeking to rationalize Commerce's action.

Specifically, Defendant asserts that in *GPX Int'l* and *TMK IPSCO I*, the Court "required more analysis concerning Commerce's decision to apply a cut-off date, not an outright rejection of the principle." *See* Def.'s Response Br. at 64, citing *GPX Int'l*, 645 F. Supp. 2d at 1250; *TMK IPSCO v. United States*, 179 F. Supp. 3d 1328, 1344 (CIT 2016) ("*TMK IPSCO I*"), *aff'd on remand*, 222 F. Supp. 3d 1306 (CIT 2017) ("*TMK IPSCO II*"). To the contrary, in both cases, the Court repudiated Commerce's application of a uniform cut-off date and ordered it to determine the existence of countervailable subsidies based on the specific facts for each of the subsidy programs at issue in the investigation. *See, e.g.*, *GPX Int'l*, 645 F. Supp. 2d at 1250 ("{T}he court remands to Commerce to determine the existence of countervailable subsidies

- 3 -

based on the specific facts for each subsidy, rather than by examining those subsidies found after an arbitrary cut-off date"); *TMK IPSCO I*, 179 F. Supp. 3d at 1344 ("{O}n remand Commerce must investigate each subsidy program and allocate subsidies beginning on the first date it could identify and measure the subsidy considering the particular program in question and the impact of relevant economic reforms on that program").

Moreover, while Defendant claims that *TMK IPSCO II* "expressly held that Commerce can apply a cut-off date to determine the basic elements of property transactions necessary for identifying and measuring subsidies," *see* Def.'s Response Br. at 64, citing *TMK IPSCO II*, 222 F. Supp. 3d at 1318, this is misleading.  In reality, in *TMK IPSCO II*, the Court approved Commerce's redetermination on remand only after Commerce individually examined each of the subsidy programs at issue and determined – on a program-by-program basis – when it was able to identify and measure the particular bestowal in question.  *See, e.g., TMK IPSCO II*, 222 F. Supp. 3d at 1317.  Contrary to Defendant's argument, *TMK IPSCO II* does not stand for the proposition that Commerce may apply a single cut-off date that applies across the board and refuse even to examine subsidies granted before that date, as Defendant admits Commerce did in the underlying investigation.[1]  *See, e.g.*, Def.'s Response Br. at 60 ( "{T}he licenses were granted prior to the cut-off date . . . As such, Commerce determined that *regardless of any methodology required to measure the benefit* from the two relevant mining rights licenses at

---

[1] Similarly, EuroChem and PhosAgro claim that Commerce's determination was consistent with *IPSCO II*, but they ignore that Commerce did not conduct the program-by-program assessment that the Court required in that case.  *See* EuroChem Resp. Br. at 8; PhosAgro Resp. Br. at 9-10.

issue, they were granted during a time when Commerce does not possess the ability to meaningfully measure the potential government distortion") (emphasis added).[2]

Furthermore, contrary to PhosAgro's contention, the fact that the underlying investigation involved Russia instead of China does not change this conclusion. *See* PhosAgro Response Br. at 9. As the record demonstrates, Commerce was "more concerned with determining on what side of the cut-off date a subsidy falls, rather than with evaluating the facts of each alleged subsidy to determine if the particular facts for that subsidy allow Commerce now to calculate a subsidy where it was previously unable to do so." *GPX Int'l*, 645 F. Supp. 2d at 1249. This was arbitrary and unreasonable.

Finally, Defendants assert that Commerce's application of a uniform cut-off date in this instance is consistent with agency practice, citing *Cold-Rolled Steel From Russia*. Def.'s Response Br. at 65; PhosAgro Response Br. at 10. But this proves nothing, because Commerce applied the same unlawful analysis in that investigation as it did here, and the issue was not appealed. *See ArcelorMittal USA LLC v. United States*, 337 F. Supp. 3d 1285 (CIT 2018). Therefore, the Court did not have an opportunity to review that determination in light of its jurisprudence.[3]

---

[2] Defendant's admission on this point contradicts its later assertion that "Commerce established criteria for the programs to determine when each type of program would first be countervailable and measurable." *See* Def.'s Response Br. at 63, citing Final IDM at 13-25. In reality, Commerce refused to examine the issue at all if the subsidy was granted prior to the cut-off date.

[3] PhosAgro seeks to defend Commerce's determination in part by quoting the memorandum that Commerce issued in 2002 graduating Russia to market economy status. *See* PhosAgro Response Br. at 10. However, Commerce did not cite this evidence in defending its action. *See* Final IDM at 13-25. Thus, PhosAgro's attempted *post-hoc* rationalization should be rejected.

For all of these reasons, Commerce's application of a uniform cut-off date was unlawful, and the Court should remand Commerce's determination accordingly.

> **2.      Commerce has the ability to identify and measure the subsidies conferred during the POI under each of the mining licenses at issue**

If Commerce had properly examined respondents' mining rights subsidies in accordance with the requirements of the statute and the Court's jurisprudence, it would have found that it had the ability to identify and measure the subsidies conferred during the POI under each of the mining licenses at issue.  Defendant's arguments to the contrary are unavailing.[4]

*First*, as Mosaic explained in its opening brief, and as Commerce acknowledged in the *Final Determination*, mining rights licenses provide recurring subsidies in the form of the provision of goods for LTAR.  *See* Mosaic Br. at 23-24; *see also* Final IDM at 19-20 ("19 C.F.R. 351.524(c)(1) states that Commerce will normally treat the provision of goods or services for LTAR as providing recurring benefits.  For this reason, we disagree with EuroChem's argument that Commerce should link the timing of the receipt of the benefit to the year in which the GOR issued the mining license, which would incorrectly result in all benefits conferred under the program being expensed prior to the POI").  Commerce's NME "cut-off" methodology has no relevance in the case of recurring subsidies, because Commerce identifies and measures recurring subsidies on the basis of the amount of benefit received during the POI, not the amount granted at the time of the subsidy's initial bestowal.[5]  *See id.*  Defendant ignores this core point

---

[4] EuroChem and PhosAgro do not present arguments in opposition to this portion of Mosaic's opening brief.  *See* EuroChem Response Br. at 8-10; PhosAgro Response Br. at 8-13.

[5] Notably, *GPX Int'l* and *TMK IPSCO I* and *II* all involved non-recurring subsidy programs, specifically loans and land-use rights.  *GPX Int'l*, 645 F. Supp. 2d at 1248; *TMK IPSCO II*, 222 F. Supp. 3d at 1319.

in attempting to distinguish *Hot-Rolled Steel From India* and *Phosphate Fertilizer From Morocco* on the grounds that they did not involve countries previously designated as nonmarket economies.  *See* Def.'s Response Br. at 66.

      *Second*, while Defendant repeatedly cites Commerce's assertion that it could not have identified and measured respondent's mining rights subsidies "regardless of any methodology" used, *see, e.g.*, Def.'s Response Br. at 63 ("{a}s a result of the nature of Russia's previous nonmarket economy status, Commerce cannot accurately identify and measure alleged subsidies conferred to Russian producers before the cut-off date irrespective of the methodology"), this is nothing more than a bald assertion, devoid of reasoned explanation.  It is well established that an agency must "examine the relevant data and articulate a satisfactory explanation for its action," including making "a 'rational connection between the facts found and the choice made.'"  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

      *Third*, Commerce's own actions during the investigation belie its assertion that it could not have identified and measured the mining rights subsidies that respondents received during the POI "regardless of any methodology," because it did just that with respect to one of the Russian licenses in question.[6]  *See* Final IDM at 17-20.  It also did the same in the parallel investigation in *Phosphate Fertilizers from Morocco*.  *See Phosphate Fertilizers From the Kingdom of Morocco: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9,482 (Dep't Commerce Feb. 16, 2021), and accompanying Issues and Decision Memorandum,

---

[6] While Defendant asserts that Commerce "focused" on the licenses obtained after the cut-off date, *see* Def.'s Response Br. at 66-67, it fails to explain why Commerce could not have similarly focused on the rest of the licenses, had it so chosen.

Comment 8.  Notably, in both cases, Commerce analyzed the subsidies in light of the conditions

in the market during the POI, not during the time when the governments initially granted the

mining rights to respondents, years in the past.  This further demonstrates that in the case of

recurring subsidies such as mining rights, the Department's cut-off date methodology is

irrelevant.

> **3.      The terms and conditions of all of the respondents' mining rights licenses changed in material ways after the "cut-off" date**

As Mosaic noted in its opening brief, there is substantial record evidence demonstrating

that the terms and conditions of all of the mining rights licenses at issue in the underlying

investigation changed in material ways after the cut-off date.[7]  *See* Mosaic Br. at 28-29, citing

Mosaic Case Br. at 17-23.  While Defendant repeats Commerce's conclusory assertions to the

contrary, *see, e.g.*, Def.'s Response Br. at 60, it does not deny that Commerce failed to engage

with the extensive record evidence and argumentation that Mosaic included on this issue in its

administrative case brief.  Mosaic devoted nine pages of its case brief to this issue, including a

six-page discussion of the record evidence pertaining to each of the relevant licenses, with

corresponding citations to the record.  *See* Mosaic Case Brief (Jan. 5, 2021), P.R. No. 373, C.R.

No. 547, at 18-23 ("Mosaic Case Br.").  Mosaic also explained that the respondents had

selectively responded to Commerce's questionnaire in a way that obfuscated the operation of

Russia's Law on Subsoil, particularly as it applies to the modification or amendment of the terms

of mining licenses.  *See id.* at 15-18.  Commerce did not address any of this evidence or

---

[7] EuroChem erroneously claims that it is "undisputed" that the post-issuance changes to
respondents' mining rights licenses were merely of a technical nature.  *See* EuroChem Response
Br. at 10.  This is false, as Mosaic made abundantly clear in its case brief and in its opening brief
in this proceeding, and as it explains further below.

argumentation in its *Final Determination*.  This failure by Commerce renders its *Final*

*Determination* unsupported by substantial evidence.  *See NMB Sing. Ltd. v. United States*, 557

F.3d 1316, 1320 (Fed. Cir. 2009).

Further, Defendants' efforts to distinguish Commerce's prior determinations in cases

involving similar fact patterns are without merit.  For example, Defendant asserts that *Steel Wire*

*Rod From Italy* "is inapposite because renegotiating an interest rate is a material term to a loan,

and Commerce had the ability to identify and measure the subsidies in question."  Def.'s

Response Br. at 67; *see also* EuroChem Response Br. at 9 (noting that Commerce treated the

Italian loan as a new loan because the renegotiation altered the interest rate).  However, like

Commerce, Defendant and EuroChem fail to address Mosaic's argument that a change in [

          ] is also material, particularly since the change

[

          ].[8]  Mosaic Br. at 29-30; *see also*

Mosaic Case Br. at 23-24.  And while PhosAgro does address this point, *see* PhosAgro Response

Br. at 13, its argument is both *post hoc* (since Commerce did not address the issue) and not

credible, since if the GOR had not acted to [

          ].  *See* Mosaic Case Br. at 20-21 (noting that the GOR

---

[8] Defendant's additional argument that "Italy has not been designated as a nonmarket economy," Def.'s Response Br. at 67, is beside the point, as it has no relevance to the question of what type of change to a contract is sufficiently "material" to constitute a new financial contribution.

[

                              ].

     Similarly, while Defendant concedes that in *Polyethylene Retail Carrier Bags From Vietnam*, Commerce determined that a change that extended a contract term by an additional 30 years constituted a new contract, it repeats Commerce's erroneous statement that the respondents' mining rights licenses "were set to automatically renew with no new contractual amendments." Def.'s Response Br. at 68.  In actuality, as Mosaic explained in its opening brief and in its administrative case brief, substantial record evidence contradicts Commerce's finding on this point.  Again, however, Commerce failed to address that evidence.[9]  And in any event, the relevant question is whether the GOR did or did not [

                                                      ], which it indisputably did.  [

                                                      ], they would still have been material.

     Finally, Defendant seeks to distinguish *Steel Wire Garment Hangers from Vietnam* on the grounds that the respondent in that case signed a new lease contract after the cut-off date.  Def.'s Response Br. at 67-68.  This argument fails, however, because the respondents in this case

[                                                                                ].  [

---

[9] For example, [

                              ].  *See* Mosaic Case Br. at 20 & n.67.  EuroChem and PhosAgro fail
to address the record evidence contradicting their assertions that mining rights licenses are
automatically extended if the license holder continues to operate the mine.  *See* EuroChem
Response Br. at 9; PhosAgro Response Br. at 12.  PhosAgro implicitly admits this point when it
qualifies its assertion with "essentially," which is another way of saying that, in reality,
[                                                                                ].

**BUSINESS PROPRIETARY**
**INFORMATION DELETED**   NON-CONFIDENTIAL VERSION

]. *See* Mosaic Case Br. at 18-23.  Thus, there is no reasonable basis for treating the

subsidies in this case differently, and Commerce's departure from prior practice without a

reasoned explanation renders its decision unlawful.  *RHP Bearings Ltd. v. United States*, 288

F.3d 1334, 1347 (Fed. Cir. 2002) (quoting *Transactive Corp. v. United States*, 91 F.3d 232, 237

(D.C. Cir. 1996)).

In sum, Commerce's refusal to countervail the mining rights subsidies that the

respondents received during the POI pursuant to mining rights licenses first issued prior to an

arbitrary cut-off date was unreasonable, unsupported by record evidence, and otherwise not in

accordance with law.  Defendant's arguments to the contrary are without merit.  Accordingly, the

Court should remand this issue to Commerce with instructions to investigate all of respondents'

mining rights licenses regardless of their initial date of issuance.

**B.      Commerce Improperly Refused to Adjust the Tier 3 World Market Benchmark
          Price For Phosphate Rock For Freight, Customs Duties, and VAT In Order To
          Arrive at a "Delivered" Benchmark Price**

To calculate the benefit from the GOR's provision of mining rights for LTAR under a tier

3 analysis, Commerce compared KGOK's built-up phosphate rock price, inclusive of

transportation costs, to an *undelivered* world market benchmark price (*i.e.,* an average of

phosphate rock market prices, each on an FOB export basis).  *See* Final IDM at 26-27;

EuroChem Final Calculation Memorandum, Attachment 1, Tab Mining LTAR Calc (Feb. 9,

2021), P.R. Nos. 407-08, C.R. Nos. 560-61 (showing the addition of per-unit transportation costs

in the KGOK cost build-up).  Mosaic has shown that Commerce unreasonably refused to adjust

the tier 3 world market benchmark in order to arrive at a "delivered" benchmark price.  Mosaic

Case 1:21-cv-00117-JAR   Document 77   Filed 04/28/22   Page 16 of 28

Consol. Court No. 21-00117                    NON-CONFIDENTIAL VERSION

Br. at 30-35.  Although it conducted a tier 3 analysis in this case, Commerce essentially used a variation of a tier 2 analysis – *i.e.*, a comparison of KGOK's phosphate rock price to a world market benchmark price for phosphate rock.  In light of the requirement under 19 C.F.R. § 351.511(a)(2)(iv) to include international delivery charges when conducting a tier 2 benchmark comparison of the government price to a world market benchmark price, Commerce unreasonably declined to include delivery charges here.  *See* Final IDM at 26-27.

Commerce's refusal is inconsistent with its methodology in *Silicon Metal From Australia*, where it compared a delivered government price to a delivered world market benchmark price.  *See Silicon Metal From Australia: Final Affirmative Countervailing Duty Determination*, 83 Fed. Reg. 9,834 (Dep't Commerce Mar. 8, 2018), and accompanying Issues and Decision Memorandum, Comment 5 at 30-31 ("*Silicon Metal from Australia* IDM"); *see also* Mosaic Br. at 33.  It is also inconsistent with Commerce's adjustment – in the determination under appeal – of the tier 3 natural gas for LTAR benchmark to arrive at a "delivered" price, which was premised on the logic underlying 19 C.F.R. § 351.511(a)(2)(iv).  Final IDM at 57 (adjusting the tier 3 benchmark prices for natural gas "by adding . . . delivery charges for the transmission and distribution of natural gas in Russia, any import duties and taxes, and surcharges" in order to "reflect what the respondents would have paid if they had imported natural gas directly"); *Phosphate Fertilizers From the Russian Federation: Preliminary Affirmative Countervailing Duty Determination*, 85 Fed. Reg. 76,524 (Dep't Commerce Nov. 30, 2020), and accompanying Decision Memorandum at 18, P.R. No. 308 ("PDM") ("when measuring the adequacy of remuneration, Commerce will adjust the benchmark price to reflect the price that a firm actually paid or would pay if it imported the product, including delivery

charges and import duties, *i.e.*, a 'delivered' price to the company's facility."); *see also* Mosaic Br. at 33-34.

As demonstrated below, Defendants fail to rebut Mosaic's arguments.  *See* Def.'s Response Br. at 69-74; EuroChem Response Br. at 10-13; PhosAgro Response Br. at 14-15.

### 1.      Defendants fail to rebut the relevance of 19 C.F.R. § 351.511(a)(2)(iv)

Defendant argues that, because 19 C.F.R. § 351.511(a)(2)(iv) applies to tier 1 and tier 2 analyses, "the regulation does not require Commerce to include delivery charges if it determines a tier three benchmark is necessary," and that Commerce's comparison of KGOK's phosphate rock built-up price to a phosphate rock world market benchmark is in accordance with the flexibility afforded by the regulation.  Def.'s Response Br. at 72-73.  EuroChem makes a similar argument.  *See* EuroChem Response Br. at 10-11.  These contentions fail to rebut Mosaic's arguments.  In fact, Defendant and EuroChem assert a position contrary to the decision Commerce made in promulgating 19 C.F.R. § 351.511(a)(2)(iv) – *i.e.*, that a world market benchmark price under tier 2 must be adjusted to reflect international delivery charges the subsidy recipient would pay if it imported the product.  It is illogical to posit that a world market price including international delivery adjustments is properly comparable to the subsidy recipient's price under tier 2, regardless of whether the recipient incurred international delivery charges, while also maintaining that a world market price excluding delivery costs is also properly comparable to the recipient's price under tier 3.  Yet Defendants would have the Court accept these inconsistent propositions.

The same fundamental contradiction also undermines the explanation Commerce provided in declining to adjust the benchmark price – *i.e.*, that international delivery charges should not be added to the benchmark because KGOK did not incur freight, VAT, and import

Case 1:21-cv-00117-JAR   Document 77   Filed 04/28/22   Page 18 of 28

Consol. Court No. 21-00117                          NON-CONFIDENTIAL VERSION

charges from the purchase of phosphate rock. *See* Final IDM at 26. Defendants contend that,

because KGOK did not incur such charges, adjusting the benchmark price for such charges

would be inappropriate. *See* Def.'s Response Br. at 73; EuroChem Response Br. at 12-13;

PhosAgro Response Br. at 14. Yet, if that were true, then 19 C.F.R. § 351.511(a)(2)(iv) would

itself be unreasonable, given that it requires international delivery cost adjustments regardless of

whether the subsidy recipient actually imported the good at issue. *Cf. Beijing Tianhai Industry*

*Co. v. United States*, 52 F. Supp. 3d 1351, 1374 (CIT 2015) (finding that it is "irrelevant" to a

tier 2 benchmark analysis whether a respondent actually incurred VAT and import charges,

because the benchmark analysis is based on a "hypothetical firm" located in the subject country).

In reality, 19 C.F.R. § 351.511(a)(2)(iv) is a reasonable exercise of Commerce's authority to

develop regulations in areas left to its discretion, and Commerce failed to provide a reasonable

explanation as to why a different approach is warranted here.

Defendants attempt to distinguish this case by arguing that, here, the good being provided

for LTAR is not the phosphate rock itself, but rather the mining rights through which the

phosphate rock is obtained. *See* Def.'s Response Br. at 74; EuroChem Response Br. at 12-13.

However, this distinction is irrelevant in this context. Commerce's approach in this case was to

assess the extent of KGOK's mining rights subsidies by comparing its built-up phosphate rock

price to a world market price for phosphate rock. The logic of this approach – which no party

challenges in principle – is that a properly constructed phosphate rock comparison will show the

extent of the mining rights subsidies. In this way, Commerce's analysis is no different from a

tier 2 analysis – *i.e.*, it compared KGOK's phosphate rock price to a world market price in order

to determine the extent of the subsidy. In such contexts, 19 C.F.R. § 351.511(a)(2)(iv) represents

Commerce's determination that the benchmark should reflect international delivery charges "a

firm actually paid or would pay if it imported the product," regardless of whether actual

importation occurred.  Thus, the fact that KGOK produced phosphate rock using ore obtained

through its government mining license (as opposed to purchasing ore on the market), *see* Final

IDM at 26, does not support Commerce's refusal to adjust the benchmark for delivery costs.

### 2.　　Defendants fail to show that Commerce's decision is consistent with its prior practice

Defendant and EuroChem argue that Commerce's refusal to adjust the benchmark for

delivery costs is consistent with its practice, *see* Def.'s Response Br. at 73-74; EuroChem

Response Br. at 11, but their arguments lack merit.  As shown below, where Commerce

conducted a tier 3 comparison of the government price for a good to a world price benchmark for

that good, *i.e.*, in *Silicon Metal from Australia*, it indicated that it used delivered prices on both

sides of the comparison.  Moreover, in all prior tier 3 LTAR analyses under discussion,

Commerce did something it failed to do here: it took steps to ensure a balanced treatment of

delivery costs between the benchmark and government prices, either by excluding delivery costs

from both sides of the comparison, or by reflecting comparable costs on both sides.[10]

Defendant acknowledges that, in *Silicon Metal From Australia*, "Commerce did elect to

include transportation expenses," and that it did so for both the government price and the

benchmark price.  Def's Response Br. at 73 (citing *Silicon Metal From Australia* IDM,

---

[10] Defendant responds to Mosaic's arguments concerning Commerce's preliminary determination
in *Granular PTFE From The Russian Federation*.  *See* Def.'s Response Br. at 73-74; *see also*
Mosaic Br. at 34.  After Mosaic submitted its Rule 56.2 motion, Commerce issued a final
determination in that case in which it used a tier 2 LTAR analysis, as opposed to the tier 3
analysis it used in its preliminary determination, which Mosaic cited.  *See Granular
Polytetrafluoroethylene Resin From The Russian Federation: Final Affirmative Countervailing
Duty Determination*, 87 Fed. Reg. 3,764 (Dep't Commerce Jan. 25, 2022), and accompanying
Issues and Decision Memorandum at 21.  Given this change, *Granular PTFE From The Russian
Federation* is now inapposite.

NON-CONFIDENTIAL VERSION

Comment 5 at 31).  Defendant contends that the instant case is distinguishable, however, because "Commerce did not need to 'bake-in' costs that KGOK did not incur to yield a more accurate benchmark."  Def's Response Br. at 73.  Defendant then asserts that, because "KGOK extracted phosphate ore from its own site through the mining license it is more appropriate to compare similar phosphate rock at a world market price and at a free-on-board price (*i.e.,* exclusive of freight, value added tax, and import duties)."  *Id.* (citing Final IDM at 26).

Defendant fails to rebut Mosaic's argument.  In *Silicon Metal From Australia*, Commerce used a benchmark composed of per-unit quartz prices of global silicon metal producers, including transportation expenses, as reported by CRU.  *See Silicon Metal From Australia* IDM, Comment 5 at 30.  Commerce compared the respondent's "total per-unit 2016 quartz costs, including transportation expenses, to the average per-unit value reflected in the CRU data (including transportation costs)."  *Id.* at 31.  Commerce used a delivered price for the respondent (*i.e.*, including the cost of transporting the quartz from mine to smelter), and all indications are that the benchmark quartz prices for global silicon metal producers were stated on the same basis.  *See id.*; Mem. from Katherine Johnson and John Anwesen to File, *Final Determination Calculations for Simcoa*, Inv. No. C-602-811, Attachment 1, Tab QuartzBenchmark.ATT1.Public (Feb. 27, 2018).  In other words, Commerce included comparable delivery costs on both sides of the comparison.

Here, in contrast, Commerce compared a price for KGOK that included transportation costs to an undelivered, FOB world benchmark price.  *See* Final IDM at 26-27; EuroChem Final Calculation Memo, Attachment 1, Tab Mining LTAR Calc.  Thus, the KGOK price reflected delivery costs but the benchmark price did not, such that the benchmark price required adjustment in order to conduct a proper comparison.  Defendant asserts that it is "more

appropriate" to compare KGOK's delivered price to an undelivered world benchmark price, *see* Def.'s Resp. Br. at 73, but that is the opposite of what Commerce did in *Silicon Metal From Australia*. Thus, *Silicon Metal From Australia* does indeed exemplify a prior decision from which the agency unreasonably departed in the instant case.

EuroChem cites *Cold-Rolled Steel From Russia*, *see* EuroChem Response Br. at 11, but that case actually supports Mosaic's arguments.  In *Cold-Rolled Steel From Russia*, Commerce used a Russian benchmark price for coking coal that was submitted by the GOR. *Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products From the Russian Federation: Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination*, 81 Fed. Reg. 49,935 (Dep't Commerce July 29, 2016), and accompanying Issues and Decision Memorandum at 30.  After initially including a respondent's transportation costs in the benchmark in post-preliminary proceedings, Commerce reconsidered that decision in the final determination.  Commerce identified problems with the comparability of transportation costs and the lack of suitable alternative transportation cost data, and accordingly Commerce determined to exclude transportation costs from both sides of the comparison:

> Vokutaugol is the member of the Severstal Companies that acquired coking coal during the POI, not PAO Severstal.  As such, any freight costs incurred by the Severstal Companies in this regard would reflect the costs that Vorkutaugol incurred to transport the extracted coking coal from the GOR mine to its facilities.  In contrast, the freight costs incorporated into the coal-based benchmark in the Post-Preliminary Decision Memorandum reflected the freight rates the Severstal Companies paid to private suppliers to transport concentrated coal to PAO Severstal.  Thus, the private freight rates utilized in the post-preliminary calculations *do not reflect what it would cost to transport mined coal to Vorkutaugol*{.} Therefore, we have determined not to include these freight rates in our coal-based benchmark.  Further, in the absence of any other suitable

Case 1:21-cv-00117-JAR   Document 77   Filed 04/28/22   Page 22 of 28

Consol. Court No. 21-00117                        NON-CONFIDENTIAL VERSION

> freight rate data, and in order to avoid an imbalance in the benefit
> calculation, we have excluded freight entirely from the benefit calculation.

*Id.*, Comment 17 at 106 (citations omitted; emphasis added).  In that analysis, Commerce

carefully considered whether the transportation costs included in the post-preliminary benchmark

calculation reflected "what it would cost to transport mined coal to" the entity that received the

government-provided good.  Answering that question in the negative, Commerce then decided to

exclude transportation costs from both sides of the comparison.

Such careful analysis is absent in this case.  Instead, Commerce compared a benchmark

reflecting undelivered, FOB prices to a KGOK price inclusive of transportation costs.  If inland

coal transport costs for two affiliated Russian companies were not sufficiently comparable for

purposes of a tier 3 LTAR comparison in *Cold-Rolled Steel From Russia*, then Commerce

certainly cannot assume that a benchmark composed of various undelivered phosphate rock

prices is comparable to KGOK's delivered price.

EuroChem also cites the *Softwood Lumber From Canada* ("*Lumber V*") CVD final

determination, *see* EuroChem Response Br. at 11, but that case does not support Commerce's

decision here.  Whereas the instant case involves a world market benchmark price, Commerce

did not use a world benchmark price to conduct its tier 3 analyses of the Government of British

Columbia's stumpage for LTAR program in *Lumber V*.  Notably, however, Commerce used a

*delivered* price as the starting point for the stumpage benchmark, and it accordingly ensured that

it accounted for B.C. respondents' delivery costs.  Specifically, Commerce (i) used delivered log

prices from the U.S. Pacific Northwest ("U.S. PNW") as a starting point for a tier 3 stumpage

benchmark because conditions in that region were determined to be comparable to British

Columbia; (ii) derived market benchmark stumpage prices by making adjustments to the U.S. log

prices, including by deducting B.C. respondents' costs for hauling timber to their mills; and (iii)

compared the derived market benchmark stumpage prices to government stumpage prices.  *See*

*Certain Softwood Lumber Products From Canada: Preliminary Affirmative Countervailing Duty*

*Determination, and Alignment of Final Determination with Final Antidumping Duty*

*Determination*, 82 Fed. Reg. 19,657 (Dep't Commerce Apr. 28, 2017), and accompanying

Preliminary Decision Memorandum at 49-50, 54; *Certain Softwood Lumber Products From*

*Canada: Final Affirmative Countervailing Duty Determination, and Final Negative*

*Determination of Critical Circumstances*, 82 Fed. Reg. 51,814 (Dep't Commerce Nov. 8, 2017),

and accompanying Issues and Decision Memorandum at 64 ("{I}n deriving market-determined

stumpage prices from U.S. log prices, we have selected prices for comparable species and made

adjustments as warranted, *e.g.*, for transportation, to the U.S. PNW log price benchmarks to

account for the commercial environment of the B.C. timber market.").  Thus, Commerce

accounted for delivery costs on both sides of the comparison.  Accordingly, *Lumber V* fails to

support Commerce's refusal in this case to adjust the phosphate rock benchmark so that it is

properly comparable to KGOK's delivered phosphate rock price.

In sum, Defendants fail to rebut Mosaic's arguments that Commerce's refusal to adjust

the phosphate rock benchmark for transportation costs is unsupported by substantial evidence

and otherwise not in accordance with law.

### C.   Commerce Improperly Refused to Adjust the IEA Benchmark Prices for Natural Gas to Exclude Exports of Russian Natural Gas

In the *Final Determination*, Commerce refused to adjust the IEA data used to construct a

tier-three benchmark for natural gas to exclude exports of Russian natural gas.  Commerce found

that the IEA prices for natural gas sold in Europe "are reflective of the market dynamics in that

market" and that it would not adjust the IEA data as it had in *Turkey Rebar II* because the "findings in that case pertained to certain record facts that Russian exports to the EU were distorted during the period of review in that proceeding" and "{s}uch information is not on the record of this proceeding pertaining to the POI." Final IDM at 56. As Mosaic demonstrated in its opening brief, Commerce's determination was unreasonable, not supported by substantial evidence, and otherwise not in accordance with law. Mosaic Br. at 35-38. In particular, Commerce's finding that the record does not contain relevant information pertaining to the POI is incorrect, and Commerce failed to reasonably distinguish the facts on the record in this case from the evidence on which it relied in *Turkey Rebar II*. *See id.*

      Contrary to Defendants' arguments, Mosaic did not fail to meet its evidentiary burden, nor is it asking the Court to improperly reweigh the record evidence. *See* EuroChem Response Br. at 14; PhosAgro Response Br. at 16-17. The substantial evidence standard requires Commerce to take into account "whatever in the record fairly detracts" from the weight of supportive evidence. *CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016). Mosaic submitted substantial record evidence showing that the GOR distorts the EU gas market – evidence which spanned the years prior to, during, and after the POI – but Commerce unlawfully disregarded this evidence in finding there was no "such information . . . on the record of this proceeding *pertaining to the POI*." Final IDM at 56 (emphasis added).

      The evidence that Commerce improperly failed to take into account includes the Office of the United States Trade Representative's ("USTR") 2019 and 2020 *National Trade Estimate Reports on Foreign Trade Barriers*, as well as articles from 2019 and 2020 describing how the GOR interferes in the EU gas market. *See* Letter from Wilmer Cutler Pickering Hale and Dorr LLP to the Department, re: Phosphate Fertilizers from Russia: Petitioner's Submission of Factual

Information to Measure the Adequacy of Remuneration (Nov. 2, 2020), P.R. Nos. 245-75,

Exhibits 22(c), 22(d), 22(e) ("Mosaic Benchmark Submission").  For example, according to a

December 2019 article (*i.e.*, during the POI), "{u}ltimately Russia aims to control Eastern

Europe and Ukraine through gas shipments so that it can use Nord Stream 2 to isolate Ukraine

from Europe and make it dependent on Russia alone for gas."  Mosaic Benchmark Submission,

Exhibit 22(c).  USTR's 2019 and 2020 *National Trade Estimate Reports on Foreign Trade*

*Barriers*, also describe, in the present tense, that Gazprom has a monopoly on exports of Russian

natural gas and charges higher prices on exports than domestic sales.  *See id.*, Exhibits 22(d) at

423; Exhibit 22(e) at 425.  Defendant's statements that these reports "reflect{} facts and figures

predating the period of investigation," Def.'s Response Br. at 41, is inaccurate.  Moreover, as

explained above, the record also contains other evidence that is contemporaneous with the POI.

Thus, Commerce's finding that information showing "that Russian exports to the EU were

distorted" "pertaining to the POI" was absent from the record is unsupported by substantial

evidence.

Defendant concedes that "The Mosaic Company presents similar evidence that

Commerce found persuasive in {*Turkey Rebar II*}, such as cutting off natural gas supplies to

Belarus, Latvia, and Lithuania," but argues Commerce found that Russia had significant

influence over EU market prices in *Turkey Rebar II* based on "specific geo-political instances"

and "those geo-political events and the articles and reports that Mosaic relies on are prior to the

period of investigation."  Def.'s Response Br. at 41.  Defendant's attempted *post hoc*

rationalization of Commerce's decision is unavailing.  Mosaic submitted ample evidence of

Russia's distortion of the EU gas market, including the exact same articles and reports that

Commerce relied upon in *Turkey Rebar II* and *Turkey Rebar I*.  *See Steel Concrete Reinforcing*

*Bar From the Republic of Turkey: Preliminary Results of Countervailing Duty Administrative Review; 2017*, 84 Fed. Reg. 48,583 (Dep't Commerce Sept. 16, 2019), and accompanying Preliminary Decision Memorandum at 12 ("*Turkey Rebar II* PDM") (citing Petitioner's Rebuttal Natural Gas Benchmark Submission at Exhibit 3); *Steel Concrete Reinforcing Bar From the Republic of Turkey: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Countervailing Duty Determination With Final Antidumping Duty Determination*, 82 Fed. Reg. 12,195 (Dep't Commerce Mar. 1, 2017), and accompanying Preliminary Decision Memorandum at 22 (citing Petitioner's July 2018 Benchmark Rebuttal Submission at Exhibits 10, 13, 14); Mosaic Benchmark Submission, Exhibits 22(c), 23(a), 23(b).

Further, the geo-political events that Defendant points to as supporting Commerce's finding that "Russia had significant influence over EU market prices in *Turkey Rebar II*" (*i.e.*, Russia's cutting off natural gas supplies to Belarus, Latvia, and Lithuania) also preceded the 2017 period of review in that case. *See* Mosaic Benchmark Submission, Exhibit 22(c) (describing Gazprom cutting gas supplies to Belarus in 2004 and 2006); *id.*, Exhibit 23(a) (stating that Russia cut off gas supplies to Latvia in 2003; to Belarus in 2004; and to Lithuania in 2006). Nonetheless, Commerce relied upon this evidence to find that "Russia can, and does, distort the EU natural gas market for its own geopolitical purposes." *See Turkey Rebar II* PDM at 12. Commerce arbitrarily reached a different conclusion in this case, rendering its determination unlawful. *See SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001).

Accordingly, Commerce's refusal to adjust the IEA benchmark prices for natural gas to exclude Russian export prices is unsupported by substantial evidence and otherwise not in accordance with law.

III.   **CONCLUSION**

For the reasons discussed above, Mosaic respectfully requests that the Court reject all arguments made by Defendants and grant Mosaic's motion for judgment on the agency record in its entirety.

Respectfully submitted,

/s/ Patrick J. McLain
David J. Ross
Patrick J. McLain
Stephanie E. Hartmann
Natan P.L. Tubman
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363
Email: patrick.mclain@wilmerhale.com

*Counsel for The Mosaic Company*

Dated: April 28, 2022

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this Reply in Support of Its Rule 56.2 Motion for Judgment upon the Agency Record complies with the word limitation requirement.  The word count for this submission, as computed by Wilmer Cutler Pickering Hale and Dorr LLP's word processing system, is 6,908 words.

<u>/s/ Patrick J. McLain</u>
(Signature of Attorney)

<u>Patrick J. McLain</u>
(Name of Attorney)

<u>The Mosaic Company</u>
(Representative Of)

<u>April 28, 2022</u>
(Date)