**UNITED STATES COURT OF INTERNATIONAL TRADE**
**Before: The Honorable Jane A. Restani, Judge**

THE MOSAIC COMPANY,

       *Plaintiff*,

PHOSAGRO PJSC, JSC APATIT,

       *Consolidated Plaintiffs*,

   and

INDUSTRIAL GROUP PHOSPHORITE LLC,

       *Consolidated Plaintiff and*
       *Consolidated Plaintiff-Intervenor*,

   v.

UNITED STATES,

       *Defendant*,

THE MOSAIC COMPANY,

       *Consolidated Defendant-Intervenor*,

   and

PHOSAGRO PJSC, JSC APATIT,
INDUSTRIAL GROUP PHOSPHORITE LLC,

       *Defendant-Intervenors*.

<u>PUBLIC VERSION</u>

Consol. Court No. 21-117

**REPLY IN FURTHER SUPPORT OF**
**CONSOLIDATED PLAINTIFF INDUSTRIAL GROUP PHOSPHORITE LLC'S**
**MOTION FOR JUDGMENT ON THE AGENCY RECORD**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

WORD COUNT CERTIFICATE OF COMPLIANCE ................................................... iii

I.      Commerce cannot justify its resort to FA or AFA to find Rosneft a government authority. ........................................................................................................................ 1

II.     Commerce's *de facto* specificity finding for the provision of natural gas is unsupported by substantial evidence and otherwise is contrary to law. ....................... 5

III.    Commerce's benchmark analysis for the provision of natural gas at less than adequate remuneration is flawed. ................................................................................ 6

     A.     Commerce failed to provide a reasonable justification supported by substantial evidence to support its determination to discard tier one benchmarks. ................................................................................................. 6

     B.     The tier-three benchmark Commerce selected to measure the adequacy of remuneration is contrary to law. ............................................................. 10

IV.    Commerce's refusal to adjust the numerator or denominator in calculating the alleged subsidy benefit from the provision of natural gas for LTAR is contrary to law. ............. 11

V.     Commerce's refusal to consider the relative consumption of natural gas used in the production of phosphate fertilizer was in error. ..................................................... 12

VI.    Commerce used the improper sales denominator by failing to treat EuroChem as a single entity. ............................................................................................................... 14

VII.   Commerce fails to address EuroChem's argument that it erroneously reduced the sales denominator used to calculate the *ad valorem* subsidy rate for the provision of natural gas at LTAR. ................................................................................................ 15

VIII.  CONCLUSION ............................................................................................................. 16

# TABLE OF AUTHORITIES

## Cases

*Anderson v. U.S. Sec'y of Agric.*, 462 F. Supp. 2d 1333 (CIT 2006) .............................6

*Changzhou Trina Solar Energy Co. v. United States*, 352 F. Supp. 3d 1316 (CIT 2018)..............3

*Citic Trading Co. v. United States*, 27 CIT 356 (2003)................................................3

*CS Wind Vietnam Co. v. United States*, 832 F.3d 1367 (Fed. Cir. 2016) .......................7

*Dongguan Sunrise Furniture Co. v. United States*, 931 F. Supp. 2d 1346 (CIT 2013)..................4

*Gallant Ocean (Thail.) Co. v. United States*, 602 F.3d 1319 (Fed. Cir. 2010)..............................4

*Gerald Metals, Inc. v. United States*, 132 F.3d 716 (Fed. Cir. 1997)................................3

*Kajaria Iron Castings Pvt. Ltd. v. United States*, 156 F.3d 1163, 1176 (Fed. Cir. 1998) .............14

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) .....................................................................................................................7, 8

*NMB Sing. Ltd v. United States*, 557 F.3d 1316 (Fed. Cir. 2009) ..................................7

*SKF USA Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001) ....................................2

## Statutes

19 U.S.C. § 1516a(b)(1)(B)(i)...............................................................................................4

19 U.S.C. § 1677(5A)(d)(iii)(II) ...........................................................................................5

19 U.S.C. § 1677(5)(E)(iv) ................................................................................................10

## Regulations

19 C.F.R. § 351.525(b)(5)(ii)..............................................................................................12

19 C.F.R. § 351.525(b)(6)(iv)..............................................................................................12

## Administrative Materials

*Countervailing Duties; Final Rule*, 63 Fed. Reg. 65348 (Dep't of Commerce Nov. 25, 1998) ............................................................................................................................6

*Issues & Decision Memo. for the Final Determination in the Countervailing Duty Investigation of Dynamic Random Access Memory Semiconductors from the Republic of Korea*, C-580-851 (Dep't of Commerce June 16, 2003) .........................................2

**WORD COUNT CERTIFICATE OF COMPLIANCE**

This brief has been prepared utilizing Microsoft Word with 12-point Times New Roman font. In accordance with the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that this brief complies with the word limitations set forth in the Chambers Procedures. Specifically, excluding those exempted portions of the brief, as set forth in 2B(1) of the Chambers Procedures, undersigned certifies that this brief contains 5,018 words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

Date: April 28, 2022

Respectfully submitted,

*/s/ Jeremy W. Dutra*
Jeremy W. Dutra

*Counsel to Consolidated Plaintiff Industrial Group Phosphorite LLC*

Consolidated Plaintiff Industrial Group Phosphorite LLC ("EuroChem") submits this reply in further support of its motion for judgment on the agency record.

**I.      Commerce cannot justify its resort to FA or AFA to find Rosneft a government authority.**

Commerce does not dispute that it application of AFA is inappropriate unless it is first appropriate to use facts otherwise available ("FA"). Commerce also does not dispute that it can use FA only to fill a gap in the record. The crux of Commerce's application of FA here is the absence of an *Input Producer Appendix* from Rosneft and Rosneftegaz. Gov't Br. at 11, 12-13. The sole "gap" Commerce identifies in its response is the alleged "conflicting record evidence that Rosneft and Rosneftegaz are state-owned authorities that supplied natural gas to NAK Azot, EuroChem's cross-owned affiliate." Gov't Br. at 11-12. The conflicting evidence allegedly arises from EuroChem's report that "its cross-owned affiliate NAK Azot purchased natural gas from Rosneft" and that Rosneft's "main shareholder is Rosneftegaz SC, which is 100 percent owned by the state," and GOR's statement that neither Rosneft nor Rosneftegaz were a vested government entity or authority. Gov't Br. at 10-11. Commerce's labored reasoning is flawed and unsupported by substantial evidence.

There is no record evidence that EuroChem purchased natural gas from Rosneftegaz, and Commerce cites none. To the contrary, as Commerce acknowledges, EuroChem reported purchases of natural gas from *Rosneft*, and merely stated that Rosneftegaz, which is 100% owned by GOR, is a shareholder of Rosneft. Gov't Br. at 10.

GOR did not dispute that it owned Rosneftegaz, nor did it dispute that it has an ownership stake in Rosneft through Rosneftegaz. *GOR Post-Preliminary Resp.* at 7-8. Commerce concedes these facts. Gov't Br. at 16 (citing *GOR Post-Preliminary Resp.* at 7-8). What GOR disputed was that either entity is—reflecting the statutory language—a "vested

government entity or authority." Gov't Br. at 11 (citing IDM at 6 and GOR 2d Supp. QR at 1). That GOR disputed the legal conclusion to be drawn from the record evidence does not create a gap concerning ownership sufficient to justify FA. Commerce's attempt to manufacture a conflict to justify its resort to FA lacks any factual or legal support.

Further, merely because a government has a minority ownership interest in a company does not *ipso facto* render the company "a vested government entity or authority" under the statute. *See, e.g.*, *Issues & Decision Memo. for the Final Determination in the Countervailing Duty Investigation of Dynamic Random Access Memory Semiconductors from the Republic of Korea*, C-580-851 (Dep't of Commerce June 16, 2003) at 16. And Commerce cites no legal support for its position. Indeed, in this investigation, Commerce found Gazprom an "authority," but stressed that it did not base that determination solely "on the GOR's majority-ownership in Gazprom," but instead based the determination on "the totality of the record evidence." *Final Determination* at 30. Commerce failed to consider the totality of the record evidence with regard to its Rosneft determination. Applying a different standard to Rosneftegaz reflects petulance by an agency, not reasoned decision-making. *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (an "agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently").

Also undermining Commerce's position is the absence of any evidence that Rosneftegaz is a producer or supplier of natural gas. There is no dispute that Rosneftegaz is merely a shareholder in Rosneft. The absence of an *Input Producer Appendix* from Rosneftegaz cannot lead to FA (or AFA) because Rosneftegaz is not an input producer of natural gas. *GOR 3d Supp. QR* at 7-8 (C.R. 502).

Citing the absence of an *Input Producer Appendix* for Rosneft, Commerce concludes that there was a "record gap." Gov't Br. at 12. But Commerce fails to identify any actual gap in factual information from which it could assess whether Rosneft is "a vested government entity or authority" under the statute. As noted, Commerce contends there was conflicting evidence in the record as to the ownership of Rosneft and Rosneftegaz, and as such, a gap existed that permitted Commerce to use FA. That is incorrect. The record shows that GOR is a *minority* shareholder of Rosneft. *EuroChem Factual Information Submission* (Dec. 17, 2020) at 3 (P.R. 338) and Ex. 10 (P.R. 340). There is no evidence to the contrary. Commerce notably fails to address any of the substantial and undisputed record evidence EuroChem supplied detailing the ownership structure of Rosneft and its corporate governance. While it may not have been in the form Commerce wanted, Commerce cannot simply ignore the very evidence it claims to seek. *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997); *Changzhou Trina Solar Energy Co. v. United States*, 352 F. Supp. 3d 1316, 1342 (CIT 2018).

Commerce's response to EuroChem's arguments on the improper application of AFA are likewise lacking. Again, the mere fact that GOR did not provide an *Input Producer Appendix* was the basis on which Commerce determined that GOR did not act to the best of its ability. Gov't Br. at 12-13. That is insufficient. *Citic Trading Co. v. United States*, 27 CIT 356, 372 (2003). Commerce fails to address, let alone distinguish, the case law EuroChem cited in its motion.

Commerce also tries to justify its AFA finding because GOR did provide *Input Producer Appendices* for Gazprom and Novatek. But that fact does not demonstrate GOR failed to act to the best of its ability in the investigation as to Rosneft. As GOR informed Commerce, [

].

Gov't Br. at 14 (citing GOR Post-Prelim. Resp. at 7-8). Undisputed record evidence

demonstrates that GOR did not, either directly or indirectly, own a majority of Rosneft.

*EuroChem Factual Information Submission* (Dec. 17, 2020) at 3 (P.R. 338) and Ex. 10 (P.R.

340). This stands in contrast to Gazprom, in which GOR is the majority shareholder. *Final*

*Determination* at Gov't Br. at 30. GOR arguably was in a position to ensure Gazprom completed

the requested *Input Producer Appendix*. Novatek, an independent producer, cooperated and

provided the requested appendix to GOR to submit to Commerce during the investigation. Gov't

Br. at 14. The fact that Rosneft [                    ] like Novatek does not mean GOR failed to act to

the best of *its* ability. It merely shows that Rosneft [                              ]. But it was

under no legal obligation to do so, nor does Commerce cite anything in the record suggesting

GOR could compel Rosneft to respond or that Rosneft had a legal obligation to respond.

Rosneft's [                              ] does not reflect on GOR such as to permit Commerce

to apply AFA and find Rosneft an authority.

EuroChem argued in its motion that "AFA is not a magic phrase that permits Commerce

to skip an analysis of the record." EuroChem Br. at 6 (quoting *Changzhou Trina Solar Energy*

*Co. v. United States*, 352 F. Supp. 3d 1316, 1342 (CIT 2018)). Commerce does not dispute this

legal principle, nor does it dispute that it must base its determination—even if applying AFA—

on substantial evidence. 19 U.S.C. § 1516a(b)(1)(B)(i); *see also Gallant Ocean (Thail.) Co. v.*

*United States*, 602 F.3d 1319, 1325 (Fed. Cir. 2010); *Dongguan Sunrise Furniture Co. v. United*

*States*, 931 F. Supp. 2d 1346, 1350 (CIT 2013). Nor does Commerce dispute EuroChem's

argument that Commerce should have applied the five-factor analysis to evaluate whether

Rosneft is an "authority." *See* Gov't Br. at 15-16. While acknowledging the analysis,

Commerce again fails to make any effort address the factors or refute the analysis EuroChem

outlined in its motion based on record evidence.  *Compare* Gov't Br. at 15-16 *with* EuorChem

Br. at 7-10.  Commerce's failure to conduct the required analysis in the first instance of whether

Rosneft is an authority warrants remand.

## II.  Commerce's *de facto* specificity finding for the provision of natural gas is unsupported by substantial evidence and otherwise is contrary to law.

Commerce bases its "predominant use" determination entirely on Gazprom's report that

the "agro-chemical" industry purchased 4.7% of the natural gas supplied by Gazprom.  Gov't Br.

at 20.  According to Commerce, "the agro-chemical industrial sector accounted for the largest

percentage of total domestic natural gas sales among industrial groups for 2019," and thus "is a

predominant consumer of natural gas when compared to other industrial sectors."  Gov't Br. at

21.  Commerce, however, misapplies the statute by artificially limiting the universe of users.

The statute defines *de facto* specificity as existing if "{a}n enterprise or industry is a

predominant user of the subsidy."  19 U.S.C. § 1677(5A)(d)(iii)(II).  Contrary to Commerce's

application here, the framework is not whether the investigated respondent is part of an industry

that is a predominant user among other industries.  Congress instead framed the analysis of

whether the enterprise or industry (*e.g.*, producers of like product) is a predominant user when

compared to all users.

In an effort to distinguish the present case from *Bethlehem Steel*, Commerce notes that

"the steel industry received over 51% of the discounts afforded by the {subsidy program} during

the period of investigation," but that here "Commerce possesses more information than simply

the 'mere fact' that the agro-chemistry industry received a greater monetary benefit than other

industries."  Gov't Br. at 23.

Leaving aside that Commerce fails to identify what "more information" it possesses here,

Commerce's argument does not make sense.  Even assuming that the fertilizer producers are in

the "agro-chemical" sector as reported by Gazprom, that sector accounted for a mere 4.7% of

natural gas purchases in Russia. By contrast, the steel industry in *Bethlehem Steel* accounted for

51% of the total benefits provided under the alleged subsidy. If receiving 51% of the benefits

"was not determinative of whether that industry was 'dominant' or receiving 'disproportionate'

benefits," then there is no basis for such a finding when the industry receives a mere 4.7% of the

benefits. Commerce's specificity analysis cannot withstand scrutiny. It is a well-established

principle of administrative law that "like cases will be treated alike." *Anderson v. U.S. Sec'y of

Agric.*, 462 F. Supp. 2d 1333, 1339 (CIT 2006). Commerce's *de facto* specificity determination

is flawed and should be remanded.

## III. Commerce's benchmark analysis for the provision of natural gas at less than adequate remuneration is flawed.

### A. Commerce failed to provide a reasonable justification supported by substantial evidence to support its determination to discard tier one benchmarks.

As EuroChem explained in its motion—and Commerce does not dispute—there is no *per

se* rule that government ownership equates to market distortion. *Compare* EuroChem Br. at 14

*with* Gov't Br. at 26-31. Nor does Commerce dispute that disregarding in-country benchmarks

is appropriate only when it is "reasonable to conclude that actual transaction prices are

significantly distorted as a result of the government's involvement in the market."

*Countervailing Duties; Final Rule*, 63 Fed. Reg. 65348 at 65377 (Dep't of Commerce Nov. 25,

1998).

Commerce argues its rejection of tier 1 benchmarks was appropriate here because: (1)

GOR owns a majority of Gazprom, whose production "accounts for at least 68 percent of the

production of natural gas in Russia; (2) GOR imposes import duties on natural gas; (3) GOR

imposes export tariffs on natural gas; and (4) Gazprom has a "natural monopoly" in natural gas

transmission.  Gov't Br. at 27-29.  Missing from Commerce's arguments—and the underlying determination—is *how* Russia's ownership of Gazprom, *how* export tariffs, *how* Gazprom's natural monopoly on the natural gas pipelines, and *how* import tariffs on natural gas significantly distort the price of natural gas in Russia.  Simply identifying GOR's ownership interest in Gazprom and import/export regulations fails to connect the dots between the alleged facts and the conclusion Commerce reaches about significant price distortion.  Commerce is obligated to provide an explanation that reasonably ties its determination to the record evidence.  *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1376 (Fed. Cir. 2016); *see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made"); *NMB Sing. Ltd v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009) ("Commerce must explain the basis for its decisions; while its explanations do not have to be perfect, the path of Commerce's decision must be reasonably discernable to a reviewing court").

Whether Gazprom produces a majority of the gas in Russia is immaterial to whether natural gas prices are significantly distorted.  The record confirms that Russian natural gas producers, combined, produced 737.7 billion cubic meters ("bcm") in 2019, but Russia consumed only 436.6 bcm of natural gas during that period.  *GOR Initial QR* at 42-43 (P.R. 131).  In other words, consumption was less than 60% of the volume produced.  Furthermore, as EuroChem noted in its motion—and Commerce does not dispute—Gazprom's domestic share of the natural gas market steadily declined and dropped below 50 percent in 2019.  *EuroChem and PhosAgro Benchmark Submission*, Appendix 2, Brattle Report at ¶ 3 (P.R. 279).  Indeed, GOR reported that Gazprom only supplied 45.99% of the natural gas consumed in Russia during the

POI.  *GOR Initial QR* at 59.  Absent from the *Final Determination* or Commerce's response in this action is any explanation of why it was reasonable to conclude that Gazprom producing a majority of the natural gas in Russia significantly distorts natural gas prices in Russia, particularly given Gazprom-produced gas accounted for less than 50% of the natural gas consumed in Russia during the POI.

While Gazprom enjoys a "natural monopoly" over natural gas transportation, Commerce again fails to explain how that natural monopoly translates to significant distortion of natural gas prices in Russia.  There is nothing in the record—and Commerce cites no evidence—indicating that Gazprom charges different transport rates based on supplier or that the rates charged to transport natural gas fail to reflect market principles.  To the contrary, the record shows that there is "non-discriminatory access rules for main gas pipelines" and "a single tariff on transporting gas through main gas pipelines to all gas suppliers."  *GOR Initial QR* at 49.  Commerce's entire argument boils down to GOR owning a majority of shares in Gazprom, Gazprom has a natural monopoly over natural gas transportation, so prices are distorted.  Never does Commerce explain why it is reasonable to conclude that those "facts" result in "significant" price distortion for natural gas.  Failing to connect the dots and explain the reasoning renders the agency's determination unlawful.  *Motor Vehicle*, 463 U.S. at 43.

Commerce's reliance on import and export controls fares no better in justifying its determination that government involvement significantly distorted natural gas prices.  First, Commerce fails to explain the connection between import tariffs on natural gas and natural gas prices in Russia.  As Commerce itself acknowledges, "{t}he record shows that domestic consumption needs are met by domestic production . . . ."  Gov't Br. at 28.  Given the enormous natural gas surplus, there is no rational connection between the minimal import tariff on natural

gas and significant distortion in natural gas prices in Russia. Second, how export tariffs and export licenses on natural gas distort domestic natural gas prices also is left unanswered in both the *Final Determination* and Commerce's response brief.

In sum, there is no evidence that GOR has ever sought to artificially lower Russian domestic natural gas prices to promote natural gas users in Russia, to even begin to claim a subsidy. And none of the "facts" Commerce highlights—whether taken individually or collectively—reasonably suggest GOR artificially depresses natural gas prices. For example, even if Gazprom has a large market share, at most, it means that Gazprom has market power. And if true (it is not), the logical implication is that Russian natural gas prices are *inflated*. Indeed, even assuming a connection between the regulated and unregulated natural gas markets, the apparently implicit claim (unsupported by any record evidence) is that regulated tariffs artificially inflate the price for natural gas beyond what it would otherwise be; namely, the prices Novatek and other independent suppliers sell in the unregulated market.

Returning to import duties, Commerce appears to suggest that Russian natural gas import duties result in imports accounting for only 2% of Russian natural gas consumption during the POI—presumably because the duties make imports *more expensive*. Indeed, that is the entire point of this proceeding: a U.S. domestic producer of phosphate fertilizers is trying to impose additional duties on Russian phosphate fertilizers to make them more expensive and permit U.S. producers to increase prices. As such, and ignoring the enormous natural gas surplus Russia enjoys, the import duties on natural gas imposed by GOR can only *increase* the price of natural gas in Russia—at least that seems to be the implicit unsupported claim, again contradicting any subsidy claim. As noted, there is no evidence that the export duties or export licenses on natural gas have an effect on Russian prices. Such export measures instead *increase* the price of natural

gas in Europe (and other export destinations), and so, if anything, means that the European price is *inflated* or *distorted* and should not be used as a benchmark.

The interventions by GOR about which Commerce frets results in *higher* natural gas prices. *Higher* prices increase the cost of production. That is, by definition, not a subsidy.

Commerce's response to EuroChem's arguments is wanting. There is no rational reason for disregarding as a tier one benchmark undisputedly profitable natural gas prices by independent Russian natural gas suppliers like Novatek. Commerce's response brief demonstrates that it instead reached the desired conclusion—eschew tier one benchmarks—and then identified how GOR is involved in the natural gas market without ever attempting to link the "facts" to the conclusion that prices are significantly distorted. The failure to make any effort to connect the dots between the "facts" and the conclusion reached renders Commerce's determination arbitrary and capricious, unsupported by substantial evidence, and otherwise contrary to law. *Motor Vehicle*, 463 U.S. at 43.

## B. The tier-three benchmark Commerce selected to measure the adequacy of remuneration is contrary to law.

Section 771(5)(E)(iv) of the Tariff Act, 19 U.S.C. § 1677(5)(E)(iv), provides that there is no benefit from an alleged provision of a good unless the good is provided for "less than adequate remuneration." Adequacy of remuneration must "be determined in relation to prevailing market conditions for the good or service being provided or the goods being purchased *in the country which is subject to the investigation or review*. Prevailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale." 19 U.S.C. § 1677(5)(E)(iv) (emphasis added). Commerce fails to even address this argument in its brief.

To comply with the statute, a benchmark must be used that reflects the market conditions in *Russia*. Using a European benchmark does not reflect the market conditions existing in *Russia*. It instead reflects the market conditions specific to Europe and is contrary to statute. The record evidence in this case conclusively demonstrates that natural gas market conditions vary significantly between Russia and Europe. In particular, Russia is a country with a substantial surplus of natural gas—only consuming 59.2% of the natural gas produced during the POI while exporting the balance (mainly to Europe). *GOR Initial QR* at 42-44, 59. Europe, in stark contrast is in substantial deficit, importing a substantial volume of its natural gas needs.

Not only did Commerce's benchmark selection here contravene the plain meaning of section 771(5)(E)(iv) of the Act, its misapplication measured a price differential caused by differences in prevailing market conditions between Europe and Russia rather than by any alleged government subsidy. In other words, the supposed benefit measures, at least in part (if not entirely), the comparative advantage Russia enjoys as to natural gas. Commerce's determination must be remanded to comply with the statutory mandate that Commerce measure the adequacy of remuneration based on prevailing market conditions in *Russia*.

**IV. Commerce's refusal to adjust the numerator or denominator in calculating the alleged subsidy benefit from the provision of natural gas for LTAR is contrary to law.**

To calculate the *ad valorem* rate for the provision of natural gas at LTAR, Commerce used the value added tax OECD benchmark price minus the government of Russia's value added tax inclusive price divided by the non-value added tax total sales. Gov't Br. at 44. EuroChem argues that this was error because Commerce used numerator and denominator that are unbalanced. To correct the error, and ensure that the numerator and denominator align, EuroChem offered two alternatives: remove the value added tax component from the numerator or include a value added tax component in the sales denominator. Gov't Br. at 44.

Commerce again rejects both approaches. Instead it argues there was no error because "the value added tax is negated in the calculation, and the resulting numerator simply provides the OECD price minus the government of Russia price. The numerator represents the subsidy, not the value added tax." Gov't Br. at 44. Commerce's argument is baseless. The benchmark price Commerce uses in the numerator includes the "import-specific value added tax and the import duty in addition to the EU export value added tax that was included in the IEA." Gov't Br. at 38. Subtracted from this benchmark price is the actual prices EuroChem paid for natural gas, which reflects the Russian VAT. The numerator accordingly includes a VAT component that is not negated through subtraction while the denominator contains no VAT component. This imbalance overstates the subsidy margin. The issue should be remanded.

## V. Commerce's refusal to consider the relative consumption of natural gas used in the production of phosphate fertilizer was in error.

Commerce fails to justify its refusal to consider the relative consumption of natural gas used in the production of phosphate fertilizer. To support its position, Commerce references 19 C.F.R. § 351.525(b)(5)(ii). That provision is inapplicable, however, because the natural gas "input" and the phosphate fertilizer "downstream product" is not produced by the same corporation. Commerce further attempts to rely on 19 C.F.R. § 351.525(b)(6)(iv) to justify attributing the natural gas subsidy received by the input supplier to the combined sales of the input and downstream products. Gov't Br. at 47. But what Commerce ignores is that this attribution regulation applies only if "production of the input product is primarily dedicated to production of the downstream product." 19 C.F.R. § 351.525(b)(6)(iv). There is no evidence in the record—and Commerce cites none—that supports a finding that the supply of natural gas (a product that no EuroChem company produces) is primarily dedicated to the production of phosphate fertilizers. To the contrary, Commerce was aware during the investigation that natural

gas is primarily dedicated to the production of non-phosphate fertilizers. *EuroChem Submission Regarding Subsidy Allocation Issues* (Dec. 28, 2020) (rejected) (P.R. 354; C.R. 520, 521); *see also EuroChem Post-Preliminary Supp. QR* at 1-4 (P.R. 332).

While Commerce's practice is to eschew tracing inputs through the production process, EuroChem does not argue for such tracing of natural gas on a "dollar-by-dollar" basis. EuroChem instead argues that Commerce is under an obligation to accurately calculate the subsidy margin and that it should have accounted for the relative consumption of natural gas used to produce phosphate fertilizer as opposed to other types of fertilizers. EuroChem Br. at 25-26. Considering the relative consumption does not require tracing natural gas supplies through the production process. Attributing the "benefit" from the provision of natural gas to the production of subject merchandise is a straightforward task.

Commerce itself acknowledges that its regulations "are intended to 'reasonably {attribute} the benefits from a subsidy based on the stated purpose of the subsidy or the purpose we evince from the record evidence at the time of bestowal." Gov't Br. at 47 (quoting 63 Fed. Reg. at 65,403). And that precisely is the crux of EuroChem's argument. Commerce does not dispute that phosphate fertilizers utilize substantially less natural gas than other fertilizers. Given Commerce must "reasonably attribute" the subsidy benefit it should have accounted for the relative consumption difference in the production of phosphate fertilizers.

Commerce's reliance on *CFS from China* and *Phosphoric Acid from Israel* is misplaced. There, as Commerce argues, "the benefit flowed equally to all downstream products that could use the subsidized inputs . . . ." Gov't Br. at 48. But the record in this investigation demonstrates that the alleged benefit of the natural gas subsidy did not flow equally to all

downstream products.  To the contrary, the vast majority of natural gas is used to produce non-phosphate fertilizers.

Commerce's attempts to distinguish *Kajaria Iron Castings Pvt. Ltd. v. United States* is unavailing.  As EuroChem explained, in that case, the Federal Circuit found that Commerce erred in countervailing as to subject merchandise the portion of a subsidy program tied to merchandise not within the scope of the review, and instructed Commerce to adjust its calculations to calculate only the subsidy received on subject merchandise.  *Kajaria Iron Castings Pvt. Ltd. v. United States*, 156 F.3d 1163, 1176 (Fed. Cir. 1998).  While "mindful" of Commerce's practice to "not engage in subsidy tracing because of the burden involved" (as an abstract matter), the Federal Circuit observed that "when the party under investigation provides documentation that allows Commerce to separate the portion of the {subsidy} related to non-subject merchandise," Commerce should not countervail the portion of the subsidy tied to non-subject merchandise.  As in *Kajaria*, Commerce had the data—which it improperly rejected—that details the percentage of overall natural gas purchases used in the production of subject phosphate fertilizers (5.75% or 7.0%, depending on calculation method) versus the percentage used to produce non-subject fertilizers.  *EuroChem Submission Regarding Subsidy Allocation Issues* (Dec. 28, 2020) (rejected) (P.R. 354; C.R. 520, 521); *see also EuroChem Post-Preliminary Supp. QR* at 1-4 (P.R. 332).  Commerce accordingly should have eliminated the provision of natural gas at LTAR subsidy attributable to non-subject merchandise.

## VI. Commerce used the improper sales denominator by failing to treat EuroChem as a single entity.

EuroChem argued in its opening motion that EuroChem should be collapsed and treated as the single entity because it is in reality.  Commerce does not dispute that in fact and reality

EuroChem is a single entity based on the record evidence. Commerce says that each case must be decided based on the facts of the record of that case. The above are the facts of this case.

Commerce says that it followed its attribution regulation. But the attribution regulation does not define when a corporate structure constitutes a single entity for purposes of the attribution regulation, or otherwise define what is a corporate structure.

Commerce argues that some entities within EuroChem are located outside of Russia and there is no analysis of whether they received subsidies from the Russian Government. If Commerce thought that relevant, it could have asked, but chose not to. Commerce fails to note that U.S. CVD law is clear not to look at cross-border subsidies except very narrow circumstances, not claimed here by anyone.

Finally, more fundamentally as to the immediately above, Commerce does not dispute that any claimed natural gas subsidies actually also flow through to instead benefit EuroChem entities outside, instead of inside, Russia. Commerce's attribution of any such subsidies entirely to entities in Russia overstates the natural gas subsidy as to Russian product. Here, we are not talking cross-border subsidies; rather we are talking the proper attribution of subsidies to the product that they actually benefit—*i.e.*, the sales denominator.

Commerce fails to address any of the above in EuroChem's opening motion.

## VII. Commerce fails to address EuroChem's argument that it erroneously reduced the sales denominator used to calculate the *ad valorem* subsidy rate for the provision of natural gas at LTAR.

As EuroChem explained in its motion, Commerce constructed the EuroChem sales denominators using the totals EuroChem provided in Exhibit 4 of its December 7, 2020 filing. EuroChem Br. at 33. EuroChem further explained that those totals assumed a collapsed entity view of the ten cross-owned entities that eliminate all inter-company sales among the ten cross-owned entities but includes all downstream sales of these companies—an analysis that

Commerce rejected. EuroChem Br. at 33. Commerce improperly used the December 7, 2020 sales eliminations to combine: (1) the sales of the three subject merchandise producing companies (Phosphorite, EuroChem-BMU, and Nevinnomissky Azot); and (2) each of the other seven cross-owned companies with the three subject merchandise producing companies.

EuroChem argued in its motion that Commerce, to ensure an accurate subsidy margin, should have used a separate elimination analyses for each company grouping that Commerce embraced, such that only inter-company sales made among the companies included in the particular grouping are eliminated to derive an accurate sales figure for the specific grouping when downstream sales of companies in the group are used. EuroChem Br. at 34.

EuroChem further provided examples in its motion demonstrating how this error by Commerce underreported the sales denominators and thus overstated the subsidy margin calculated for the programs purportedly found to be countervailable. EuroChem Br. at 34-37. As EuroChem showed, Commerce's improper sales eliminations from its sales denominator calculations resulted in an 11.14% percentage point overstatement of the *ad valorem* rate for the provision of natural gas at LTAR just as to this particular issue alone. EuroChem Br. at 37.

Commerce failed to address, let alone dispute EuroChem's arguments. Because this issue is undisputed, the Court should remand the *Final Determination* and instruct Commerce to, at a minimum, calculate EuroChem's sales denominators using the calculations EuroChem provided in its ministerial error submission. *See EuroChem Feb. 16, 2021 Submission* at 3-7, Attachment 2 (C.R. 566).

## VIII. CONCLUSION

For all of the foregoing reasons, Plaintiff respectfully requests that this Court: (1) hold that the subsidy margin Commerce calculated for EuroChem in the *Final Determination* is

unsupported by substantial evidence and is otherwise not in accordance with law; and (2) remand

the *Final Determination* to Commerce with instructions to correct the errors set forth above.

Dated: April 28, 2022

<div style="margin-left: 40%;">

Respectfully submitted,

*/s/ Jeremy W. Dutra*
Peter Koenig
peter.koenig@squirepb.com
Jeremy W. Dutra
jeremy.dutra@squirepb.com
SQUIRE PATTON BOGGS (US) LLP
2550 M Street, NW
Washington, DC 20037
Tel:  (202) 457-6000

*Counsel for Plaintiff*
*Industrial Group Phosphorite LLC*

</div>