**Slip Op. 22-103**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| **THE MOSAIC COMPANY,** | |
| Plaintiff, | |
| **PHOSAGRO PJSC, JSC APATIT,** | |
| Consolidated Plaintiff, | |
| **INDUSTRIAL GROUP PHOSPHORITE LLC,** | |
| Consolidated Plaintiff and Consolidated Plaintiff-Intervenor, | Before: Jane A. Restani, Judge |
| v. | Consol. Court No. 21-00117 |
| **UNITED STATES,** | PUBLIC VERSION |
| Defendant, | |
| **THE MOSAIC COMPANY,** | |
| Consolidated Defendant, | |
| **PHOSAGRO PSJC, JSC APATIT, INDUSTRIAL GROUP PHOSPHORITE LLC,** | |
| Defendant-Intervenor | |

OPINION AND ORDER

Dated: September 2, 2022

[Commerce's final determination in the countervailing duty investigation of phosphate fertilizers from the Russian Federation is partially sustained and partially remanded for reconsideration consistent with this opinion.]

Consol. Court No. 21-00117                                                    Page 2
**Public Version**

Patrick James McLain, David J. Ross, and Stephanie Ellen Hartmann, Wilmer, Cutler, Pickering, Hale and Dorr LLP, of Washington, DC, argued for Plaintiff The Mosaic Company.  With them on the brief were Alexandra S. Mauer, Eliot Kim, and Natan Pinchas Lyons Tubman.

Meen Geu Oh, Commercial Litigation Branch, U.S. Department of Justice, of Washington, DC, argued for the Defendant.  With him on the brief was Ebonie I. Branch.  Of counsel on the brief was Jared Michael Cynamon, Office of Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

Jonathan Thomas Stoel and Cayla Danielle Ebert, Hogan Lovells US LLP, of Washington, DC, argued for Defendant-Intervenors PhosAgro PJSC and JSC Apatit.  With them on the brief were Harold Deen Kaplan, Jared Rankin Wessel, Maria Alejandra Arboleda Gonzalez, and Nicholas R. Sparks.

Peter J. Koenig, Squire Patton Boggs (US) LLP, of Washington, DC, argued for Defendant-Intervenor Industrial Group Phosphorite, LLC.  With him on the brief was Jeremy William Dutra.

  Restani, Judge:  This action is a challenge to the final determination made by the United States Department of Commerce ("Commerce") in the countervailing duty ("CVD") investigation of phosphate fertilizers from the Russian Federation ("Russia") covering the period from January 1, 2019, through December 31, 2019.

  Plaintiffs, Consolidated Plaintiffs, and Consolidated Plaintiff-Intervenors request that the court hold aspects of Commerce's final determination unsupported by substantial evidence or otherwise not in accordance with law.  The United States ("Government") asks that the court sustain Commerce's final determination.

## BACKGROUND

  The Mosaic Company ("Mosaic") filed a CVD petition on June 26, 2020, concerning imports of phosphate fertilizers from Russia.  Petitions for Imposition of Countervailing Duties: Phosphate Fertilizers from Morocco and Russia, P.R. 1-8, C.R. 1-8 (June 26, 2020).  Commerce initiated the CVD investigation on July 23, 2020.  Phosphate Fertilizers From the Kingdom of

Consol. Court No. 21-00117                                              Page 3
**Public Version**

Morocco and the Russian Federation: Initiation of Countervailing Duty Investigations, 85 Fed.

Reg. 44,505 (Dep't Commerce July 23, 2020).  On August 4, 2020, the U.S. International Trade

Administration selected LLC Industrial Group Phosphorite ("EuroChem") and PhosAgro-

Cherepovets ("PhosAgro") as mandatory respondents ("Plaintiffs") in this review.  See

Countervailing Duty Investigation of Phosphate Fertilizers from Russia: Respondent Selection,

P.R. 55, C.R. 23 (Aug. 4, 2020).

Commerce published its preliminary results on November 30, 2020, see Phosphate

Fertilizers From the Russian Federation: Preliminary Affirmative Countervailing Duty

Determination, 85 Fed. Reg. 76,524 (Dep't Commerce Nov. 30, 2020), along with the

accompanying Decision Memorandum for the Affirmative Preliminary Determination of the

Countervailing Duty Investigation of Phosphate Fertilizers from the Russian Federation, C-821-

825, POR 1/1/2019-12/31/2019 (Dep't Commerce Nov. 23, 2020) ("PDM").

Commerce published its final determination on April 7, 2021.  See Phosphate Fertilizers

From the Kingdom of Morocco and the Russian Federation: Countervailing Duty Orders, 86 Fed.

Reg. 18,037 (Dep't Commerce Apr. 7, 2021) ("Final Results"); see also Issues and Decision

Memorandum for the Final Affirmative Determination of the Countervailing Duty Investigation

of Phosphate Fertilizers from the Russian Federation, C-821-825, POR 1/1/2019-12/31/2019

(Dep't Commerce Feb. 8, 2021) ("IDM").  Commerce determined the countervailable subsidy

rate to be 47.05 percent for EuroChem and 9.19 percent for PhosAgro.  Final Results, 86 Fed.

Reg. at 18,038.  Relevant here, Commerce found subsidies based on the government of Russia's

("GOR") provision of natural gas for less than adequate remuneration ("LTAR").  IDM at 8–9.

Additionally, as relevant here, Commerce found that a subsidy for phosphate mining rights for

Consol. Court No. 21-00117                                                    Page 4
**Public Version**

LTAR did not yield a measurable benefit.  Id. at 10.  Mosaic, EuroChem, and PhosAgro raise

challenges to the final determination.

<strong>JURISDICTION & STANDARD OF REVIEW</strong>

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C.

§ 1516a(a)(2)(B)(i).  The court will uphold Commerce's determinations in a CVD proceeding

unless they are "unsupported by substantial evidence on the record, or otherwise not in

accordance with law[.]"  19 U.S.C. § 1516a(b)(1)(B)(i).

<strong>DISCUSSION</strong>

**I.     Rosneft as a Government Authority**

In the final determination, Commerce applied adverse facts available ("AFA") to determine

that Rosneft is a government authority such that its provision of natural gas to a cross-owned

affiliate of EuroChem was a countervailable financial contribution.  See IDM at 6, 9, 35–37.

EuroChem challenges this determination.[1]

During the investigation, Commerce issued a questionnaire requesting that the GOR

provide an Input Producer Appendix for any company or enterprise that is wholly or partially

owned by the GOR, whether directly or indirectly.  See Letter from USDOC to Embassy of

Russian Federation Pertaining to GOR Initial Questionnaire, P.R. 56 (Aug. 4, 2020) ("Initial

Qnaire to GOR").  In its initial questionnaire response, the GOR provided an appendix for

Gazprom and PJSC Novatek.  Response from Mayer Brown, LLP to Sec of Commerce

---

[1] In its brief, PhosAgro incorporates EuroChem's challenge to Commerce's determination that
Rosneft was a government authority.  PhosAgro Br. at 17.

Pertaining to Ministry, Initial QR at 41, P.R. 131, C.R. 305 (Sept. 25, 2020) ("GOR IQR").

EuroChem, however, reported that its cross-owned affiliate, Nak Azot purchased natural gas

from Russian corporation Rosneft.  Response from Squire Patton Boggs (US) LLP to Sec of

Commerce Pertaining to EuroChem Supp QR at 12–13, P.R. 229, C.R. 437 (Oct. 26, 2020)

("EuroChem 1st SQR").  It is undisputed that Rosneft's main shareholder, Rosneftegaz JSC

("Rosneftegaz"), is 100 percent owned by the GOR.  Id. at 13, Ex. SQ-16.2.  Commerce

requested that the GOR provide an Input Producer Appendix for both Rosneft and Rosneftegaz,

but the GOR declined, stating that neither entity was a vested government authority in the

Russian natural gas market.  See Letter from USDOC to Mayer Brown Pertaining to GOR 2nd

Sec II Suppl Qnaire, P.R. 282 (Nov. 3, 2020) ("Suppl. 2d Qnaire to GOR"); Response from

Mayer Brown, LLP to Sec of Commerce Pertaining to Ministry 2nd Suppl QR at 1–2, P.R. 300,

C.R. 418 (Nov. 13, 2020) ("GOR 2d SQR").  Following the preliminary determination,

Commerce again requested the Input Producer Appendices for Rosneft and Rosneftegaz from the

GOR, but the GOR did not submit the requested information.  See Letter from Mayer Brown,

LLP Pertaining to GOR 2nd Supp Qnaire, P.R. 317, C.R. 489 (Nov. 25, 2020) ("GOR Post-

Prelim. Qnaire"); Response from Mayer Brown, LLP to Sec of Commerce Pertaining to Ministry

3rd Suppl QR at 6–7, P.R. 331, C.R. 502 (Dec. 8, 2020) ("GOR 3rd SQR").

A subsidy is countervailable if the following elements are satisfied: (1) an authority has

provided a financial contribution directly or entrusts a private entity to make a financial

contribution; (2) a benefit is thereby conferred on a recipient of the financial contribution; and

(3) the subsidy is specific to a foreign enterprise or foreign industry, or a group of such

enterprises or industries.  See 19 U.S.C. § 1677(5)(A)–(B), (D)–(E), (5A).  Normally,

information from the foreign government is necessary for Commerce to make a reasonable

determination about whether an entity is a government authority.  See <u>Fine Furniture (Shanghai)</u>

<u>Ltd. v. United States</u>, 748 F.3d 1365, 1369–70 (Fed. Cir. 2014) ("<u>Fine Furniture</u>").  If the record

is missing necessary information to an investigation, Commerce may use facts otherwise

available to fill in any gaps that are necessary to find that the elements of the CVD statute have

been satisfied.  <u>See</u> 19 U.S.C. § 1677e(a) (2015); <u>see also</u> <u>Changzhou Trina Solar Energy Co. v.</u>

<u>United States</u>, 43 CIT __, __, 359 F. Supp. 3d 1329, 1325 (2019).

      19 U.S.C. § 1677e specifically provides two avenues to fill in the gap for the missing

information: "facts otherwise available" and "facts otherwise available" with "adverse

inferences."  <u>See</u> 19 U.S.C. § 1677e(a)–(b).  Accordingly, the court has interpreted the two

subsections in the statute to have slightly different purposes.  <u>See</u> <u>Mueller Commercial de</u>

<u>Mexico v. United States</u>, 753 F.3d 1227, 1232 (Fed. Cir. 2014).  Facts otherwise available shall

be used when necessary information is not available on record, or if an interested party or any

other person fails to satisfactorily respond to Commerce's requests for "necessary information"

by: (1) withholding requested information, (2) failing to provide information by the submission

deadlines or in the form or manner requested, (3) significantly impeding a proceeding, or (4)

providing information that cannot be verified.  <u>Id.</u> § 1677e(a)(1)–(2).  Separately, pursuant to §

1677e(b), Commerce is authorized to use an adverse inference when selecting from available

facts if an interested party "has failed to cooperate by not acting to the best of its ability to

comply with a request for information."  <u>Id.</u> § 1677e(b).  For the following reasons, the court

holds that Commerce satisfied both prongs of the statutory requirement for AFA and lawfully

determined that Rosneft is a government authority within the meaning of § 1677(5)(A).

Consol. Court No. 21-00117                                                  Page 7
**Public Version**

> **A. The GOR's failure to provide the Input Producer Appendix resulted in a gap in the record and EuroChem's factual submission did not cure this gap**

To apply AFA, Commerce must first identify a gap in the record.  Zhejiang DunAn Hetian Metal Co. v. United States, 652 F.3d 1333, 1346 (Fed. Cir. 2011) ("The use of facts otherwise available . . . is only appropriate to fill gaps when Commerce must rely on other sources of information to complete the factual record.").  Notably, the gap in the record must be relevant to the investigation and the use of AFA must fill in information that is actually missing. See e.g., Guizhou Tyre Co. v. United States, 42 CIT __, __, 348 F. Supp. 3d 1261, 1270 (2018).

Here, Commerce has made an affirmative showing that there was a relevant gap in the record created by the GOR's failure to provide the requested Input Producer Appendix for Rosneft and Rosneftegaz.  See IDM at 36.  Specifically, Commerce requested the following information: (1) a trace of all ownership in Rosneft back to the GOR; (2) an explanation of the history of government ownership in Rosneft; (3) an explanation of the corporate governance structure of each entity in Rosneft's chain of ownership and the role of minority shareholders; (4) an explanation of any obligations each entity is required to carry out on behalf of the state; and (5) a description of the role of the GOR in any restructuring.  See GOR Post-Prelim. Qnaire at Section II.  In the preliminary determination, Commerce identified that there was conflicting record evidence regarding the GOR's authority over Rosneft.  See PDM at 9.  Commerce sought Input Producer Appendices from Rosneft and Rosneftegaz to understand the corporate structures of state-sponsored enterprises and assess the level of governmental influence.  See IDM at 6–7. Further, the GOR was able to provide this information for Gazprom and PJSC Novatek when it supplied Input Producer Appendices for both entities.  See GOR IQR at 41.  Thus, the

Consol. Court No. 21-00117                                                        Page 8
**Public Version**

information requested was reasonably sought and the investigative questions issued by

Commerce were reasonable.

After Commerce issued its preliminary determination, the GOR responded to the request

for information and provided Rosneft's charter, which included information regarding

shareholder rights, voting rights, and regulations surrounding composition and selection of board

members and executives.  See GOR 3rd SQR at Ex. TQ-I-6.  The GOR's response, however,

failed to include the requested information regarding the corporate history and the role of the

GOR in any restructuring.  Id.  More importantly, the GOR's response did not include the

requested Index Producer Appendix information for Rosneftegaz.  Id. at 6–8.

EuroChem contends that it submitted supplementary information following the

preliminary determination that cured any gap in the record.  EuroChem Br. at 4.  Indeed,

although EuroChem provided additional information regarding Rosneft's corporate governance,

the information provided was not responsive to Commerce's request for the Input Producer

Appendix.  See Letter from Squire Patton Boggs (US) LLP to Sec of Commerce Pertaining to

EuroChem Rebuttal Comments on Suppl QR, P.R. 340 (Dec. 17, 2020) ("EuroChem Factual

Submission").  EuroChem's submission included a Rosneft affidavit and publicly available

profiles for Rosneft's board of directors and management board, but remained silent on

Rosneftegaz's corporate structure and the corporate history of both Rosneft and Rosneftegaz.  Id.

at Ex. 1–10.  Thus, the Eurochem's submission did not provide sufficient information for

Commerce to determine whether Rosneft is a government authority.  Id.

Absent the necessary information from the GOR, Commerce was unable to determine the

extent of governmental ownership and influence over Rosneft.  Additionally, EuroChem's

submission did not cure the gap in the record created by the GOR's failure to submit the requisite

information.  Pursuant to § 1677e(a), Commerce was authorized to fill in the relevant gap in the

record by selecting from facts available.  See, e.g., Jindal Poly Films Ltd. of India v. United

States, 44 CIT __ , __ , 439 F. Supp. 3d 1354, 1361 (2020); 19 U.S.C. § 1677e(a).

> **B.  The GOR did not cooperate with Commerce's requests for information to the best of its ability**

The second prong in the AFA statute authorizes Commerce to apply adverse inferences

by selecting from facts otherwise available when "an interested party has failed to cooperate by

not acting to the best of its ability to comply with a request for information."  See 19 U.S.C. §

1677e(b)(1).  An interested party, such as a foreign government, fails to meet the "best of its

ability" statutory standard if it has not demonstrated "maximum effort."  See Nippon Steel Corp.

v. United States, 337 F.3d 1373, 1382 (Fed. Cir. 2003) (stating that "[c]ompliance with the 'best

of its ability' standard is determined by assessing whether respondent has put forth maximum

effort to provide Commerce with full and complete answers to all inquiries in an investigation").

When a foreign government fails to respond to the best of its ability, Commerce may apply AFA

to find that a government authority provided a financial contribution to a specific industry.

Archer Daniels Midland Co. v. United States, 37 CIT 760, 769, 917 F. Supp. 2d 1331, 1342

(2013) ("Archer Daniels").  Although Commerce should seek to avoid collateral impact to a

cooperating party in an investigation if relevant information exists elsewhere on the record,

absent satisfactory record evidence, Commerce may lawfully apply AFA based on

noncooperation.  See, e.g., Fine Furniture, 748 F.3d at 1372–73.

Consol. Court No. 21-00117                                                        Page 10
**Public Version**

      Substantial evidence supports a finding that the GOR did not cooperate to the best of its

ability during the investigation.  Commerce requested, twice, that the GOR submit an Input

Producer Appendix for both Rosneft and Rosneftegaz.  See Suppl. 2d Qnaire to GOR at Attach.

I; GOR Post-Prelim. Qnaire at Section II.  After the first request, the GOR responded with a

statement that neither Rosneft nor Rosneftegaz were vested government authorities.  See GOR

2d SQR at 1.  The GOR declined to provide any record evidence to support its statement.  See id.

at 1–2.  After its preliminary determination, Commerce again requested the GOR to furnish the

appendices, but the GOR refused to do so claiming that [[

                                                      ]].  See GOR

3rd SQR at 6.  [[

                                  ]].  Id. ([[

                                  ]]).  Even if the GOR believed that the information was

not relevant, the information sought was related to Commerce's proper investigatory purpose,

and Commerce, not the GOR, determines what information is relevant to the investigation.  See

Ansaldo Componenti, S.p.A. v. United States, 10 CIT 28, 37, 628 F. Supp. 198, 205 (1986).

      The court has held that Commerce must "tread carefully" when its use of an adverse

inference would injure a cooperating party such that Commerce must provide respondents with a

"meaningful opportunity" to submit factual evidence that weighs in their factor.  See Yama

Ribbons and Bows Co. v. United States, 43 CIT __, __, 419 F. Supp. 3d 1341, 1347, 1356 (2019)

(holding that Commerce erred in applying AFA and "overlooked that there was a complete lack

*Confidential Information Omitted*

Consol. Court No. 21-00117                                                    Page 11
**Public Version**

of evidence that [the plaintiff] had obtained a benefit" through the Government of China's

Export Buyer's Credit Program).  Commerce provided both EuroChem and the GOR a

meaningful opportunity to provide alternative evidence before the final determination.  See, e.g.,

EuroChem Factual Submission; GOR 3rd SQR.  Commerce did not simply ignore the factual

evidence submitted; rather, Commerce explained that it preliminarily found conflicting record

evidence and after the GOR's repeated failure to furnish the necessary information for Rosneft

and Rosneftegaz, it lawfully substituted the missing information in accordance with 19 U.S.C. §

1677e(b).  See IDM at 35–37.

Specifically, Commerce requested that the GOR explain the discrepancy between the

GOR's contention that neither Rosneft nor Rosneftegaz are vested government authorities in the

natural gas market in Russia and the factual submission by EuroChem which stated that the main

shareholder of Rosneft is Rosneftegaz, which is 100 percent owned by the state.  See, e.g., GOR

3rd SQR at 7–8; see also EuroChem 1st SQR at 13, Ex. SQ-16.2.  The GOR's response merely

emphasized that [[

                    ]]  See GOR 3rd SQR at 8 (emphasis in original).  Even if the GOR deemed

that Rosneftegaz was not directly engaged in the provision of oil or raw gas materials to

EuroChem's cross-affiliate, the court has found that a holding company exerts indirect control

when it entrusts or directs a private entity to make a financial contribution within the meaning of

19 U.S.C. § 1677(5)(B).  Guangdong Wireking Housewares & Hardware Co. v. United States,

37 CIT 319, 333–34, 900 F. Supp. 2d 1362, 1377 (2013), aff'd, 745 F.3d 1194 (Fed. Cir. 2014)

("Commerce's interpretation of 'public entities' reflects the realities of corporate ownership and

control and enables it to detect certain forms of subsidization which are not provided directly by

*Confidential Information Omitted*

the government but instead pass through private or quasi-private channels.").  Commerce

explained in its final determination that the GOR failed to cooperate by not complying with

Commerce's request for information because it did not respond by the deadline dates, nor did it

adequately explain why it was unable to provide the requested information.  See IDM at 35–37.

Therefore, Commerce's use of AFA satisfies both prongs in identifying a relevant gap in the

record and the GOR's failure to cooperate to the best of its ability.  Accordingly, Commerce did

not err in concluding that Rosneft was a government authority.

## II.   De Facto Specificity for the Provision of Natural Gas

EuroChem challenges Commerce's de facto specificity analysis for the provision of

natural gas at LTAR, arguing that the fertilizer industry is not a predominant user of natural gas

and therefore de facto specificity was lacking.  EuroChem argues that Commerce's explanation

does not support the specificity finding because Commerce relied only on the fact that "the

Agro-chemistry industry is a predominant consumer of natural gas when compared to other

industrial sectors."  EuroChem Br. at 11 (internal citation omitted).  EuroChem asserted that

Bethlehem Steel[2] instructs that Commerce must rely on more than just "predominant usage"

when a subsidy, such as natural gas in Russia, is available and widely used throughout the

market.  Id. at 11–12.  EuroChem contends that the fertilizer industry must consume some

natural gas, but it only consumed 4.7 percent of Russian natural gas, and thus, there was not de

facto specificity.  Id. at 12.

---

[2] Bethlehem Steel Corp. v. United States, 25 CIT 307, 322, 140 F. Supp. 2d 1354, 1369 (2001).

Under 19 U.S.C. § 1677(5A)(D)(iii), a subsidy is de facto specific if one or more of the

following factors exist: (1) the actual recipients of the subsidy, whether considered on an

enterprise or industry basis, are limited in number; (2) the enterprise or industry is a predominant

user of the subsidy; (3) the enterprise or industry receives a disproportionately large amount of

the subsidy; and (4) the manner in which the authority providing the subsidy has exercised

discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored

over others.  19 U.S.C. § 1677(5A)(D)(iii).  "Because neither 'dominant' nor 'disproportionate'

are defined in the relevant statute, [the court] is obligated to defer to Commerce's reasonable

interpretation thereof."  Bethlehem Steel, 25 CIT at 322, 140 F. Supp. 2d at 1369.

In Bethlehem Steel, the court found that it was reasonable for Commerce to consider an

industry's relative usage of an alleged subsidy program in determining whether the industry was

a "dominant" or "disproportionate" user of the program.  Id.  The alleged subsidy program at

issue in Bethlehem Steel provided discounted electricity to large users that curtailed their usage

by at least 20 percent during designated times.  Id. at 1367.  The court stated that although the

Korean "steel industry received over 51 [percent] of the [] benefits [of the subsidy program], . . .

there is nothing in the record to indicate this percentage was disproportionately higher than

would be expected."  See id. at 1369 (concluding that the large consumption of energy was

inherent in the Korean steel industry; therefore, the discounted rate per unit resulted in a

significant benefit overall).  The court thus sustained Commerce's determination that the steel

industry's usage was neither dominant nor disproportionate if indeed it was a subsidy.  Id.

In its IDM here, Commerce affirmed its preliminary finding that the provision of natural

gas for LTAR program was de facto specific.  See IDM at 44–45; PDM at 12.  Commerce asked

Consol. Court No. 21-00117                                                    Page 14
**Public Version**

the GOR to provide purchase data for natural gas based on industrial classification, and the GOR

responded that it did not maintain the requested statistics but referred Commerce to Gazprom's

2019 annual report.  See Initial Qnaire at Section II, Provision of Natural Gas for LTAR

(Questions Regarding the Natural Gas Industry, Question 8); GOR 2d SQR at 4–5.  The report

indicated that the agrochemical industry consumed 4.7 percent of all Russian natural gas

provided in 2019.  GOR 2d SQR at 4–6.  The report showed that electricity, communal services,

and households used greater amounts of natural gas, but in relation to other industrial uses the

agrochemical industry used significantly more than any other industry.  Id. at 6.[3]

In its final determination, Commerce relied on the annual report to conclude that the

agrochemical industry was a predominant user of the subsidy because the agrochemical sector

was the single largest industrial consumer of natural gas sold by Gazprom.  See IDM at 44.

Commerce explained that the next three largest industries accounted "for a small percentage less

than half that of the agro-chemical industry."  Id.  Commerce excluded the natural gas

consumption by households, services, and electricity because they were not industrial users.  Id.

Commerce explained that, when compared to other industrial users of natural gas, the

---

[3] Gazprom sold a total of [[          ]] million cubic meters of natural gas to Russian consumers
in 2019.  GOR 2d SQR at 6.  Gazprom sold the Russian agrochemical industry [[          ]]
million cubic meters of natural gas.  Id.  Electricity, households, and communal services
purchased [[          ]], [[          ]], and [[          ]] million cubic meters respectively.  Id.  The
agro-industrial complex purchased [[          ]] million cubic meters.  Id.  The oil industry,
metallurgical industry, cement industry, and petrochemical industry purchased [[          ]],
[[          ]], [[          ]], and [[          ]] million cubic meters respectively.  Id.  All other
industries purchased [[          ]] million cubic meters.  Id.

*Confidential Information Omitted*

Consol. Court No. 21-00117                                                    Page 15
**Public Version**

agrochemical industry used a predominant amount and, thus, the subsidy was <u>de facto</u> specific.

<u>Id.</u>

      Here, substantial evidence supports Commerce's determination that the provision of natural gas was <u>de facto</u> specific.  Although the agrochemical industry purchased only a small percentage of Gazprom's total natural gas sales, that ratio included a comparison of all industrial and household, electrical, and communal services purchases.  <u>See</u> GOR 2d SQR at 4–6. Commerce has discretion to determine what predominant means in the context of § 1677(5A)(D)(iii), and it reasonably chose to exclude certain users in order to evaluate predominate industrial use.  <u>See</u> <u>IDM</u> at 44; <u>Bethlehem Steel</u>, 25 CIT at 322, 140 F. Supp. 2d at 1369.  When comparing only industrial users' purchases, the record reflects that the agrochemical industry purchased a far greater amount than any other industrial user, perhaps because of the specific uses here of natural gas, not just for power, but in the production of ammonia (a component in the production of phosphate fertilizer) and fertilizer.  <u>See</u> EuroChem 1st SQR at 8–9; GOR 2d SQR at 4–6.  Thus, the agrochemical industry was "a predominant user of the subsidy."  <u>See</u> 19 U.S.C. § 1677(5A)(D)(iii)(2).  EuroChem wrongly points to <u>Bethlehem Steel</u> for support because it is distinguished by the kind of program at issue there (encouragement of off-hours electricity usage) and how increased consumption was part of the inherent nature of the program.  <u>See</u> <u>Bethlehem Steel</u>, 25 CIT at 320, 140 F. Supp. 2d at 1367. Substantial evidence supports Commerce's <u>de facto</u> specificity determination here.

## III.   Natural Gas Benchmark Analysis

      To calculate the benefit for the <u>ad valorem</u> subsidy rate, Commerce utilized a tier-three benchmark to assess the unsubsidized value of natural gas used by EuroChem and PhosAgro.

Consol. Court No. 21-00117                                                        Page 16
**Public Version**

The parties argue that Commerce's use of tier-three benchmark, sourced from European

Organisation for Economic Co-operation and Development ("OECD") natural gas export prices,

was unlawful and unsupported by substantial evidence because: (1) Commerce should have used

actual transaction prices in Russia as a tier-one benchmark, see PhosAgro Br. at 16–24;

EuroChem Br. at 13–17; (2) Commerce erred by using OECD natural gas prices because they did

not reflect prevailing market conditions and the information submitted by Plaintiffs was more

accurate, see PhosAgro Br. at 26–31; EuroChem Br. at 17–23; and (3) Commerce did not

properly adjust the selected benchmark, see PhosAgro Br. at 31–32; Mosaic Br. at 35–38.

A foreign government's provision of goods to a respondent for LTAR constitutes a

benefit.  19 U.S.C. § 1677(5)(E)(iv).  In such circumstances, Commerce determines the amount

of the subsidy by comparing remuneration actually paid to a market-determined price for the

goods or services, under "a three-tiered hierarchy" employed by Commerce "to determine the

appropriate remuneration benchmark."  Changzhou Trina Solar Energy Co. v. United States, 42

CIT __, __, 352 F. Supp. 3d 1316, 1332 (2018) ("Changzhou I"); see 19 C.F.R. §

351.511(a)(2)(i)–(iii).

The Brattle Report, submitted by the Plaintiffs, provided data proposed to be used as a

benchmark price for natural gas from independent Russian natural gas producers.  See Letter

from Crowell & Moring to Sec of Commerce Pertaining to PhosAgro and EuroChem Benchmark

Data at App. 2, P.R. 279, C.R. 464 (Nov. 2, 2020) ("Brattle Report").  The Brattle Report

contained prices compiled from actual transactions in Russia during the POI.  See id. at v.  The

Brattle Report stated that Gazprom's prices were higher than those of the unregulated Russian

market, which it also stated were equal to or higher than regional European prices, and thus

Consol. Court No. 21-00117                                                                    Page 17
**Public Version**

consistent with market principles.  Id. at v, viii.  It concluded that the independent gas producers

exerted market pressure on Gazprom.  Id. at vi.  The Brattle Report identified Rosneft as one of

the two largest independent gas suppliers.  Id. at v.

 Mosaic, for its part, proposed International Energy Agency ("IEA") data regarding

OECD and European countries' natural gas prices as a benchmark.  Letter from Wilmer Hale

Pickering Hale and Dorr LLP to Sec of Commerce Pertaining to Mosaic Benchmark Submission,

Mosaic Russia at Ex. 14, Part II.B, P.R. 245 (Nov. 2, 2020) ("Petitioner's Benchmark

Submission").

 In its decision, Commerce determined that it was unable to rely on tier-one or tier-two

benchmarks.  See IDM at 49–52.  First, in its analysis, Commerce reasoned that the market was

distorted because the GOR provided "the majority, or a substantial portion of the market," when

a substantial portion of the domestic production was attributable to companies the GOR directly

or indirectly managed and Gazprom itself accounted for a majority of the production.  Id. at 49.

Commerce specifically noted that, in 2019, "Gazprom alone produced 68 percent of the natural

gas consumed in Russia."  Id.  The GOR stated that there was a regulated and unregulated

market.  Id.  Commerce, however, found that the regulated market "account[ed] for a majority of

the domestic natural gas market," and only two percent of domestic consumption came from

imported natural gas.  Id.  Commerce cited record evidence that the GOR made significant

interventions into the market through a value added tax ("VAT") of 20 percent, an import tariff

of 5 percent, an export duty of 30 percent, and by giving Gazprom the exclusive right to

transport and export natural gas.  Id.  Commerce thus concluded that Russian prices could not be

considered market-determined prices.  Id. at 49–50.  Commerce also stated that a tier-two

benchmark was not possible because the Russian natural gas pipelines were not capable of

conveying imports into Russia.  Id. at 51–52.

Next, Commerce moved through a tier-three analysis based on the OECD natural gas

prices because any data from the Russian market was distorted, including unregulated private

market.  Id. at 53–54.  Commerce explained that the OECD data was clearly related to industry

use.  Id. at 54.  Commerce also explained that it did not use the Brattle Report because it was

prepared at the request of the respondents for the investigation, did not contain the original

source documentation or the methodology, and had not been used as a benchmark before,

making it less reliable in comparison to the previously used benchmark source.  Id.  Regarding

the OECD natural gas prices, Commerce did not remove sales of natural gas from Russia in

Europe from the data because there was no record evidence of market distortion in Russian sales

to European countries.  Id. at 56.  Finally, Commerce added VAT and import duties to the

benchmark price in order to reflect the price a firm would pay if it imported natural gas from

Europe into Russia.  Id. at 57.

### A. Tier-One Benchmark

Plaintiffs argue that Commerce erred in not employing a tier-one benchmark because

supply and demand affected the Russian market, reflecting that actual transactions would have

been the most reasonable benchmark.  See PhosAgro Br. at 16–17; EuroChem Br. at 13–17.

Further, Plaintiffs assert that Commerce erred by applying a "per se" rule of market distortion

due to a government-owned supplier constituting a substantial portion of the market.  See

EuroChem Br. at 13–15.  Plaintiffs contend that Commerce should have relied on the private

market prices, those reported in the Brattle Report or prices otherwise available, because they are

Consol. Court No. 21-00117                                                    Page 19
**Public Version**

not distorted, are lower than the Gazprom rates, and are independent from the GOR.  See

PhosAgro Br. at 24–26; EuroChem Br. at 16–17.

Commerce derives a tier-one benchmark "by comparing the government price to a

market-determined price for the good or service resulting from actual transactions in the country

in question."  19 C.F.R. § 351.511(a)(2)(i).  Government involvement "will normally be minimal

unless the government provider constitutes a majority or, in certain circumstances, a substantial

portion of the market."  Countervailing Duties, 63 Fed. Reg. 65,348, 65,377 (Dep't Commerce

Nov. 25, 1998) ("Preamble").  If so, then Commerce may reasonably "conclude that actual

transaction prices are significantly distorted as a result of the government's involvement in the

market," and decline to apply a tier-one benchmark.  Id.  Commerce cannot, however, apply

"what amount[s] to a per se rule of market distortion" after finding a government "controlled a

substantial portion of the market."  Maverick Tube Corp. v. United States, 857 F.3d 1353, 1362

(Fed. Cir. 2017) (discussing that the record evidence only established that a government

authority accounted for a substantial portion of the market, not a majority of the market).

In Archer Daniels, the court upheld Commerce's rejection of a tier-one benchmark where

the government controlled 56 percent of production and there was an export tax.  See Archer

Daniels, 37 CIT at 765–72, 917 F. Supp. 2d at 1339–45.  And in Guangdong Wireking, the court

upheld Commerce's finding of market distortion where the government controlled 47.97 percent

of production, imports comprised only 1.53 percent of the market, and there was an export tax.

See Guangdong Wireking, 37 CIT at 338–40, 900 F. Supp. 2d at 1380–82.

Similarly, here Commerce reasonably determined that GOR influence sufficiently

distorted the Russian natural gas market to preclude identifying a market-based price for the

Consol. Court No. 21-00117                                                    Page 20
**Public Version**

purposes of a tier-one benchmark.  See IDM at 49.  Government-owned or managed companies

produced a majority of natural gas in 2017, 2018, and 2019, reflecting that the GOR played a

significant role in the market.  See GOR IQR at 42–44.[4]  Contrary to Plaintiffs' arguments,

however, Commerce did not rely exclusively on the amount of government production or create

a per se rule.  Compare EuroChem Br at 13–15, with IDM at 49.  Commerce relied on record

evidence showing that, in 2017, 2018, and 2019, 98 percent of Russian domestic consumption of

natural gas came from Russian production.  See GOR IQR at 43; see also IDM at 49.  During the

POI, Gazprom also held the exclusive right to transport and export natural gas, meaning that

non-government producers could only sell to the Russian market, and the GOR imposed a VAT

of 20 percent, import tariffs of 5 percent, and export duties of 30 percent.  See IDM at 49–50; see

also GOR IQR at 54–55.  Substantial evidence supports Commerce's explanation that these

restrictions would distort the Russian market because government authorities controlled the

majority of the market and there existed restrictions on private natural gas companies.  See

Preamble, 63 Fed. Reg. at 65,377; Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United

States, 39 CIT __, __, 61 F. Supp. 3d 1306, 1327 (2015).  Thus, Commerce did not err in

disregarding sales data for natural gas from private Russian companies.

        PhosAgro more specifically argues that Commerce should have accepted data about

private Russian producers in the Brattle Report as a tier-one benchmark.  See PhosAgro Br. at

24–26.  Commerce, however, rejected the data in the Brattle Report and found it not "useable in

---

[4] Specifically, GOR companies produced [[                              ]] billion cubic meters of
natural gas in 2017, 2018, and 2019, respectively, when the total volume of domestic production
was 691.1, 725.4, and 737.7 billion cubic meters for those corresponding years.  See GOR IQR
at 42–44.

*Confidential Information Omitted*

the natural gas benchmark calculation" because PhosAgro had the report prepared for the

investigation and it did not include the original documentation containing its sources, data, or

methodology.  See IDM at 54; see e.g., Brattle Report at 40–45.  Commerce reasonably declined

to use the data in the Brattle Report based on these flaws.  Further, the Brattle Report's data on

Russia's independent gas suppliers included Rosneft, contrary to Commerce's authority finding

based on this record.  See Brattle Report at v.  Additionally, Commerce found the entire Russian

natural gas market to be distorted, which would affect the independent gas suppliers as well.  See

IDM at 49.  Thus, Commerce's decision not to rely on the data in the Brattle Report was

reasonable as is its overall decision was not to use a tier-one benchmark.[5]

### B. Tier-Three Benchmark

Plaintiffs argue that Commerce unlawfully rejected the data from the Brattle Report and

the actual transactions in the private Russian market as a tier-three benchmark because private

Russian companies operated on market principles.  See PhosAgro Br. at 26–27.  They also assert

---

[5] At oral argument, the court raised the issue of Commerce's treatment of the Brattle Report and
any obligation to provide an opportunity to remedy deficits under 19 U.S.C. § 1677m(d).  When
Commerce determines requested information does not comply with a request, § 1677m(d)
requires Commerce to inform the submitter of the deficit and provide an opportunity to remedy
it.  19 U.S.C. § 1677m(d).  Commerce argues that § 1677m(d) does not apply to benchmark
submissions because they are not specifically requested in a questionnaire.  Obviously,
benchmark data is necessary to the LTAR determination and Commerce expects parties to
provide it.  Section 1677m(d) likely applies whenever a party has control of information that, if
not provided, would result in a gap in the record.  See id.  Here, there is no gap in the record
because benchmark data is not unique to respondents and Mosaic provided an acceptable
alternative benchmark.  See IDM at 54; see also Petitioner's Benchmark Submission at Ex. 14.
Additionally, the Brattle Report contained numerous flaws, some of which could not be
remedied by clarification of the missing sources, such as including Rosneft as an independent
gas supplier when Commerce determined it was a government authority.  See Brattle Report at v,
40–45; see also supra at 4–12.  As a result, Commerce's treatment of the Brattle Report was not
an improper disregard of § 1677(m).

that the IEA data was not reflective of prevailing market conditions because the prices were not

available to Russian buyers, natural gas was difficult to import, and Russia was the lowest cost

producer compared to the sources for the IEA data.  See id. at 27–30.  Finally, Plaintiffs contend

that Commerce unnecessarily adjusted the benchmark upward to account for the European 20

percent VAT and Russian 5 percent import duty, which did not reflect prevailing market

conditions in Russia, thus, the cost of importing natural gas and effectively double counted taxes

already reflected in the benchmark.  Id. at 31–32.[6]  At the same time, Mosaic argues that

Commerce erred by refusing to adjust the IEA benchmark by excluding Russian exports, which

would be including alleged distorted prices, as Commerce did in Turkey Rebar[7].  See Mosaic Br.

at 35–38.

In the absence of a tier-one benchmark, Commerce turns to a tier-two benchmark "by

comparing the government price to a world market price where it is reasonable to conclude that

such price would be available to purchasers in the country in question."  19 C.F.R. §

351.511(a)(2)(ii).  "In measuring adequate remuneration under [tier-one benchmarks] or [tier-

two benchmarks], [Commerce] will adjust the comparison price to reflect the price a firm

actually paid or would pay if it imported the product."  Id. § 351.511(a)(2)(iv).  "If there is no

world market price available to purchasers in the country in question," however, Commerce

---

[6] Plaintiffs do not meaningfully raise any challenge to Commerce's determination that there was
no tier-two benchmark available.  See PhosAgro Br. at 26.

[7] Steel Concrete Reinforcing Bar from the Republic of Turkey: Preliminary Results of
Countervailing Duty Administrative Review; 2017, 84 Fed. Reg. 48,583 (Dep't Commerce Sept.
16, 2019) along with the accompanying Decision Memorandum for the Preliminary Results of
Countervailing Duty Administrative Review: Steel Concrete Reinforcing Bar from the Republic
of Turkey; 2017, C-489-830, POR 3/1/2017–12/31/2017 at 18, 23 ("Turkey Rebar IDM").

Consol. Court No. 21-00117                                                                    Page 23
**Public Version**

moves on to a tier-three analysis and "measures[s] the adequacy of remuneration by assessing

whether the government price is consistent with market principles." Id. § 351.511(a)(2)(iii).  If

Commerce determines that the government price is not consistent with market principles it will

look to construct an external benchmark.  Canadian Solar Inc. v. United States, 45 CIT __, __,

537 F. Supp. 3d 1380, 1389 n.6 (2021).  "It is within Commerce's discretion to weigh the

relevant factors."  Id. at 1391.  "Commerce's goal in setting a benchmark rate is to best

approximate the market rate … not to choose the rate respondents were most likely to pay" in a

market Commerce finds is tainted by the government's interference.  Changzhou I, 42 CIT at

___, 352 F. Supp. 3d at 1343.

  "When Commerce is faced with the decision to choose between two alternatives and one

alternative is favored over the other in [its] eyes, then [it has] the discretion to choose

accordingly if [its] selection is reasonable."  Timken Co. v. United States, 16 CIT 142, 147, 788

F. Supp. 1216, 1220 (1992) (internal citation omitted); see also Heze Huayi Chem. Co. v. United

States, 45 CIT __, __, 532 F. Supp. 3d 1301, 1326 (2021) ("The record shows that Commerce

exercised properly its broad discretion in selecting the best available information for the record

from a reliable database.").  Commerce may consider "other factors, such as price-setting and

price discrimination (in a Tier 3 analysis), when market-based prices are unavailable."  POSCO

v. United States, 42 CIT __, __, 296 F. Supp. 3d 1320, 1356 (2018).  The court has sustained

Commerce's reliance on IEA European data in constructing a tier-three natural gas benchmark

for Turkey.  See Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States, 45 CIT__,

__, 498 F. Supp. 3d 1345, 1371 (2021) (citing Rebar Trade Action Coal. v. United States, 43 CIT

__, __, 389 F. Supp. 3d 1371 (2019)).

Consol. Court No. 21-00117                                                      Page 24
**Public Version**

Here, Commerce's tier-three benchmark also is supported by substantial evidence.
Commerce reasonably rejected the actual transaction prices in Russia as a tier-three benchmark
for the same reasons as it rejected a tier-one benchmark.  Specifically, Commerce reasonably
determined the Brattle Report was unreliable and the Russian market was distorted.  Regarding
the IEA data, even where Commerce's explanation is "of less than ideal clarity," the court is
obligated to "sustain a determination . . . where Commerce's decisional path is reasonably
discernable." Rebar Trade Action Coal., 43 CIT at __, 389 F. Supp. 3d at 1381–82 (quoting
Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).  The IEA
data was a reasonable benchmark selection because the data stated it was for industry users and
would be comparable to natural gas for industrial use in Russia.  See IDM at 54; Petitioner's
Benchmark Submission at Ex. 15.

Further, Commerce reasonably declined to remove the Russian natural gas data from the
IEA data for the benchmark.  Commerce's explanation—that there was no evidence that natural
gas produced in Russia and sold in Europe was distorted—was supported by substantial
evidence.  See IDM at 56.  Commerce specifically distinguished the Turkey Rebar IDM because
there was record evidence about Russian natural gas exports to Europe during that review that
was not in the current administrative record.  Id.  The aim of the tier-three analysis was not to
precisely estimate the price of natural gas, but to determine the market value for natural gas as
consumed in Russia, relying on what data are available on the record.  Commerce clearly
explained its methodology in arriving at the tier-three benchmark, and the parties have not
demonstrated that the record cannot reasonably be construed to support Commerce's
determination.

Consol. Court No. 21-00117                                                    Page 25
**Public Version**

      Finally, Commerce may have erred in adjusting the benchmark price by adding the 20

percent VAT and 5 percent import duty.  See IDM at 57.  Commerce explained that it added

"delivery charges and import duties" in order to "reflect the price that a firm actually paid or

would pay if it imported the product."  Id.  This is the same language as § 351.511(a)(2)(iv),

which expressly applies only to tier-one and tier-two benchmarks.  See 19 C.F.R. §

351.511(a)(2)(iv).  A tier-three benchmark, on the other hand, is used when "there is no world

market price available," and reflects "market principles" in Russia.  See id. § 351.511(a)(2)(iii).

There appears to be no reason to treat the hypothetical market price here as an import price.

Although the regulations give Commerce little guidance on how to conduct a tier-three analysis,

it is important that Commerce's choices do not result in an unreasonable comparison between the

benchmark price and the government price.  It is unreasonable to rely only on a regulation

pertaining to tier-one and tier-two benchmarks to adjust a tier-three benchmark price without

some compelling reason.  Further, the IEA benchmark price already included the European

export VAT, and by adding the import costs, Commerce may have double counted VAT for the

benchmark.  See generally Petition Benchmark Submission at Ex. 14; see also IDM at 57

("Therefore, to the monthly benchmark prices, we added import-specific VAT and the import

duty in addition to the EU export VAT that was included in the IEA benchmark price to reflect

the price that a firm would pay if it imported the product into Russia.").  Thus, by trying to

construct a tier-two type import price rather than a general market principle price under

tier-three, Commerce appears to have unlawfully added the 20 percent VAT and 5 percent

import duty to the benchmark price.[8]

Accordingly, Commerce, in part, reasonably measured the adequacy of remuneration

pursuant to 19 U.S.C. § 1677(5)(E)(iv) by using on IEA natural gas prices to constitute a tier-

three benchmark.  The court, however, remands to Commerce to remove the added VAT and

import duties from the benchmark price or offer further explanation why, when tier-one and tier-

two are rejected, it is reasonable to add additional VAT and import duties and why there is not

double counting, particularly based on this record.

## IV.    Calculation of the <u>Ad Valorem</u> Subsidy Rate

At issue here is Commerce's calculation of the <u>ad valorem</u> subsidy rate and whether

Commerce improperly inflated the rate.  The <u>ad valorem</u> subsidy rate approximates the per unit

manufacturing cost savings granted to the subject merchandise by dividing the benefit by the

revenue generated from sales ("Total Sales").[9]  Commerce calculates the benefit by subtracting

the price actually paid for the input product from the benchmark price and multiplying the result

by the number of units purchased.  <u>See</u> 19 C.F.R. § 351.511(a)(2)(i) ("The Secretary will

normally seek to measure the adequacy of remuneration by comparing the government price to a

market-determined price for the good or service resulting from actual transactions . . . ."); <u>see</u>

<u>also</u> <u>IDM</u> at 47–57.  To calculate Total Sales for a domestic subsidy, Commerce finds the sales

---

[8] Note that as to the tier-three phosphate rock benchmark, Commerce made no similar
adjustments for delivery charges or import duties.  <u>See</u> <u>infra</u> at 39–41.

[9] <u>See</u> 19 C.F.R. § 351.525(a) ("The Secretary will calculate an <u>ad valorem</u> subsidy rate by
dividing the amount of the benefit allocated to the period of investigation or review by the sales
value during the same period of the product or products to which the secretary attributes the
subsidy under paragraph (b) of this section.").

Consol. Court No. 21-00117                                                      Page 27
**Public Version**

value during the POI by summing the revenue from all sales external to a predefined group of

companies which benefit from the subsidy.  See 19 C.F.R. § 351.525(a).  Delivery charges,

surcharges, and taxes during the POI are included only as they relate to the costs and revenues of

the company.

EuroChem contends that Commerce improperly inflated the ad valorem subsidy rate by

adding VAT to the benchmark for the benefit but excluding VAT from the calculation of Total

Sales.[10]  In support of this contention, EuroChem cites Mannesmann-Sumerbank Boru Endustrisi

T.A.S. v. United States which required Commerce to ensure both the benefit and Total Sales take

into account "factors affecting value such as, in this case, inflation and foreign exchange

movements."  23 CIT 1052, 1065, 86 F. Supp. 2d 1266, 1277 (1999); EuroChem Br. at 24.

EuroChem misunderstands the law.  Mannesmann-Sumerbank applies to profits and

losses that occurred as a result of changes in the foreign exchange rate during the POI, and other

changes in value that depend on how Commerce choses to convert foreign currency into U.S.

Dollars.  See id.  VAT does not fall into this category as it is a cost incurred rather than a factor

affecting the exchange rate calculation.  Furthermore, EuroChem's interpretation of

Mannesmann-Sumerbank contradicts the plain reading of 19 C.F.R. § 351.511(a)(2)(iv) which

adjusts tier-one and tier-two benchmark calculations to include VAT without adjusting the Total

Sales calculation.  If the benefit and the Total Sales are each calculated correctly, regardless of

---

[10] EuroChem does not contest the exclusion of delivery charges and surcharges from Total Sales
despite their inclusion in the benefit.

costs included in one but not the other, then so is the <u>ad valorem</u> subsidy rate.[11]  Thus Commerce

did not err in this regard.

**V.     Commerce's Calculation of Total Sales**

Commerce calculated the Total Sales for EuroChem and affiliates as part of its <u>ad</u>

<u>valorem</u> subsidy rate calculation regarding the provision of natural gas for LTAR by the GOR.

<u>See</u> <u>PDM</u> at 5.  EuroChem presents three challenges to Commerce's calculation of Total Sales.

First, EuroChem claims that Commerce should have collapsed the sales from all companies

owned by Swiss parent company EuroChem Group ("Swiss EuroChem Group") as a single

entity.  <u>See</u> EuroChem Br. at 30.  Second, EuroChem suggests that Commerce should have

included external sales from two subsidiaries Commerce excluded from the calculation.  <u>See</u>

EuroChem Br. at 33–34.  Finally, EuroChem claims that Commerce erred mathematically in the

application of its stated methodology.  <u>See</u> <u>id.</u>

19 C.F.R. § 351.525 instructs Commerce to "calculate an ad valorem subsidy rate by

dividing the amount of the benefit allocated to the period of investigation . . . by the sales value

during the same period of the product or products to which [Commerce] attributes the subsidy."

<u>TMK IPSCO v. United States</u>, 41 CIT __, __, 222 F. Supp. 3d 1306, 1322 (2017) ("<u>TMK IPSCO</u>

---

[11] EuroChem also argues that Commerce erred in its calculation by not considering the "relative consumption of natural gas used in the production of subject merchandise."  EuroChem Br. at 25 (citing <u>IDM</u> at 59–62).  EuroChem interprets the statute wrongly.  The regulations allow Commerce to attribute the subsidy to all input and downstream products produced by the company.  <u>See</u> 19 C.F.R. § 351.252(5)(ii).  As recently as 2021, the court has affirmed the practice, stating that it is "well-settled that Commerce is not required to examine the ultimate use of the subsidy."  <u>Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S.</u>, 45 CIT at __, 498 F. Supp. 3d at 1364 (citing <u>Fabrique de Fer de Charleroi, SA v. United States</u>, 25 CIT 567, 576, 166 F. Supp. 2d 593, 603 (2001)).

II") (citing 19 C.F.R. § 351.525(a)).  To calculate Total Sales, or the sales value during the POI,

the regulation generally requires Commerce to "attribute a subsidy to the products produced by

the corporation that received the subsidy."  19 C.F.R. § 351.525(b)(6)(i).

      Where Commerce finds cross-ownership between companies, § 351.525 provides

specific guidance for Total Sales calculation.  See id. § 351.525(b)(6).  Cross-ownership "exists

. . . where one corporation can use or direct the individual assets of the other corporation(s) in

essentially the same ways it can use its own assets."  Id. § 351.525(b)(6)(vi).  This standard is

typically met where the corporations share a majority voting interest or common ownership.  See

id.

      Section 351.525 instructs Commerce how to calculate Total Sales given different

relationships between cross-owned companies.  See id. § 351.525(b)(6)(ii)–(iv).  In the case of

cross-owned subject merchandise producers, Commerce will "attribute subsidies received by

either or both corporations to the products produced by both corporations."  Id. §

351.525(b)(6)(ii).  If the subsidy recipient is a holding or parent company, Commerce will

"attribute the subsidy to consolidated sales of the holding company and its subsidiaries."  Id. §

351.525(b)(6)(iii).  If the subsidy recipient is an input supplier, Commerce will "attribute

subsidies received by the input producer to the combined sales of the input and downstream

products produced by both corporations (excluding the sales between the two corporations)."  Id.

§ 351.525(b)(6)(iv).

      If a subject merchandise producer is cross-owned with another company that neither

produces the subject merchandise nor benefits from government subsidies, however, the non-

benefitting corporation's sales do not factor into the total sales calculation. See generally id. §

351.525.  Commerce employed this principle in <u>Yama Ribbons</u>, where Commerce calculated an

<u>ad valorem</u> subsidy rate by attributing Chinese subsidies to the combined sales of two cross-

owned subject merchandise producers, excluding sales by a Hong Kong affiliate that neither

produced the subject merchandise nor benefitted from Chinese subsidies.  <u>See Yama Ribbons</u>

<u>and Bows Co. v. United States</u>, 36 CIT 1250, 1253–1254, 865 F. Supp. 2d 1294, 1298 (2012)

("<u>Yama Ribbons</u>").

      Here, Commerce's stated methodology would correctly calculate Total Sales for

EuroChem and affiliates in accordance with 19 C.F.R. § 351.525.  The parties do not dispute that

parent company Swiss EuroChem Group owns ten companies involved in the production, input

supply, and distribution of the subject merchandise fertilizer.  <u>See</u> <u>PDM</u> at 6–7; EuroChem Br. at

33; <u>Response from Squire Patton Boggs (US) LLP to Sec of Commerce Pertaining to EuroChem</u>

<u>Cross Owned Affiliate QR</u> at 7–8, P.R. 76, C.R. 25 (Aug. 18, 2020) ("EuroChem Affiliation

Resp.").  Mineral and Chemical Company EuroChem, JSC ("MCC EuroChem") holds and

manages Russian assets for Swiss EuroChem Group.  <u>See</u> <u>PDM</u> at 5; EuroChem Affiliation

Resp. at 3.  The three subject merchandise producers are EuroChem, EuroChem-BMU, LLC

("BMU"), and JSC Nevinnomyssky Azot ("Nevinka").  <u>See</u> <u>PDM</u> at 5; EuroChem Affiliation

Resp. at 7.

      Another five companies act as input suppliers for the subject merchandise producers.

<u>See</u> <u>PDM</u> at 6; EuroChem Affiliation Resp. at 7.  NAK Azot, JSC ("NAK Azot"); EuroChem

Northwest, JSC ("EuroChem Northwest"); Joint Stock Company Kovdorksy GOK ("KGOK");

and EuroChem-Energo, LLC ("EuroChem Energo") sell inputs to EuroChem.  <u>See</u> <u>PDM</u> at 6;

EuroChem Affiliation Resp. at 3.  EuroChem-Usolsky Potash Complex, LLC ("UKK") sells

Consol. Court No. 21-00117                                                    Page 31
**Public Version**

inputs to BMU and Nevinka.  <u>See</u> <u>PDM</u> at 6; <u>Response from Squire Patton Boggs (US) LLP to</u>

<u>Sec of Commerce Pertaining to Eurochem Affiliates/Cross Owned QR</u> at 2, P.R. 88 (Aug. 28,

2022).  Finally, export trading company EuroChem Trading Rus, LLC ("Trading Rus") sells the

Russian-produced fertilizer.  <u>See</u> <u>PDM</u> at 6; EuroChem Affiliation Resp. at 2, 7.

        First at issue is whether Commerce acted reasonably in declining to treat all subsidiaries

of Swiss EuroChem Group as a collapsed entity in calculating Total Sales.  EuroChem argues

that Commerce unreasonably departed from its precedent in failing to do so.  <u>See</u> EuroChem Br.

at 30.  EuroChem misunderstands the process required by 19 C.F.R. § 351.525(b).  Although

Commerce has attributed subsidies received by cross-owned affiliates to the collapsed sales of

the combined corporate entity in previous determinations, collapsing the entirety of Swiss

EuroChem Group in this case would be a misapplication of 19 C.F.R. § 351.525(b), which only

calls for the collapsing of cross-owned affiliates related to the production and distribution of the

subject merchandise.[12]  <u>See</u> EuroChem Br. at 30–31; <u>see, e.g.</u>, 19 C.F.R. § 351.525(b)(6)(iii)

(excluding parent companies from the calculation of Total Sales if the company merely served as

a conduit for the transfer of the subsidy from the government to a subsidiary); <u>see also</u>

---

[12] EuroChem also cites <u>Ta Chen Stainless Steel Pipe</u> as an example of Commerce's supposed
pattern of treating companies as collapsed entities in sales denominator calculations.  <u>See</u>
EuroChem Br. at 30; <u>Ta Chen Stainless Steel Pipe, Ltd. v. United States</u>, Slip Op. 990117, 1999
WL 1001194, at *4 (CIT Oct. 28, 1999).  In that case, the court affirmed Commerce's finding
that two Taiwanese companies were affiliated for purposes of antidumping duties under 19
U.S.C. § 1677(33).  <u>Id.</u> at *11.  The court looked to evidence of shared control over subject
merchandise production and pricing.  <u>Id.</u> at *4.  Although EuroChem cites this case as evidence
that Commerce has long treated entities that "in substance and reality" operate as one company
as a single entity, EuroChem's reliance is misplaced.  EuroChem Br. at 30.  <u>Ta Chen</u> does not
concern subsidy calculations and is further distinguished on the issue of shared control of
production.  <u>See</u> <u>Ta Chen Stainless Steel Pipe, Ltd.</u>, 1999 WL 1001194 at *4.

Consol. Court No. 21-00117                                                        Page 32
**Public Version**

Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from the Russian

Federation: Final Affirmative Countervailing Duty Determination and Final Negative Critical

Circumstances Determination, 81 Fed. Reg. 49,935 (Dep't Commerce July 29, 2016) ("Russia

Cold-Rolled Steel"), and accompanying Issues and Decision Memorandum, Countervailing Duty

Investigation of Certain Cold-Rolled Steel Flat Products from the Russian Federation: Issues and

Decision Memorandum for the Final Determination, C-821-823, POR 1/1/2014-12/31/2014 at

10–11 (Dep't Commerce July 29, 2016) (applying 19 C.F.R. § 351.525(b)(6)(iii) to combine

sales from a parent company and subsidiaries).

      EuroChem further suggests that despite its legal divisions, Swiss EuroChem Group

functions as a single entity, and it is thus unreasonable for Commerce to calculate Total Sales

without including sales by all Swiss EuroChem Group subsidiaries.  See EuroChem Br. at 30.

Commerce responds that including sales by non-Russian Swiss EuroChem Group subsidiaries

would be unreasonable, as these companies do not benefit from GOR subsidies.  See IDM at 64.

Commerce clearly explains the irrelevance of sales by Swiss EuroChem Group subsidiaries in

countries like Lithuania and Kazakhstan—"Commerce is not investigating subsidies to entities

outside of Russia, nor is Commerce investigating whether sales of subject merchandise to third

countries are unfairly subsidized."  IDM at 64; see EuroChem Affiliation Resp. at 7.  In fact,

excluding Swiss EuroChem Group's non-Russian affiliates from Total Sales aligns Commerce

with its analysis in Yama Ribbons and with 19 C.F.R. § 351.525(b)'s mandate that Commerce

generally attribute subsidies to the sales of subsidy recipients.  See Yama Ribbons, 36 CIT at

Consol. Court No. 21-00117                                                    Page 33
**Public Version**

1253–54, 865 F. Supp. 2d at 1298; 19 C.F.R. § 351.525(b)(6)(i).[13]

 Finally at issue is whether Commerce erred in its mathematical calculation of Total Sales.
See EuroChem Br. at 33–34.  Commerce explains that it calculated Total Sales by combining all
sales by the subject matter producers and input suppliers, minus intercompany sales among the
eight subject matter producers and input suppliers, as required by 19 C.F.R. § 351.525(b)(6)(ii)
and (iv).  See PDM at 5–6.  Commerce also confirms that according to its methodology MCC
EuroChem and Trading Rus did not receive subsidies and should not be included in the
calculation.  See id.  The court takes no issue with Commerce's asserted methodology.
Nevertheless, Commerce's calculations do not reflect this methodology.  In the calculation of
intercompany sales, Commerce wrongly relied on a number provided by EuroChem that
included sales from the eight subject matter producers and input suppliers to Trading Rus.  See
IDM at 8 (citing Response from Squire Patton Boggs (US) LLP to Sec of Commerce Pertaining
to EuroChem Suppl QR, P.R. 332, C.R. 494 (Dec. 8, 2020)).  This inclusion failed to follow
Commerce's stated methodology and artificially increased the ad valorem rate by subtracting the
sales to Trading Rus from the total rather than adding them as external sales.  In a letter to the
court, Commerce confirmed this error.  See Def.'s Resp. to the Ct.'s Post-Oral Arg. Questions at
2–3, ECF No. 91 (Aug. 10, 2022).

---

[13] EuroChem also argues that Commerce should have calculated Total Sales using the collapsed
sales of two additional Swiss EuroChem Group subsidiaries, MCC EuroChem and Trading Rus.
See EuroChem Br. at 30.  Neither of these two affiliates received a benefit from GOR subsidies.
See generally Response from Squire Patton Boggs (US) LLP to Sec of Commerce Pertaining to
EuroChem Sec III QR at 29, P.R. 114, C.R. 44 (Sept. 24, 2020) ("EuroChem IQR
"); see also PDM at 5–6.  Thus, there is no benefit to attribute.  See 19 C.F.R. § 351.525(b)(6)(iii),
(c).  Accordingly, Commerce reasonably declined to treat these subsidiaries as part of a collapsed
entity.

Consol. Court No. 21-00117                                                  Page 34
**Public Version**

Accordingly, although Commerce need not alter its stated methodology for calculating

Total Sales, the court remands for Commerce to provide a correct Total Sales number and

explanation of its calculation.[14]

## VI.    Refusal to Countervail Some Phosphate Mining Rights Licenses

Mosaic argues that Commerce should have countervailed all benefits for mining rights

licenses issued by the GOR to EuroChem, cross-owned with KGOK and PhosAgro, cross-owned

with JSC Apatit.  See Mosaic Br. at 23; GOR IQR at Ex. II–1.  KGOK reported receiving

[[      ]] phosphate mining licenses in [[                          ]], and JSC Apatit reported

receiving [[     ]] licenses between [[                  ]], [[    ]] in [[    ]], and [[        ]] in

[[    ]].  Response from Squire Patton Boggs (US) LLP to Sec of Commerce Pertaining to

EuroChem Sec III QR at 29, P.R. 114, C.R. 44 (Sept. 24, 2020); Response from Crowell &

Moring LLP to Sec of Commerce Pertaining to PhosAgro Sec III QR at 9–12, P.R. 115, C.R. 45

(Sept. 24, 2020).

Commerce determined that it could not measure subsidies in the Russian economy before

April 1, 2002, the date on which Russia was designated a market economy ("ME").  See IDM at

23; Russia Cold-Rolled Steel, 81 Fed. Reg. at 49,935, and accompanying memorandum, Market

Economy Status for the Russian Federation, C-821-823, POR 1/1/2014-12/31/2014 (Dep't

Commerce Sept. 14, 2015) ("ME Status for the GOR Memo").  Accordingly, Commerce

declined to countervail [[        ]] of the licenses.  See IDM at 24.  Commerce further determined

---

[14] It is unclear whether this issue was completely exhausted before the agency.  Exhaustion may
have been waived.  Further, as this matter is remanded for various reasons there is no point in
perpetuating an error.  Here, interests of finality would not be advanced.

*Confidential Information Omitted*

Consol. Court No. 21-00117                                                              Page 35
**Public Version**

that the benefits from the licenses could not be accounted for in the CVD calculations as the

license had not undergone material alterations following the cut-off date.  Id. at 24–25.  Mosaic

claims that Commerce's decision not to countervail benefits from all licenses deprived them of

substantial relief, as JSC Apatit and KGOK mined [[                                              ]] tons of

ore respectively during the POI.  See Mosaic Br. at 27.

     Mosaic challenges Commerce's cut-off date methodology on two primary grounds.  See

id. at 23–30.  First, Mosaic argues that Commerce's cut-off date is inapplicable under these facts,

as Commerce could identify and measure subsidies using the same methodology it utilized for

the sole active license granted after the cut-off date.  See id. at 23–26.  Second, Mosaic argues

that even if a cut-off date were appropriate, Commerce did not provide substantial evidence that

it could only identify and measure subsidies in the Russian economy after April 1, 2002.  See id.

at 26–30.  The application of a selected cut-off date may in fact be reasonable, but Commerce

has not produced sufficient evidence in support of the date chosen or a viable explanation of the

date's applicability to recurring benefits.[15]

     In 2012, Congress amended Section 701 of the Tariff Act of 1930 to require that

Commerce impose countervailing duties on merchandise imported from NME countries.  See 19

---

[15] Mosaic further contends that the licenses at issue all materially changed following the cut-off
date such that each license confers new and thus countervailable subsidies.  See Mosaic Br. at
28–30.  Commerce and the GOR concede that licenses underwent auto-renewals, technical
changes such as [[

                                ]], and in one case, [[

                    ]].  See Response from Mayer Brown, LLP to Sec of Commerce
Pertaining to Ministry 1st Suppl QR at 78, P.R. 234, C.R. 445 (Oct. 29, 2020); EuroChem IQR at
31–32.  Because the court does not accept Commerce's cut-off date explanation in this case, the
court is not required to decide today whether these changes are sufficient to constitute new
agreements.

*Confidential Information Omitted*

Consol. Court No. 21-00117                                           Page 36
**Public Version**

U.S.C. § 1671(f)(1).  Commerce is only relieved of imposing CVDs where it cannot "identify

and measure" subsidies because the NME country's economy is "essentially comprised of a

single entity."  Id. § 1671(f)(2).  Following that amendment, the court has only permitted

Commerce to apply a cut-off date given evidence of reforms permitting the identification and

measurement of specific types of subsidies in a NME country.  In TMK IPSCO, the court

required Commerce to provide specific evidence justifying its use of the People's Republic of

China's ("PRC") accession to the World Trade Organization as the cut-off date for applying

CVD law.  See TMK IPSCO v. United States, 40 CIT __, __, 179 F. Supp. 3d 1328, 1343 (2016)

("TMK IPSCO I"), aff'd on remand, TMK IPSCO II, 41 CIT at __, 222 F. Supp. 3d at 1314.

Remanding for further explanation, the court required Commerce to "allocate subsidies

beginning on the first date it could identify and measure the subsidy considering the particular

program in question" and to identify "the impact of relevant economic reforms on that program."

TMK IPSCO I, 40 CIT at __, 179 F. Supp. 3d at 1344.

   The court subsequently upheld Commerce's cut-off dates when Commerce identified four

types of subsidies and specific economic reforms that made each type identifiable and

measurable.  TMK IPSCO II, 41 CIT at __, 222 F. Supp. 3d at 1314–15.  Commerce noted that

the PRC's 1994 Company Law permitted private actors to freely participate in commercial

activity, allowing Commerce to measure grant program subsidies in the Chinese economy.  Id. at

1314.  Commerce further identified laws passed in 1994, 1996, and 1999 that created unique cut-

off dates for the measurement of credit, tax, and land-oriented subsidies.  Id. at 1314–15.  In so

doing, the court held that Commerce fulfilled its duty under § 1671(f) by "articulat[ing] a

rational relationship between specific legal reforms in China and the effect of such reforms on

Commerce's ability to identify and measure subsidies." Id. at 1314. Thus, although Commerce

has "significant discretion in determining whether it can identify and measure subsidies . . .

within the NME country," the court only found Commerce's cut-off date analysis reasonable

after Commerce provided evidence of legal reforms impacting specific programs. See id. at

1313. Thus, with countries partially or fully transitioned to ME status, the issue is the

measurability of particular subsidies.

      Here, Commerce asserts that it cannot identify or measure mining rights subsidies from

licenses granted prior to Russia's designation as a ME country "notwithstanding any

methodology." See IDM at 24. This is plainly incorrect. There is no legal impediment to

calculating subsidies for previously designated NME countries. Further, in measuring the

subsidies that KGOK received from its only active mining license granted after the cut-off date,

Commerce did not rely on the amount of KGOK's initial financial contribution at the time the

license was granted, admittedly post-NME status. See IDM at 26. Instead, Commerce treated

the license as a recurring subsidy because KGOK benefitted each year from its GOR-subsidized

mining license.[16] See id. Thus, Commerce calculated the benefit that KGOK received using

---

[16] 19 C.F.R. § 351.524(c)(1) provides examples of recurring and non-recurring benefits,
including the provision of goods and services for LTAR. See 19 C.F.R. § 351.524(c)(1).
Commerce has historically treated mining rights as recurring subsidies as they confer an
underlying good in the form of natural resources. See, e.g., Certain Hot-Rolled Carbon Steel Flat
Products from India: Final Results of Countervailing Duty Administrative Review, 73 Fed. Reg.
40,295 (Dep't Commerce July 14, 2008), and accompanying Issues and Decision Memorandum,
C-533-821, POR 1/1/06-12/31/06 at Comment 24 (Dep't Commerce July 14, 2008); Phosphate
Fertilizers from the Kingdom of Morocco: Final Affirmative Countervailing Duty
Determination, 86 Fed. Reg. 9,482 (Dep't Commerce Feb. 16, 2021), and accompanying Issues
and Decision Memorandum for the Final Affirmative Determination of the Countervailing Duty
Investigation of Phosphate Fertilizers from the Kingdom of Morocco, C-714-001, POR

evidence of "the actual per-unit cost build-up of KGOK's beneficiated phosphate rock" during

the POI.  See id.  By Commerce's own logic, its methodology did not assume that KGOK

received the license in a market-based auction, suggesting that Commerce can use the same

methodology regardless of whether the mining licenses were granted under claimed market-

economy principles.  See id. at 17.  Commerce can therefore identify and measure subsidies from

all mining licenses in this way, regardless of whether the licenses were granted prior to its cut-off

date.  See id.  Commerce's failure to do so contravenes 19 U.S.C. § 1671 and, to the extent it

applies, § 1671(f)(1).

   Furthermore, even if Commerce's cut-off date were applicable to the recurring subsidies

at issue, Commerce's chosen cut-off date is unsupported by substantial evidence because there

are no citations to specific reforms that justify the chosen cut-off date.  See IDM at 24; TMK

IPSCO II, 41 CIT at __, 222 F. Supp. 3d at 1314.  Commerce does cite specific legal reforms

underlying its determination that Russia became a ME country on April 1, 2002.  See IDM at

23–24; see generally ME Status for the GOR Memo.  For example, Commerce notes that the

2002 tax code revision boosted the earning potential of private businesses, and the 2002 labor

code further liberalized wages and the market.  See ME Status for the GOR Memo at 10–14.

Nowhere in its support of this ME cut-off date, however, does Commerce reference legal reforms

permitting the measurement of mining rights or similar subsidies in the Russian economy.  See

id.; IDM at 23–24.  Although Commerce does explain that the 2001 Law on Privatization led to

the denationalization of state-owned monopolies, the GOR merely leases ore-rich land for

---

1/1/2019-12/31/2019 at Comment 8 (Dep't Commerce Feb. 16. 2021); Russia Cold-Rolled Steel,
81 Fed. Reg. at 49,935, and accompanying Issues and Decision Memorandum at Comment 9.

Consol. Court No. 21-00117                                                                    Page 39
**Public Version**

private companies to mine in this case—land privatization is inapplicable to these facts.  See ME

Status for the GOR Memo; see generally IDM.  Thus, unlike in TMK IPSCO II where

Commerce "articulated a rational relationship between specific legal reforms in China and the

effect of such reforms on Commerce's ability to identify and measure subsidies," Commerce

here fails to provide substantial evidence in support of its cut-off date considering the "particular

type of subsidy" at issue.  See TMK IPSCO II, 41 CIT at __, 222 F. Supp. 3d at 1314; IDM at

23–24.

            The court finds that Commerce's cut-off methodology is inapplicable to the facts of this

case, as Commerce can identify and measure subsidies from all mining rights using the same

methodology applied to the lone analyzed mining license.  Additionally, Commerce failed to

provide substantial evidence supporting its decision to treat the date of Russia's ME designation

as a cut-off for CVD law applicability.  If Commerce needs to apply a cut-off date for the

application of CVD law, Commerce must reference specific legal reforms that permit the

identification and measurement of mining rights subsidies in the relevant state's economy.  The

court remands for Commerce to either abandon its cut-off date methodology or to explain why it

is unable to countervail recurring subsidies from the contested licenses granted by the GOR prior

to its designation as a ME.

**VII.    Mining Rights for Phosphate Rock Benchmark**

            Mosaic takes issue with Commerce's tier-three benchmark for phosphate rock.  It argues

that Commerce erred in refusing to adjust the benchmark price for the delivered prices including

freight, import duties, and VAT.  Mosaic Br. at 30–32.  Mosaic asserts that there is no reasonable

justification for not applying delivery charges through 19 C.F.R. § 351.11(a)(2)(iv) to a tier-three

Consol. Court No. 21-00117                                                    Page 40
**Public Version**

benchmark when the benchmark is based on world market prices, in essence a tier-two

benchmark.  Id. at 32.  It contends that Commerce's reasoning for refusing to use delivered

prices was inapposite because the fact that KGOK did not itself purchase phosphate rock did not

affect the benchmark calculation.  Id. at 33.

As discussed above, Commerce applies a tier-three benchmark when "there is no world

market price available" and instead "measures[s] the adequacy of remuneration by assessing

whether the government price is consistent with market principles."  19 C.F.R. §

351.511(a)(2)(iii).  Commerce "will adjust" benchmark prices to include "delivery charges and

import duties" for tier-one and tier-two benchmarks.  Id. § 351.511(a)(2)(iv).

In the post-preliminary decision memorandum, Commerce explained that it could not

apply a tier-two benchmark for mining licenses because they were not goods that lent themselves

comparison to a world market price.  Decision Memorandum for the Post-Preliminary Analysis

of the Countervailing Duty Investigation of Phosphate Fertilizers from the Russian Federation,

C-821-825, POR 1/1/2019-12/31/2019 at 6–7 (Dep't Commerce Dec. 21, 2020) ("PPDM").

Commerce further explained that it could consider "world market prices for the underlying good

that is conveyed with the mining rights, i.e., phosphate, under a 'tier three' anlaysis [sic]."  Id. at

7 (emphasis in original).  Thus, in its final determination, Commerce applied a tier-three

benchmark comparing "the actual per-unit cost build-up of KGOK's beneficiated phosphate

rock, inclusive of all taxes paid," to the "world market price of comparable phosphate rock."

IDM at 26.  Commerce used data submitted from Global Trade Atlas and UN Comtrade to

determine the price of phosphate rock.  Id. at 25–26.  Commerce declined to adjust the

benchmark to include freight, VAT, and import duties because KGOK did not purchase the

Consol. Court No. 21-00117                                                    Page 41
**Public Version**

phosphate rock from a world market and would not have paid similar fees in the production of

phosphate rock.  Id. at 26–27.

Here, Commerce's exclusion of freight, VAT, and import duties appear reasonable and

supported by substantial evidence.  The regulations only require Commerce to include delivery

charges and import duties for tier-one and tier-two benchmarks.  See 19 C.F.R. §

351.511(a)(2)(iv).  Although here the tier-three benchmark relies on world market prices for

phosphate rock, Commerce reasonably distinguished its analysis from that of a true tier-two

benchmark because KGOK never purchased phosphate ore.  See IDM at 26–27; PPDM at 7.

Commerce used the world market price merely to determine a reasonable price for the phosphate

rock KGOK actually mined, and Commerce declined to use the benchmark to estimate what

KGOK would have paid to import phosphate rock.  See 19 C.F.R. § 351.511(a)(2); IDM at 26–

27.  In that light, Commerce was using the benchmark to compare the Russian price with prices

established by market principles.  Thus, Commerce was applying a tier-three benchmark only; §

351.511(a)(2)(iv) did not apply; and freight, VAT, and import duties did not need to be included.

Accordingly, Commerce's determination regarding the benchmark for the mining rights appears

to be supported by substantial evidence.  On remand, however, if Commerce continues to add

VAT and import duties to the natural gas benchmark, for a product that is not imported,

Commerce must also explain why the methodology should be different for the phosphate rock

benchmark.

## CONCLUSION

The court sustains Commerce's determination regarding Rosneft as a government

authority and the de facto specificity finding, and utilization of a tier-three benchmark for natural

Consol. Court No. 21-00117                                                    Page 42
**Public Version**

gas.  For the foregoing reasons, the court remands to Commerce for a determination consistent

with this opinion on certain calculation issues and with regard to the phosphate rock input.  The

remand shall be issued within 60 days hereof.  Comments may be filed 30 days thereafter and

any response 15 days thereafter.

                                                /s/        Jane A. Restani
                                                Jane A. Restani. Judge


Dated: <u>September 2, 2022</u>
          New York, New York