C-821-825
Remand
Slip Op. 22-103
POI:  01/01/2019 – 12/31/2019
**PUBLIC VERSION** ~~**PROPRIETARY DOCUMENT**~~
E&C/OVIII:  Team

### The Mosaic Company, Phosagro PJSC, JSC Apatit, Industrial Group Phosphorite LLC v. United States, The Mosaic Company, Phosagro PSJC, JSC Apatit, Industrial Group Phosphorite LLC,
### Consol. Court No. 21-00117 (CIT September 2, 2022)
### Phosphate Fertilizers from the Russian Federation

### FINAL RESULTS OF REDETERMINATION
### PURSUANT TO COURT REMAND

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) has prepared these final results of

redetermination pursuant to the remand order of the U.S. Court of International Trade (CIT) in

*The Mosaic Company, et al v. United States*, Consol. Court No. 21-00117, Slip Op. 22-103 (CIT

September 2, 2022) (*Remand Order*).  These final results of redetermination concern the *Final*

*Determination* of the investigation for the countervailing duty (CVD) order on phosphate

fertilizers from the Russian Federation (Russia).[1]  In its *Remand Order*, the CIT directed

Commerce to:  (1) adjust the final total sales calculation for Industrial Group Phosphorite LLC

(Phosphorite)[2] to the proper figures and explain the calculation; (2) either remove the added

value-added tax (VAT) and import duties from the natural gas benchmark price or offer further

---

[1] *See Phosphate Fertilizers from the Russian Federation:  Final Affirmative Countervailing Duty Determination*, 86 FR 9479 (February 16, 2021) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM); *see also Phosphate Fertilizers from the Kingdom of Morocco and the Russian Federation:  Countervailing Duty Orders*, 86 FR 18037 (April 7, 2021).

[2] Commerce found the following companies to be cross-owned with Phosphorite in the *Final Determination*: Mineral and Chemical Company EuroChem, JSC (MCC EuroChem); NAK Azot, JSC (NAK Azot); EuroChem Northwest, JSC (EuroChem NW); Joint Stock Company Kovdorsky GOK (KGOK); EuroChem-Energo, LLC (Energo); EuroChem-Usolsky Potash Complex, LLC (UKK); EuroChem-BMU, LLC (BMU); JSC Nevinnomyssky Azot (Nevinka); and EuroChem Trading Rus, LLC (Trading Rus).  *See Final Determination*, 87 FR at 9480.  Unless otherwise specified, Commerce has collectively referred to these companies as "EuroChem" in these final results of redetermination.

explanation for why, when tier one and tier two benchmark prices are rejected, it is reasonable to add additional VAT and import duties; and (3) either explain why Commerce is unable to countervail recurring subsidies from mining licenses granted by the Government of Russia (GOR) prior to Russia's designation as a market economy on April 1, 2002, or abandon the cut-off date methodology.[3]

On November 18, 2022, Commerce released its Draft Results of Redetermination on the three issues identified above.[4] On November 30, 2022, The Mosaic Company (the petitioner), EuroChem, and PhosAgro submitted timely comments on the Draft Results of Redetermination.[5]

As set forth in detail below, pursuant to the CIT's *Remand Order*, we have adjusted the final total sales calculation to the proper figures and explained the calculation further, removed the added VAT and import duties from the natural gas benchmark price, and revised our subsidy calculation for the Provision of Mining Rights for Less Than Adequate Remuneration (LTAR) program by countervailing recurring subsidies from mining licenses granted by the GOR prior to Russia's designation as a market economy on April 1, 2002. Consequently, for the purposes of these final results of redetermination on remand, Commerce has made changes to both EuroChem's and Joint Stock Company Apatit's[6] (JSC Apatit) final subsidy rates from the

---

[3] *See Remand Order* at 33-34, 39, and 41.

[4] *See* Draft Results of Redetermination Pursuant to Court Remand, *The Mosaic Company, Phosagro PJSC, JSC Apatit, Industrial Group Phosphorite LLC v. United States, The Mosaic Company, Phosagro PSJC, JSC Apatit, Industrial Group Phosphorite LLC*, Consol. Court No. 21-00117, Slip Op. 22-103 (CIT September 2, 2022), dated November 18, 2022 (Draft Results of Redetermination).

[5] *See* Petitioner's Letter, "Petitioner's Comments on Draft Results of Redetermination Pursuant to Court Remand," dated November 30, 2022 (Petitioner's Draft Remand Comments); EuroChem's Letter, "Comments on Draft Remand Redetermination," dated November 30, 2022 (EuroChem's Draft Remand Comments); and PhosAgro's Letter, "PhosAgro PJSC's Comments on Commerce's Draft Results of Redetermination," dated November 30, 2022 (PhosAgro's Draft Remand Comments).

[6] Commerce found the following companies to be cross-owned with JSC Apatit in the *Final Determination*: PhosAgro PJSC; PhosAgro-Belgorod LLC; PhosAgro-Don LLC; PhosAgro-Kuban LLC; PhosAgro-Kursk LLC; PhosAgro-Lipetsk LLC; PhosAgro-Orel LLC; PhosAgro-Stavropol LLC; PhosAgro-Volga LLC; PhosAgro-SeveroZapad LLC; PhosAgro- Tambov LLC; and Martynovsk AgrokhimSnab LLC. *See Final Determination*, 87 FR at 9480. Unless otherwise specified, Commerce has collectively referred to these companies as "PhosAgro" in these final results of redetermination.

investigation, as well as the all-others rate.[7]  We have also addressed comments from interested

parties in the "Interested Party Comments" section below.

## II.  BACKGROUND

### A.  Calculation of Total Sales of EuroChem

In the investigation, Commerce explained that it calculated total sales by combining all

sales by EuroChem's cross-owned subject merchandise producers and input suppliers, less the

intercompany sales among the eight subject merchandise producers and input suppliers, as

required by 19 CFR 351.525(b)(6)(ii) and (iv).[8]  Commerce also confirmed that:  (1) MCC

EuroChem and Trading Rus did not receive subsidies; and (2) sales by Trading Rus should not

be included in the subsidy rate calculations.[9]  The CIT took no issue with Commerce's asserted

methodology.[10]

However, Commerce's calculations did not reflect this methodology.  In the calculation

of intercompany sales, Commerce wrongly relied on a number provided by EuroChem that did

not include sales *from* the eight subject merchandise producers and input suppliers *to* Trading

Rus.[11]  The calculations failed to follow Commerce's stated methodology and artificially

increased the *ad valorem* rate by excluding the sales *to* Trading Rus from the total sales figures.

In a letter to the CIT, Commerce confirmed this error.[12]  The CIT thus remanded this issue for

Commerce to provide a correct total sales number and explanation of its calculation.

---

[7] *See Final Determination*, 87 FR at 9480.
[8] *See Phosphate Fertilizers from the Russian Federation:  Preliminary Affirmative Countervailing Duty Determination*, 85 FR 76524 (November 30, 2020) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM) at 5-6.
[9] *Id.*
[10] *See Remand Order* at 33.
[11] *See Final Determination* IDM at 8 (citing EuroChem's Letter, "Phosphate Fertilizers from Russia," dated December 7, 2020 (EuroChem's December 7, 2020 SQR)).
[12] *See Remand Order* at 33.

**B.  Calculation of the Tier Three Natural Gas Benchmark**

In the *Final Determination*, Commerce determined that a tier three benchmark pursuant to 19 CFR 351.511(a)(2)(iii) was appropriate to measure the adequacy of remuneration under the Provision of Natural Gas for LTAR program during the period of investigation (POI).[13]  To determine the adequacy of remuneration under 19 CFR 351.511(a)(2)(i) and (a)(2)(ii), Commerce includes delivery charges and import duties in the benchmark price to reflect the price that a firm actually paid or would pay if it imported the product (*i.e.*, a "delivered" price).[14] To ensure that the quarterly benchmark prices in the International Energy Agency (IEA) data reflected what the respondents would have paid if they had imported natural gas directly, Commerce adjusted the average prices by adding the delivery charges for the transmission and distribution of natural gas in Russia, any import duties and taxes, and surcharges.[15]  In addition, because the GOR reported that imports of natural gas into Russia would be subject to a 20 percent VAT and five percent import duty, Commerce added these amounts to the monthly benchmark prices to reflect the price that a firm would pay if it imported the product into Russia.[16]

The CIT sustained Commerce's decision not to use a tier one benchmark, and it held that Commerce's use of a tier three benchmark, which relied on IEA data, was supported by substantial evidence.[17]  However, the CIT concluded that Commerce may have erred in adjusting the benchmark price by adding the 20 percent VAT and five percent import duty.[18]  The CIT expressed two concerns:  (1) Commerce's adjustment of the tier three benchmark appears to rely

---

[13] *See Final Determination* IDM at Comment 3i.
[14] *See* 19 CFR 351.511(a)(2)(iv); *see also, e.g., Beijing Tianhai Industry Co., Ltd. v. United States*, Slip Op. 15-14 (CIT February 6, 2015), at 36-37.
[15] *See Final Determination* IDM at Comment 3j.
[16] *Id.*
[17] *See Remand Order* at 21 and 24.
[18] *Id.* at 25.

on the regulation pertaining to tier one or tier two benchmarks, and there appears to be no reason to treat the hypothetical tier three market price as an import price; and (2) the IEA benchmark price already included the European export VAT, and by adding the import costs, Commerce may have double counted VAT for the benchmark.[19]  The CIT remanded for "Commerce to remove the added VAT and import duties from the benchmark price or offer further explanation why, when tier one and tier two are rejected, it is reasonable to add additional VAT and import duties and why there is not double counting, particularly based on this record."[20]

### C.  The Provision of Mining Rights for LTAR

Consistent with *Cold-Rolled Steel from Russia*, Commerce determined in the investigation that it could not measure subsidies in the Russian economy before April 1, 2002, the date on which Russia was designated a market economy.[21]  Commerce reasoned that the application of a cut-off date was appropriate to identify and measure subsidies from non-market economy countries for purposes of the CVD law.[22]  In the case of Russia, applying a cut-off date for when the country was recognized to have transitioned to a market economy reflected the fact that its economy had undergone changes and reforms that could permit Commerce to determine whether and to what extent countervailable subsidies were being bestowed on Russian producers.[23]

---

[19] *Id.* at 25-26.
[20] *Id.* at 26.
[21] *See Final Determination* IDM at Comment 2d (citing *Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from the Russian Federation:  Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination*, 81 FR 49935 (July 29, 2016) (*Cold-Rolled Steel from Russia*), and accompanying IDM at 24).
[22] *See Final Determination* IDM at Comment 2d.
[23] *Id.*

For the Provision of Mining Rights for LTAR program, the record demonstrated that the GOR granted mining licenses both prior to and after the cut-off date.[24]  PhosAgro reported that it did not extract phosphate rock during the POI from two deposits for which it acquired licenses after 2002.[25]  On this basis, Commerce determined that PhosAgro did not use the program during the POI.[26]  By contrast, EuroChem reported that it obtained four mining licenses from the GOR, two of which were obtained after the "cut-off" date.[27]  Commerce analyzed the countervailability of the two mining licenses issued after the "cut-off" date under which EuroChem mined phosphate during the POI.[28]  In the *Final Determination*, Commerce determined that EuroChem received no measurable benefit under the program during the POI.[29]

In the *Remand Order*, the CIT rejected Commerce's decision not to countervail benefits from mining rights provided to PhosAgro and EuroChem prior to 2002.[30]  The CIT concluded that Commerce's cut-off methodology was inapplicable to the facts of this case, as Commerce can identify and measure subsidies from all mining rights using the same methodology used with respect to KGOK.[31]  Additionally, the CIT held that Commerce failed to provide substantial evidence supporting its decision to treat the date of Russia's market economy designation as a cut-off for CVD law applicability.[32]  In the *Remand Order*, the CIT instructed Commerce to either abandon its cut-off date methodology or explain why it is unable to countervail recurring subsidies from licenses granted by the GOR prior to Russia's designation as a market

---

[24] *Id.*; *see also Preliminary Determination* PDM at 34; Memorandum, "Decision Memorandum for the Post-Preliminary Analysis of the Countervailing Duty Investigation of Phosphate Fertilizers from the Russian Federation," dated December 21, 2020 (Post-Preliminary Analysis Decision Memorandum), at 4.

[25] *See Preliminary Determination* PDM at 34; *see also* Post-Preliminary Analysis Decision Memorandum at 4.

[26] *Id.*

[27] *Id.*

[28] *See* Post-Preliminary Analysis Decision Memorandum at 4-8.

[29] *See Final Determination* IDM at 10.

[30] *See Remand Order* at 39.

[31] *Id.*

[32] *Id.*

economy.[33]  Noting that Commerce had calculated the benefit that KGOK received from its only active mining license granted after the cut-off date as a recurring subsidy, the CIT reasoned that Commerce could similarly identify and measure subsidies from all mining licenses in this way, regardless of whether the licenses were granted prior to its cut-off date.[34]

## III.   ANALYSIS

### A.  Calculation of Total Sales of EuroChem

In light of the CIT's *Remand Order*, Commerce has relied on EuroChem's post-preliminary determination questionnaire response and added the sales of each responding cross-owned company to Trading Rus back into the EuroChem companies' total sales for 2019.[35]

As an initial matter, EuroChem reported that Trading Rus is an export trading company that sells phosphate fertilizers.[36]  Under 19 CFR 351.525(c),

> benefits from subsidies provided to a trading company which exports subject merchandise shall be cumulated with benefits from subsidies provided to the firm which is producing subject merchandise that is sold through the trading company, regardless of whether the trading company and the producing firm are affiliated.

Because EuroChem reported that Trading Rus did not receive any subsidies during the POI or average useful life period,[37] there was no reason to include Trading Rus's sales in any subsidy calculation, and this methodology was affirmed by the CIT.

However, as noted above and in a letter to the CIT, certain sales *from* Phosphorite and its affiliates *to* Trading Rus were excluded from the total sales denominator.  On December 7, 2020, EuroChem reported its sales denominators in a supplemental questionnaire, where it included

---

[33] *Id.*
[34] *Id.* at 37-38.
[35] *See* EuroChem's December 7, 2020 SQR at Exhibit 1.
[36] *See Preliminary Determination* PDM at 6 (citing EuroChem's Letter, "Phosphate Fertilizers from Russian Federation," dated August 18, 2020 (EuroChem's Affiliation QR), at 7).
[37] *See Preliminary Determination* PDM at 6 (citing *generally* EuroChem's Letter, "Phosphate Fertilizers from Russian Federation," dated September 24, 2020).

sales figures for all EuroChem affiliates involved in the production and sale of subject merchandise, as well as sales figures for Trading Rus.[38]  In Exhibit 3 of this submission, EuroChem provided "a summary of the sales made to each of the affiliates and reclassifie{d} these sales into cross-owned and not cross-owned."[39]  EuroChem also stated that "{o}nly sales made to other cross-owned companies should be eliminated to avoid double counting as to the cross-owned company sales."[40]  In Exhibit 4 of this submission, EuroChem provided a summary of the total sales to each of the ten cross-owned companies, and it deducted only the sales made to these ten companies.[41]

In calculating subsidy rates for the *Final Determination*, Commerce used a value reported by EuroChem as being exclusive of intercompany sales as the total sales denominator.[42] However, EuroChem's submitted sales values removed not only sales between various cross-owned affiliates (intercompany sales), but also sales to Trading Rus, which is a trading company — not a producer of subject merchandise or an input supplier.  In reporting these sales figures, EuroChem incorrectly treated Trading Rus the same as each of its other cross-owned affiliates, rather than as a trading company under 19 CFR 351.525(c).  While the sales denominator used in the calculation of the subsidy rate normally would include sales by Phosphorite and its cross-owned affiliates, including those to Trading Rus, Commerce did not realize that EuroChem's reported sales values had excluded sales to Trading Rus.  Rather, Commerce relied on the total "sales" that Phosphorite reported in Exhibit 4 of its December 7, 2020, supplemental

---

[38] *See* EuroChem's December 7, 2020 SQR at Exhibit 3.
[39] *Id.* at 2 and Exhibit 3.
[40] *Id.* at 2.
[41] *Id.* at 2 and Exhibit 4.
[42] *See Final Determination* IDM at 8; *see also* EuroChem's December 7, 2020 SQR at 2 and Exhibits 3 and 4.

questionnaire response, which did not include sales to Trading Rus.[43]  Thus, the sales by

Phosphorite and its cross-owned affiliates to Trading Rus were excluded from the denominator.

 Under 19 CFR 351.525, "Commerce calculates an *ad valorem* subsidy rate by dividing

the amount of the benefit allocated to the period of investigation . . . by the sales value during the

same period of the product or products to which Commerce attributes the subsidy."[44]  Commerce

normally attributes a subsidy to the products produced by the company that received the

subsidy.[45]  "However, if two or more corporations are cross-owned, Commerce's regulations

provide a number of exceptions to its default attribution rule."[46]  Further, 19 CFR 351.525(c)

provides that "{b}enefits from subsidies provided to a trading company which exports subject

merchandise shall be cumulated with benefits from subsidies provided to the firm which is

producing subject merchandise that is sold through the trading company, regardless of whether

the trading company and the producing firm are affiliated."[47]

 During the investigation, Phosphorite reported that its cross-owned affiliates BMU and

Nevinka are producers of phosphate fertilizers.[48]  Further, Phosphorite also received various

inputs from several cross-owned affiliates to produce subject merchandise:  ammonia and nitric

acid from NAK Azot, ammonia from EuroChem NW, phosphate rock from KGOK, and energy

from Energo.[49]  In addition, EuroChem reported that UKK supplied potash inputs for phosphate

fertilizer production to BMU and Nevinka.[50]  Pursuant to 19 CFR 351.525(b)(6)(iv), Commerce

---

[43] *See* EuroChem's December 7, 2020 SQR at Exhibit 4.

[44] *See TMK IPSCO v. United States*, 222 F. Supp. 3d 1306, 1322 (CIT May 3, 2017) (*TMK IPSCO*) (citing 19 CFR 351.525(a) (internal brackets omitted)).

[45] *See* 19 CFR 351.525(b)(6)(i).

[46] *See TMK IPSCO*, 222 F. Supp. 3d at 1322; *see also* 19 CFR 351.525(b)(6)(ii)-(v); *see also Preliminary Determination* PDM at 4.

[47] *See* 19 CFR 351.525(c); *see also Preliminary Determination* PDM at 4.

[48] *See Preliminary Determination* PDM at 5; *see also* EuroChem's Affiliation QR at 7.

[49] *See Preliminary Determination* PDM at 6; *see also* EuroChem's Affiliation QR at 3.

[50] *See Preliminary Determination* PDM at 6; *see also* EuroChem's Letter, "Phosphate Fertilizers from Russian Federation," dated August 28, 2020, at 1-2.

attributes benefits to the combined sales of the input and downstream products produced by both corporations, excluding the sales between the two corporations.  Accordingly, Commerce attributed subsidies received by the cross-owned input suppliers to their total sales plus the combined total sales of Phosphorite, BMU, and Nevinka, net of intercompany sales.[51]

As noted above, the proper sales denominator for purposes of the subsidy rate calculations is these companies' total sales, net of intercompany sales.  Removing sales *to* Trading Rus was inappropriate given its status as a trading company that received no subsidies and was not otherwise involved in the subsidy calculations.  Therefore, for purposes of these final results of redetermination, Commerce has relied on EuroChem's questionnaire responses and added the sales by each cross-owned affiliated company to Trading Rus back into EuroChem's total sales for 2019.  This results in an increase in the total sales used as the denominator in Commerce's calculations.  Accordingly, this change has required Commerce to recalculate the subsidy rates for each program in the proceeding for EuroChem.[52]

### B.  Calculation of the Tier Three Natural Gas Benchmark

We note as an initial matter that the regulations, at 19 CFR 351.511(a)(2)(iii), provide that in situations where "there is no world market price available to purchasers in the country in question, {Commerce} will normally measure the adequacy of remuneration by assessing whether the government price is consistent with market principles."  However, the regulations do not prescribe a specific methodology that Commerce is to follow in such situations.[53]  In fact,

---

[51] *See Preliminary Determination* PDM at 6; *see also* Memorandum, "Post-Preliminary Determination Calculations for EuroChem Group," dated December 21, 2020, at 2; and *Final Determination* IDM at 59.

[52] *See* Memorandum, "Draft Remand Redetermination Calculations for EuroChem Group," dated November 18, 2022 (EuroChem Draft Remand Calculation Memorandum).  For these final results of redetermination, EuroChem's subsidy rates remain unchanged from the Draft Results of Redetermination.  Thus, for these final results of redetermination, we have not issued a separate calculation memorandum for EuroChem.

[53] *See Preliminary Determination* PDM at 17 (citing *Certain Uncoated Paper from Indonesia:  Final Affirmative Countervailing Duty Determination*, 81 FR 3104 (January 20, 2016), and accompanying IDM, at 15-16 ("Provision

different methodologies may be appropriate to fit specific fact patterns and circumstances, as is demonstrated in Commerce's practice in applying tier three benchmarks.  The statute also does not prescribe a specific methodology, only stating that a benefit exists to the extent that goods or services are provided for LTAR, and that "the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review," which could "include price, quality, availability, marketability, transportation, and other conditions of purchase or sale."[54]

In this case, we determined to use a proxy for a market-determined price as a benchmark in the form of European Organization for Economic Cooperation and Development export prices from the IEA.[55]  Given that we are using world market prices as a proxy market-based price, Commerce continues to find that it would be appropriate to include VAT and import duties that would be conditions of sale were the respondents to import such natural gas.[56]  However, while the statute and regulations give Commerce significant discretion in how to conduct a tier three analysis, and while we believe in theory (consistent with the statute) it is appropriate to have added Russian VAT and import duties to the benchmark, we recognize, and the CIT noted, that the benchmark IEA data are *already inclusive* of European export VAT and other taxes.[57] Therefore, to comply with the CIT's *Remand Order* and avoid the possibility of double counting given that the data are already inclusive of VAT and other taxes, we have removed the Russian

---

of Standing Timber for Less Than Adequate Remuneration") (where Commerce found that the government price was not set in accordance with market principles, and thus sought a proxy to determine a market-based stumpage benchmark)).
[54] *See* section 771(5)(E)(iv) of the Tariff Act of 1930, as amended (the Act).
[55] *See Final Determination* IDM at Comment 3i.
[56] *Id.* at Comment 3j.
[57] *See Remand Order* at 25.

VAT and import duties from the benchmark in this instance.[58]  For the calculation of revised

subsidy rates for the Provision of Natural Gas for LTAR program under this benchmark, *see* the

company-specific calculation memoranda for these final results of redetermination.[59]

### C.  The Provision of Mining Rights for LTAR

Pursuant to the CIT's *Remand Order*, under respectful protest,[60] we determine not to

apply the cut-off date methodology in this case with respect to the Provision of Mining Rights

for LTAR program in Russia.  Subsequent to the *Remand Order*, we requested and received

additional information on mining rights granted to PhosAgro and EuroChem prior to April 1,

2002.[61]  This information was necessary for Commerce to determine the level of benefit that the

respondents received from the GOR's provision of these mining rights.[62]

As noted in Commerce's post-preliminary analysis decision memorandum, the GOR has

sovereign rights over subsoil resources in Russia, and it provides mining rights to access these

resources.[63]  Thus, consistent with that finding and Commerce's determination in *Cold-Rolled*

---

[58] In the *Remand Order*, the CIT stated that "if Commerce continues to add VAT and import duties to the natural gas benchmark, for a product that is not imported, Commerce must also explain why the methodology should be different for the phosphate rock benchmark."  *See Remand Order* at 41.  Given that we have removed the Russian VAT and import duties from the natural gas benchmark in this instance, we have not compared the two methodologies.

[59] *See* EuroChem Draft Remand Calculation Memorandum; *see also* Memorandum, "Final Remand Redetermination Calculations for PhosAgro," dated concurrently with these final results of redetermination (PhosAgro Final Remand Calculation Memorandum).

[60] *See Viraj Group Ltd. v. United States*, 343 F.3d 1371, 1376-77 (Fed. Cir. 2003).  While Commerce respectfully disagrees with the CIT, it complies with the CIT's *Remand Order* under respectful protest.

[61] *See* EuroChem's Letter, "EuroChem Response to Supplemental Questionnaire," dated October 25, 2022 (EuroChem's Remand SQR); *see also* PhosAgro's Letter, "Response to Supplemental Questionnaire," dated October 25, 2022 (PhosAgro's Remand SQR).

[62] On November 3, 2022, the petitioner submitted comments in which it requested that the respondents demonstrate a sufficient relationship between reported costs and the phosphate mining and/or beneficiation operations at issue. *See* Petitioner's Letter, "Petitioner's Deficiency Comments on JSC Apatit's and Industrial Group Phosphorite LLC's Supplemental Questionnaire Responses," dated November 3, 2022, at 3.  However, the CIT's *Remand Order* stated that Commerce "can identify and measure subsidies from all mining rights *using the same methodology applied to the lone analyzed mining license.*"  *See Remand Order* at 39 (emphasis added).  Accordingly, for these final results of redetermination, we have relied on the information provided by EuroChem and PhosAgro to determine the level of benefit that the respondents received under the program, and we have not changed our methodology from the *Final Determination*.  *See* Final Determination IDM at Comments 2c, 2e, and 2f.

[63] *See* Post-Preliminary Analysis Decision Memorandum at 3-4.

*Steel from Russia*, we continue to determine that the GOR's sale of mining rights to the respondents constitutes a financial contribution in the form of a provision of a good within the meaning of section 771(5)(D)(iii) of the Act.[64]  In addition, while record evidence did not indicate that the GOR's provision of phosphate mining rights licenses to subsoil users in the phosphate fertilizers industry was *de jure* specific, we found that there were only six recipients of phosphate mining rights.[65]  Based on this evidence, we found that this program was *de facto* specific because there were only a limited number of users within the meaning of section 771(5A)(D)(iii)(I) of the Act.[66]  Consistent with that finding and Commerce's determination in *Cold-Rolled Steel from Russia*, we continue to determine that the GOR's sale of phosphate mining rights is *de facto* specific within the meaning of section 771(5A)(D)(iii)(I) of the Act.[67]

Following the benefit calculation methodology that we used in the *Final Determination*, we calculated the level of benefit that PhosAgro and EuroChem received from these mining rights.[68]  On this basis, we find that PhosAgro received a countervailable subsidy of 8.08 percent *ad valorem* under the Provision of Mining Rights for LTAR program.[69]  For EuroChem, we find that it received no measurable benefit from the GOR's provision of mining rights.[70]  In the *Final Determination*, we also determined that EuroChem received no measurable benefit under this program.[71]  Accordingly, we continue to find that EuroChem received no measurable benefit under the program.

---

[64] *Id.* at 4-5; *see also Cold-Rolled Steel from Russia* IDM at 24.
[65] *See* Post-Preliminary Analysis Decision Memorandum at 5.
[66] *Id.*
[67] *Id.*; *see also Cold-Rolled Steel from Russia* IDM at 28.
[68] *See Final Determination* IDM at 10 and Comments 2c, 2e, and 2f; *see also* EuroChem Draft Remand Calculation Memorandum; Memorandum, "Draft Remand Redetermination Calculations for PhosAgro PJSC," dated November 18, 2022 (PhosAgro Draft Remand Calculation Memorandum); and PhosAgro Final Remand Calculation Memorandum.
[69] *See* PhosAgro Final Remand Calculation Memorandum.
[70] *See* EuroChem Draft Remand Calculation Memorandum.
[71] *See Final Determination* IDM at 10.

**IV.      INTERESTED PARTY COMMENTS**

   **A.  Calculation of Total Sales of EuroChem**

*EuroChem's Comments*

- Commerce's Calculation of the EuroChem sales denominators is incorrect. [72]
   - o   In its Remand Order, the CIT directed Commerce to, *inter alia*, adjust the final total sales calculation for EuroChem to the proper figures and explain the calculation.  Commerce's methodology involved using EuroChem's post-preliminary determination questionnaire response (Post-Prelim QR) to add the sales of each affiliated company to Trading Rus back into the respective company's total sales for 2019.  This methodology, however, does not correct the previous error with respect to the calculation of the sales denominators.
   - o   First, by using the sales numbers reported in "Total Sales for CVD Purposes" from Exhibit 4, Commerce is using a sales value for each cross-owned affiliate that deducts all sales among all cross-owned affiliates.  Simply adding the sales to Trading Rus to each of the three producers still eliminates sales that should not be eliminated to derive the total sales for this grouping.  Commerce instead should start with the "Total" values from Exhibit 4 and deduct only those sales among the grouping of companies being considered.
   - o   Second, the "Total Sales" number that Commerce used for adding the Trading Rus sales—column C in Exhibit 3—is incorrect because it reflects sales not adjusted to FOB, as Commerce desires and requests in its pertinent questionnaires.  Because Exhibit 4 reflects sales for each company "adjusted to FOB," when considering the specific cross-owned company sales, Commerce should use column E in Exhibit 3, as that column reflects the "FOB Sales Value."

**Commerce's Position:**

   We disagree with EuroChem.  In the investigation, Commerce explained that it calculated

total sales by combining all sales by EuroChem's cross-owned subject merchandise producers

and input suppliers, less the intercompany sales among the eight subject merchandise producers

and input suppliers, as required by 19 CFR 351.525(b)(6)(ii) and (iv).[73]  Commerce also

confirmed that:  (1) MCC EuroChem and Trading Rus did not receive subsidies; and (2) sales by

---

[72] *See* EuroChem's Draft Remand Comments at 2-6.
[73] *See Preliminary Determination* PDM at 5-6.

Trading Rus should not be included in the subsidy rate calculations.[74]  The CIT took no issue with Commerce's asserted methodology.[75]

However, Commerce's calculations did not reflect this methodology.  In the calculation of intercompany sales, Commerce wrongly relied on a number provided by EuroChem that did not include sales *from* the eight subject merchandise producers and input suppliers *to* Trading Rus.[76]  The calculations failed to follow Commerce's stated methodology and artificially increased the *ad valorem* rate by excluding the sales *to* Trading Rus from the total sales figures. In a letter to the CIT, Commerce confirmed this error.[77]  The CIT thus remanded this issue for Commerce to provide a correct total sales number and explanation of its calculation.

Commerce has provided in its final remand results the correct total sales number and explanation of its calculation, as discussed above.  As noted, the CIT took no issue with Commerce's methodology,[78] and stated that "although Commerce need not alter its stated methodology for calculating Total Sales," Commerce must "provide a correct Total Sales number and explanation of its calculation" on remand.[79]  Consistent with this directive, Commerce applied its intended methodology by correcting the total sales number calculated for EuroChem to include sales to Trading Rus by each of the responding cross-owned companies.

Further, EuroChem argues "the 'Total Sales' number that Commerce used for adding the {} Trading Rus sales—column C in Exhibit 3—is incorrect as it is sales not adjusted to {free on board (FOB)}, as Commerce desires and requests in its pertinent questionnaires."[80]  As we explained in the Draft Results of Redetermination, we "added the sales by each cross-owned

---

[74] *Id.*
[75] *See Remand Order* at 33.
[76] *See Final Determination* IDM at 8 (citing EuroChem's December 7, 2020 SQR).
[77] *See Remand Order* at 33.
[78] *Id.*
[79] *Id.* at 44.
[80] *See* EuroChem's Draft Remand Comments at 3.

company to Trading Rus back into EuroChem's total sales for 2019."[81]  For each responding cross-owned company's sales, we used the same sales denominators that we used in the calculations for the *Final Determination*.[82]  For sales by each responding cross-owned company to Trading Rus, we used EuroChem's reported sales to Trading Rus [

] from its supplemental questionnaire response during the investigation.[83]  Thus, we relied on FOB sales data as reported by EuroChem in the *Final Determination* and in these final results of redetermination.  In its comments on the Draft Results of Redetermination, EuroChem provided no evidence that the sales denominators we used in the Draft Results of Redetermination were "not adjusted to FOB" and they did not elaborate on what error they are seeking to correct.[84]  Accordingly, we have made no changes to the calculations based on EuroChem's argument.

### B.  Calculation of the Tier Three Natural Gas Benchmark

*Petitioner's Comments*

- Commerce removed both Russian VAT and import duties from the benchmark, ostensibly to avoid double-counting; however, there is no double-counting issue with respect to Russian import duties. Rather, Commerce's own reasoning in the Draft Remand Results dictates that Russian import duties continue to be included.  Specifically, such import duties would be a condition of sale were the respondents to import such natural gas.  Commerce should, therefore, continue to include the five percent import duty adjustment that the Government of Russia confirmed would be applicable to imported natural gas.[85]

---

[81] *See* Draft Results of Redetermination at 6; *see also* EuroChem Draft Remand Calculation Memorandum at 1.
[82] *See* EuroChem Draft Remand Calculation Memorandum at 1 and Attachment 2; *see also* Memorandum, "Final Determination Calculations for EuroChem Group," dated February 8, 2021, at 2 and Attachment 2 (EuroChem Final Determination Calculation Memorandum).  EuroChem states that "Commerce appears to have taken the 'Total Sales for CVD Purposes' from Exhibit 4 to EuroChem's Post-Prelim QR ('Exhibit 3') (Cell I13 [          ])."  *See* EuroChem's Draft Remand Comments at 2.  This is the sales value that we used in the calculations for the *Final Determination*, and EuroChem's response identifies this value as "Adjusted to FOB."  *See* EuroChem Final Determination Calculation Memorandum at Attachment 2; *see also* EuroChem's December 7, 2020 SQR at Exhibit 4.  Therefore, EuroChem's claim that the Total Sales number "is not adjusted to FOB" is incorrect based on the description in EuroChem's own response.
[83] *See* EuroChem Draft Remand Calculation Memorandum at 1 and Attachment 2 (citing EuroChem's December 7, 2020 SQR at Exhibit 1).
[84] *See* EuroChem's Draft Remand Comments at 3.
[85] *See* Petitioner's Draft Remand Comments at 10-11.

*EuroChem's Comments*

- Commerce should adjust the rate calculation for the provision of natural gas for LTAR to exclude EuroChem-Energo.
    - In the investigation, Commerce relied on 19 CFR 351.525(b)(6)(iv), which permits Commerce to attribute the benefit received by an input supplier whose production of inputs is primarily dedicated to the production of the downstream product by a cross-owned producer to the combined sales of the input and downstream products produced by both companies. However, EuroChem-Energo is not a producer of any input product. It instead supplies natural gas purchased from the St. Petersburg International Mercantile Exchange (SPIMEX).[86]
    - In the recent countervailing duty investigation of urea ammonium nitrate (UAN) solutions from the Russian Federation, Commerce—based on the same information submitted in this case—declined to include EuroChem-Energo in the benefit calculations for the provision of natural gas for LTAR. Based on Commerce's reasoning in UAN concerning EuroChem-Energo, and to ensure consistency between investigations involving the same entity under the provision of natural gas for LTAR and thus ensure an accurate subsidy rate, Commerce should remove EuroChem-Energo from the LTAR benefit calculations of EuroChem under the provision of natural gas program.[87]

**Commerce's Position:**

### A. Whether to Include Import Duties under the Tier Three Benchmark Calculation

We disagree with the petitioner. Commerce finds that the petitioner's benchmark submission from the investigation demonstrates that in determining the "total tax" figures that are included in the "total price" for the natural gas industry, both VAT and, in some cases, other taxes such as excise taxes are included.[88] Therefore, while the petitioner argues that the "double-counting" concern only applies to the Russian import VAT but not import duties, we find that the IEA European export prices may in some cases include additional taxes other than VAT.[89] Thus, the concern with respect to double-counting taxes included in the benchmark persists. Given the

---

[86] *See* EuroChem's Draft Remand Comments at 7.
[87] *Id.* at 8.
[88] *See* Petitioner's Letter, *Phosphate Fertilizers from Russia: Petitioner's Submission of Factual Information to Measure the Adequacy of Remuneration*, dated November 2, 2020, at Exhibit 14.
[89] *Id.*

ambiguity in these additional taxes included in the benchmark, Commerce finds that the reasonable approach is to continue to remove the Russian VAT and import duty from the benchmark.  As the IEA data are already inclusive of VAT and additional taxes, to avoid the possibility of double-counting taxes and duties in this specific factual circumstance, and consistent with the Court's remand order, Commerce has continued to remove the Russian import duties in its final remand calculations.

### B.  Whether to Remove EuroChem-Energo from the Benefit Calculation

We disagree with EuroChem.  As an initial matter, EuroChem's claim regarding treatment of EuroChem-Energo seeks to question Commerce's attribution findings, and what purchases should be included in the numerator of our benefit calculation, and is not pertinent to whether Russian import VAT and import duties should be included in the benchmark calculation. Further, in the final determination of the investigation, EuroChem-Energo was treated consistently with all the other affiliated companies in the EuroChem group, *i.e.*, its purchases were included in the numerator.  No parties made arguments about its treatment before the final determination and the attribution of EuroChem-Energo's purchases was not an issue remanded to Commerce.  While Commerce may have treated the EuroChem-Energo differently in the preliminary determination (unchanged in the final determination) of urea ammonium nitrate from Russia (UAN),[90] the treatment of EuroChem-Energo here is consistent with the information that is on the record of this proceeding.[91]  It is well established that "{e}ach administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on

---

[90] *See Urea Ammonium Nitrate Solutions From the Russian Federation:  Preliminary Affirmative Countervailing Duty Determination and Alignment Of Final Determination With the Final Antidumping Duty Determination*, 86 FR 68635 (December 3, 2021), and accompanying PDM at 30, unchanged in *Urea Ammonium Nitrate Solutions From the Russian Federation:  Final Affirmative Countervailing Duty Determination*, 87 FR 37836 (June 24, 2022), and accompanying IDM at 10.

[91] *See Preliminary Determination* PDM at 6.

different facts in the record."[92]  While Commerce  may consider a different treatment for EuroChem-Energo in future, based on the information presented in future segments, we find that the facts and methodology in this case remain supported by evidence on the record.[93]  As previously noted, the CIT took no issue with Commerce's methodology, in the specific factual context of this investigation.  EuroChem has proposed an unsolicited methodological change, unrelated to whether Russian import VAT and import duties should be included in the benchmark calculation.  Accordingly, Commerce did not consider EuroChem's proposal for the final results of this remand.[94]

### C.  The Provision of Mining Rights for LTAR

*Petitioner's Comments*

- Commerce relied on unsupported and unreliable mining cost data in the Draft Results of Redetermination.[95]
  - JSC Apatit failed to reconcile its reported mining costs to its financial statements.  As a result, Commerce has no way of assessing the validity of these costs.[96]
  - Using such costs without more information would unlawfully depart from Commerce's methodology in *Phosphate Fertilizers From Morocco*, where Commerce scrutinized the respondent's reported costs and excluded certain costs from its mining rights cost buildup.[97]
  - EuroChem also failed to properly support its reported costs as related to the phosphate mining and beneficiation operations of its affiliate KGOK.[98]
  - Commerce should seek information from PhosAgro and EuroChem to correct these deficiencies, or it should rely on phosphate rock cost information from the petition.[99]

---

[92] *See Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1387 (Fed. Cir. 2014) (*Qingdao*) (internal citation omitted); *QVD Food Co. v. United States*, 658 F.3d 1318, 1326 (Fed. Cir. 2011) (sustaining Commerce's decision to reject financial data used in a previous administrative review for surrogate valuation because new record information suggested that the data previously used was unreliable).  Thus, "{t}he question is whether the record adequately supports the decision of {Commerce.}" *Daewoo Elecs. Co. v. Int'l Union of Elec., Elec., Technical, Salaried & Mach. Workers, AFL–CIO*, 6 F.3d 1511, 1520 (Fed. Cir. 1993).

[93] *See Preliminary Determination* PDM at 6.

[94] *See Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States*, 701 F.3d 1367, 1374-75 (Fed. Cir. 2012).

[95] *See* Petitioner's Draft Remand Comments at 3-9.

[96] *Id.* at 5-6.

[97] *Id.* at 7 (citing *Phosphate Fertilizers From the Kingdom of Morocco:  Final Affirmative Countervailing Duty Determination*, 86 FR 9482 (February 16, 2021) (*Phosphate Fertilizers from Morocco*), and accompanying IDM at Comment 4, p. 24).

[98] *Id.* at 8-9.

[99] *Id.* at 7 and 9.

- Commerce used an incorrect profit ratio for PhosAgro in its calculations.[100]
  - To obtain PhosAgro's profit ratio, the Department "divided its 2019 gross profit by its overall 2019 cost of sales." The use of gross profit in the numerator is incorrect.[101]
  - Commerce used "profit before tax" to calculate KGOK's profit ratio for EuroChem's calculations in this remand proceeding and in the underlying investigation, and it did likewise in *Phosphate Fertilizers From Morocco*.[102]

*PhosAgro's Comments*

- Commerce erred in the Draft Results of Redetermination by countervailing mining licenses obtained prior to April 1, 2002.[103]
  - Rather than expand its analysis by identifying specific reforms that justify the use of a cut-off date, Commerce reversed its decision from the *Final Determination* and countervailed licenses obtained prior to April 1, 2002.[104]
  - The CIT has not prohibited Commerce's use of a cut-off date generally, and Commerce's reasoning for using a cutoff date for the mining rights LTAR program in the *Final Determination* was consistent with its precedent.[105]

- To calculate the benefit as accurately as possible, Commerce must use JSC Apatit's cost of production for phosphate rock sold to third parties, not phosphate rock sold to all parties.[106]
  - JSC Apatit reported its cost of production for both phosphate rock sold to third parties and phosphate rock sold to all parties (*i.e.*, inclusive of inter-company sales).[107]
  - Commerce's general practice is to exclude intercompany sales in its benefit calculations.[108]

- Commerce must revise its calculations to include JSC Apatit's average per-unit transportation costs in total per-unit production costs.[109]
  - For EuroChem's calculations in the *Final Determination* and Draft Results of Redetermination, Commerce constructed a "per-unit delivered production cost" by adding EuroChem's per-unit cost of transportation to its total per-unit cost.[110]
  - Commerce did not use the same methodology for JSC Apatit in the Draft Results of Redetermination, and it therefore failed to compare per-unit delivered production costs to a delivered benchmark price.[111]

---

[100] *Id.* at 9-10.
[101] *Id.* at 9 (citing PhosAgro Draft Remand Calculation Memorandum at 2).
[102] *Id.* (citing EuroChem Draft Remand Calculation Memorandum; and *Phosphate Fertilizers from Morocco* IDM at 27).
[103] *See* PhosAgro's Draft Remand Comments at 3-4.
[104] *Id.* at 4.
[105] *Id.* (citing *TMK IPSCO*, 222 F.Supp.3d at 1317; and *Cold-Rolled Steel from Russia* IDM at 24).
[106] *See* PhosAgro's Draft Remand Comments at 5-6.
[107] *Id.* at 5.
[108] *Id.* at 6 (citing *Final Determination* IDM at 72).
[109] *Id.* at 6-7.
[110] *Id.* at 6 (citing EuroChem Draft Remand Calculation Memorandum).
[111] *See* PhosAgro's Draft Remand Comments at 7.

- o  If Commerce does not add the cost of transportation, then it will not perform an "apples to apples" benchmark comparison, which will skew PhosAgro's CVD rate.[112]

- Commerce erred by excluding additional costs that relate to extraction and the maintenance of mining licenses.[113]
  - o  Commerce must account for all costs incurred to extract phosphate ore and maintain active mining licenses.[114]
  - o  Specifically, Commerce included mineral extraction payments in its per-unit cost of production calculation, but it did not include environmental payments.  Commerce should include these payments in JSC Apatit's cost of production for phosphate rock.[115]

- Commerce ignored the "negative benefit" that JSC Apatit received from mining rights licenses obtained after April 1, 2002.[116]
  - o  JSC Apatit did not extract ore under licenses obtained after April 1, 2002, but it incurred costs to maintain those active licenses.[117]
  - o  Commerce should add land rental payments and other production costs that it incurred for these licenses to JSC Apatit's cost of production.[118]

**Commerce's Position:**

### A.  Reliability and Usability of Respondents' Mining Cost Data

We disagree with the petitioner regarding the reliability and usability of PhosAgro's and EuroChem's submitted cost data.  As an initial matter, when considering relevant cost adjustments, neither 19 CFR 351.511(a)(2)(iii) nor our *1998 Final Preamble*[119] directs us to undertake a cost analysis similar to what we would conduct in an antidumping duty proceeding.[120]  Our benefit calculation at tier 3, in this circumstance, compares the actual per-unit cost buildup of respondents' beneficiated phosphate rock to a market price for phosphate rock.[121]  We are investigating the GOR's provision of mining rights for LTAR, but no market-

---

[112] *Id.*
[113] *Id.*
[114] *Id.* at 7-8.
[115] *Id.* at 8.
[116] *Id.*
[117] *Id.*
[118] *Id.* at 8-9.
[119] *See Countervailing Duties; Final Rule*, 63 FR 65348, 65378 (November 25, 1998) (*1998 Final Preamble*).
[120] *See, e.g.*, section 773(b)(3) of the Act (Calculation of Cost of Production).
[121] *See Final Determination* IDM at Comment 2c.

based price for mining rights to compare to the price of mining rights provided by the GOR is available.  Thus, in this tier 3 analysis, we are conducting a benefit analysis not on mining rights *per se*, but on the value of the underlying good conveyed *via* the mining rights.[122]

Despite the petitioner's contention that EuroChem's and PhosAgro's cost data are unsupported and unusable, we see no basis in the record to doubt the veracity of EuroChem's and PhosAgro's books and records upon which they relied to report these costs.  We requested that both companies report all costs incurred to mine phosphate ore and process the ore into beneficiated phosphate rock during the POI, and both companies provided the information we requested.[123]  Further, both companies provided supporting documentation and tied their reported cost information to their financial statements, as we requested.[124]  Where possible, Commerce will rely on a respondent's reported information to determine the existence and the amount of the benefit to the extent that such information is usable and verifiable.[125]  No record evidence leads us to doubt the reliability of respondents' reported costs incurred to mine and process phosphate ore into beneficiated phosphate rock.  Additionally, no record evidence leads us to conclude that the reported costs are unrelated to the mining and processing of phosphate ore.  Accordingly, we conclude that PhosAgro's and EuroChem's reported cost data are reliable for use in the mining rights cost buildup for each company.[126]

---

[122] *Id.*

[123] *See* EuroChem's Remand SQR at 1-2 and Supplemental Exhibit 6; *see also* PhosAgro's Remand SQR at 3-4 and Exhibits REM-3 and REM-4.

[124] *Id.*

[125] *See, e.g.*, *Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China:  Preliminary Results of Countervailing Duty Administrative Review; 2016*, 83 FR 50891 (October 10, 2018), and accompanying PDM at "D. Provision of Synthetic Yarn for LTAR" (unchanged in *Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China:  Final Results of Countervailing Duty Administrative Review; 2016*, 84 FR 11052 (March 25, 2019)).

[126] *See* EuroChem Draft Remand Calculation Memorandum at Attachment 2; *see also* PhosAgro Final Remand Calculation Memorandum at Attachment 2.

For example, the petitioner notes that "JSC Apatit reported [

]."[127]

However, JSC Apatit reported its [

].[128]

Moreover, JSC Apatit provided information directly from its accounting system to demonstrate that its accounting records were the source of its reported costs.[129]  Given this record evidence, and in the absence of evidence to the contrary, we have no basis to conclude that the [

] costs cited by the petitioner are [

].[130]  As cited above, the petitioner argues that "[

]."[131]  The central issue for our analysis, however, is whether JSC Apatit records these [                    ] costs as part of its costs of production [                                        ] in its normal books and records. We find no basis on the record to conclude that JSC Apatit reported its [                ] costs in a manner inconsistent with its normal books and records.  Accordingly, we find it appropriate to include these [                ] costs in the phosphate rock cost buildup for JSC Apatit and subsequent benefit calculation pursuant to 19 CFR 351.511(a)(2)(iii).

[127] *See* Petitioner's Draft Remand Comments at 6-7 (citing PhosAgro's Remand SQR at Exhibit REM-3(2)).
[128] *See* PhosAgro's Remand SQR at 3 and Exhibit REM-3.
[129] *Id.* at 4 and Exhibit REM-4.
[130] *See* Petitioner's Draft Remand Comments at 6-7.
[131] *Id.* at 7.

Finally, contrary to the petitioner's assertion, our methodology is consistent with our methodology in *Phosphate Fertilizers from Morocco*. In that case, Commerce determined that "the record does not contain sufficient evidence that would allow us to segregate and remove those costs which are considered unrelated to mining operations."[132] Commerce found "no evidence on the record which would lead us to doubt the reliability of {the mandatory respondent's} reported direct costs" and "no evidence on the record to doubt these direct expenses are related to mining costs."[133] On this basis, Commerce relied on the respondent's reported costs in the phosphate rock production cost buildup.[134] Thus, consistent with *Phosphate Fertilizers from Morocco*, we have continued to rely on EuroChem's and PhosAgro's reported production costs for phosphate rock for these final results of redetermination.

## B. PhosAgro's Profit Ratio Used in Calculations

We agree with the petitioner. The CIT's *Remand Order* stated that Commerce "can identify and measure subsidies from all mining rights using the same methodology applied to the lone analyzed mining license."[135] Thus, as we explained in the Draft Results of Redetermination, we intended to make no changes to our benefit calculation methodology that we used for EuroChem's lone analyzed mining license in the *Final Determination*.[136] Based on a review of record information, however, we acknowledge that using PhosAgro's 2019 gross profit instead of profit before tax in the calculation of PhosAgro's profit ratio for the Draft Results of Redetermination represented a slight change in the benefit calculation methodology that we used in the *Final Determination* and the Draft Results of Redetermination for respondent

---

[132] *See Phosphate Fertilizers from Morocco* IDM at Comment 4.
[133] *Id.*
[134] *Id.*
[135] *See Remand Order* at 39.
[136] *See* Draft Results of Redetermination at 12, n. 60.

EuroChem.  As we stated in EuroChem's calculation memorandum for the *Final Determination*, we divided KGOK's "profit before tax" by its cost of goods sold to calculate its profit ratio.[137] This was consistent with our methodology in *Phosphate Fertilizers from Morocco*, in which we calculated the respondent's profit ratio based on "'income before taxes' (profit before tax)," and *Cold-Rolled Steel from Russia*.[138]  On this basis, we have used profit before taxes instead of gross profit to calculate PhosAgro's profit ratio for the Provision of Mining Rights for LTAR benefit calculation for PhosAgro, which is consistent with Commerce's calculation for EuroChem and the Court's *Remand Order*.[139]

### C.  Mining Licenses Received Prior to April 1, 2002

We disagree with PhosAgro.  The CIT concluded that Commerce's cut-off methodology "is inapplicable to the facts of this case, as Commerce can identify and measure subsidies from all mining rights using the same methodology applied to the lone analyzed mining license.[140] Additionally, the CIT held that Commerce failed to provide substantial evidence to support its decision to treat the date of Russia's market economy designation as a cut-off for CVD law applicability.[141]  In the *Remand Order*, however, the CIT did not instruct Commerce to explain why it was unable to countervail subsidies from licenses granted prior to April 1, 2002, in the *Final Determination* regardless of any changes in response to the *Remand Order*.  Rather, the CIT instructed Commerce to either abandon its cut-off date methodology or explain why it is unable to countervail recurring subsidies from licenses granted by the GOR prior to Russia's designation as a market economy.[142]  As discussed in the "Analysis" section above, pursuant to

---

[137] *See* EuroChem Final Determination Calculation Memorandum at 3.
[138] *See Phosphate Fertilizers from Morocco* IDM at Comment 4 (citing *Cold-Rolled Steel from Russia* IDM at 4, "Provision of Mining Rights for LTAR").
[139] *See* PhosAgro Final Remand Calculation Memorandum at 2 and Attachment 2.
[140] *See Remand Order* at 39.
[141] *Id.*
[142] *Id.*

the CIT's *Remand Order*, we have determined, under protest, not to apply the cut-off date methodology in this case with respect to the Provision of Mining Rights for LTAR program in Russia.  Accordingly, given that our redetermination complies with the CIT's instructions in the *Remand Order*, we have not revisited or further elaborated on our decision in the *Final Determination* not to countervail subsidies from licenses granted prior to April 1, 2002.[143]

## D.  JSC Apatit's Phosphate Rock Delivered to Third Parties

We disagree with PhosAgro.  Citing the *Final Determination* IDM, PhosAgro states that "{i}t is Commerce's general practice to exclude intercompany sales in its benefit calculations."[144]  Commerce's exclusion of intercompany sales, however, relates to the attribution of calculated subsidy benefits pursuant to the subsections of 19 CFR 351.525(b)(6).[145] PhosAgro's comment, by contrast, relates to the basis of the per-unit cost buildup for beneficiated phosphate rock that Commerce is using to calculate the benefit amount under this program.  As discussed above, our benefit calculation pursuant to 19 CFR 351.511(a)(2)(iii) for this program compares the actual per-unit cost buildup of respondents' beneficiated phosphate rock to a market price for phosphate rock.[146]  The exclusion of intercompany sales from the denominator of a subsidy rate calculation pursuant to the subsections of 19 CFR 351.525(b)(6) is not pertinent to the costs that Commerce will include to value mining rights received from the GOR under this program pursuant to 19 CFR 351.511(a)(2)(iii).

---

[143] *See Final Determination* IDM at Comment 2d.
[144] *See* PhosAgro's Draft Remand Comments at 6 (citing *Final Determination* IDM at 72).
[145] *See, e.g.*, *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China:  Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2019*, 87 FR 40491 (July 7, 2022), and accompanying IDM at Comment 16; *see also Certain Vertical Shaft Engines Between 225cc and 999cc, and Parts Thereof From the People's Republic of China:  Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination*, 86 FR 1933 (January 11, 2021), and accompanying IDM at Comment 25.
[146] *See Final Determination* IDM at Comment 2c.

Regardless of the applicability of Commerce's practice with respect to sales denominators, the core issue that PhosAgro has raised is whether it received a countervailable benefit from beneficiated phosphate rock that it sold through intercompany transactions.[147]  We find no basis to exclude this phosphate rock from the benefit calculations.  As we stated in the Post-Preliminary Analysis, "as in *Russia Cold-Rolled Steel*, we consider the calculation of a benefit under this program to be not on the value of the mining rights *per se*, but on the value of the underlying good conveyed via the mining rights, and specifically any benefit from such good extracted during the relevant period under examination."[148]  The fundamental goal of this benefit calculation is to determine an accurate per-unit cost for JSC Apatit's production of phosphate rock.  Whether JSC Apatit eventually sells that phosphate rock to "third parties" or to related companies, it has incurred costs in its production that Commerce should account for to conduct an accurate comparison with a benchmark price.  Excluding phosphate rock that JSC Apatit sold through intercompany transactions effectively treats the value of the underlying good extracted *via* the mining rights (*i.e.*, phosphate ore) as irrelevant in certain cases.  When JSC Apatit mines phosphate ore under the GOR's provision of mining rights, processes the ore into beneficiated phosphate rock, and sells the phosphate rock, it receives a benefit if the per-unit cost is less than the benchmark price, regardless of whether it sells processed phosphate rock to an "intercompany" party or a third party.

In the *Final Determination*, we "divide{d} the total cost of production incurred in 2019 by the total amount of phosphate rock produced by KGOK during 2019 to obtain KGOK's per-

---

[147] *See* PhosAgro's Draft Remand Comments at 5 (stating that "JSC Apatit provided its cost of production of both phosphate rock sold to third parties (*i.e.*, excluding intercompany sales) and rock sold to all parties (*i.e.*, inclusive of inter-company sales.").

[148] *See* Post-Preliminary Analysis at 4 (citing *Cold-Rolled Steel from Russia* IDM at 24).

unit production costs during the POI."[149]  PhosAgro provided no basis for us to depart from this methodology by using a subset of production costs and quantity of phosphate rock produced in the benefit calculation, as opposed to total production costs and quantity produced.  Additionally, in our supplemental questionnaire released after the CIT's *Remand Order*, we instructed PhosAgro to report all costs incurred to mine phosphate ore and process phosphate ore into beneficiated phosphate rock during the POI.[150]  PhosAgro reported its production costs for phosphate rock and all individual cost elements on this basis.[151]  PhosAgro identified no evidence that would lead us to conclude that its reported production costs, or any portion thereof, are unusable in the benefit calculations.[152]  Accordingly, we are continuing to use JSC Apatit's total production costs for phosphate rock sold to all parties (*i.e.*, inclusive of intercompany sales) in the benefit calculations.

As a final matter, PhosAgro stated that it "reported its cost of production for both phosphate rock sold to third parties and rock sold to all parties (*i.e.*, inclusive of inter-company sales)."[153]  However, we do not find that PhosAgro adequately reported JSC Apatit's cost of production for phosphate rock sold to third parties.  In our supplemental remand questionnaire to PhosAgro, we instructed PhosAgro to provide charts detailing all costs to mine phosphate ore and process the ore into beneficiated phosphate rock during the POI.[154]  In Exhibit REM-3 of PhosAgro's supplemental questionnaire response, PhosAgro provided [

].[155]

---

[149] *See Final Determination* IDM at 10.
[150] *See* Commerce's Letter, "Supplemental Questionnaire," dated October 14, 2022 (PhosAgro Remand Supplemental Questionnaire), at Attachment I.
[151] *See* PhosAgro's Remand SQR at 3-4 and Exhibits REM-3 and REM-4.
[152] *Id.* at 2-4.
[153] *See* PhosAgro's Draft Remand Comments at 5 (citing PhosAgro's Remand SQR at 3-4 and Exhibit REM-3).
[154] *See* PhosAgro Remand Supplemental Questionnaire at Attachment I.
[155] *See* PhosAgro's Remand SQR at Exhibit REM-3.

PhosAgro did not, however, provide [

].[156]     Thus, in addition to finding no factual basis to use only JSC

Apatit's cost of production for phosphate rock sold to third parties, we also find that PhosAgro

did not provide information that would have been necessary for any such analysis.  Accordingly,

we have made no changes to the calculations from the Draft Results of Redetermination based on

PhosAgro's argument.

### E.  JSC Apatit's Per-Unit Transportation Costs

We agree with PhosAgro that we calculated a "per-unit delivered production cost,"

inclusive of transportation costs, for the Provision of Mining Rights for LTAR program for

EuroChem.[157]  To determine the benefit that EuroChem received, we compared this "per-unit

delivered production cost" to the phosphate rock benchmark.[158]  Therefore, while we agree that

including transportation costs in JSC Apatit's cost of production buildup for phosphate rock is

appropriate, based on the information submitted by PhosAgro, we find that the per-unit

phosphate rock production costs that we used in the Draft Results of Redetermination were

*already* inclusive of transportation costs.  Specifically, Exhibit REM-3 of PhosAgro's

supplemental questionnaire response shows that JSC Apatit [

].[159]  We relied on JSC Apatit's cost information in this exhibit in the Draft

Results of Redetermination.[160]

---

[156] *Id.*
[157] *See* PhosAgro's Draft Remand Comments at 6-7 (citing EuroChem Draft Remand Calculation Memorandum); *see also* EuroChem Final Determination Calculation Memorandum at 4.
[158] *See* EuroChem Draft Remand Calculation Memorandum at 2-3; *see also* EuroChem Final Determination Calculation Memorandum at 4.
[159] *See* PhosAgro's Remand SQR at Exhibit REM-3.
[160] *See* PhosAgro Draft Remand Calculation Memorandum at 2.

PhosAgro did not address this information in its comments on the Draft Results of Redetermination.[161]  Based on the information in PhosAgro's response, we find that including the additional transportation costs JSC Apatit reported in Exhibit REM-1 of its supplemental questionnaire response would result in double counting of these costs.[162]  Thus, the benefit calculations for PhosAgro are consistent with our stated methodology of using "per-unit delivered production costs."[163]

### F.  JSC Apatit's Costs Related to Extraction and Maintenance of Mining Licenses

We agree with PhosAgro.  In the *Final Determination*, we "divide{d} the total cost of production incurred in 2019 by the total amount of phosphate rock produced by KGOK during 2019" to calculate the benefit for EuroChem for this program.[164]  Environmental compliance expenses that JSC Apatit incurred to produce phosphate rock during the POI are therefore appropriate to include in JSC Apatit's cost of production buildup.  PhosAgro reported these expenses in the completed Mining Rights Template in its supplemental questionnaire response.[165]  Additionally, PhosAgro provided supporting documentation for these payments.[166]  Based on the record information that PhosAgro provided, we find it appropriate to include these expenses as part of JSC Apatit's total cost of production for phosphate rock.

Additionally, PhosAgro explained that the environmental payments were not included in JSC Apatit's reported cost of production because JSC Apatit records the payments separately in its accounting system.[167]  We find no evidence in PhosAgro's supplemental questionnaire

---

[161] *See* PhosAgro's Draft Remand Comments at 6-7.
[162] *Id.* at 7 (citing PhosAgro's Remand SQR at Exhibit REM-1).
[163] *See* EuroChem Draft Remand Calculation Memorandum at 2; *see also* PhosAgro Draft Remand Calculation Memorandum at 3.
[164] *See Final Determination* IDM at 10.
[165] *See* PhosAgro's Remand SQR at Exhibit REM-1.
[166] *Id.* at 4 and Exhibit REM-6.
[167] *See* PhosAgro's Draft Remand Comments at 7, n. 6 (citing PhosAgro's Remand SQR at Exhibits REM-1 and REM-3).

response to indicate that JSC Apatit already included these environmental expenses in its reported cost of production.[168]   As such, we find no evidence to indicate that adding these expenses would result in double counting.   Accordingly, for these final results of redetermination, we have included the environmental payments that JSC Apatit made during the POI in its production cost buildup for phosphate rock.

### G.  Offset for "Negative Benefits"

We disagree with PhosAgro regarding offsets for "negative benefits."[169]   Commerce has addressed and rejected similar arguments in other proceedings.[170]   In a subsidy analysis, a benefit is either conferred or not conferred, and a positive benefit cannot be masked or otherwise offset by "negative benefits."[171]   There is no offsetting credit for mining licenses that did not provide a subsidy benefit to PhosAgro, including offsets for costs that PhosAgro incurred to maintain licenses under which it did not extract phosphate ore during the POI.[172]   Such an adjustment is not contemplated under the statute and is inconsistent with Commerce's practice.[173]

The Act defines the "net countervailable subsidy" as the gross amount of the subsidy less three statutorily prescribed offsets:  (1) the deduction of application fees, deposits or similar payments necessary to qualify for or receive a subsidy; (2) accounting for losses due to deferred receipt of the subsidy; and (3) the subtraction of export taxes, duties or other charges intended to

---

[168] *See* PhosAgro's Remand SQR at Exhibits REM-1 and REM-3.

[169] *See* PhosAgro's Draft Remand Comments at 8.

[170] *See, e.g.*, *Wood Mouldings and Millwork Products From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 86 FR 67 (January 4, 2021), and accompanying IDM at Comment 8 (*Wood Mouldings from China*); *see also Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China:  Final Results of Countervailing Duty Administrative Review and Rescission of Review, in Part; 2016*, 84 FR 45125 (August 28, 2019), and accompanying IDM at Comment 8; and *Certain Softwood Lumber Products from Canada:  Final Affirmative Countervailing Duty Determination, and Final Negative Determination of Critical Circumstances*, 82 FR 51814 (November 8, 2017) (*Softwood Lumber from Canada*), and accompanying IDM at Comments 13 and 15.

[171] *See, e.g.*, *Wood Mouldings from China* at Comment 8; *see also Softwood Lumber from Canada* at Comment 15.

[172] *See* PhosAgro's Draft Remand Comments at 8.

[173] *See, e.g.*, *Wood Mouldings from China* at Comment 8; *see also Softwood Lumber from Canada* at Comment 15.

offset the countervailable subsidy.[174]  Both Congress and the courts have confirmed that these

are the only offsets Commerce is permitted to make under the statute.[175]  Offsetting the

calculated benefit from active mining licenses during the POI with a "negative benefit" from

inactive licenses is not among the enumerated permissible offsets.  Therefore, we have made no

modifications to the benefit calculations for alleged "negative benefits."

## V.     FINAL RESULTS OF REDETERMINATION

Consistent with the *Remand Order*, we reconsidered:  (1) our calculation of the total sales

for EuroChem; (2) our calculation of the natural gas benchmark; and (3) our analysis of the

mining rights for LTAR program.  Based on the foregoing explanations, we revised the subsidy

rate calculations for the mandatory respondents EuroChem and PhosAgro, as well as the

calculation of the all-others rate.  If the CIT affirms these final results of redetermination, we

intend to issue a notice of the court's decision[176] and of amended final determination, which will

include the revised CVD rates for the POI of January 1, 2019, through December 31, 2019, as

listed in the chart below.[177]

---

[174] *See* section 771(6) of the Act.

[175] *See* S. Rep. No. 96-249, at 86 (1979), reprinted in 1979 U.S.C.C.A.N. 381, 472 ("{t}he list is narrowly drawn and is all inclusive."); *see also Kajaria Iron Castings Pvt. Ltd. v. United States*, 156 F.3d 1163, 1174 (Fed. Cir. 1998) ("we agree that 19 U.S.C. § 1677(6) provides the exclusive list of permissible offsets ...."); *Geneva Steel v. United States*, 914 F.Supp. 563, 609 (CIT 1996) (explaining that section 771(6) contains "an exclusive list of offsets that may be deducted from the amount of a gross subsidy.").

[176] In its decision in *Timken*, as clarified by *Diamond Sawblades*, the U.S. Court of Appeals for the Federal Circuit held that, pursuant to section 516A(e) of the Act, Commerce must publish a notice of a court decision not "in harmony" with a Commerce determination and must suspend liquidation of entries pending a "conclusive" court decision.  *See Timken Co.* v. *United States,* 893 F.2d 337, 341 (Fed. Cir. 1990); *Diamond Sawblades Mfrs. Coalition* v. *United States,* 626 F.3d 1374 (Fed. Cir. 2010).

[177] For details on the revised calculations for these final results of redetermination, *see* PhosAgro Final Remand Calculation Memorandum and Memorandum, "Calculation of the 'All-Others' Rate," dated concurrently with these final results of redetermination.  EuroChem's subsidy rate calculations remain unchanged from the Draft Results of Redetermination.  *See* EuroChem Draft Remand Calculation Memorandum.

| Company | Subsidy Rate in *Final Determination*[178] (percent *ad valorem*) | Subsidy Rate in Final Remand Redetermination (percent *ad valorem*) |
|---|---|---|
| EuroChem | 47.05 | 23.77 |
| PhosAgro | 9.19 | 14.30 |
| All Others | 17.20 | 16.30 |

12/16/2022

X 

Signed by: LISA WANG

Lisa W. Wang
Assistant Secretary
  for Enforcement and Compliance

---

[178] *See Final Determination*, 86 FR at 9480.