**Slip Op. 23-99**

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **THE MOSAIC COMPANY,** | |
| Plaintiff, | |
| **PHOSAGRO PJSC, JSC APATIT,** | |
| Consolidated Plaintiff, | |
| **INDUSTRIAL GROUP PHOSPHORITE, LLC,** | |
| Consolidated Plaintiff and Consolidated Plaintiff-Intervenor, | Before: Jane A. Restani, Judge |
| v. | Consol. Court No. 21-00117 |
| **UNITED STATES,** | |
| Defendant, | |
| **THE MOSAIC COMPANY,** | |
| Consolidated Defendant, | |
| **PHOSAGRO PSJC, JSC APATIT, INDUSTRIAL GROUP PHOSPHORITE, LLC,** | |
| Defendant-Intervenor | |

## OPINION AND ORDER

[Commerce's Remand Results in the countervailing duty investigation of phosphate fertilizers from the Russian Federation is partially sustained and partially remanded for reconsideration consistent with this opinion.]

Dated: July 11, 2023

Patrick James McLain, Wilmer, Cutler, Pickering, Hale and Dorr LLP, of Washington, DC, argued for Plaintiff The Mosaic Company.  With him on the brief were David J. Ross, Stephanie Ellen Hartmann, and Natan Pinchas Lyons Tubman.

Ebonie I. Branch, Commercial Litigation Branch, U.S. Department of Justice, of Washington, DC, argued for the Defendant.  With her on the brief were Brian M. Boynton, Patricia M. McCarthy, and L. Misha Preheim.  Of counsel on the brief was Jared Michael Cynamon, Office of Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

Jonathan T. Stoel and Cayla D. Ebert, Hogan Lovells US LLP, of Washington, DC, argued for Defendant-Intervenors PhosAgro PJSC and JSC Apatit.  With them on the brief were H. Deen Kaplan, Jared Wessel, and Maria A. Arboleda.

Jeremy W. Dutra, Squire Patton Boggs (US) LLP, of Washington, DC, argued for Defendant-Intervenor Industrial Group Phosphorite, LLC.  With him on the brief was Peter Koenig.

Restani, Judge:  Before the court are the remand results of the United States Department of Commerce ("Commerce") pursuant to the court's order in Mosaic Co. v. United States, 46 CIT __, 589 F. Supp. 3d 1298 (2022), in the countervailing duty ("CVD") investigation of phosphate fertilizers from the Russian Federation ("Russia") covering the period from January 1, 2019, through December 31, 2019.  See Redetermination Pursuant to Court Remand Order, ECF Nos. 96–97 ("Remand Results").  Plaintiff The Mosaic Company ("Mosaic") and Consolidated Plaintiff PhosAgro PJSC and JSC Apatit, cross-owned, (collectively, "PhosAgro")[1] challenge the Remand Results as unsupported by substantial evidence or otherwise not in accordance with law.  The United States ("Government") asks that the court sustain Commerce's Remand Results.

---

[1] In the Remand Results, Commerce stated the following companies were cross-owned with JSC Apatit: PhosAgro PJSC; PhosAgro-Belgorod LLC; PhosAgro-Don LLC; PhosAgro-Kuban LLC; PhosAgro-Kursk LLC; PhosAgro-Lipetsk LLC; PhosAgro-Orel LLC; PhosAgro-Stavropol LLC; PhosAgro-Volga LLC; PhosAgro-SeveroZapad LLC; PhosAgro-Tambov LLC; and Martynovsk AgrokhimSnab LLC.  Remand Results at 2.

## BACKGROUND

While the court presumes familiarity with the facts as set out in <u>Mosaic</u>, the court briefly summarizes the relevant record evidence for ease of reference.  After Mosaic filed a CVD petition on June 26, 2020, concerning imports of phosphate fertilizers from Russia, Commerce initiated the investigation on July 23, 2020.  <u>Petitions for the Imposition of Countervailing Duties: Phosphate Fertilizers from Morocco and Russia</u>, P.R. 1–8, C.R. 1–8 (June 26, 2020); <u>Phosphate Fertilizers From the Kingdom of Morocco and the Russian Federation: Initiation of Countervailing Duty Investigations</u>, 85 Fed. Reg. 44,505 (Dep't Commerce July 23, 2020).  On August 4, 2020, the U.S. International Trade Administration selected LLC Industrial Group Phosphorite ("EuroChem")[2] and PhosAgro (collectively, "Mandatory Respondents") as mandatory respondents in this investigation.  <u>See Countervailing Duty Investigation of Phosphate Fertilizers from Russia: Respondent Selection</u>, P.R. 55, C.R. 23 (Aug. 4, 2020).

Commerce published its preliminary results on November 30, 2020, <u>see Phosphate Fertilizers From the Russian Federation: Preliminary Affirmative Countervailing Duty Determination</u>, 85 Fed. Reg. 76,524 (Dep't Commerce Nov. 30, 2020), along with the accompanying <u>Decision Memorandum for the Affirmative Preliminary Determination of the Countervailing Duty Investigation of Phosphate Fertilizers from the Russian Federation</u>, C-821-825, POR 1/1/2019-12/31/2019 (Dep't Commerce Nov. 23, 2020).

Commerce published its final determination on April 7, 2021.  <u>See Phosphate Fertilizers From the Kingdom of Morocco and the Russian Federation: Countervailing Duty Orders</u>, 86 Fed.

---

[2] EuroChem is cross-owned with Joint Stock Company Kovdorsky GOK ("KGOK").  Remand Results at 1.

Reg. 18,037 (Dep't Commerce Apr. 7, 2021); see also Issues and Decision Memorandum for the

Final Affirmative Determination of the Countervailing Duty Investigation of Phosphate Fertilizers

from the Russian Federation, C-821-825, POR 1/1/2019-12/31/2019 (Dep't Commerce Feb. 8,

2021) ("IDM").

      In Mosaic, the court sustained aspects of Commerce's tier-three benchmark calculation for

natural gas. 589 F. Supp. 3d at 1314–15. The court remanded the matter, however, for Commerce

to: (1) adjust the final total sales calculation for EuroChem; (2) either remove the added value-

added tax ("VAT") and import duties from the natural gas benchmark price or offer further

explanation as to why there was no double counting; and (3) either abandon the cut-off date

methodology and countervail mining right licenses for phosphate rock or explain what specific

reforms justified the market economy cut-off date for valuing mining rights in Russia. Id. at 1315–

24.

      Following remand, Commerce: (1) adjusted the total sales calculation for EuroChem;[3] (2)

removed the added VAT and import duties from the natural gas benchmark; and (3) countervailed

recurring subsidies from phosphate rock mining licenses prior to April 1, 2002, after dropping the

cut-off date, under protest. Remand Results at 1–2.

      At issue in this case is the calculation of the benefit received by Mandatory Respondents

for two inputs: natural gas and phosphate rock. The Remand Results do not adequately address

---

[3] On remand, Commerce recalculated EuroChem's total sales to include transactions with an
intercompany party that had been previously excluded. Remand Results at 7–8. No party
challenges Commerce's recalculation of EuroChem's total sales. See Gov't Resp. in Supp. of
Remand Results at 23, ECF Nos. 114–115 (April 6, 2023). Accordingly, the court will not address
this issue further.

all of the court's concerns in <u>Mosaic</u> and the Remand Results are not supported by substantial evidence.  Accordingly, the court once again remands with further instructions.

## JURISDICTION & STANDARD OF REVIEW

The court's jurisdiction continues pursuant to 19 U.S.C. § 1516a(a)(2)(B)(i) and 28 U.S.C. § 1581(c).  The court sustains Commerce's final redetermination results unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]" 19 U.S.C. § 1516a(a)(2)(B)(i).  "The results of a redetermination pursuant to court remand are also reviewed for compliance with the court's remand order."  <u>U.S. Steel Corp. v. United States</u>, 41 CIT __, __, 219 F. Supp. 3d 1300, 1307 (2017) (internal quotations and citations omitted).

## DISCUSSION

### I.    Tier-Three Natural Gas Benchmark

To calculate the benefit for the <u>ad valorem</u> subsidy rate, Commerce utilized a tier-three benchmark to assess the unsubsidized value of natural gas used by EuroChem and PhosAgro.  <u>See</u> <u>IDM</u> at 53.  Commerce adopted Mosaic's proposed International Energy Agency ("IEA") data regarding European countries' natural gas prices to calculate the benchmark.  <u>See</u> <u>IDM</u> at 53–54; <u>see also</u> <u>Letter from Wilmer Cutler Pickering Hale and Dorr LLP to Sec of Commerce Pertaining to Mosaic Benchmark Submission, Mosaic Russia</u> at Ex. 14, Part II.B, P.R. 245 (Nov. 2, 2020) ("<u>Petitioner's Benchmark Submission</u>").  The IEA data included EU export VAT in the proposed benchmark price data.  <u>Id.</u>  Because the government of Russia ("GOR") reported that natural gas imports would be subject to a 20% VAT and 5% import duty, Commerce added those same escalators to the benchmark price.  <u>IDM</u> at 57.

The court sustained much of Commerce's determination, but remanded Commerce's adjustments that added Russian VAT and import duties that reflected duties that would be imposed on natural gas imported into Russia. Mosaic, 589 F. Supp. 3d at 1315. The court was concerned that Commerce may have double counted VAT because the IEA data included European export VAT, and Commerce added an additional import-specific 20% VAT and 5% import duty. See id.; see also Petitioner's Benchmark Submission at Ex. 14; IDM at 57. Further, the court observed that 19 C.F.R. § 351.511(a)(2)(iv), the regulation authorizing Commerce to add "delivery charges and import duties" to a benchmark price, expressly applied only to tier-one and tier-two benchmarks. See Mosaic, 589 F. Supp. 3d at 1315. As a result, the court remanded to Commerce to either remove the added VAT and import duties or explain why it was reasonable to add the duties and confirm that there was no double counting. Id.

On remand, Commerce explained that the regulations do not prescribe a specific methodology for tier-three benchmarks because different methodologies might be necessary to fit different fact patterns. Remand Results at 10–11. Because Commerce was using the IEA data as a proxy for a market-determined price, Commerce continued to find that it would be appropriate to include VAT and import duties when they would be applied if the respondent imported the natural gas from the world market. Remand Results at 11. Commerce, however, removed the VAT and import duties because the IEA data already included European export VAT and other taxes in order for Commerce to avoid the possibility of double counting. Remand Results at 11. Specifically, Commerce found that the "total price" data included "total tax" figures that were "VAT and, in some cases, other taxes such as excise taxes." Remand Results at 17. Thus, Commerce concluded that the reasonable approach to address the ambiguity was to remove the

import-specific 20% VAT and 5% import duty to avoid potential double-counting taxes.  Remand Results at 18.

A foreign government's provision of goods to a respondent for LTAR constitutes a benefit. 19 U.S.C. § 1677(5)(E)(iv).  In such circumstances, Commerce determines the amount of the subsidy by comparing remuneration actually paid to a market-determined price for the goods or services, under "a three-tiered hierarchy" employed by Commerce "to determine the appropriate remuneration benchmark." Changzhou Trina Solar Energy Co. v. United States, 42 CIT __, __, 352 F. Supp. 3d 1316, 1332 (2018); see 19 C.F.R. § 351.511(a)(2)(i)–(iii).

In the absence of a tier-one benchmark, Commerce turns to a tier-two benchmark "by comparing the government price to a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question."  19 C.F.R. § 351.511(a)(2)(ii).  "In measuring adequate remuneration under [tier-one benchmarks] or [tier-two benchmarks], [Commerce] will adjust the comparison price to reflect the price that a firm actually paid or would pay if it imported the product." Id. § 351.511(a)(2)(iv).  "If there is no world market price available to purchasers in the country in question," however, Commerce moves on to a tier-three analysis and "measure[s] the adequacy of remuneration by assessing whether the government price is consistent with market principles."  Id. § 351.511(a)(2)(iii).  If Commerce determines that the government price is not consistent with market principles it will look to construct an external benchmark. Canadian Solar Inc. v. United States, 45 CIT __, __, 537 F. Supp. 3d 1380, 1389 n.6 (2021).  "It is within Commerce's discretion to weigh the relevant factors." Id. at 1391.

Section 351.511(a)(2)(iv) is silent as to whether Commerce is to adjust the benchmark price for tier-three benchmarks. See 19 C.F.R. § 351.511(a)(2)(iv). The regulations do not compel any specific methodology for Commerce to follow for a tier-three benchmark. Thus, Commerce has some matter of discretion in its calculation. The IEA data contain natural gas "Total price" for European countries along with "Excise tax" and "VAT" figures grouped as "Total tax." See Petitioner's Benchmark Submission at Exs. 14–15. There is at least some ambiguity regarding what is included as "Total tax" because it includes more than just VAT. As Mosaic correctly points out, however, nothing in the submission indicates that import duties would have been included as part of "excise tax" or any other figure. See Mosaic Co.'s Cmts. on Remand Redetermination at 15–16, ECF No. 103–104 (Feb. 7, 2023) ("Mosaic Br."); Petitioner's Benchmark Submission at Ex. 14.

Regardless, the court's remand order required Commerce to provide a compelling reason for including the import duties under the factual scenario here, and Commerce did not do so. See Mosaic 589 F. Supp. 3d at 1315; Remand Results at 4–5, 11. Commerce relied on a tier-three benchmark because it could not construct a world market tier-two price as Russia could not import natural gas as the pipelines only flowed away from Russia. See IDM at 51–54. There is still no reason to treat the tier-three hypothetical market price as an import price under these facts. As a result, Commerce did not err by not including the import-specific 20% VAT and 5% import duty in the benchmark price. Accordingly, Commerce's tier-three benchmark calculation for natural gas is sustained.

## II.   Commerce's Decision Not to Apply the Cut-Off Date for Phosphate Rock Mining Rights

In its original administrative decision, Commerce determined that it could not measure

subsidies in the Russian economy before April 1, 2002, the date on which Russia was designated

a market economy ("ME").  See IDM at 23; Countervailing Duty Investigation of Certain Cold-

Rolled Steel Flat Products from the Russian Federation: Final Affirmative Countervailing Duty

Determination and Final Negative Critical Circumstances Determination, 81 Fed. Reg. 49,935

(Dep't Commerce July 29, 2016) ("Russia Cold-Rolled Steel"), and accompanying memorandum,

Market Economy Status for the Russian Federation, C-821-823, POR 1/1/2014-12/31/2014 (Dep't

Commerce Sept. 14, 2015) ("ME Status for the GOR Memo").  Accordingly, Commerce declined

to countervail several of the licenses for phosphate rock mining rights issued by the GOR to

EuroChem, cross-owned with KGOK, and PhosAgro, cross-owned with JSC Apatit.  See IDM at

24; Response from Mayer Brown, LLP to Sec of Commerce Pertaining to Ministry, Initial QR at

Ex. II–1, P.R. 131, C.R. 305 (Sept. 25, 2020).

In Mosaic, the court instructed Commerce to either abandon its cut-off date methodology

or to explain why it is unable to countervail what it otherwise treated as recurring subsidies from

the licenses granted by the GOR prior to its designation as a ME.  See Mosaic, 589 F. Supp. 3d at

1320–22.  The court explained that Commerce's cut-off date was unsupported because Commerce

did not reference specific legal reforms that permitted the measurement of mining rights or similar

subsidies beginning on April 1, 2002, in the Russian economy.  See id.  Further, the court observed

that Commerce treated the one license it analyzed as providing a recurring subsidy, and calculated

the benefit by comparing "the actual per-unit cost build-up of KGOK's beneficiated phosphate

rock" during the period of investigation ("POI").  Id.  Thus, the court concluded that Commerce

could apply the same methodology to all the mining licenses because it did not rely on the initial

financial contribution when the GOR granted the license, i.e. prior to its designation as a ME

country.[4]  See id.

On remand, Commerce determined not to apply the cut-off date methodology, under respectful, but unexplained, protest.  Remand Results at 12.  Commerce proceeded to request and receive additional information on the mining rights to countervail the benefit of the remaining licenses.  Remand Results at 12–13.

Now, PhosAgro challenges Commerce's decision not to apply the cut-off date.  PhosAgro and JSC Apatit Cmts. on Remand Redetermination at 3–6 ECF No. 101–102 (Feb. 7, 2023) ("PhosAgro Br.").  PhosAgro argues that the April 1, 2022, cut-off date was supported by the 2015 Market Economy Status Memorandum, which discussed the GOR's control over production, land ownership, and the allocation of resources, even though it did not explicitly discuss mining rights. Id.  PhosAgro asserts that Commerce could not identify and measure subsidies in Russia before April 1, 2002, and has not provided any evidence for why it is able to countervail mining licenses now.[5]  Id. at 6.

---

[4] It is irrelevant to this proceeding at issue that the GOR has now been designation a non-market economy ("NME") for antidumping purposes.  See  Press Release, International Trade Administration, U.S. Department of Commerce Revokes Russia's Market Economy Status in Antidumping Proceedings (Nov. 10, 2022), https://www.trade.gov/press-release/us-department-commerce-revokes-russias-market-economy-status-antidumping-proceedings (last accessed June 29, 2023).

[5] The court previously ordered Commerce to either abandon the cut-off date methodology or articulate specific reforms that supported the cut-off date for mining licenses in Russia.  See Mosaic, 589 F. Supp. 3d at 1322.  PhosAgro points to two reforms on the record that it believes sufficiently support the cut-off date: the private use of land and allocation of resources.  See PhosAgro Br. at 5.  First, the court has already rejected the 2001 law on land privatization's applicability to these subsidies because the GOR leases ore-rich land to private companies to mine—"land privatization is inapplicable to these facts."  See Mosaic, 589 F. Supp. 3d at 1322; ME Status for the GOR Memo at 16; see generally IDM.  And second, Commerce's memorandum does not discuss mining rights in relation to the allocation of resources.  See ME Status for the GOR Memo at 16–20, 30.  PhosAgro fails to identify any specific legal reform on the record that

In 2012, Congress amended Section 701 of the Tariff Act of 1930 to require that Commerce impose countervailing duties on merchandise imported from NME countries.  See 19 U.S.C. § 1671(f)(1).  Commerce is only relieved of imposing CVDs where it cannot "identify and measure" subsidies because the NME country's economy is "essentially comprised of a single entity."  Id. § 1671(f)(2).  Following that amendment, the court has only permitted Commerce to apply a cut-off date given evidence of reforms newly permitting the identification and measurement of specific types of subsidies in a NME country.  In TMK IPSCO, the court required Commerce to provide specific evidence justifying its use of the day the People's Republic of China ("PRC") ascended to the World Trade Organization as the cut-off date for imposing CVD.  See TMK IPSCO v. United States, 40 CIT __, __, 179 F. Supp. 3d 1328, 1343 (2016) ("TMK IPSCO I"), aff'd on remand, TMK IPSCO II, 41 CIT at __, 222 F. Supp. 3d at 1314.  Remanding for further explanation, the court required Commerce to "allocate subsidies beginning on the first date it could identify and measure the subsidy considering the particular program in question" and to identify "the impact of relevant economic reforms on that program."  TMK IPSCO I, 40 CIT at __, 179 F. Supp. 3d at 1344.

The court subsequently upheld Commerce's cut-off dates when Commerce identified four types of subsidies and specific economic reforms that made each subsidy identifiable and measurable.  TMK IPSCO II, 41 CIT at __, 222 F. Supp. 3d at 1314–15.  Commerce noted that the PRC's 1994 Company Law permitted private actors to freely participate in commercial

---

relate to the "particular type of subsidy" at issue here.  See TMK IPSCO v. United States, 41 CIT __, __, 222 F. Supp. 3d 1306, 1314 (2017) ("TMK IPSCO II").  Thus, PhosAgro fails to show support for applying the April 1, 2002, cut-off date or any other cut-off date.

Consol. Court No. 21-00117                                                      Page 12

activity, allowing Commerce to measure grant program subsidies in the Chinese economy.  Id. at

1314.  Commerce further identified laws passed in 1994, 1996, and 1999 that created unique cut-

off dates for the measurement of credit, tax, and land-oriented subsidies.  Id. at 1314–15.  In so

doing, the court held that Commerce fulfilled its duty under § 1671(f) by "articulat[ing] a rational

relationship between specific legal reforms in China and the effect of such reforms on Commerce's

ability to identify and measure subsidies."  Id. at 1314.  Thus, although Commerce has "significant

discretion in determining whether it can identify and measure subsidies . . . within the NME

country," the court only found Commerce's cut-off date analysis reasonable after Commerce

provided evidence of legal reforms impacting specific programs.  See id. at 1313.  Thus, with

countries partially or fully transitioned to ME status, the issue is the measurability of particular

subsidies.

        PhosAgro's challenge to Commerce's decision not to apply the cut-off date fails.

Commerce is able to measure the value of the phosphate rock mining license because Commerce's

methodology did not look at the issuance of the license before Russia achieved ME status but

instead looked to the actual cost build-up of the mining.[6]  See IDM at 26; see also 19 U.S.C. §

1671(f)(2).  By treating the licenses as a recurring subsidy, Commerce demonstrated that no

necessary factual information was missing from the period prior to Russia's designation as a ME

country.  For the purpose of this proceeding, Russia is a ME country.  Thus, subsidies are presumed

to be measurable.  See 19 U.S.C. § 1671.  Commerce could identify and measure subsidies

stemming from the mining licenses issued before April 1, 2002, and § 1671(f)(2) does not apply.

---

[6] The licenses were not auctioned in a manner that would result in a usable value figure.  See
Mosaic, 589 F. Supp. 3d at 1322.

In abandoning the cut-off date methodology, Commerce properly selected one of the options allowed by the court's remand order.  Nothing in the record regarding Russian mining rights undermines Commerce's reasonable exercise of discretion.  If Commerce attempted to calculate the benefit of the mining license by looking at the original auction, then PhosAgro might have some argument for a particular cut-off date.  Instead, Commerce's methodology looked at annual costs to determine the recurring benefit of the license.  Accordingly, Commerce complied with the court's remand order, and the decision to countervail the phosphate rock mining licenses is supported by substantial evidence.

### III.    Mining Rights for Phosphate Rock Benchmark

After deciding not to apply the cut-off date, Commerce requested and received supplemental information about the mining rights held by PhosAgro and EuroChem prior to April 1, 2002.  Commerce issued questionnaires requesting that the Mandatory Respondents: provide all costs incurred to mine phosphate ore during the POI; reconcile the cost data to 2019 financial statements; and "[s]upport your reported costs with documentation maintained in the normal course of business."  Commerce Letter Pertaining to PhosAgro PJSC Supp. Questionnaire, R.P.R. 2 (Oct. 14, 2022); Commerce Letter Pertaining to EuroChem Supp. Questionnaire, R.P.R. 1 (Oct. 14, 2022).  PhosAgro and EuroChem provided information about the reported costs of their phosphate mining operations during the POI.  Response from Squire Patton Boggs (US) LLP to Sec of Commerce Pertaining to EuroChem's Supp. QR at 1–2, R.P.R. 10, R.C.R. 3–4 (Oct. 25, 2022) ("EuroChem's Remand SQR"); Response from Hogan Lovells US LLP to Commerce Pertaining to JSC Apatit Supp. QR  at 3–4, R.P.R. 9, R.C.R. 1–2 (Oct. 25, 2022) ("PhosAgro's Remand SQR").

Mosaic submitted comments that raised alleged deficiencies in PhosAgro and EuroChem's reported costs.  Mosaic Cmts. On Draft Remand Determination at 3–9, R.P.R. 22, R.C.R. 13 (Dec. 1, 2022).  Specifically, Mosaic claimed that PhosAgro failed to reconcile its reported mining costs on the financial statements, and thus, Commerce could not verify the costs.  Id. at 5–6.  Further, Mosaic asserted that EuroChem failed to support its reported costs for mining and beneficiation[7] operations.  Id. at 8–9.  Mosaic requested that Commerce seek additional information from PhosAgro and EuroChem.  Id. at 3–9.

In the Remand Results, Commerce disagreed with Mosaic's objections to EuroChem's and PhosAgro's reported production costs.  Remand Results at 19–24.  Relying on the submissions, Commerce found the mining licenses countervailable, assigning an 8.08% rate for PhosAgro but determining that EuroChem received no measurable benefit.  Remand Results at 13.

Now, Mosaic argues that there were significant flaws found in respondents' cost information submissions that required Commerce to issue follow-up questionnaires.  Mosaic Br. at 4–13.  Meanwhile, PhosAgro challenges Commerce's methodology for the benchmark calculation.  First, PhosAgro argues that Commerce unlawfully calculated the benefit by using a consolidated "Profit Before Tax" figure instead of a "Gross Profit" figure in order to account for exported phosphate rock prices.  PhosAgro Br. at 6–7.  Second, PhosAgro asserts that Commerce failed to include all of maintenance costs, inflating the benefit.  PhosAgro Br. at 11–14.  Finally, PhosAgro contends that Commerce failed to exclude the cost of sales sold to affiliates as required by regulation.  PhosAgro Br. at 14–17.

---

[7] In mining, beneficiation is the treatment of a raw ore to improve its economic properties.

   A.  Commerce's Acceptance of PhosAgro's and EuroChem's Cost Information Over Mosaic's Objections

Mosaic argues that Commerce erred by accepting PhosAgro and EuroChem's submissions without additional questionnaires when Mosaic had identified flaws in the data.  Mosaic Br. at 5.  Mosaic asserts that PhosAgro's submission was flawed because it failed to reconcile costs to JSC Apatit's financial statements.  Mosaic Br. at 7–9.  Further, Mosaic contends that Commerce failed to address deficiencies in KGOK's cost information because EuroChem's summary was in Russian without translation and some of the reported costs did not appear to be related to phosphate production.  Mosaic Br. at 10–11.  Finally, Mosaic argues that Commerce acted arbitrarily by varying from its procedures in <u>Phosphate Fertilizers from Morocco</u>, where it "scrutinized" reported costs and only relied on direct costs from mining rights.  Mosaic Br. at 11–12.

"Commerce has a duty to determine CVD rates as accurately as possible."  <u>Canadian Solar Inc. v. United States</u>, 45 CIT __, __, 537 F. Supp. 3d 1380, 1395 (2021).  To do so, sometimes Commerce must issue supplemental questionnaires.  The court reviews Commerce's decision not to issue a supplemental questionnaire for substantial evidence.  <u>See</u> <u>e.g.</u>, <u>Mittal Steel USA, Inc. v. United States</u>, 31 CIT 1395, 1400 (2007) (sustaining Commerce's determination because domestic plaintiff failed to show that Commerce did not have all the information it needed); <u>see also</u> <u>PPG Industry v. United States</u>, 978 F.2d 1232, 1238–39 (Fed. Cir. 1992) (holding that plaintiff failed to show that the alleged missing information addressed the issue at hand or cast doubt on Commerce's conclusion).  Commerce has "considerable discretion in deciding whether a party has sufficiently replied to an information request."  <u>Mannesmannrohren-Werke AG v. United States</u>, 23 CIT 826, 849, 77 F. Supp. 2d 1302, 1321 (1999).

Beginning with PhosAgro's submission, PhosAgro provided Commerce documentation demonstrating mining costs and reconciliation of production costs.  PhosAgro's Remand SQR at Ex. REM-3–REM-7.  The documentation purports to reconcile PhosAgro cost of sales data with PhosAgro's 2019 financial statements showing the same number also for cost of sales.  PhosAgro's Remand SQR, Ex. REM-3 at 4.  Mosaic asserts, however, that PhosAgro did not comply with Commerce's instructions because the questionnaire instructed PhosAgro to reconcile JSC Apatit's costs to JSC Apatit's 2019 financial statements, not the entire PhosAgro group.  See Mosaic Br. at 8; PhosAgro's Remand SQR at 3, Ex. REM-3.

The interpretation of financial documents and if a submission sufficiently satisfied a request is a factual inquiry on which Commerce is entitled to considerable deference.  See Mannesmannrohren-Werke AG, 23 CIT at 849, 77 F. Supp. at 1321.  The court must still be able to review Commerce's rationale for substantial evidence.  See Mittal Steel USA, 31 CIT at 1400. Here, Mosaic raised specific objections that Commerce did not respond to in the Remand Results. Commerce's questionnaire requested that reported costs be reconciled against JSC Apatit's 2019 financial statements.  PhosAgro's Remand SQR at 3.  When Mosaic raised concerns with the submission that reconciled costs with PhosAgro's 2019 financial statements, Commerce could have provided an explanation as to why this sufficiently complied with the questionnaire.  Instead, Commerce did not respond.  See Remand Results at 22–24.  While Commerce responded specifically to one of Mosaic's challenges, it would not have been burdensome to address the entirety of Mosaic's objections.  See id. at 22–23.  Accordingly, Commerce's reliance on PhosAgro's submission is not supported by substantial evidence.  On remand, Commerce may

explain why reconciling to PhosAgro's statements was sufficient and respond to Mosaic's objection or seek further information from the respondent.

Regarding EuroChem's submission,[8] Mosaic raised specific objections to the data that some of the submitted spreadsheets were in Russian and untranslated, specific products included as costs did not appear to be related to phosphate production, and some of the calculations lacked an explained methodology.  Petitioner Cmts. on Draft Remand at 8–9, R.C.R. 13 (Dec. 1, 2022). Many of EuroChem's submitted spreadsheets are in Russian without translation.  EuroChem's Remand SQR, Ex. 6.  The court also notices, however, that the cost calculation, including itemized variable costs and fixed costs, are in English.  Id.  In the Remand Results, Commerce's only response was that there was "no basis in the record to doubt the veracity of EuroChem's . . . books and records upon which they relied to report these costs."  Remand Results at 22.

This is an insufficient response.  In the light of specific objections, Commerce must provide the court an explanation for rejecting a challenge in order for the court to review it for substantial evidence.  And Commerce's regulations and supplemental questionnaire required EuroChem to submit documents in a foreign language with an English translation.  See 19 C.F.R. § 351.202(e); EuroChem's Remand SQR at 1.  As currently set forth in the Remand Results, the court cannot

---

[8] EuroChem suggests that Mosaic failed to exhaust its administrative remedies on this challenge because Mosaic did not object to a similar exhibit in the administrative review before remand. EuroChem Resp. to Mosaic Cmts. on Remand Redetermination at 2–3, ECF No. 113 (April 6, 2023).  Although Mosaic did not object to the exhibit originally, in context, significant changes necessitated by the court's remand make it inappropriate to bar argument based on failure to exhaust remedies.  When the issue became sufficiently significant, Mosaic put the relevant argument before Commerce in a case brief during the remand proceedings.  See Remand Results at 21.  Further, the government did not raise any concern with exhaustion.  Commerce had the opportunity to respond to Mosaic's challenges.  Accordingly, the court will consider the argument. See DuPont Teijin Films China Ltd. v. United States, 38 CIT __, __, 7 F. Supp. 3d 1338, 1354 (2014).

ascertain on what basis Commerce accepted EuroChem's submission as accurate.  Accordingly,
the court remands for Commerce to explain why it found EuroChem's submission supported and
respond to Mosaic's specific objections.  Commerce may also allow EuroChem to supplement the
record with an English translation.

   B.   PhosAgro's Challenges to Commerce's Calculation of JSC Apatit's Mining Rights Benefit

        Commerce calculated the phosphate rock cost of production by dividing JSC Apatit's
reported "Cost of Production" of phosphate rock by the total amount of phosphate rock produced,
resulting in a per unit cost amount.  <u>PhosAgro Final Remand Calculation</u>, R.P.R. 26, R.C.R. 17
Dec. 16, 2022).  Commerce then multiplied the per unit cost amount by a "profit ratio," which
Commerce calculated by dividing "Profit Before Tax" by the total cost of sales in the financial
statements.  <u>Id.</u>  Commerce adopted this methodology only after comments to the draft remand
results by Mosaic.  <u>See</u> Remand Results at 20, 24.  Commerce stated that Profit Before Tax was
consistent with past practice and with the court's instruction to use the same methodology as
applied in the original proceeding.  <u>See</u> Remand Results at 24.

        PhosAgro first argues that Commerce erred by using its Profit Before Tax instead of Gross
Profit in order to calculate the profit for the benchmark calculation.  PhosAgro Br. at 6–7.
PhosAgro asserts that Gross Profit would be a more accurate profit ratio because it included
additional expenses, such as administrative and selling expenses, that are considered when
calculating price but are not part of the cost of sales.  PhosAgro Br. at 9–10.  Alternatively,
PhosAgro asks that the court order Commerce to include the additional expenses independently to
the profit ratio in order to build a more accurate comparison with the benchmark data, which
PhosAgro asserts included similar expenses.  PhosAgro Br. at 10–11.

Here, Commerce has not adequately supported its decision to use Profit Before Tax when calculating the profit ratio.  PhosAgro claims that using Profit Before Tax instead of Gross Profit would leave important considerations, such as administrative and selling expenses, out of the profit comparison.  See Response from Crowell & Moring LLP to Commerce Pertaining to PhosAgro Sec III QR, Ex. CVD-6 at 86, P.R. 115–116, C.R. 45–46 (Sept. 24, 2020).   Commerce's explanation for its choice is insufficient for the court to review.  Although the court's remand order instructed Commerce to measure the mining right subsidy using the same methodology as before, the court did not rule on the specific calculations because no party raised any issue with the profit ratio.  See Mosaic, 589 F. Supp. 3d at 1320.  Commerce's only other support for using Profit Before Tax was stating it was consistent with past practice in Phosphate Fertilizers from Morocco[9] and Cold-Rolled Steel from Russia.[10]  See Remand Results at 24–25.  Commerce did not proffer why Profit Before Tax was used in previous proceedings or explain why it produced an accurate result now.  And PhosAgro never had an opportunity to argue for using Gross Profit because Commerce did not make the change until the Remand Results.  See Remand Results at 24.  The

---

[9] Phosphate Fertilizers from the Kingdom of Morocco: Final Affirmative Countervailing Duty Determination, 86 Fed. Reg. 9,482 (Dep't Commerce Feb. 16, 2021), and accompanying Issues and Decision Memorandum for the Final Affirmative Determination of the Countervailing Duty Investigation of Phosphate Fertilizers from the Kingdom of Morocco, C-714-001, POR 1/1/2019-12/31/2019 at Comment 8 (Dep't Commerce Feb. 16. 2021).

[10] Issues and Decision Memorandum, Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from the Russian Federation: Issues and Decision Memorandum for the Final Determination, C-821-823, POR 1/1/2014-12/31/2014 at Comment 10–11 (Dep't Commerce July 29, 2016).

court remands for Commerce to consider PhosAgro's arguments and explain why it selected Profit

Before Tax for the profit ratio.[11]

Next, PhosAgro argues that Commerce erred by excluding JSC Apatit's expenses related

to mining licenses that still incurred some expenses during the POI despite JSC Apatit not utilizing

them.  PhosAgro Br. at 11–13.  PhosAgro asserts that Commerce failed to consider the benefit

from the program as a whole, which must include expenses on related mining licenses such as land

rental payments to the GOR and other incurred costs, even if there was no phosphate rock mined

under those licenses.  PhosAgro Br. at 13–14.  PhosAgro contends that, by excluding these costs,

Commerce ignored record evidence that it was required to consider in its decision.  PhosAgro Br.

at 14.

In calculating CVD margins, Commerce must consider the record as a whole, including

evidence contrary to its findings.  See Ceramark Tech., Inc. v. United States, 38 CIT __, __, 11 F.

Supp. 3d 1317, 1321 (2014).  Under 19 U.S.C. § 1677(6), "net countervailable subsidy" is defined

as the gross amount of the subsidy less three statutory offsets: (A) application fees, deposits, or

similar payments necessary to qualify for or receive a subsidy; (B) losses due to deferred receipt

of the subsidy, if the deferral is mandated by Government order; and (C) export taxes, duties, or

other charges intended to offset the countervailable subsidy.  19 U.S.C. § 1677(6).  This is an

exclusive list of permissible offsets from a CVD subsidy.  See Kajaria Iron Casting Pvt. Ltd. v.

United States, 156 F.3d 1163, 1174 (Fed. Cir. 1998).

---

[11] Despite receiving questions in advance of oral argument, the government appeared unwilling to address various issues, in particular matters relating to the profit ratio.  The court suggests that, if an issue cannot be addressed because Commerce did not consider it, the proper recourse is to request remand for that purpose.

Commerce explained that there is no statute that allows it to provide offsetting credit for mining licenses that did not provide a benefit to PhosAgro.  Remand Results at 31.  Commerce rejected PhosAgro's request for a "negative benefit" regarding the mining licenses that PhosAgro did not use during the POI because no benefit was conferred.  Remand Results at 31–32.  Commerce relied on § 1677(6) to conclude that it was not permitted to allow the offsetting credit that PhosAgro sought.  Remand Results at 31–32.

Here, Commerce's exclusion of the expenses related to unused mining licenses was supported by substantial evidence.  Commerce did not ignore the expenses as PhosAgro asserts because Commerce directly explained why it would not grant the adjustment PhosAgro sought.  Remand Results at 31.  And Commerce correctly concluded that it lacked the statutory authority to provide an offset based on these expenses.  Section 1677(6) is an exclusive list, and the fees paid for unused mining licenses does not fit the statutory framework as an application fee, deposit, or similar payment.  See 19 U.S.C. § 1677(6)(A).  Thus, Commerce's exclusion of these costs from calculating the benefit was supported by substantial evidence.

Finally, PhosAgro argues that Commerce unlawfully included JSC Apatit's intercompany sales of phosphate rock in the benefit calculation, and instead Commerce should have relied only on sales to third parties.  PhosAgro Br. at 14–17.  PhosAgro asserts that it is Commerce's general practice to exclude intercompany sales, which it followed when it excluded the sales from EuroChem's calculation.  PhosAgro Br. at 16.  PhosAgro acknowledges, however, that the exclusion of intercompany sales is the methodology for determining total sales in subsidy rates, but suggests that it should be consistently applied to benefit calculations as well.  PhosAgro Br. at 15–17.

In Mosaic, the court took no issue with Commerce's methodology to determine EuroChem's total sales by removing intercompany sales among producers and input suppliers. See Mosaic, 589 F. Supp. 3d at 1319.  The court noted that this methodology was required by 19 C.F.R. § 351.525(b)(6)(ii) and (iv) to determine the ad valorem subsidy denominator.  Id.

After remand, in response to PhosAgro's request to remove intercompany sales from the benefit calculation, Commerce explained that its practice of excluding intercompany sales was for calculating total sales under 19 C.F.R. § 351.525(b)(6).  Remand Results at 26.  Commerce distinguished PhosAgro's request because the request was related to calculating the benefit under 19 C.F.R. § 351.511(a)(2)(iii), which, here, Commerce used the actual per-unit cost buildup to determine.  Remand Results at 26.  Commerce also reasoned that there was no reason to exclude intercompany sales because the purpose of the benefit calculation is to determine an accurate per-unit cost of mining phosphate rock, which an eventual sale of phosphate rock to any party does not impact.  Remand Results at 27.

Here, Commerce has considered PhosAgro's request and provided sufficient reasoning to justify its use of intercompany sales.  The regulation requiring the exclusion of intercompany sales, § 351.525(b), does not apply to determine what Commerce is required to account for as part of the benefit.  19 C.F.R. § 351.525.  As Commerce recognized, whenever JSC Apatit mines phosphate rock and processes it, it generates a benefit regardless of whether the rock is sold to an intercompany entity or to a third party.  See Remand Results at 27.  Thus, it is reasonable for Commerce to include intercompany sales when a regulation does not require their exclusion.  PhosAgro cites no authority to the contrary.  Accordingly, Commerce's treatment of intercompany sales is supported by substantial evidence.

Consol. Court No. 21-00117                                                          Page 23

## CONCLUSION

      For the foregoing reasons, the court remands to Commerce for a determination consistent with this opinion.  The remand shall be issued within 60 days hereof.  Comments may be filed 30 days thereafter and any response 15 days thereafter.

                       /s/      Jane A. Restani     
                       Jane A. Restani. Judge

Dated: <u>July 11, 2023</u>
      New York, New York